## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIO EPELBAUM, on behalf of himself and all others similarly situated, | **CIVIL ACTION NO.** |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| DYNAGAS LNG PARTNERS LP, DYNAGAS GP, LLC, DYNAGAS HOLDING LTD., TONY LAURITZEN, MICHAEL GREGOS and GEORGE J. PROKOPIOU, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR
## <u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE ...................................................................... 8

III.    PARTIES ......................................................................................................... 10

IV.     SUBSTANTIVE ALLEGATIONS ................................................................ 12

        A.    Prokopiou Forms Dynagas as a Wholly Owned Subsidiary of His
              Family's Shipping Business, Dynagas Holding.................................... 12

        B.    Dynagas Goes Public in 2013 and Begins Paying Substantial and
              Consistent Quarterly Distributions ...................................................... 14

        C.    Prior to the Class Period, Dynagas Renews Two Long-Term
              Charter Contracts on Terms, Which, Unbeknownst to Investors,
              Provide Less Revenue to Dynagas........................................................ 16

        D.    The Fraud Begins on February 15, 2018, When Dynagas Misstates
              the Terms of the Contract Continuation on the *Arctic Aurora* and
              Assures Investors that It Will Soon Announce A Distribution That
              is Sustainable ....................................................................................... 17

        E.    Dynagas Announces a Reduced Quarterly Distribution of 25 Cents
              per Share and Repeatedly Assures Investors that the Already-
              Reduced Distribution is Sustainable ..................................................... 19

        F.    July 27, 2018: Dynagas Is Forced to Reveal That the *Ob River* Is
              Employed at a Lower Rate, but Again Assures Investors That the
              Distribution Is Safe ............................................................................. 25

        G.    Dynagas Is Forced to Reveal That the *Arctic Aurora* Is Employed
              Under a New Charter Contract at a Substantially Lower Rate,
              Implicating the Distribution.................................................................. 26

        H.    Dynagas Slashes Its Distribution by 75% and Admits that Its Cash
              Flow Profile Did Not Support the Prior Distribution............................. 28

        I.    Dynagas Further Reveals the Impact of the Fraud, and Gregos
              Admits that the Dynagas Defendants had *Never* Expected the
              Company's Cashflow to Sustain the 25-cent Quarterly
              Distribution. ......................................................................................... 28

V.      ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .............................. 30

VI.      LOSS CAUSATION .................................................................................................. 32

VII.     CLASS ACTION ALLEGATIONS ........................................................................... 34

VIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................... 35

IX.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
         MARKET DOCTRINE ............................................................................................. 36

X.       CAUSES OF ACTION ............................................................................................. 37

COUNT  I On Behalf of Plaintiff and the Class Against Dynagas, Lauritzen and Gregos for
         Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
         ...................................................................................................................................... 37

COUNT II  On Behalf of Plaintiff and the Class Against Dynagas GP, Dynagas Holding, and
         Prokopiou for Violations of Section 20(a) of the Exchange Act ...................................... 38

XI.      PRAYER FOR RELIEF ........................................................................................... 40

XII.     JURY DEMAND ........................................................................................................ 41

Plaintiff Mario Epelbaum ("Plaintiff") alleges the following based upon personal knowledge as to himself and on information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, the investigation of Plaintiff's counsel, Entwistle & Cappucci LLP. This investigation included, but was not limited to, a review of: (i) public filings with the Securities and Exchange Commission ("SEC") by Dynagas LNG Partners LP ("Dynagas" or the "Company"); (ii) research reports by securities and financial analysts; (iii) transcripts of Dynagas investor conference calls; (iv) press releases and media reports issued by Dynagas; (v) economic analyses of securities movement and pricing data; (vi) media and economic reports regarding the Company; and (vii) consultation with a damages expert.

Plaintiff's investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiff's allegations are known only by Dynagas and the Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  INTRODUCTION

1.    This is a case about a company that misled its investors regarding the terms of two key long-term contracts, concealed the fact that its revenue derived from those contracts had been severely diminished and ***outright lied*** about its ability to continue to make substantial distributions to shareholders based on its current cash flow profile.

2.    Dynagas is a publicly traded company limited partnership that owns six tanker ships, designed for the transportation of liquified natural gas ("LNG"). These LNG tanker ships

are operated by a Dynagas affiliate and are chartered to large energy companies including Statoil (now known as Equinor), Gazprom, and Yamal, typically for periods of eight to ten years.

3.      Since the completion of its initial public offering in 2013, and until recently, Dynagas attracted investors in its common stock by paying a substantial quarterly distribution (i.e. dividend). Dynagas was able to make the distribution consistently in part due to the highly predictable nature of revenue derived from long-term contracts with stable counterparties. In its press releases and public presentations and on conference calls with investors, Dynagas and its officers routinely touted the Company's long-term charter contracts and reminded investors that these contracts "provide steady, predictable cash flows." Indeed, prior to 2018, Dynagas had always paid holders of its common stock at least 36.5 cents per quarter per share.

4.      In early 2018, it became apparent, even to outside analysts, that Dynagas would need to reduce its quarterly distributions to maintain adequate liquidity to meet debt obligations and continue operations. The Company's management conducted a review and determined to reduce the quarterly distribution to 25 cents per share. However, unknown to investors, Dynagas and its senior management knew that the Company's predictable cash flow did not support even this (reduced) distribution, because Dynagas had already agreed to receive a reduced charter rate for two of its six LNG tanker ships, the *Arctic Aurora* and the *Ob River*, beginning in 2018 and continuing for years to come. The impact of the rate reduction for one third of Dynagas's fleet on the Company's cash flow would extend for years into the future, such that the Company would not be able to support even the 25-cent quarterly distributions. But instead of admitting this fact, Dynagas and its senior executives repeatedly assured investors that the new, somewhat lower, dividend was sustainable, and that further reductions would not be needed.

5.    <u>First</u>, on February 15, 2018 (before Dynagas had even announced the reduced distribution amount, but after outside analysts and Dynagas's then ongoing financial review had concluded that some reduction was necessary), Dynagas issued a press release, stating that "[o]n December 20, 2017, the Partnership entered into a new three year charter agreement with Statoil ASA ("Statoil") for the employment of the *Arctic Aurora*. . . . This new charter for the *Arctic Aurora* is expected to commence in the third quarter of 2018 in direct continuation of the current charter with Statoil."  This statement was materially false and misleading when made because, as Dynagas knew, the new charter was not a direct continuation of the current contract, but rather an entirely new agreement that provided Dynagas with significantly less revenue than the current contract, as a result of the reduced rate.

6.    <u>Second</u>, during a conference call with investors the next day, February 16, 2018, Dynagas's CEO, defendant Tony Lauritzen ("Lauritzen"), falsely assured investors that the new distribution rate, once it was determined, would be consistent and sustainable for the long term. Specifically, Lauritzen stated, "we have a very good visibility of what our cash flows will look like.  What I can say is, it's an ongoing analysis, we would like to end up with a distribution coverage of above one-times which is sustainable for the longer term. And we're very fortunate because we can use the word long-term because we held it long time, the long-term contracts which is a necessary ingredient for having sustainable distribution."  In short, Lauritzen stated that the long-term nature of the contracts allowed the company to predict its cash flow for years into the future (which was true) and that the revenue from the long-term contracts would sustain the new distribution for the longer term (which he knew to be false).  Contrary to Lauritzen's assurances, Dynagas knew then that its steady, predictable cash flow would be reduced in 2018 and for years

thereafter, because of the then-existing condition that it had renewed the long-term charter contracts on the *Arctic Aurora*, as well as another ship, the *Ob River*, on less favorable terms.

7.     Third, on April 18, 2018, Dynagas issued a press release announcing that the new distribution rate would be 25 cents per quarter per share, which was reduced from previous levels but still high for the industry and still considered attractive by investors and analysts.  The press release quoted Lauritzen again assuring investors that the distribution was sustainable.  Lauritzen stated that the change "align[ed Dynagas's] distribution level with its capacity to generate cash flow in the long term."  Lauritzen further assured investors that "we believe the new distribution level is viable on an actual cash basis," and even touted Dynagas's recent "success[ ] in securing a ten year contract for the [*Ob River*] . . . and a three year contract for [the *Arctic Aurora*]" ***without mentioning that those contracts provided significantly less revenue for the Company***.

8.     Fourth, on May 17, 2018, Dynagas held a conference call with investors to discuss the Company's first quarter, 2018 earnings.  The accompanying presentation materials mentioned the recently announced 25-cent quarterly distribution, but again assured investors that "[t]he revised distribution level is expected to align the Partnership's cash distributions with its capacity to generate cash flow in the long term."  The presentation also included a slide which stated that the Company's "Long Term Contracts Provide Stable, Visible Cash Flow" and showed the charter contracts for *Arctic Aurora* and *Ob River* running through 2021/2023 and 2028, respectively.  On the call with investors, in his prepared remarks and again in response to questioning, Dynagas Chief Financial Officer Michael Gregos ("Gregos") assured investors that further distribution reduction would not be necessary. When an analyst directly asked: "So now that the distribution is more aligned with the suitable cash flow, do you feel like this current level is pretty easily sustainable in the coming quarters and years," Gregos answered: "***Yeah, definitely***. What we

wanted to achieve was this alignment. ***And as for the foreseeable future this distribution, as I mentioned before is sustainable***."[1]  Also on the call, Lauritzen referred to "extending" the *Arctic Aurora's* charter contract (which had not been extended but rather replaced by a new, less favorable contract), and likewise assured another analyst that the new distribution was "based on expectations which are reasonable," and that only "extreme scenarios" could threaten the 25-cent distribution amount.  These statements were false because Dynagas had already agreed to accept a lower rate for the *Arctic Aurora*, effective within the following three months, and was by then ***already receiving*** a lower rate for the *Ob River*.

9.      Fifth, on July 27, 2018, less than a month before the charter rate reduction for *Arctic Aurora* was set to become effective, Dynagas held another conference call with its investors to discuss second quarter 2018 earnings.  Although Dynagas was forced to admit in the accompanying press release that the *Ob River* was employed on less favorable terms (to explain that quarter's revenue decline), Dynagas assured investors that the distribution was safe.  On the call, Gregos said: "Of course, you ask how do you envision maintaining the distribution . . . ***the distribution is supported by our current cash flow profile for quite a long time***."  Put simply, Dynagas and its senior management told investors that the Company's cashflow profile supported the payment of quarterly distributions of at least 25 cents per share for at least the next several years, which they knew to be false.

10.     Dynagas and its senior management were finally forced to admit that the *Arctic Aurora* was also operating at a reduced charter rate, further decreasing the Company's revenue and cash flow.  That admission came in a November 15, 2018 evening press release announcing Dynagas's earnings for the third quarter of 2018.  Dynagas announced that it had realized lower

---

[1] Unless otherwise noted, emphasis in quoted materials herein is added.

earnings than in the previous quarters, lower earnings than the same quarter of 2017, and lower earnings than analysts expected.  The Company explained that the lower earnings in the third quarter of 2018 were due, in part, to the less favorable terms under which the *Arctic Aurora* and the *Ob River* were now operating.  More troubling than the implications for the third quarter earnings, the reduction of the charter rate for one third of Dynagas's fleet implicated the Company's ability to generate revenue for years to come, because one of the less favorable contracts runs through the year 2028, and the other runs through at least 2021, and may run through 2023 at the counterparty's option.

11.     Further alarming investors, and implicitly contradicting the prior assurances that the 25-cent quarterly distributions were safe for the foreseeable future, Gregos declined to answer a question about the future of the distributions on a public conference call the following morning, November 16, 2018.  Investors and analysts correctly inferred from this non-response that the quarterly distributions were not covered by the company's cash flow and might be further reduced. On November 16, 2018, the price of Dynagas common stock fell 13.7%.

12.     The magnitude of the fraud was further revealed on January 25, 2019.  That evening, Dynagas announced that it would pay a reduced quarterly distribution of only 6.25 cents per share of common stock, a reduction of 75% from the prior quarterly distribution of 25 cents per share.  Lauritzen explained in the press release that this drastic reduction was "necessary in order to retain more of the cash generated from the Partnership's long term contracts to maintain a steady cash balance."  In other words, Dynagas's prior distribution level was not supported by its cash flow profile. The following trading day, Dynagas's common stock closed at $2.91 per share, down 27.6% from its close on the previous trading day.

13.     On the morning of March 22, 2019, Dynagas's management was finally forced to explicitly contradict Gregos's prior statements to the effect that the 25-cent quarterly distribution was supported by its current cash flow profile as of summer 2018.  When asked on the conference call what had changed since the distribution had been set to 25 cents per quarter the previous April, Gregos explained that when he made his prior comments, he and Lauritzen had expected the Master Limited Partnership ("MLP") market to improve, thereby allowing the Company to issue equity to fund future distribution.  That is, rather than being sustainable for the "foreseeable future" and "supported by the [then-]current cashflow profile," Lauritzen and Gregos had known since at least April 2018 that the quarterly distribution could only be maintained through the issuance of new equity, and only if certain market conditions improved.  Dynagas stock closed at $2.38 per share on March 22, 2019, down 8.6% from its close on the previous day.

14.     All told, Dynagas's common stock declined 78.4% from its closing price on February 16, 2018 (the day after Dynagas's post-market-close misstatements about its charter contracts and the ability of the revenue derived therefrom to support its distributions) and its closing price on March 22, 2019 (the day it was fully revealed that the prior statements were false), Series A Preferred Units declined 24.7% during the same period, and other Dynagas securities suffered substantial price decreases as well.

15.     Plaintiff brings this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Dynagas, Lauritzen, and Gregos (the "Dynagas Defendants"), and Section 20(a) of the Exchange Act against George J. Prokopiou ("Prokopiou"), Dynagas GP LLC ("Dynagas GP") and Dynagas Holding Ltd. ("Dynagas Holding," and collectively with Prokopiou and Dynagas GP, the "Controlling Defendants") on behalf of all persons and entities that purchased or otherwise acquired Dynagas

securities from February 16, 2018 through March 21, 2019, inclusive (the "Class Period"), excluding Defendants (the "Class").  Plaintiff and other members of the Class purchased Dynagas securities at prices that were inflated by the misstatements described above, the omission of facts necessary to make those statements not misleading, and the failure to timely correct those misstatements.  This action seeks to remedy the losses that Plaintiff and other Class members suffered as a result.

## II.   **JURISDICTION AND VENUE**

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     As Dynagas has advised investors in its public filings, including the November 2013 Registration Statement and Prospectus pursuant to which its IPO was affected ("IPO Prospectus"), Dynagas has "expressly submitted to the jurisdiction of the U.S. federal and New York state courts sitting in the City of New York for the purpose of any suit, action or proceeding arising under the securities laws of the United States or any state in the United States."

18.     Personal jurisdiction also exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

19.     For example, Defendants Prokopiou and Dynagas Holding availed themselves of the financial markets of the United States and this district in order to raise capital for the continued growth of Prokopiou's shipping business.  In the IPO prospectus, Dynagas explained, "we are selling 8,250,000 of our common units and our Sponsor, Dynagas Holding Ltd., is selling

4,250,000 of our common units. . . . We have applied to list our common units on the Nasdaq Global Select Market under the symbol "DLNG." As Prokopiou admitted in a public interview on or about January 24, 2019, Dynagas Holding's decision to list Dynagas on NASDAQ and subsequently the New York Stock Exchange "was a good opening for raising funds in order to expand in LNG business, which is highly capital intensive." Tellingly, Prokopiou did not distinguish between Dynagas Holding and Dynagas, adding: "*our* involvement there [on the stock exchanges in this this district] was just *six out of the seventeen vessels that we have*." That is, Prokopiou recognizes that the ships, which have formally become the legal assets of Dynagas, remain under the practical control of, and continue to serve the financial interests of Dynagas Holding, and further recognizes that Dynagas Holding has raised capital for its own expansion by selling securities related to "six out of the seventeen vessels that [it has]" on the stock exchanges within this district.

20. Additionally, Prokopiou and Dynagas Holding avail themselves of the ports of the United States. For example, Prokopiou recounted in the January 24, 2019 interview that, during the fracking revolution, "we had a vessel, that we arrived in the United States with a cargo, it was one of the first import cargos of LNG, we discharged, and after three days we reloaded, and we went to Japan." Prokopiou is well aware of the financial benefits that he and Dynagas Holdings reap from conducting operations in the United States; a March 25, 2019 Wall Street Journal article quoted Prokopiou as follows: "'The energy costs in the U.S. are half of those in Europe and a third compared to the Far East,' Mr. Prokopiou said. 'The financial benefits the U.S. has are tremendous, and more ships will be needed to move gas to export markets.'"

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

22. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III. **PARTIES**

23. Plaintiff Mario Epelbaum resides in New York, New York. Mr. Epelbaum acquired Dynagas securities, as set forth in the accompanying certification, and has been damaged thereby.

24. Defendant Dynagas is a Marshall Islands limited partnership founded by Defendant Prokopiou, a shipping billionaire, and maintains its principal executive offices at 23, Rue Basse, 98000 Monaco. Dynagas, through its subsidiaries and affiliates, owns and operates six LNG tankers and derives substantially all of its revenue from charter contracts with natural gas producers to export their LNG products to markets around the world. Although Dynagas sometimes enters short-term charter contracts when its ships are in between longer-term charter contracts or otherwise idle, Dynagas strongly favors long-term charter contracts because these provide steady and predictable revenue.

25. As of January 31, 2019, Dynagas had more than 35,490,000 common units issued and outstanding, 3,000,000 Series A Cumulative Redeemable Preferred Units (the "Series A Preferred Units") issued and outstanding, 2,200,000 Series B Cumulative Redeemable Preferred Units (the "Series B Preferred Units") issued and outstanding and 35,526 General Partner Units issued and outstanding. Dynagas common stock is listed and traded on the New York Stock Exchange under the ticker symbol "DLNG." Dynagas Series A Preferred Units are listed and traded on the New York Stock Exchange under the ticker symbol "DLNG PR A". Dynagas Series B Preferred Units are listed and traded on the New York Stock Exchange under the ticker symbol "DLNG PR B").

10

26.     Defendant Tony Lauritzen ("Lauritzen") has served as the CEO of Dynagas since the Company's IPO in 2013.  Lauritzen has also served on the Company's Board of Directors since 2013.  Previously, Lauritzen worked as an executive for the predecessor to Dynagas Holding since that company began operations in 2007.  Lauritzen is married to Marina Kalliope Prokopiou, the daughter of Dynagas's founder and controlling shareholder Prokopiou.  Lauritzen also serves as the General Manager of Dynagas Holding, also wholly-owned by members of the Prokopiou family.

27.     Defendant Michael Gregos ("Gregos") has served as Chief Financial Officer of Dynagas since the Company's IPO in 2013.  Since 2009, Gregos has also served as the commercial manager of oil tanker shipping company Dynacom Tankers Management Ltd., founded by George Prokopiou.  From 2010 to 2014, Gregos served on the board of Ocean Rig UDW Inc., an operator of semi-submersible oil platforms chaired by Greek shipping magnate George Economou until its acquisition by Transocean.

28.     Defendant Dynagas Holding Ltd. is a Marshall Islands corporation wholly owned by the Prokopiou family.  Dynagas partially or wholly owns and operates several other LNG tanker ships through its subsidiaries and affiliates other than Dynagas.

29.     Defendant Dynagas GP is a Marshall Islands limited partnership and has been the general partner of Dynagas since the Company's inception.  Dynagas GP is wholly owned by members of the Prokopiou family, and, along with Dynagas Holding Ltd., is one of the entities by which the Prokopiou family exerts control over Dynagas and its operations.

30.     Dynagas Holding wholly owns Dynagas GP and directly owns 43.9% of Dynagas. In addition, Dynagas Holding partially or wholly owns and operates several other LNG tanker ships through its subsidiaries and affiliates other than Dynagas.

11

31. Dynagas GP and Dynagas Holding exercise control over Dynagas through an Omnibus Agreement as amended on April 12, 2016, which governs the relationship between the entities. The Omnibus Agreement specifies under which conditions vessels may be acquired and operated, contains detailed voting and distribution rights, and restricts Dynagas's ability to compete.

32. Defendant Prokopiou is the founder of Dynagas and its predecessor and has served as Chairman of the Board of Directors since the Company's IPO. Prokopiou (together with members of his family) beneficially owns 43.9% (or 15,595,000) of the outstanding shares of Dynagas common stock through Dynagas Holding and another 0.1% through Dynagas GP. At all relevant times, Prokopiou controlled Dynagas through Dynagas Holding, the Company's controlling shareholder and "Sponsor," and through Dynagas GP, as disclosed in Dynagas's public filings.

33. As alleged herein, Defendants are liable for: (i) making false statements; and (ii) failing to disclose adverse material facts known to them about Dynagas, the omission thereof rendered the Defendants' statements misleading. Defendants' fraudulent scheme, which operated as a fraud or deceit on purchasers of Dynagas securities, was a success, as it: (i) deceived the investing public regarding Dynagas's prospects and business; (ii) artificially inflated the price of Dynagas common securities; and (iii) caused plaintiff and other members of the Class to purchase Dynagas securities at inflated prices.

IV. **SUBSTANTIVE ALLEGATIONS**

A. **Prokopiou Forms Dynagas as a Wholly Owned Subsidiary of His Family's Shipping Business, Dynagas Holding**

34. Defendant Dynagas was founded by billionaire Greek shipping magnate Prokopiou on May 30, 2013 as a wholly-owned subsidiary of his family's private company, Dynagas Holding.

Dynagas was created to own, operate and acquire LNG tanker ships previously owned by Dynagas Holding and currently employed on multi-year charters.

35.    Dynagas was organized as a Marshall Islands limited partnership, and a second entity, Dynagas GP, which is also wholly owned by Dynagas Holding, was formed to serve as Dynagas's general partner.

36.    Immediately following the formation of Dynagas, Prokopiou began to prepare to take Dynagas public.  On information and belief, Prokopiou's moves were designed to enable the continued growth and profitability of Dynagas Holding though a series of "drop down" transactions, in which vessels owned by Dynagas Holding would be sold to Dynagas for cash, funded by debt and equity issued by Dynagas.  This would facilitate the growth of Dynagas Holding, and Prokopiou's shipping empire, while sharing the risk (and revenue) attached to several LNG tanker ships of Prokopiou's choice with public shareholders.

37.    The creation of, borrowing by, transactions with, and IPO of Dynagas collectively provided Dynagas Holding with more than half a billion dollars in cash in 2013.

38.    At the same time, Prokopiou, through Dynagas Holding and Dynagas GP, continued to control Dynagas and the assets (LNG tanker ships) he purportedly sold to the new Company.  Prokopiou has thereby been able to leverage the LNG tanker ships to facilitate favorable terms for charter contracts on other LNG tanker ships that Dynagas Holding did not drop down, and other vessels and assets of various types owned by other segments of Prokopiou's shipping empire.  This was an especially attractive arrangement for Prokopiou given that Dynagas and Dynagas Holding operate in an industry notorious for its opacity and for bulk negotiation of charters and other contracts – the terms of any given contract are privately negotiated with implicit or explicit reference to other existing or contemplated contracts between the parties, as Dynagas's

own public filings indicate.  The arrangement would also allow Prokopiou to use Dynagas as a "bank" to which he could "drop down" additional LNG tanker ships when Dynagas Holding needed cash, and from which he could repurchase them, at his option.

39.     Promptly upon its inception, Dynagas purchased three LNG tanker ships, including the *Ob River*, from Dynagas Holding, financed primarily by private debt, but also by equity privately "issued" back to Dynagas Holding.  Those LNG tanker ships were then employed in long term charter contracts, which provided Dynagas with steady, predictable revenue for years to come.

**B. Dynagas Goes Public in 2013 and Begins Paying Substantial and Consistent Quarterly Distributions**

40.     On November 13, 2013, Dynagas completed its IPO, through which it raised $225 million by selling 12,500,000 shares to the public at $18 per share.  In connection with the IPO, Dynagas Holding received approximately $76.5 million (in addition to the approximately $450 million in cash it had received for the three LNG tanker ships it had sold to Dynagas earlier that year) and retained a 52% interest in Dynagas.  Dynagas common stock was listed on the NASDAQ Global Select Market under the ticker symbol DLNG on or about November 13, 2013.  (It has since transferred its listing to the New York Stock Exchange, effective December 2014).

41.     Prokopiou appointed himself chairman of Dynagas's board, a position which he has held since the IPO.  The fact that Dynagas was controlled by Prokopiou and Dynagas Holding was plainly stated in Dynagas's initial and subsequent filings with the SEC, as was the fact that the Company's ownership structure created a conflict of interest that might result in Prokopiou or Dynagas Holding causing Dynagas to take action that favored Prokopiou and his family to the detriment of the public shareholders.

14

42.     However, Dynagas took steps to assure public shareholders that they would share in Dynagas's earnings, as those earnings accrued.  According to the IPO Prospectus, Dynagas's partnership agreement required it to distribute all of its available cash to its stockholders on a quarterly basis.  That prospectus further stated that the Company intended to make quarterly distributions to holders of its common stock of at least $0.365 per share (36.5 cents).

43.     Following the IPO, Dynagas began making substantial quarterly distributions, as stated in the IPO Prospectus.  On February 20, 2014, the Company announced a distribution of $0.1746 per share, which equals $0.365 per share pro-rated to account for the fact that the company had only been public for approximately half of the prior quarter.  Dynagas then made quarterly distributions to holders of its common stock of at least $0.365 throughout 2014, and quarterly distributions of $0.4225 throughout 2015, 2016, and 2017.

44.     From August 6, 2014 onward, Dynagas repeatedly assured investors in its quarterly earnings presentations that its "Fixed Charters Provide Steady, Predictable Cash Flows."  These and similar statements to this effect were true.  Dynagas derives most of its revenue from long-term charter contracts at fixed rates with reliable counterparties, and therefore has stable cash flow, and that cash flow is predictable to Dynagas and its leadership who are privy to the terms of those contracts.  The charter contracts typically run for eight years or more, and, for example, as stated in Dynagas's October 2018 prospectuses (related to its public offering of Series B Preferred Units), its fleet had an "average remaining charter term of approximately 10.0 years," and therefore enabled the Company to make consistent distributions to its shareholders, as investors and analysts have noted throughout Dynagas's history as a public company.

45.     The substantial, consistent distributions attracted institutional and individual investors alike over the Company's first several years; as analysts also noted, the distributions

were not only consistent, but consistently large relative to its share price.  For example, a May 14, 2016 article in *The Motley Fool* identified Dynagas as a "high-yield dividend stock" that offered "sustainable, generous, dividend income" and therefore represented one of the "best long-term income opportunities in the industry" and was therefore "worth owning."

### C. Prior to the Class Period, Dynagas Renews Two Long-Term Charter Contracts on Terms, Which, Unbeknownst to Investors, Provide Less Revenue to Dynagas

46.     Over the course of 2014 and 2015, Dynagas Holding conducted three transactions with Dynagas structured as "drop downs," the term Dynagas used for the transactions and which is commonly understood to mean the transfer of assets from a parent to a subsidiary, in exchange for cash (or debt) owed to the parent.  Dynagas financed each of these dropdowns by issuing equity to the public, and in the process diluted Dynagas Holding's ownership stake in Dynagas, ultimately to 44%.  However, the three post-IPO drop down transactions have collectively provided Dynagas Holding with more than half a billion dollars in cash.  Each of the LNG tanker ships dropped down, including the *Arctic Aurora*, was, as the time of the transaction, employed in a long-term charter contract with a reliable counterparty.  By the end of 2015, and at all times thereafter, Dynagas has owned six LNG tanker ships, all of which it acquired from Dynagas Holding.

47.     Dynagas sought to keep its fleet employed in long-term charter contracts. Therefore, beginning by at least early 2017, Dynagas sought to enter long-term contracts for the *Ob River* and the *Arctic Aurora*, which were at that time operating under charter contracts set to expire in late 2017 and in August of 2018, respectively.

48.     On March 31, 2016, Dynagas announced that the then-current charter for the *Ob River* had been extended until May 1, 2018 (plus-or-minus 15 days), and that Dynagas had entered into a new long-term contract for the *Ob River* with its then-current charterer, to commence immediately upon the expiration of the prior charter.  Unbeknownst to the public, the new long-

term charter contract provided that a lower rate would be paid to Dynagas, compared to what Dynagas was receiving at the time.

49.     On the same day, the Company also announced that two of its other LNG tanker ships had entered new, long-term (approximately 15-year) contracts with Yamal.  This left the *Arctic Aurora* as the only one of Dynagas's six LNG tanker ships that was not committed to a long-term charter contract through 2021.

50.     On December 20, 2017, Dynagas entered into a new long-term (approximately 10-year) charter contract for the *Arctic Aurora* with the same entity to which it was then chartered (Statoil, now called Equinor).  This charter contract, which was not immediately announced, provided that a lower rate would be paid to Dynagas than what Dynagas was receiving at the time.

### D.  The Fraud Begins on February 15, 2018, When Dynagas Misstates the Terms of the Contract Continuation on the *Arctic Aurora* and Assures Investors that It Will Soon Announce A Distribution That is Sustainable

51.     On February 15, 2018, Dynagas issued a press release, stating that "[o]n December 20, 2017, the Partnership entered into a new three year charter agreement with Statoil ASA ("Statoil") for the employment of the *Arctic Aurora*. . . . This new charter for the *Arctic Aurora* is expected to commence in the third quarter of 2018, in direct continuation of the current charter with Statoil.").  This statement was materially false and misleading when made because, as the Dynagas Defendants knew, the new charter was not a direct continuation of the current contract, but rather an entirely new agreement that provided Dynagas with significantly less revenue than the current contract, as a result of the reduced rate.

52.     This statement was further misleading because Dynagas had previously announced, in its August 6, 2014 investor presentation, that Statoil had the option to extend the charter on the *Arctic Aurora* through 2021 at an "escalated rate[ ]," i.e., on terms ***more*** favorable to Dynagas.

17

53.     Dynagas repeated the February 15, 2018 misstatement on a conference call with investors the next day, February 16, 2018, and in the presentation that accompanied that call, and even further misled investors by stating on the call that long-term charter rates in the industry, generally, were improving.  On the conference call, Lauritzen answered a question as follows:

> [Analyst:] There has been some talk around the spot charter rates but have the 3, 5 and 7-year time charter rates responded in recent months as well?
>
> [Lauritzen:] *Yes,* I think we've seen along with a substantial improvement in the spot markets. We've seen everything from multi-months to multi-year charter is being discussed. *So yes, we can answer affirmative to that*.

54.     This statement was misleading under the circumstances because Lauritzen omitted the fact that Dynagas had not only failed to secure an improved time charter rate on the *Arctic Auror*a when its contract was "continued" two months prior, but had failed to obtain even the same rate that ship had previously commanded from the charterer.

55.     Also on the conference call, Lauritzen addressed an analyst's question about the future of Dynagas's historically large and consistent distribution.  Lauritzen admitted that the then-current distribution level – which had been constant for three years at 42.25 cents per quarter per share – was under review, but he falsely assured the public that the forthcoming adjusted distribution rate would be sustainable in the long term, based on the predictable revenue derived from the Company's charter contracts.  The colloquy was as follows:

> [Analyst:] I was wondering if we can get some additional color around the distribution; in particular, how low of a cash balance and coverage ratio would you be comfortable with until the new contract start in 2019? And are you committed to the current distribution level or is there a possibility that that might be reduced in the coming quarters?
>
> [Lauritzen:] We're not looking at the near-term as we have to look at the long-term as far as the distribution is concerned because once our Yamal contract start [sic] we have a very good visibility of what

our cash flows will look like. What I can say is, it's an ongoing analysis, we would like to end up with a distribution coverage of above one-times which is sustainable for the longer term. And we're very fortunate because we can use the word long-term because we held it long time, the long-term contracts which is a necessary ingredient for having sustainable distribution, so that's what I can say at this point.

56.     Lauritzen's statement was materially false and misleading when made because in fact, the forthcoming distribution level was not "sustainable for the longer term" because the fixed revenue from the long-term contracts entered into for the *Arctic Aurora* and the *Ob River* would not support it.  Lauritzen knew that the statement was false because, as the CEO, he was well aware of the terms under which one third of the Company's fleet would be operating for the next several years.

### E.  Dynagas Announces a Reduced Quarterly Distribution of 25 Cents per Share and Repeatedly Assures Investors that the Already-Reduced Distribution is Sustainable

57.     On April 18, 2018, Dynagas issued a press release announcing a reduction in the quarterly distribution to holders of its common stock, to 0.25 per share of common stock from the previous level of $0.4225 per share.  The press release quoted Lauritzen, who explained:  "[t]his decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution is necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term." Lauritzen further stated:

> The Partnership's Board of Directors believes that the new distribution level is in the best interest of the Partnership's common unitholders as it aligns the Partnership's cash flows with our cash payment obligations. The new distribution level is expected to provide the Partnership with approximately $24.5 million in annual cash savings in order to enhance our liquidity, strengthen our balance sheet and improve our distribution coverage ratio.  Although our pro-forma 2018 distribution coverage ratio is expected to be below 1x, **we believe the new distribution level is viable on an actual cash basis** since it reduces the Partnership's current need to utilize existing cash reserves to fund distributions to unitholders.

58.     Approximately one month later, on May 16, 2018, Dynagas issued a press release discussing its financial results for the first quarter of 2018.  The press release stated that: "the revised distribution level is expected to align the partnership's cash distributions with its capacity to generate cash flow in the long term," and quoted Lauritzen making a substantially similar comment:  "This decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution was necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term."

59.     The next day, Dynagas held its first quarter 2018 earnings call to discuss, among other things, the Company's financial performance during the months of January, February and March of 2018.  Also on that call, Lauritzen explained in his prepared remarks that the April 2018 reduction of the quarterly distributions "was necessary to align the Partnership's [Dynagas's] distribution level with [its] capacity to generate cash flow in the long term."

60.     Gregos assured investors even more explicitly that the new distribution level (25 cents per quarter per share) was sustainable.  Gregos said in his prepared remarks:

> We do find it noteworthy that certain analysts commented that a higher distribution reduction was necessary.  The board and the management felt it would be unwarranted for the new distribution to be based on overly pessimistic scenarios.
>
> Management does not believe in for the limited moving parts that can affect our financial performance.  Ultimately, distribution policy reflects the boards and management expectations and is not based on scenarios which are unlikely to materialize.
>
> The moving parts . . . are: how long and at what rate [t]he *Yenesei River* and the *Lena River* will be trading in the short term market, pending the delivery into their 15-year contracts, once their [current, long-term] contracts expire in Q3 of this year.

61.     Following the prepared remarks, questions from the public understandably focused on the sustainability of the distributions going forward, and Gregos and Lauritzen confirmed in their answers that the 25-cent quarterly distribution was sustainable.

62.     Gregos was asked: "So now that the distribution is more aligned with the suitable cash flow, do you feel like this current level is pretty easily sustainable in the coming quarters and years?"  Gregos responded: "***Yeah, definitely***. What we want to achieve was this alignment.  And as ***for the foreseeable future this distribution, as I mentioned before is sustainable***.  Basically, the expectations that we have on the market, there are some moving parts as I mentioned, which are the *Lena River* and *Yenesei River*.[2]  Again, how long they're going to be in [the spot] market and what they'll make [therein].  ***But under a reasonable scenarios [sic]; yes, definitely this distribution is sustainable***."  (emphasis added.)

63.     The above statements were materially false and misleading when made because the distribution was not sustainable for the foreseeable future, and was not sustainable under reasonable scenarios, because, as the Dynagas Defendants knew, for years to come, Dynagas would receive substantially less revenue from its charter contracts on the *Arctic Aurora* and the *Ob River*, such that the 25-cents-per-quarter-per-share distribution was not sustainable.

64.     Similarly, Lauritzen was asked by another analyst: "Is [there] a way that you can tell us what could be an extreme event that would force you to reduce this distribution based on the development of the spot charter rate Yamal for these vessels?" Lauritzen responded: "[ ] All I can say is that, we experience let's say extreme scenarios, which we're not, we don't believe it's going to happen.  Then that's something to be discussed, but that's more of a longer term discussion. It's not a near term discussion."

---

[2] The *Lena River* and the *Yenesei River* are other ships owned by Dynagas.

65.     This statement was materially false and misleading when made because it meant that only extreme and unexpected conditions would cause Dynagas to (further) reduce its quarterly distribution, when in fact Dynagas had already agreed to accept reduced revenue for one third of its fleet, a condition which would force it to reduce its distribution and which cannot seriously be described as something that the Dynagas Defendants did not believe was going to happen (*because it essentially already had happened*) and which was a topic for near-term discussion, given that the new rates were scheduled to go into effect in the following quarter.

66.     Notably, neither Gregos nor Lauritzen indicated that any plan to maintain the then-current distribution levels depended on the MLP market or Dynagas's ability to issue additional equity at favorable prices in the future (the explanation that Gregos later gave, on March 22, 2019, when asked what had changed since April 2018 to require a further cut).

67.     The presentation accompanying the May 17, 2018 call also repeated in substance Dynagas's earlier false and misleading statements relating to the Company's ability to sustain the 25-cents-per-quarter-per-share dividend.  The presentation stated:

> "On April 12, 2018, following a strategic review of its financial profile and distribution policy, the Partnership's Board of Directors unanimously approved a plan to reduce the quarterly distribution on the Partnership's common units to $0.25 per common unit from $0.4225 per common unit, or from $1.69 per common unit to $1.00 per common unit on an annualized basis. The revised distribution level is expected to align the Partnership's cash distributions with its capacity to generate cash flow in the long term, strengthen its balance sheet and improve its distribution coverage ratio.[3]

(footnote in original).

68.     This statement was materially false and misleading when made because the revised distribution levels did not align with the Company's ability to generate cash flow in the long term.

---

[3] Coverage ratio is the distributable cash flow available for distribution in proportion to actual cash distributed.

Defendants knew that the statement was false, or acted with reckless disregard to its truth or falsity, because Defendants knew that Dynagas was receiving reduced revenue from the charter of the *Ob River* and, beginning in August, it would receive substantially less revenue from its charter contract on the *Arctic Aurora*.  Defendants further knew that these unfavorable terms would, by agreement, continue for years into the future such that its capacity to generate cash flow in the long term did not align with the 25-cents-per-quarter-per-share cash distribution.

69.     The presentation also included a slide showing continuous employment of the *Ob River* and the *Arctic Aurora*, each with a single charterer, through the end of 2021, and which stated: "Long Term Contracts Provide Stable, Visible Cash Flows."  *See infra* Figure 1.

70.     This slide was misleading because it omitted the fact that Dynagas had agreed to accept a substantially lower rate for the *Arctic Aurora* beginning in August of 2018, and a substantially lower rate for the *Ob River* which was ***already in effect***.

23

Figure 1



**Long Term Contracts Provide Stable, Visible Cash Flows**

| LNG Carrier Name | Year Built | Capacity (cbm) | Charterer | 2018 | 2019 | 2020 | 2021 | 2022 | |
|---|---|---|---|---|---|---|---|---|---|
| Clean Energy | 2007 | 149,700 | Gazprom | | | | | | 2026 |
| Ob River | 2007 | 149,700 | Sakhalin Energy (1) | | | | | | 2028 |
| Amur River | 2008 | 149,700 | Gazprom / Sakhalin Energy (1) | | | | | | 2028 |
| Arctic Aurora | 2013 | 155,000 | Statoil | | | | | | 2023 |
| Yenisei River | 2013 | 155,000 | Gazprom YAMAL LNG | | | | | | 2033/34 |
| Lena River | 2013 | 155,000 | Gazprom YAMAL LNG | | | | | | 2034/35 |

Firm charter    Available    Delivery Window    Optional Period

Five out of six LNG carriers with ice class specification

85% contracted fleet for 2018, 92% for 2019 and 100% for 2020 (basis earliest delivery) with minimal capital requirements provides significant free cash flow

Total estimated contract backlog of approximately $1.46 billion[2] – 10.2 years remaining average duration

DYNAGAS LNG Partners LP    (1) Amur River and Ob River are sub-charted to Sakhalin Energy Investment Company as the project requires ice class vessels to load cargoes during the winter season.    (2) As of 16 May 2016, including the Yenisei River and Lena River time charter contracts. The time charter contracts with Yamal are subject to the satisfaction of certain conditions, which, if not satisfied, or waived by the charterer, may result in their cancellation or amendment before or after the charter term commences and in such case the Partnership may not receive the contracted revenues thereunder.    11

71.    By way of contrast, in prior years, after the Company announced that another of its ships, the *Clean Force*, had entered a new charter contract to begin in 2015 immediately upon the completion of its then-current charter, the Company explicitly stated that the new contract was on more favorable terms, gave an estimate of the increased revenue, and distinguished the new contract on an analogous slide with a red box and bold white lettering on a dark field.  *See infra* Figure 2.

Figure 2



**Multi-Year Fixed Charters with Established Counterparties Provide Steady, Predictable Cash Flows**

### F. July 27, 2018: Dynagas Is Forced to Reveal That the *Ob River* Is Employed at a Lower Rate, but Again Assures Investors That the Distribution Is Safe

72.     On July 27, 2018, Dynagas issued a press release discussing its second quarter 2018 financial results.  The press release disclosed that the Company's earnings were lower than the previous quarter, lower than the second quarter of 2017, and lower than analysts' expectations.

73.     To explain the Company's reduced earnings, the press release stated that earnings were impacted by: "the completion of the multiyear charter contract with Gazprom for the *Ob River* in April 2018 and the subsequent employment of the vessel with the same company at a lower rate of hire reflecting a longer charter term of ten years."

74.     The Dynagas Defendants still did not admit that the *Arctic Aurora* would also be chartered for a lower rate of hire, beginning mere days later.  Notably, the contract for the *Arctic Aurora* going forward had been consistently described by the Company as a "***direct continuation*** of the current charter with Statoil," unlike the contract for the *Ob River*, which it had not described as a continuation.

25

75.     The Dynagas Defendants also continued to falsely assure investors that the 25-cents-per-quarter-per-share distribution was sustainable for the long term. On a conference call with investors later that day, Gregos repeated the substance of the misstatement on July 27, 2018, during Dynagas's Second Quarter 2018 (2Q18) earnings call.  On that call, Gregos represented that the current dividend payout (representing a substantial yield) was sustainable based on expected cash flow from the subject contracts.  Gregos said:

> I think the maintaining this [distribution] we've already achieved that with our previous distribution realignment, I mean, *if you look at our cash flows, they're supported, the distribution is supported by our current cash flow profile for quite a long time*.

76.     This statement was materially false and misleading when made because Dynagas's distribution was not supported by its cash flow profile, given that, within days, yet another of its six LNG tanker ships would begin to yield a substantially reduced charter rate.

### G. Dynagas Is Forced to Reveal That the *Arctic Aurora* Is Employed Under a New Charter Contract at a Substantially Lower Rate, Implicating the Distribution.

77.     On November 15, 2018, Dynagas issued a press release discussing its third quarter 2018 financial results.  The earnings that the Company reported for the third quarter were lower than its earnings for the second quarter, lower than its earnings for the third quarter of 2017, and lower than analysts' expectations.

78.     In the press release, when explaining the disappointing financial results for the third quarter of 2018, the Company revealed *for the first time* that the *Arctic Aurora's* current long-term charter contract was not a direct continuation of its prior contract on substantially similar terms, but rather a new contract that provided substantially less revenue to Dynagas.  Specifically, in explaining the factors that impacted Dynagas's earnings, Defendant Lauritzen was quoted as stating that "two of our vessels, the *Arctic Aurora* and the *Ob River*, commenced employment

under extended charter contracts with their respective charterers at ***lower rates compared with the previous charter contracts***."

79.    Although Dynagas had paid the expected 25-cent quarterly distribution in October, on a conference call the following day, Gregos declined to confirm that the distribution was supported by the Company's contracts, and suggested that the Company was re-evaluating the level of distribution, in response to a direct question:

> [Analyst]: And I guess lastly, is there any – with the whole 250 million kind of still outstanding for refinancing that, but obviously all of your vessels, like you said, fully contracted for many years. Is there any concerns, fears, questions about the current level of the distribution?

> [Gregos]: Well, listen, I mean, I can only give you a general answer here. I mean, we are reviewing how to maximize value going forward. As I said, the refinancing of our notes is a high priority, but we also are concerned that we're getting a little to no credit for the current distribution. And our current equity yield has kind of hinted our ability to grow. So we will be looking at how distribution can be used to improve the equity value overtime.

80.    This non-response from Gregos was in stark contrast to his assurances on the previous two earnings calls (in May and July) in which he readily assured investors that the distribution was sustainable based on the Company's cash flow profile.

81.    On this news, the price of Dynagas securities declined.  For example, the price of Dynagas common stock dropped from $7.76 per share, to close at $6.69 on November 16, 2018.

82.    Indeed, the market understood that Dynagas's distribution to holders of common stock was in serious doubt, given the less favorable long-term contracts on two of Dynagas's ships and the CFO's sudden refusal to confirm that the distributions were supported just three months after he assured investors that they were supported by the Company's cash flow.  As one analyst wrote in an article for *Seeking Alpha*, published on November 19, 2018, with respect to Dynagas common stock, "further distribution cuts could be on their way."

27

83.     In the weeks following the November 15th announcement, the price of Dynagas securities continued to slide, and its common stock closed at $4.08 on November 28, 2018.

**H.  Dynagas Slashes Its Distribution by 75% and Admits that Its Cash Flow Profile Did Not Support the Prior Distribution**

84.     On Friday, January 25, 2019, Dynagas issued a press release announcing that the Company would cut its quarterly distribution another 75% – from 25 cents per share to 6.25 cents per share.  Significantly, this was just 9 months following the Company's initial 41% dividend cut.

85.     Dynagas's CEO, defendant Tony Lauritzen, explained that this drastic reduction was "necessary in order to retain more of the cash generated from the Partnership's long term contracts to maintain a steady cash balance."

86.     On this news, the price of Dyanagas securities fell.  For example, the price of Dynagas common stock fell from $4.02 per share at close on Friday, January 25, 2019 to $2.88 per share at close on Monday, January 28, 2019 – a drop of nearly 30%, and the price of Series A Preferred Units fell more than 10% in the same time.

**I.  Dynagas Further Reveals the Impact of the Fraud, and Gregos Admits that the Dynagas Defendants had *Never* Expected the Company's Cashflow to Sustain the 25-cent Quarterly Distribution.**

87.     On March 21, 2019, after the market closed, Dynagas issued a press release concerning the Company's fourth quarter 2018 financial results. This was the first time that the Company released financial results for a quarter in which both the *Arctic Aurora* and the *Ob River* had operated under the new, less lucrative, charter contracts throughout the entire quarter. Dynagas's press release reflected quarterly losses of approximately four cents per share, significantly worse that analyst expectations. (*See, e.g.* Akanksha Bakshi, *Dynagas LNG Partners LP Misses by $0.11, Misses on Revenue*, March 21, 2019.)

88.     Although Dynagas's performance missed analyst expectations, management was not surprised.  Lauritzen stated in the release: "Our reported earnings for the fourth quarter ended December 31, 2018 were in line with our expectations.  Compared to the same period in 2017, our fourth quarter earnings were impacted by the following occurrences:  (i) the decrease in revenues as a result of the *Arctic Aurora* and the *Ob River* commencing employment under extended charter contracts with their respective charterers at lower rates compared with the previous charter contracts."

89.     The following morning, Dynagas held a conference call with investors, which was the first such conference call since the January 25, 2019 announcement that the distributions to shareholders would be decreased.

90.     On that call, Lauritzen and Gregos were called upon to explain why the distribution had been cut despite the assurances throughout 2018 that it would not be.

91.     Specifically, one caller asked: "And then just one more on the level of the distribution cut.  You mentioned a disconnect between the equity price and what's going on with the company's underlying operations. So I was curious, maybe what's changed in the rationale for the degree of the cut this time around versus the earlier cut back in April 2018?"

92.     Gregos answered in relevant part: "So when we did our previous cut, we have assumed that the MLP market broadly would improve going forward and enable us and other MLPs to issue cheap equity.  Whereas, that didn't happen, and that is the reason why we had to make a second cut and a more severe cut that goes hand-in-hand and enables us to discuss a wide range of refinancing options."

93. By giving this answer, Gregos explicitly admitted and unequivocally revealed that the prior statements by the Dynagas Defendants described herein were knowingly false and misleading when they were made:

(a) Gregos's answer admitted and revealed that the Dynagas Defendants had known since *at least* April 2018 that they would need to issue equity in order to sustain the 25-cent distribution level, despite their assurances that the distribution could be sustained for the foreseeable future by the Company's "current cashflow profile."

(b) Gregos's answer further admitted and revealed that the Dynagas Defendants had known since at least April 2018 that contingencies other than "extreme scenarios," including the failure of the market to improve sufficiently, threatened the Company's ability to maintain the 25-cent distribution level.

(c) Gregos's answer further admitted and revealed that the Dynagas Defendants had – since at least April 2018 – expected the diminution of the Company's financial performance and knew that this diminution would necessitate the reduction in the distributions to shareholders unless market conditions improved and new equity issued at favorable pricing.

## V. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

94. The Dynagas Defendants were motivated to make the misstatements alleged herein, and to conceal the negative information about Dynagas's new contracts and inability to sustain distributions, in order to appease the Controlling Defendants, to support the October 2018 offering of preferred equity at a higher price, and to support an offering of additional equity and debt securities at favorable prices, which they had planned and prepared to make, including filing a registration statement, but were ultimately unable to complete.

95.     Dynagas Holding controlled Dynagas through its total ownership of Dynagas GP, its large ownership stake in Dynagas itself and its historical relationship with Dyanagas's senior management.  From 2014 through 2015, Dynagas Holding had "dropped down" three LNG tanker ships, and has long suggested that it would "drop down" additional LNG tanker ships, as it has publicly stated on investor calls, investor presentations and SEC filings.  Dynagas Holding explicitly contemplated making one or more drop down transactions to Dynagas in 2018 as it publicly stated throughout 2017 and into 2018.  Dynagas went as far as to identify the LNG tanker ships owned by the Sponsor as the subjects of potential drop downs.

96.     The prior drop down transactions between Dynagas Holding and Dynagas had been funded by equity and debt issued by Dynagas; therefore Dynagas Holding contemplated that the anticipated drop down transactions in 2018 would likewise be funded by Dynagas equity.  Indeed, Dynagas filed a shelf registration statement for up to $750 million worth of securities in January 2018, enabling it to finance up to three drop down transactions, assuming the share price remained high.  A higher price of Dynagas's stock at the time of the drop down and attendant equity sale would mean that fewer shares would need to issue to finance the transaction thereby reducing the dilution of Dynagas Holding's ownership.  Put simply, Dynagas and Dynagas Holding could obtain the same cash for less of their ownership stake if Dynagas's stock price remained high.

97.     Dynagas Holding was therefore highly motivated to cause the Dynagas Defendants to make the misstatements and omissions of material fact alleged herein to inflate the price of Dynagas common stock throughout 2018.

98.     In addition to the contemplated sale of securities by Dynagas, Dynagas Holding itself prepared to sell more than $180 million of its shares of Dynagas to the public, as indicated and explicitly authorized by the same January 2018 offering documents described above. Dynagas

Holding sought to benefit directly from the higher price of common stock with respect to these shares, because a higher share price would provide Dynagas Holding with more cash for its shares, immediately upon sale.

99.     In addition to the contemplated sale of common stock by Dynagas and Dynagas Holding, Dynagas sold $55 million worth of a new series of preferred common units (Series B) in an offering that it conducted in October 2018.  Defendants knew, by virtue of their sophistication and understanding of basic finance and economic principles, that negative information about the company – including the reduced revenue expected from the *Arctic Aurora's* "direct continuation" of its charter with Statoil (Equinor) and the Company's inability to sustain distributions to holders of common stock – would prevent investors from purchasing the preferred common units at the price offered.  Defendants were therefore motivated to make the material misstatements and omissions described herein.

100.    Furthermore, Dynagas management was focused throughout 2018 on its efforts to refinance debt that would mature in 2019.  The Dynagas Defendants have each stated publicly that those efforts were ongoing throughout most of 2018, although those efforts appear to have been unsuccessful, at least as of the date of this filing.  The Dynagas Defendants were motivated to make the material misstatements and omissions described herein because such misstatements and omissions gave the appearance of stability and profitability to potential lenders, who would therefore be more likely to offer debt refinancing, or to offer debt refinancing at a more favorable rate.

## VI.    LOSS CAUSATION

101.    Defendants' misrepresentations and omissions of material fact alleged above artificially inflated the price of Dynagas securities during the Class Period.

102.    The artificial inflation created by Defendants' misrepresentations and omissions was removed from the prices of Dynagas's securities in direct response to information revealed in the disclosures alleged above, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed and/or the risks concealed by such misrepresented and omitted material facts partially materialized.

103.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiff and other Class members would not have purchased or otherwise acquired Dynagas securities, or would not have purchased or otherwise acquired securities at the artificially inflated prices that they paid. It was also entirely foreseeable to Defendants that misrepresenting and concealing these material facts would artificially inflate the price of Dynagas securities and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Dynagas securities to decline.

104.    The economic loss, i.e. damages, suffered by Plaintiff and other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities when the truth was revealed, and/or the risks previously concealed by Defendants' material misstatements and omissions materialized. As a result of the previously misrepresented and concealed material information and risks that were disclosed and/or realized on November 15, 2018, November 16, 2018, January 25, 2019 and March 21, 2019, and the corresponding substantial declines in the price of Dynagas stock as the market absorbed this information, Plaintiff and other Class members have suffered economic loss.

33

## VII.    CLASS ACTION ALLEGATIONS

105.    This class action is brought on behalf of all individuals and entities who purchased shares of Dynagas securities during the February 16, 2018 through March 21, 2019 Class Period, except Defendants and their affiliates.

106.    The Class is so numerous that joinder of all members is impracticable.  As of the close of business on January 31, 2019, approximately 35 million shares of Dynagas common stock were outstanding.  Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

107.    Questions of law and fact are common to the Class, including, among others, (i) whether Defendants violated the Exchange Act; and (ii) whether and to what extent Defendants' conduct harmed Plaintiff and other members of the Class.

108.    There is a well-defined community of interests in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

109.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

110.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

111.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   <u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u>

112.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading based on then-existing conditions, and/or the forward-looking statement was authorized or approved by an executive officer of Dynagas who knew that the statement was false when made.

## IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

113.   At all relevant times, the market for Dynagas securities was efficient for the following reasons, among others:

(a)   Dynagas stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(b)   As a regulated issuer, Dynagas filed periodic reports with the SEC and the NYSE;

(c)   Dynagas regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Dynagas was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

114.   As a result of the foregoing, the market for Dynagas's securities reasonably promptly digested current information regarding Dynagas from all publicly available sources and reflected such information in the price of Dynagas's securities.   All purchasers of Dynagas securities during the Class Period suffered similar injury through their purchase of Dynagas securities at artificially inflated prices, and a presumption of reliance applies.

115.   A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X.    CAUSES OF ACTION

### COUNT  I

**On Behalf of Plaintiff and the Class Against Dynagas, Lauritzen and Gregos for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

116.    Plaintiff repeats and reallege each and every allegation contained as if fully set forth herein.

117.    During the Class Period, the Dynagas Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Dynagas securities at artificially inflated prices.

118.    The Dynagas Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Dynagas's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

119.    The Dynagas Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the long-term contracts for the *Arctic Aurora* and the *Ob River* and Dynagas's resulting inability to sustain its quarterly distributions.

120.     During the Class Period, the Dynagas Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.     The Dynagas Defendants had actual knowledge of the falsity of their misrepresentations and the misleading nature of their omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Dynagas Defendants engaged in this misconduct to conceal the unfavorable terms of the contracts on *Arctic Aurora* and *Ob River* and its resulting inability to sustain its quarterly distributions.

122.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dynagas securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Dynagas securities had been artificially inflated by Dynagas's and the Individual Defendants' fraudulent course of conduct.

123.     As a direct and proximate result of Dynagas's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered economic loss and damages in connection with their respective purchases of the Company's securities during the Class Period as the prior artificial inflation in the price of Dynagas securities was removed over time.

124.     By virtue of the foregoing, the Dynagas Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**On Behalf of Plaintiff and the Class Against Dynagas GP, Dynagas Holding, and Prokopiou for Violations of Section 20(a) of the Exchange Act**

125.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

126.    The Controlling Defendants acted as controlling persons of Dynagas within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

127.    Dynagas GP is, and was at all relevant times, the general partner of Dynagas. Dynagas GP therefore had the ability to control Dynagas, and did control Dynagas with respect to the acts alleged herein.

128.    Dynagas Holding is the sole owner of Dynagas GP and owns 44% of Dynagas. By virtue of its complete ownership of the General Partner, Dynagas Holding had the ability to control Dynagas, and did control Dynagas with respect to the acts alleged herein.  In addition, its large ownership interest and its historical relationship with Dynagas – including its actions in placing Lauritzen on the board and in the position of CEO, and Gregos (who previously served as commercial manager for Dynacom Tankers Management Ltd, which has ownership that overlaps with that of Dynagas Holding) as CFO – further enabled Dynagas Holding to exercise control over Dynagas.

129.    Prokopiou, by virtue of his position as chairman of Dynagas's board, his historical role as the company's founder, his ownership of Dynagas Holding, his status as the patriarch of the Prokopiou family and head of the Prokopiou shipping empire, and the father-in-law of Dynagas's CEO, had the ability to control Dynagas, and did control Dynagas with respect to the acts alleged herein.

130.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the

materially false and misleading public statements about Dynagas during the Class Period, the Controlling Defendants had the power and ability to control the actions of Dynagas and its employees.  By reason of such conduct, the Controlling Defendants are liable pursuant to Section 20(a) of the Exchange Act.

XI.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Declaring that the Dynagas Defendants violated Section 10(b) of the Exchange Act as well as Rule 10b-5 promulgated thereunder, and that the Controlling Defendants violated Section 20(a) of the Exchange Act;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

40

## XII.   <u>JURY DEMAND</u>

Plaintiff respectfully demands a trial by jury on all issues so triable.

DATED:  May 16, 2019

Respectfully Submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
Robert N. Cappucci
Brendan J. Brodeur
Sean M. Riegert
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
aentwistle@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com
sriegert@entwistle-law.com

*Counsel for Plaintiff Mario Epelbaum.*