**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE DYNAGAS LNG PARTNERS LP SECURITIES LITIGATION | No. 19-cv-04512 (AJN)<br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT FOR**
**<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 2

II.     JURISDICTION AND VENUE ..................................................................... 12

III.    PARTIES ......................................................................................................... 15

        A.      Plaintiffs .............................................................................................. 15

        B.      Defendants ........................................................................................... 15

                1.      The Controlling Entity Defendants .................................. 16

                2.      The Director and Officer Defendants .............................. 17

                3.      The Underwriter Defendants............................................. 18

IV.     SUBSTANTIVE ALLEGATIONS ................................................................ 19

        A.      Prokopiou Forms Dynagas as a Wholly Owned Subsidiary of
                His Family's Shipping Business, Dynagas Holding .................... 19

        B.      Dynagas Goes Public in 2013 and Begins Paying a
                Substantial and Consistent Distribution......................................... 21

        C.      Prior to the Class Period, Dynagas Renews Two Long-Term
                Charter Contracts on Terms That, Unbeknownst to Investors,
                Provide Less Revenue to Dynagas..................................................... 23

        D.      Dynagas Devises a Plan to Conceal Its Reduced Capacity to
                Generate Revenue and Temporarily Prop up Its Distribution
                by Issuing New Equity......................................................................... 25

        E.      The Class Period Begins on December 21, 2017, When
                Dynagas Misstates the Terms of the New Contract on the
                *Arctic Aurora* ...................................................................................... 26

        F.      Defendants Dynagas, Lauritzen and Gregos Escalate Their
                Fraud on February 15-16, 2018 by Repeating the
                Misstatements about Dynagas's Charter Contracts and
                Assuring Investors Dynagas's Distribution Will Be
                Sustainable, Both in a Press Release and on an Investor Call ..... 28

        G.      Dynagas Repeatedly Falsely Assures Investors That Its
                Current Distribution Is Sustainable Throughout Spring of
                2018.......................................................................................................... 30

H.     July 27, 2018:  Dynagas Is Forced to Reveal That the *Ob River* Is Employed at a Lower Rate, but Again Assures Investors the Distribution Is Safe.............................................. 37

I.     Dynagas Sells Series B Preferred Units Pursuant to Offering Materials That Contain Misstatements about the *Arctic Aurora* ................................................................................. 38

J.     Dynagas Is Forced to Reveal the *Arctic Aurora* Is Also Employed under a New Charter Contract at a Substantially Lower Rate ............................................................................. 41

K.     Dynagas Slashes Its Distribution by 75% and Admits Its Cash Flow Profile Did Not Support the Prior Distribution........................ 43

L.     Dynagas Further Reveals the Impact of the Fraud, and Gregos Admits Defendants Dynagas, Lauritzen and Gregos Had *Never* Expected the Company's Cash Flow to Sustain the 25-Cent Distribution ............................................................... 43

V.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 45

VI.     LOSS CAUSATION.................................................................................... 49

VII.     CLASS ACTION ALLEGATIONS ................................................................ 51

VIII.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 52

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE ............................................................................ 53

X.     CAUSES OF ACTION PURSUANT TO THE EXCHANGE ACT.............................. 54

COUNT I     On Behalf of Plaintiffs and the Class Against Defendants Dynagas, Lauritzen and Gregos for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ............................................................................... 54

COUNT II     On Behalf of Plaintiffs and the Class Against Defendant Dynagas for Violations of Section 20A of the Exchange Act .................... 56

COUNT III     On Behalf of Plaintiffs and the Class Against Defendants Dynagas GP, Dynagas Holding and Prokopiou for Violations of Section 20(a) of the Exchange Act ........................................................ 58

XI.     CAUSES OF ACTION PURSUANT TO THE SECURITIES ACT ............................... 59

        COUNT IV  On Behalf of Plaintiff Braun and Other Class Members
                  Against Defendant Dynagas, the Director and Officer
                  Defendants and the Underwriter Defendants for Violations of
                  Section 11 of the Securities Act .................................................................... 59

        COUNT V   On Behalf of Plaintiff Braun and Other Class Members
                  Against Dynagas and the Underwriter Defendants for
                  Violations of Section 12(a)(2) of the Securities Act.................................... 63

        COUNT VI  On Behalf of Plaintiff Braun and Other Class Members
                  Against the Controlling Entity Defendants and the Director
                  and Officer Defendants for Violations of Section 15 of the
                  Securities Act .................................................................................................. 66

XII.    PRAYER FOR RELIEF ................................................................................................ 68

XIII.   JURY DEMAND ........................................................................................................... 70

Court-appointed lead plaintiffs FNY Partners Fund LP ("FNY"), Mario Epelbaum and Scott Dunlop (collectively, "Lead Plaintiffs"), along with plaintiff Irving Braun ("Braun" and together with Lead Plaintiffs, "Plaintiffs"), bring this action (the "Action") pursuant to Sections 10(b), 20A and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of themselves and all other persons or entities that, during the period from December 21, 2017 through March 21, 2019, inclusive (the "Class Period"), purchased or otherwise acquired Dynagas LNG Partners LP ("Dynagas" or the "Company") securities, purchased or otherwise acquired call options on Dynagas securities or sold or otherwise transferred put options on Dynagas securities, excluding all Defendants (the "Class").

The claims asserted herein pursuant to Sections 10(b) and 20(a) of the Exchange Act are brought on behalf of all Class members.  The claims asserted herein pursuant to Section 20A of the Exchange Act are brought only on behalf of FNY, Braun and such other Class members whose transactions were contemporaneous with, and directionally opposite to, Dynagas's sale of Series B Fixed to Floating Rate Cumulative Redeemable Perpetual Preferred Units (the "Series B Preferred Units") in October 2018.  The claims asserted herein pursuant to the Securities Act are brought only on behalf of Braun and such other Class members that purchased or otherwise acquired Series B Preferred Units in or traceable to Dynagas's October 2018 offering of 2.2 million such Units (the "Offering") or pursuant to certain related Offering Materials (defined below).

Plaintiffs' allegations herein are based upon personal knowledge as to themselves and on information and belief as to all other matters.  Plaintiffs' information and belief is based on, *inter alia*, the investigation of Plaintiffs' counsel.  This investigation included, but was not limited to, a review of:  (i) public filings with the Securities and Exchange Commission ("SEC") by Dynagas;

(ii) research reports by securities and financial analysts; (iii) transcripts and recordings of Dynagas investor conference calls; (iv) press releases and media reports issued by Dynagas; (v) economic analyses of securities movement and pricing data; (vi) media and economic reports regarding the Company; and (vii) consultations with a damages expert.

Plaintiffs' investigation into the factual allegations contained herein is continuing, and many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein or are exclusively within their custody and control. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be obtained after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      In the years leading up to the wrongdoing complained of herein, billionaire shipping magnate, Defendant George J. Prokopiou ("Prokopiou"), and his family's privately held company, Defendant Dynagas Holding, Ltd. ("Dynagas Holding"), lined their own pockets by selling equity and debt securities in publicly held Dynagas and siphoning the proceeds out of the Company through related-party transactions, and by paying themselves outsized distributions (dividends). Acting through Dynagas, which they controlled, Prokopiou and Dynagas Holding lured public investors with promises of large quarterly distributions and assurances that such distributions could be sustained based on Dynagas's revenue. As described herein, Dynagas and its senior management continued to give such assurances, and made related misrepresentations and omissions, even when the promised distributions were no longer supported by the Company's revenue. With full knowledge of this reality, Dynagas and its senior management planned to support the distributions with a Ponzi-style issuance of additional Dynagas securities.

2.      Beginning on December 21, 2017, Dynagas and its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"):  (i) misled investors regarding the financial terms of two long-term contracts that were vital to Dynagas's financial condition, (ii) concealed the fact that the revenue Dynagas derived from those contracts had been severely diminished and (iii) **outright lied** about Dynagas's ability to continue to make substantial distributions to shareholders based on its available cash flow.  Compounding this misconduct, Dynagas raised more than $50 million by selling additional securities to the public at prices inflated by the misstatements and omissions.

3.      The truth – that the subject contracts were significantly less favorable, Dynagas would no longer be profitable and the distributions were not supported – was revealed to the public in a series of corrective disclosures between November of 2018 and March of 2019, resulting in a dramatic decline in the market price of Dynagas securities and harm to its public investors.  For example, Dynagas's common units representing limited partner interests, herein referred to as "shares" of "common stock," lost 79% of their market value during the Class Period.

### Circumstances Leading to the Wrongdoing

4.      Prokopiou and Dynagas Holding created Defendant Dynagas in 2013 for the purpose of accessing the United States financial markets in order to raise the capital needed to operate and expand their business.  Dynagas now owns six tanker ships, designed for the transportation of liquified natural gas ("LNG").  These LNG tanker ships are operated by a Dynagas affiliate and are chartered to large energy companies including Statoil ASA ("Statoil," now known as Equinor), P.J.S.C. Gazprom[1] and Yamal LNG, typically for periods of eight to ten years.

---

[1] Public Joint Stock Company Gazprom, which is one of the largest companies in Russia.

5.      Following the completion of its initial public offering ("IPO") in 2013, and until recently, Dynagas attracted investors in its common stock by paying a substantial quarterly distribution.  Dynagas was able to make consistent distributions because the revenue derived from long-term contracts with stable counterparties is highly predictable.  In its press releases and public presentations, and on conference calls with investors, Dynagas and its senior officers routinely touted the Company's long-term charter contracts and reminded investors that these contracts "provide steady, predictable cash flows."  Indeed, prior to 2019, Dynagas always paid holders of its common stock a distribution of at least 25 cents per quarter, per share, which was high for the industry and was considered attractive by investors and analysts.

6.      The long-term charter contracts for two of Dynagas's ships (the *Ob River* and the *Arctic Aurora*) were set to expire in 2018.  Unbeknownst to the public, Dynagas agreed in 2016 to a new contract on the *Ob River* that provided for a lower rate, thereby slashing Dynagas's ability to generate revenue for years to come.   Further compounding Dynagas's troubles, and unbeknownst to the public, Dynagas agreed on December 20, 2017 to also accept a significantly reduced rate for the *Arctic Aurora*.  Concurrently, Dynagas conducted an internal financial review and realized that the Company could not support significant future distributions based on its cash flow profile.

### Summary of Key Misstatements and Omissions

7.      In a desperate effort to prop up the distribution that had long attracted public investors, Dynagas and its senior management devised a plan to issue additional securities and use the proceeds of the sale to pay distributions.  To that end, on December 21, 2017 (the first day of the Class Period), Dynagas filed a shelf registration statement for up to $750 million in additional securities.  The prospectus attached to the registration statement misleadingly omitted the fact that

two of Dynagas's ships were committed to long-term charters at significantly reduced rates, and included the affirmative misstatement: "In December 2017, we entered into a time charter contract with Statoil for the employment of the *Arctic Aurora*. This charter will be in direct continuation of the vessel's current charter with Statoil." This statement was false because the new charter was **not** a direct continuation of the current contract, but rather an entirely new agreement that provided Dynagas with significantly less revenue than the current contract.

8.     Dynagas continued to mislead investors, repeating the substance of its December 21, 2017 misstatements in a February 15, 2018 press release. During a conference call with investors the next day, February 16, 2018, Dynagas CEO, Defendant Tony Lauritzen ("Lauritzen"), escalated the deception by falsely telling investors that the new quarterly distribution rate (which was not yet announced) would be consistent and sustainable for the long term. Specifically, Lauritzen stated, "we have a very good visibility of what our cash flows will look like. What I can say is, it's an ongoing analysis, we would like to end up with a distribution coverage of above one-times which is sustainable for the longer term. And we're very fortunate because we can use the word long-term because we held it long time, the long-term contracts which is a necessary ingredient for having sustainable distribution." In short, Lauritzen stated the multi-year nature of the contracts enabled the Company to predict its cash flow for years into the future (which was true) and that the revenue from the long-term contracts would sustain the new distribution for multiple years into the future (which Lauritzen and the Company knew to be false).

9.     On April 18, 2018, Dynagas issued a press release that quoted Lauritzen again falsely assuring investors that Dynagas's distribution was sustainable. Lauritzen stated a recent adjustment to the distribution rate (down to 25 cents per quarter, per share) "align[ed Dynagas's] distribution level with its capacity to generate cash flow in the long term." Lauritzen further

assured investors that "we believe the new distribution level is viable on an actual cash basis," and even touted Dynagas's recent "**success**[ ] in securing a ten year contract for [the *Ob River*] . . . and a three year contract for [the *Arctic Aurora*]," without mentioning that both of those contracts provided significantly less revenue for the Company. In reality, Dynagas, Lauritzen and Dynagas's CFO, Defendant Michael Gregos ("<u>Gregos</u>"), knew the Company's anticipated cash flow would not support distribution because Dynagas had **already agreed** to receive a reduced charter rate for two of its ships.

10. On May 17, 2018, Dynagas held a conference call with investors to discuss the Company's first quarter 2018 earnings. The accompanying presentation included a slide which stated the Company's "Long Term Contracts Provide Stable, Visible Cash Flow" and showed the existing charter contracts for the *Ob River* and the *Arctic Aurora*, which expired in 2018, running through 2028 and 2021/2023, respectively. On the call with investors, in his prepared remarks and again in response to questioning, Gregos assured investors that a further quarterly distribution reduction would not be necessary. When an analyst directly asked: "So now that the distribution is more aligned with the suitable cash flow, do you feel like this current level is pretty easily sustainable in the coming quarters and years," Gregos answered: "**Yeah, definitely**. What we wanted to achieve was this alignment. **And as for the foreseeable future this distribution, as I mentioned before is sustainable**."[2] Also on the call, Lauritzen referred to "extending" the *Arctic Aurora's* charter contract (which had not been extended but rather replaced by a new, less favorable contract), and likewise assured another analyst that the new distribution was "based on expectations which are reasonable," and that only "extreme scenarios" could threaten the 25-cent distribution amount. These statements were false because Dynagas had already agreed to accept

---

[2] Unless otherwise noted, emphasis in quoted materials herein is added.

a lower rate for the *Arctic Aurora*, effective within the following three months, and was by then **already receiving** a lower rate for the *Ob River*.

11.     Finally, on July 27, 2018, less than a month before the charter rate reduction for *Arctic Aurora* was set to become effective, Dynagas held another conference call with its investors to discuss second quarter 2018 earnings.   Although Dynagas was forced to admit in the accompanying press release that the *Ob River* was employed on less favorable terms (to explain its reduced revenue in that quarter), Dynagas assured investors that the distribution was safe.   On the call, Gregos stated:  "Of course, you ask how do you envision maintaining the distribution . . . ***the distribution is supported by our current cash flow profile for quite a long time***."   Put simply, Dynagas and its senior management told investors that the Company's cash flow profile supported the payment of a distribution of at least 25 cents per share for at least the next several years, which they knew to be false.

12.     As Gregos has since ***admitted***, contrary to their public statements, Dynagas and its senior management knew, throughout 2018, that they could only sustain the distribution by issuing new equity and, even then, only if the relevant securities market improved.   That is, current investors would be paid out of the proceeds from new investments – essentially operating as a Ponzi scheme.   In furtherance of this scheme, Dynagas filed the shelf registration described above on December 21, 2017 for $750 million of securities (the day after it agreed to a reduced rate on the *Arctic Aurora*) and managed to sell $55 million of Series B Preferred Units pursuant to that registration statement in the October 2018 Offering, before the fraud was revealed.   Dynagas repeated its misstatement about the *Arctic Aurora's* new contract being a direct continuation of its

prior contract in the Offering Materials[3] pursuant to which it sold the Series B Preferred Units and omitted from the Offering Materials the fact that the new contract contained significantly less favorable terms.

### Revelation of the Truth and Harm to Class Members

13.     After misleading the Company's public investors throughout the majority of 2018, Dynagas and its senior management were finally forced to admit the *Arctic Aurora* had also been engaged at a reduced charter rate, further decreasing the Company's revenue and cash flow. That admission came in a November 15, 2018 evening press release announcing Dynagas's earnings for the third quarter of 2018 and a conference call the following day. Specifically, Dynagas announced that the earnings it had realized in that quarter were lower than its earnings in the previous quarters, lower than its earnings in the same quarter of 2017 and lower than analysts had expected. The Company explained that the lower earnings in the third quarter of 2018 were due, in part, to the less favorable terms under which the *Arctic Aurora* and the *Ob River* were now operating. The reduction of the charter rate for one-third of Dynagas's fleet undermined the Company's ability to generate revenue for years to come, because of the multi-year nature of the contracts.

14.     Further alarming investors, and implicitly contradicting the prior assurances that the 25-cent distribution was safe for the foreseeable future, Gregos declined to answer a question about the future of the quarterly distribution on a public conference call the following morning,

---

[3] The term "Offering Materials" as used herein includes the "Registration Statement" together with the "Prospectus." The Registration Statement includes the following two documents: (1) Dynagas's December 21, 2017 registration statement on Form F-3, filed as part of the shelf registration on that date; and (2) Dynagas's October 23, 2018 registration statement filed on Form 8-A for Series B Preferred Units. The Prospectus includes the following three documents: (1) Dynagas's preliminary prospectus filed on December 21, 2017 as part of the shelf registration, (2) a subsequent October 16, 2018 free writing prospectus and (3) Dynagas's October 18, 2018 final prospectus supplement related to the Offering of Series B Preferred Units.

November 16, 2018.  Investors and analysts correctly inferred from this non-response that the distribution was not supported by the Company's cash flow and might be further reduced.  On November 16, 2018, the price of Dynagas common stock fell 13.7%.

15.    The magnitude of the wrongdoing was further revealed on January 25, 2019, when Dynagas announced in a press release it would pay a distribution of only 6.25 cents per share of common stock, **a reduction of 75%** from the prior distribution of 25 cents per share.  Lauritzen explained in the press release that this drastic reduction was "necessary in order to retain more of the cash generated from the Partnership's long-term contracts to maintain a steady cash balance." In other words, Dynagas's prior distribution level was not supported by its cash flow profile.  The following trading day, Dynagas's common stock closed at $2.91 per share, down 27.6% from its close on the previous trading day.  The chart below illustrates several of the misstatements described herein, along with Dynagas's earnings and distributions (dividends) during the Class Period.

**Figure 1**

16.     On the morning of March 22, 2019, Dynagas's management finally was forced to explicitly contradict Gregos's prior statements that the 25-cent distribution was supported by its cash flow profile as of spring and summer of 2018.  When asked on the conference call what had changed since the distribution had been set to 25 cents per quarter the previous April, Gregos audibly struggled and awkwardly explained that when he made his prior comments, he and Lauritzen had expected the Master Limited Partnership ("MLP") market to improve, thereby allowing the Company to issue equity at high prices to fund future distributions.  That is, rather than being sustainable for the "foreseeable future" and "supported by the [then-]current cashflow profile," Lauritzen and Gregos had known since at least April 2018 that the quarterly distribution could only be maintained through the issuance of new equity, and only if certain market conditions improved.  Dynagas stock closed at $2.38 per share on March 22, 2019, down 8.6% from its close on the previous day.

17.     All told, Dynagas's common stock declined 79.4% between the beginning of the Class Period and the close of trading after the last corrective disclosure.  Dynagas Series A Cumulative Redeemable Preferred Units (the "Series A Preferred Units") declined 24.7% during the same period, and Dynagas Series B Preferred Units, Dynagas notes and Dynagas call options also suffered substantial price decreases.

### Summary of Claims

18.     Plaintiffs bring this Action:

> (a)     pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Defendants Dynagas, Lauritzen and Gregos, on behalf of all persons and entities that purchased or otherwise acquired Dynagas securities, purchased or otherwise acquired call options on Dynagas securities or sold or otherwise transferred put options on Dynagas securities, during the Class Period (Count I);

(b)      pursuant to Section 20A of the Exchange Act, against Defendant Dynagas on behalf of all persons and entities that purchased or otherwise acquired Dynagas securities or sold or otherwise transferred put options on Dynagas securities contemporaneously with Dynagas's sales of Dynagas Series B Preferred Units in October of 2018 (Count II);

(c)      pursuant to Section 20(a) of the Exchange Act against Dynagas GP LLC ("Dynagas GP") and Dynagas Holding (together, the "Controlling Entity Defendants"), and against Prokopiou, on behalf of all persons and entities that purchased or otherwise acquired Dynagas securities, purchased or otherwise acquired call options on Dynagas securities or sold or otherwise transferred put options on Dynagas securities, during the Class Period (Count III);

(d)      pursuant to Section 11 of the Securities Act against Defendants Dynagas, Prokopiou, Lauritzen, Gregos, Evangelos Vlahoulis ("Vlahoulis"), Alexios Rodopoulos ("Rodopoulos") and Levon A. Dedegian ("Dedegian" and collectively with Prokopiou, Lauritzen, Gregos, Vlahoulis, Rodopoulos and Dedegian, the "Director and Officer Defendants") along with UBS Securities LLC ("UBS"), Stifel, Nicolaus & Company, Incorporated ("Stifel"), Morgan Stanley & Co. LLC ("Morgan Stanley"), and B. Riley FBR, Inc. ("B. Riley" and collectively with UBS, Stifel and Morgan Stanley, the "Underwriter Defendants") on behalf of Braun and all other persons who purchased Dynagas Series B Preferred Units in or traceable to the Offering, excluding all defendants (Count IV);

(e)      pursuant to Section 12(a)(2) of the Securities Act against Dynagas and the Underwriter Defendants on behalf of Braun and all other persons who purchased Dynagas Series B Preferred Units from the Underwriter Defendants pursuant to the Prospectus (Count V); and

(f)      pursuant to Section 15 of the Securities Act against the Controlling Entity Defendants and the Director and Officer Defendants on behalf of Braun and all other persons who purchased Dynagas Series B Preferred Units during the Class Period, in or traceable to the Offering (Count VI).

19.      As a result of the misstatements and omissions described above, Plaintiffs and other

Class members:  (a) purchased Dynagas securities or call options referencing Dynagas securities

at prices that were inflated; and/or (b) sold put options referencing Dynagas securities at prices

that were artificially deflated.  This Action seeks to remedy the losses that Plaintiffs and other Class members suffered as a result of Defendants' wrongdoing.

## II.   **JURISDICTION AND VENUE**

20.    This Court has jurisdiction over the subject matter of this Action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and Section 22 of the Securities Act, 15 U.S.C. § 77v. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

21.    As Dynagas has advised investors in its public filings, including the November 2013 Registration Statement and Prospectus pursuant to which its IPO was affected ("IPO Prospectus"), Dynagas has "expressly submitted to the jurisdiction of the U.S. federal and New York state courts sitting in the city of New York for the purpose of any suit, action or proceeding arising under the securities laws of the United States or any state in the United States."

22.    Personal jurisdiction also exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

23.    Defendants Prokopiou and Dynagas Holding availed themselves of the financial markets of the United States and this District in order to raise capital for the continued growth of Dynagas Holding and Prokopiou's other shipping businesses.  In the IPO Prospectus, Dynagas explained, "we are selling 8,250,000 of our common units and our Sponsor, Dynagas Holding Ltd., is selling 4,250,000 of our common units. . . . We have applied to list our common units on the Nasdaq Global Select Market under the symbol 'DLNG.'"  As Prokopiou admitted in a public

interview on or about January 24, 2019, Dynagas Holding's decision to list Dynagas on NASDAQ and subsequently the New York Stock Exchange "was a good opening for raising funds in order to expand in LNG business, which is highly capital intensive."  Tellingly, Prokopiou did not distinguish between Dynagas Holding and Dynagas, adding: "*our* involvement there [on the stock exchanges in this this District] was just *six out of the seventeen vessels that we have*."  That is, Prokopiou recognizes that the ships, which have formally become the legal assets of Dynagas, remain under the practical control of, and continue to serve the financial interests of Dynagas Holding, and further recognizes that Dynagas Holding has raised capital for its own expansion by selling securities related to "six out of the seventeen vessels that [it has]" on the stock exchanges within this District.

24.     Defendants Prokopiou and Dynagas Holding created Dynagas for the purpose of accessing the financial markets of the United States and this District.

25.     Each of the Controlling Entity Defendants continued to avail itself of the financial markets of New York and of the United States long after the IPO of Dynagas common stock, including through the collection of a substantial distribution made to them by Dynagas due to their holding of Dynagas securities, the continued payments by Dynagas on favorable and exclusive management contracts, and the sale of additional securities by Dynagas to support those payments, including the sale of Series B Preferred Units in the Offering.  All told, Dynagas Holding itself has received more than one billion dollars through participation in the financial markets of New York and the United States, as set forth herein.

26.     Each of the Underwriter Defendants maintains offices in New York, New York.  In addition, Defendants Morgan Stanley and UBS are headquartered in New York, New York. Further, each of the Underwriter Defendants availed itself of the financial and securities markets

13

of the United States and of New York when they underwrote the IPO of Dynagas Series B Preferred Units listed on the New York Stock Exchange and sold 2.2 million such units.

27.    Defendants Dynagas, Gregos and Lauritzen made the misstatements described herein in press releases and conference calls for the purpose of inflating the price of Dynagas Securities traded in New York and in the United States.  They intended that their misstatements be disseminated in New York and the United States to investors herein.  The misstatements were indeed disseminated in New York and in the United States, including through Dynagas's filing of certain of the misstatements with the SEC.  Indeed, some of the alleged misstatements were made on conference calls in response to analysts employed by New York and United-States based firms known to advise their New York and United-States based clients, among others.

28.    In addition to their use of the United States in connection with the fraud herein alleged, Prokopiou and Dynagas Holding routinely avail themselves of the ports of the United States.  For example, Prokopiou recounted in the January 24, 2019 interview that, during the fracking revolution, "we had a vessel, that we arrived in the United States with a cargo, it was one of the first import cargos of LNG, we discharged, and after three days we reloaded, and we went to Japan."  Prokopiou is well aware of the financial benefits that he and Dynagas Holding reap from conducting operations in the United States; a March 25, 2019 article in *The Wall Street Journal* quoted Prokopiou as follows: "'The energy costs in the U.S. are half of those in Europe and a third compared to the Far East,' Mr. Prokopiou said. 'The financial benefits the U.S. has are tremendous, and more ships will be needed to move gas to export markets.'"

29.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

30.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiffs

31.     Plaintiff FNY Partners Fund LP is a Delaware Limited Partnership that invests in equity securities.  FNY acquired Dynagas securities as set forth in the accompanying certification and has been damaged thereby.  FNY maintains its principal offices in New York, New York.

32.     Plaintiff Mario Epelbaum resides in New York, New York.  Mr. Epelbaum acquired Dynagas securities, as set forth in the accompanying certification, and has been damaged thereby.

33.     Plaintiff Scott Dunlop resides in the Federation of Saint Kitts and Nevis.  Mr. Dunlop acquired Dynagas securities and sold put options obligating him to purchase Dynagas securities as set forth in the accompanying certification, and has been damaged thereby.

34.     Plaintiff Irving Braun resides in Flushing, New York.  Mr. Braun acquired Dynagas securities, as set forth in the accompanying certification, and has been damaged thereby.

### B.     Defendants

35.     Defendant Dynagas is a Marshall Islands limited partnership founded by Defendant Prokopiou.  Dynagas maintains its principal executive offices at 23, Rue Basse, 98000 Monaco. Dynagas, through its subsidiaries and affiliates, owns and operates six LNG tankers and derives substantially all of its revenue from charter contracts with natural gas producers to transport their LNG products to markets around the world.  Although Dynagas sometimes enters short-term charter contracts when its ships are in between long-term charter contracts or otherwise idle, Dynagas strongly favors long-term charter contracts because these provide steady and predictable revenue.

15

36.     As of January 31, 2019, Dynagas had more than 35,490,000 shares of common stock issued and outstanding, 3,000,000 Series A Preferred Units issued and outstanding, 2,200,000 Series B Preferred Units issued and outstanding.  Dynagas common stock is listed and traded on the New York Stock Exchange under the ticker symbol "DLNG."  Dynagas Series A Preferred Units are listed and traded on the New York Stock Exchange under the ticker symbol "DLNG PR A."  Dynagas Series B Preferred Units are listed and traded on the New York Stock Exchange under the ticker symbol "DLNG PR B."

### 1. The Controlling Entity Defendants

37.     Defendant Dynagas Holding Ltd. is a Marshall Islands corporation wholly owned by the Prokopiou family.  Dynagas Holding partially or wholly owns and operates several other LNG tanker ships, through its subsidiaries and affiliates other than Dynagas.

38.     Defendant Dynagas GP is a Marshall Islands limited partnership and has been the general partner of Dynagas since the Company's inception.  Dynagas GP is wholly owned by members of the Prokopiou family, and, like Dynagas Holding, is one of the entities by which the Prokopiou family exerts control over Dynagas and its operations.

39.     Dynagas Holding wholly owns Dynagas GP and directly owns 43.9% of Dynagas. In addition, Dynagas Holding partially or wholly owns and operates several other LNG tanker ships through its subsidiaries and affiliates other than Dynagas.

40.     Dynagas GP and Dynagas Holding exercise control over Dynagas through an Omnibus Agreement as amended on April 12, 2016, which governs the relationship between the entities.  The Omnibus Agreement specifies under which conditions vessels may be acquired and operated, contains detailed voting and distribution rights, and restricts Dynagas's ability to compete with Dynagas Holding and its other affiliates.

16

## 2. The Director and Officer Defendants

41.     Defendant Prokopiou is the founder of Dynagas and its predecessor and has served as chairman of the board of directors since the Company's IPO.  Prokopiou (together with members of his family) beneficially owns 43.9% (or 15,595,000) of the outstanding shares of Dynagas common stock through Dynagas Holding and another 0.1% through Dynagas GP.  At all relevant times, Prokopiou controlled Dynagas through Defendant Dynagas Holding, the Company's controlling shareholder and "sponsor," and through Defendant Dynagas GP.

42.     Defendant Tony Lauritzen has served on the Company's board of directors since 2013.  Lauritzen has also served as the CEO of Dynagas since the Company's IPO in 2013.  Previously, Lauritzen worked as an executive for the predecessor to Dynagas Holding since that company began operations in 2007.  Lauritzen is married to Marina Kalliope Prokopiou, Prokopiou's daughter.  Lauritzen also serves as the General Manager of Dynagas Holding, also wholly-owned by members of the Prokopiou family. He was a signatory to the Offering Materials.

43.     Defendant Michael Gregos has served as CFO of Dynagas since the Company's IPO in 2013.  Since 2009, Gregos has also served as the commercial manager of oil tanker shipping company Dynacom Tankers Management Ltd., founded by George Prokopiou.  From 2010 to 2014, Gregos served on the board of Ocean Rig UDW Inc., an operator of semi-submersible oil platforms chaired by Greek shipping magnate George Economou until its acquisition by Transocean.  He was a signatory to the Offering Materials

44.     Defendant Evangelos Vlahoulis is Dynagas board member, who, upon  information and belief resides in Greece.  He has been a member of the Dynagas board since 2013 and was a signatory to the Offering Materials.

45.     Defendant Alexios Rodopoulos is Dynagas board member, who resides in Athens, Greece.  He has been a member of the Dynagas board since 2013. He was a signatory to the Offering Materials.

46.     Defendant Levon A. Dedegian is Dynagas board member, who on information and belief, resides in Greece.  He has been a Dynagas board member since 2013 and was a signatory to the Offering Materials.  Previously, Mr. Dedegian was the General Manager of Dynacom Tankers Management LTD in Greece, another Prokopiou-founded company.

47.     As stated above, Defendants Prokopiou, Lauritzen, Gregos, Vlahoulis, Rodopoulos and Dedegian are referred to collectively herein as the "Director and Officer Defendants."

### 3.   The Underwriter Defendants

48.     The Underwriter Defendants are not alleged to have violated the Exchange Act or to have committed fraud or any act of deliberate deception.  The claims against the Underwriter Defendants are based on strict liability or negligence and relate only to their roles as underwriters of the Offering.

49.     Defendant UBS is a Delaware limited liability company with its headquarters and offices in New York, New York. UBS was a joint book-runner for the Offering.  Related to the Offering, UBS sold and distributed approximately 825,000 Series B Preferred Units, pursuant to the Offering Materials which contained statements that were false, misleading and/or incomplete concerning material information about the long-term contracts for the *Arctic Aurora* and Dynagas's resulting inability to sustain its quarterly distribution.

50.     Defendant Stifel is a Delaware corporation headquartered in Saint Louis, Missouri and offices in New York, New York. Stifel was a joint bookrunner for the Offering.  Related to the Offering, Stifel sold and distributed approximately 440,000 Series B Preferred Units and offered them to the public, pursuant to the Offering Materials which contained statements that

were false, misleading and/or incomplete concerning material information about the long-term contracts for the *Arctic Aurora* and Dynagas's resulting inability to sustain its quarterly distribution.

51.     Defendant Morgan Stanley is a Delaware limited liability company with its headquarters and offices in New York, New York.  Morgan Stanley was a joint book-runner for the Offering. Related to the Offering, Morgan Stanley sold and distributed approximately 825,000 Series B Preferred Units, pursuant to the Offering Materials which contained statements that were false, misleading and/or incomplete concerning material information about the long-term contracts for the *Arctic Aurora* and Dynagas's resulting inability to sustain its quarterly distribution.

52.     Defendant B. Riley is a Delaware corporation headquartered in Los Angeles, California with offices in New York, New York. It was an underwriter of the Offering.  Related to the Offering, B. Riley sold and distributed approximately 110,000 Series B Preferred Units and offered them to the public, pursuant to the Offering Materials which contained statements that were false, misleading and/or incomplete concerning material information about the long-term contracts for the *Arctic Aurora* and Dynagas's resulting inability to sustain its quarterly distribution.

53.     As stated above, Defendants UBS, Stifel, Morgan Stanley and B. Riley are referred to collectively herein as the "Underwriter Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Prokopiou Forms Dynagas as a Wholly Owned Subsidiary of His Family's Shipping Business, Dynagas Holding

54.     Defendant Dynagas was founded by billionaire Greek shipping magnate Prokopiou on May 30, 2013 as a wholly-owned subsidiary of his family's private company, Dynagas Holding.

Dynagas was created to own, operate and acquire LNG tanker ships then owned by Dynagas Holding and employed on multi-year charters.

55.     Dynagas was organized as a Marshall Islands limited partnership, and a second entity, Dynagas GP, which is also wholly owned by Dynagas Holding, was formed to serve as Dynagas's general partner.

56.     Immediately following the formation of Dynagas, Prokopiou began to prepare to take Dynagas public by an IPO in the United States.

57.     Prokopiou and Dynagas Holding formed Dynagas for the purpose of accessing the financial and equity markets of the United States and New York.  Prokopiou and Dynagas Holding structured Dynagas to enable the continued growth and profitability of Dynagas Holding though a series of "drop down" transactions, in which vessels owned by Dynagas Holding would be sold to Dynagas for cash, funded by debt and equity issued by Dynagas.  This would facilitate the growth of Dynagas Holding and Prokopiou's shipping empire by issuing debt and equity securities in the United States, supported by the assets (ships and related contractual rights) that Dynagas Holding was selling to its new subsidiary.  At the same time, Prokopiou and Dynagas Holding shifted the risk associated with the several LNG tanker ships that were "dropped down" to the public shareholders and noteholders who invested in Dynagas through NASDAQ and the New York Stock Exchange.

58.     The creation of, borrowing by, transactions with, and IPO of Dynagas collectively provided Dynagas Holding with more than half a billion dollars in cash in 2013 alone.

59.     At the same time, Prokopiou, through Dynagas Holding and Dynagas GP, continued to control Dynagas and the assets (LNG tanker ships) he purportedly sold to the new Company.  Prokopiou has thereby been able to leverage the LNG tanker ships to facilitate

favorable terms for charter contracts on other LNG tanker ships that Dynagas Holding did not drop down, and other vessels and assets of various types owned by other segments of Prokopiou's shipping empire.  This was an especially attractive arrangement for Prokopiou given that Dynagas and Dynagas Holding operate in an industry notorious for its opacity and for bulk negotiation of charters and other contracts – the terms of any given contract are privately negotiated with implicit or explicit reference to other existing or contemplated contracts between the parties, as Dynagas's own public filings indicate.  The arrangement would also allow Prokopiou to use Dynagas as a *de facto* bank to which he could drop down additional LNG tanker ships when Dynagas Holding needed cash, and from which he could repurchase them, at his option.

60.     Promptly upon its inception, Dynagas purchased three LNG tanker ships, including the *Ob River*, from Dynagas Holding, financed primarily by private debt, but also by equity privately "issued" back to Dynagas Holding.  Those LNG tanker ships were employed in long-term charter contracts, which provided Dynagas with steady, predictable revenue for years to come.

**B.      Dynagas Goes Public in 2013 and Begins Paying a Substantial and Consistent Distribution**

61.     On November 13, 2013, Dynagas completed its IPO, through which it raised approximately $225 million by selling 12,500,000 shares to the public at $18 per share.  In connection with the IPO, Dynagas Holding received approximately $76.5 million (in addition to the approximately $450 million in cash it had received for the three LNG tanker ships it had sold to Dynagas earlier that year) and retained a 52% interest in Dynagas.  Dynagas common stock was listed on the NASDAQ Global Select Market under the ticker symbol DLNG on or about November 13, 2013.  Dynagas has since transferred its listing to the New York Stock Exchange, effective December 2014.

21

62.     Prokopiou appointed himself chairman of Dynagas's board, a position which he has held since the IPO.  The fact that Dynagas was controlled by Prokopiou and Dynagas Holding was plainly stated in Dynagas's initial and subsequent filings with the SEC, as was the fact that the Company's ownership structure created a conflict of interest that might result in Prokopiou or Dynagas Holding causing Dynagas to take action that favored Prokopiou and his family to the detriment of the public shareholders.

63.     However, Dynagas took steps to assure public shareholders that they would participate in Dynagas's earnings, as those earnings accrued.  According to the IPO Prospectus, Dynagas's partnership agreement required it to distribute all of its available cash to its stockholders on a quarterly basis.  The IPO Prospectus further stated that the Company intended to make quarterly distributions to holders of its common stock of at least $0.365 per share (36.5 cents).

64.     Following the IPO, Dynagas began making a substantial quarterly distribution, as prescribed by the IPO Prospectus.  On February 20, 2014, the Company announced a distribution of $0.1746 per share, which roughly equals $0.365 per share, pro-rated to account for the fact that the Company had only been public for approximately half of the prior quarter.  Dynagas then made a distribution to holders of its common stock of at least $0.365 throughout 2014, and a distribution of $0.4225 throughout 2015, 2016, and 2017.

65.     From August 6, 2014 onward, Dynagas repeatedly assured investors in its quarterly earnings presentations that its "Fixed Charters Provide Steady, Predictable Cash Flows."  These and similar statements to this effect were true.  Dynagas has always derived most of its revenue from long-term charter contracts at fixed rates with reliable counterparties, and therefore has stable cash flow.  That cash flow is predictable to Dynagas and its leadership who are privy to the terms of those contracts, including CEO Lauritzen and CFO Gregos.  The charter contracts typically run

for eight years or more.  For example, as stated in Dynagas's Offering Materials, its fleet had an "average remaining charter term of approximately 10.0 years."  This enabled the Company to make a consistent quarterly distribution to its shareholders, as investors and analysts have noted throughout Dynagas's history as a public company.

66.     The substantial, consistent quarterly distribution attracted institutional and individual investors alike over the Company's first several years; as analysts also noted, the distribution was not only consistent, but consistently large relative to its share price.  For example, a May 14, 2016 article in *The Motley Fool* identified Dynagas as a "high-yield dividend stock" that offered "sustainable, generous, dividend income" which represented one of the "best long-term income opportunities in the industry" and was therefore "worth owning."

### C.     Prior to the Class Period, Dynagas Renews Two Long-Term Charter Contracts on Terms That, Unbeknownst to Investors, Provide Less Revenue to Dynagas

67.     Over the course of 2014 and 2015, Dynagas Holding conducted three transactions with Dynagas structured as "drop downs," the term Dynagas used for the transactions and which is commonly understood to mean the transfer of assets from a parent to a subsidiary, in exchange for cash (or debt) owed to the parent.  Dynagas financed each of these drop downs by selling equity to the public, and in the process diluted Dynagas Holding's ownership stake in Dynagas, ultimately to 44%.  However, the three post-IPO drop down transactions have collectively provided Dynagas Holding with more than half a billion dollars in cash.  Each of the LNG tanker ships dropped down, including the *Arctic Aurora*, was, as the time of the transaction, employed in a long-term charter contract with a reliable counterparty.  By the end of 2015, and at all times thereafter, Dynagas has owned six LNG tanker ships, all of which it acquired from Dynagas Holding.

68.     Dynagas Holding availed itself of the financial markets of New York and the United States when it entered drop down transactions with Dynagas, financed by debt and equity issued

and sold in New York.  As stated above, on March 25, 2019, *The Wall Street Journal* quoted Prokopiou as follows: "'The energy costs in the U.S. are half of those in Europe and a third compared to the Far East,' Mr. Prokopiou said. 'The financial benefits the U.S. has are tremendous, and more ships will be needed to move gas to export markets.'"

69.    Dynagas sought to keep its fleet employed in long-term charter contracts. Therefore, Dynagas sought to enter long-term contracts for the *Ob River* and the *Arctic Aurora*, which were at that time operating under charter contracts set to expire in late 2017 and in August of 2018, respectively.

70.    On March 31, 2016, Dynagas announced that the then-current charter for the *Ob River* had been extended until May 1, 2018 (plus-or-minus 15 days), and that Dynagas had entered into a new long-term contract for the *Ob River* with its then-current charterer, to commence immediately upon the expiration of the prior charter (on or about May 1, 2018).  Unbeknownst to the public, the new long-term charter contract provided that a lower rate would be paid to Dynagas, compared to what Dynagas was receiving at the time.

71.    On the same day, the Company announced that two of its other LNG tanker ships had entered new, long-term (approximately 15-year) contracts with Yamal.  This left the *Arctic Aurora* as the only one of Dynagas's six LNG tanker ships that was not committed to a long-term charter contract through 2021.

72.    On December 20, 2017, Dynagas entered into a new long-term (approximately 10-year) charter contract for the *Arctic Aurora* with the same entity to which it was then chartered (Statoil, now called Equinor).  This charter contract provided that a lower rate would be paid to Dynagas than what Dynagas was receiving at the time.

24

### D.    Dynagas Devises a Plan to Conceal Its Reduced Capacity to Generate Revenue and Temporarily Prop up Its Distribution by Issuing New Equity

73.    From 2013 through 2016, Dynagas's earnings had approximately matched its distributions. In other words, the distributions were supported by the Company's cash flow.  However, as its earnings declined in 2017, Dynagas did not adjust its distribution accordingly.   (See Figure 2 below).  And even when Dynagas was finally forced to reduce its quarterly distribution to 25 cents per quarter, per share, the reduced distribution was still not supported by the Company's earnings.

**Figure 2**



74.    As Dynagas's CFO, Defendant Gregos has since admitted, Dynagas planned to sustain the 25-cent distribution by issuing and selling new equity.   In essence, Dynagas's management intended to run a Ponzi scheme in which capital raised from new investment would be used to pay distributions to existing investors, including Defendants Dynagas Holding and Prokopiou.  But Defendants Dynagas, Lauritzen and Gregos lied to the investors by telling them that the (reduced) distribution could and would be sustained by the operations of the Company,

and – to support that lie – further lied by overstating the revenue that would be generated by two of Dynagas's new, long-term charter contracts.

E.     **The Class Period Begins on December 21, 2017, When Dynagas Misstates the Terms of the New Contract on the *Arctic Aurora***

75.     In the midst of Dynagas's internal financial review, on December 21, 2017, Dynagas filed a shelf registration statement permitting it to issue up to $750 million in new securities.  Notably, the filing occurred on the day after Dynagas entered the new, less favorable, charter agreement on the *Arctic Aurora*.  Dynagas and its senior management planned to use the proceeds from the sale of these securities to pay quarterly distributions, which would no longer be supported by the Company's cash flow.  The prospectus attached to (and incorporated into) the shelf registration statement provided historical revenue data but omitted the fact that the *Ob River* and the *Arctic Aurora* were committed to long-term charter contracts at significantly reduced rates.

76.     The December 21, 2017 prospectus, which was signed by the Director and Officer Defendants, also affirmatively stated:

> In December 2017, we entered into a time charter contract with Statoil for the employment of the *Arctic Aurora*. This charter will be in direct continuation of the vessel's current charter with Statoil (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of three years +/- 30 days. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates.

77.     This statement was materially false and misleading when made because, as Defendants Dynagas, Lauritzen and Gregos knew, the new charter was not a direct continuation of the current contract, but rather an entirely new agreement that provided Dynagas with significantly less revenue than the current contract, as a result of the reduced rate.

78.     This statement was further misleading because Dynagas had previously announced, in its August 6, 2014 investor presentation, that Statoil had the option to extend the charter on the *Arctic Aurora* through 2021 at an "escalated rate[ ]," *i.e.*, on terms **more** favorable to Dynagas.

79.     The December 21, 2017 prospectus incorporated by reference the following risk factors from Dynagas's 2016 Annual Report that were inadequate and, themselves misleading:

> If any of our charters is terminated, we may be unable to re-deploy the related vessel on terms as favorable to us as our current charters, or at all. If we are unable to re-deploy a vessel for which the charter has been terminated, we will not receive any revenues from that vessel, and we may be required to pay ongoing expenses necessary to maintain the vessel in proper operating condition.  Any of these factors may decrease our revenue and cash flows.  Further, the loss of any of our charterers, charters or vessels, or a decline in charter hire under any of our charters, could have a material adverse effect on our business, results of operations, financial condition and ability to make minimum quarterly distributions and other distributions to our unitholders.

80.     In addition to being inadequate, these risk factors were themselves false and misleading because they falsely implied that the *Ob River* and the *Arctic Aurora* had not **already** been committed to reduced charter rates, impacting the Company's ability to make distributions.

81.     Also on December 21, 2017, Dynagas issued a press release similarly misleading investors about the terms of the *Arctic Aurora's* charter with Statoil.  The press release provided:

> The Partnership has entered into a new three year charter agreement with Statoil ASA ("Statoil") for the employment of the *Arctic Aurora*, [ ] (the "Extended Charter"). . . . The Extended Charter is expected to commence in the third quarter of 2018 in direct continuation of the Current Charter. . . . Statoil will have the option to extend the Extended Charter by two consecutive 12-month periods at escalated rates.

82.     This statement was false and misleading when made because the new charter was not a direct continuation of the current charter and because it omitted the material fact that the new charter contained terms that were significantly less advantageous to Dynagas.  It was further

27

misleading because, like the Prospectus, it references the potential future *escalation* of the charter rate, rendering the omission of the certain, immediate *reduction* of the rate necessary in order to make the statement made, in the light of the circumstances under which it was made, not misleading.

83.     The press release further misled investors because it refers to the new contract on the *Arctic Aurora* multiple times as an "extension," and quotes Lauritzen stating "We are pleased to report our extended charters with Statoil and PetroChina," when in fact the contract for the *Arctic Aurora* had not been extended but rather replaced by a less favorable contract.

**F.     Defendants Dynagas, Lauritzen and Gregos Escalate Their Fraud on February 15-16, 2018 by Repeating the Misstatements about Dynagas's Charter Contracts and Assuring Investors Dynagas's Distribution Will Be Sustainable, Both in a Press Release and on an Investor Call**

84.     On February 15, 2018, Dynagas issued a press release which again falsely stated that "[o]n December 20, 2017, the Partnership entered into a new three-year charter agreement with Statoil for the employment of the *Arctic Aurora*. . . . This new charter for the *Arctic Aurora* is expected to commence in the third quarter of 2018, in direct continuation of the current charter with Statoil."

85.     Dynagas repeated the February 15, 2018 misstatement on a conference call with investors the next day, February 16, 2018, and in the presentation that accompanied that call, and further misled investors by stating on the call that long-term charter rates in the industry, generally, were improving.  On the conference call, Lauritzen answered a question as follows:

> [Analyst:] There has been some talk around the spot charter rates but have the 3, 5 and 7-year time charter rates responded in recent months as well?
>
> [Lauritzen:] *Yes,* I think we've seen along with a substantial improvement in the spot markets. We've seen everything from multi-months to multi-year charter is being discussed. *So yes, we can answer affirmative to that*.

28

86.     This statement was misleading under the circumstances because it implied that Dynagas had been able to secure long-term contracts that were "improved" from, or at least not worse than, the existing contracts and because Lauritzen omitted the fact that Dynagas had not only failed to secure an improved time charter rate on the *Arctic Aurora* when its contract was "continued" two months prior but had failed to obtain even the same rate the ship had previously commanded from the charterer.

87.     Also, on the conference call, Lauritzen addressed an analyst's question about the future of Dynagas's historically large and consistent distribution.  Lauritzen admitted that the then-current distribution level – which had been constant for three years at 42.25 cents per quarter, per share – was under review, but he falsely assured the public that the forthcoming adjusted quarterly distribution rate would be sustainable in the long term, based on the predictable revenue derived from the Company's charter contracts.  The colloquy was as follows:

> [Analyst:] I was wondering if we can get some additional color around the distribution; in particular, how low of a cash balance and coverage ratio would you be comfortable with until the new contract start in 2019? And are you committed to the current distribution level or is there a possibility that that might be reduced in the coming quarters?

> [Lauritzen:] We're not looking at the near-term as we have to look at the long-term as far as the distribution is concerned because once our Yamal contract start [sic] we have a very good visibility of what our cash flows will look like. What I can say is, it's an ongoing analysis, we would like to end up with a distribution coverage of above one-times which is sustainable for the longer term. And we're very fortunate because we can use the word long-term because we held it long time, the long-term contracts which is a necessary ingredient for having sustainable distribution, so that's what I can say at this point.

88.     Lauritzen's statement was materially false and misleading when made because, in fact, the forthcoming distribution level was not "sustainable for the longer term" because the fixed revenue from Dynagas's long-term contracts, including those newly entered into for the *Arctic*

*Aurora* and the *Ob River*, would not support it.  Lauritzen knew that the statement was false because, as the CEO, he was well aware of the terms of the Company's charter contracts for the *Arctic Aurora*, the *Ob River*, and Dynagas's other ships.  Moreover, he knew his comments concerning the sustainability of the distribution were false and misleading because one-third of Dynagas's fleet was now operating under contracts that generated reduced revenue.

### G.  Dynagas Repeatedly Falsely Assures Investors That Its Current Distribution Is Sustainable Throughout Spring of 2018

89.     On April 18, 2018, Dynagas issued a press release announcing a reduction in the quarterly distribution to holders of its common stock, to $0.25 per share of common stock from the previous level of $0.4225 per share.  The press release quoted Lauritzen, who explained:  "[t]his decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution is necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term." Lauritzen further stated:

> The Partnership's Board of Directors believes that the new distribution level is in the best interest of the Partnership's common unitholders as ***it aligns the Partnership's cash flows with our cash payment obligations.*** The new distribution level is expected to provide the Partnership with approximately $24.5 million in annual cash savings in order to enhance our liquidity, strengthen our balance sheet and improve our distribution coverage ratio.  Although our pro-forma 2018 distribution coverage ratio is expected to be below 1x, ***we believe the new distribution level is viable on an actual cash basis*** since it reduces the Partnership's current need to utilize existing cash reserves to fund distributions to unitholders.

90.     Defendant Lauritzen's statement was knowingly false and misleading when it was made because:

(a)     Defendants Dynagas, Lauritzen and Gregos knew then that they would need to issue equity in order to sustain the 25-cent distribution level, despite

the assurances that the distribution could be sustained for the foreseeable future by the Company's "current cashflow profile"; and

> (b)      Defendants Dynagas, Lauritzen and Gregos expected the diminution of the Company's financial performance and had known that this diminution would necessitate the reduction in the distribution to shareholders unless market conditions improved, and new equity issued at favorable pricing.

91.     Approximately one month later, on May 16, 2018, Dynagas issued a press release discussing its financial results for the first quarter of 2018.  The press release stated that:  "the revised distribution level is expected to align the partnership's [Dynagas's] cash distributions with its capacity to generate cash flow in the long term," and quoted Lauritzen making a substantially similar comment:  "This decision by our Board of Directors to reduce the level of the Partnership's quarterly common unit distribution was necessary to align the Partnership's distribution level with its capacity to generate cash flow in the long term."

92.     The next day Dynagas held its first quarter 2018 earnings call to discuss, among other things, the Company's financial performance during the months of January, February and March of 2018.  Also on that call, Lauritzen explained in his prepared remarks that the April 2018 reduction of the distribution "was necessary to align the Partnership's [Dynagas's] distribution level with [its] capacity to generate cash flow in the long term."

93.     Gregos assured investors even more explicitly that the new distribution level (25 cents per quarter, per share) was sustainable.  Gregos said in his prepared remarks:

> We do find it noteworthy that certain analysts commented that a higher distribution reduction was necessary.  The board and the management felt it would be unwarranted for the new distribution to be based on overly pessimistic scenarios.
>
> Management does not believe in for the limited moving parts that can affect our financial performance.  Ultimately, distribution policy

31

reflects the boards and management expectations and is not based on scenarios which are unlikely to materialize.

The moving parts . . . are: how long and at what rate [t]he *Yenesei River* and the *Lena River* will be trading in the short term market, pending the delivery into their 15-year contracts, once their [current, long-term] contracts expire in Q3 of this year.

94.     Again, Defendant Gregos's statement was knowingly false because Defendants Dynagas, Lauritzen and Gregos knew then: (i) they would need to issue equity in order to sustain the 25-cent distribution level; (ii) that contingencies other than "extreme scenarios," threatened the Company's ability to maintain the 25-cent distribution level; and (iii) the Company's financial performance continued to diminish and that this diminution would necessitate a reduction in the distribution to shareholders unless market conditions improved and new equity issued at favorable pricing.

95.     Following the prepared remarks, questions from the public understandably focused on the sustainability of the distribution going forward, and Gregos and Lauritzen confirmed in their answers that the 25-cent distribution was sustainable.

96.     Gregos was asked: "So now that the distribution is more aligned with the suitable cash flow, do you feel like this current level is pretty easily sustainable in the coming quarters and years?" Gregos responded: "***Yeah, definitely***. What we want to achieve was this alignment. And as ***for the foreseeable future this distribution, as I mentioned before is sustainable***. Basically, the expectations that we have on the market, there are some moving parts as I mentioned, which are the *Lena River* and *Yenesei River*.[4] Again, how long they're going to be in [the spot] market

---

[4] The *Lena River* and the *Yenesei River* are other ships owned by Dynagas. The "moving parts" appears to refer to the rates they would command in short-term contracts in 2018, prior to the commencement of their 15-year contracts, for which rates had already been set. (Footnote added).

and what they'll make [therein].  ***But under a reasonable scenarios [sic]; yes, definitely this distribution is sustainable***."

97.     The above statements were materially false and misleading when made because the distribution was not sustainable for the foreseeable future, and was not sustainable under reasonable scenarios, because, as Defendants Dynagas, Lauritzen and Gregos knew, for years to come, Dynagas would receive substantially less revenue from its charter contracts on the *Arctic Aurora* and the *Ob River*, such that the distribution of 25 cents per quarter, per share was not sustainable.  Further, given the new rates and revenue, there was no economically feasible way to sustain the distribution, and ultimately, the Company was forced eliminate it altogether in June of 2019.

98.     Similarly, Lauritzen was asked by another analyst: "Is [there] a way that you can tell us what could be an extreme event that would force you to reduce this distribution based on the development of the spot charter rate Yamal for these vessels?" Lauritzen responded: "[ ] All I can say is that, we experience let's say extreme scenarios, which we're not, we don't believe it's going to happen.  Then that's something to be discussed, but that's more of a longer term discussion. It's not a near term discussion."

99.     This statement was materially false and misleading when made because it meant that only extreme and unexpected conditions would cause Dynagas to (further) reduce its distribution, when in fact Dynagas had already agreed to accept reduced revenue for one-third of its fleet, a condition which would force it to reduce its quarterly distribution and which cannot seriously be described as something that Defendants Dynagas, Lauritzen and Gregos did not believe was going to happen, ***because they knew it had already happened***.  Nor was the topic

accurately described as a "longer term discussion"; it was near-term discussion, given that the new

rates were scheduled to go into effect in the following quarter.

100.     This statement was further materially false and misleading because it omitted the

fact that new equity would need to be issued to maintain the distribution.  Notably, neither Gregos

nor Lauritzen indicated that any plan to maintain the then-current distribution levels depended on

the MLP market or Dynagas's ability to issue additional equity at favorable prices in the future

(the explanation that Gregos later gave, on March 22, 2019, when asked what had changed since

April 2018 to require a further cut).

101.     The presentation accompanying the May 17, 2018 call also repeated in substance

Dynagas's earlier false and misleading statements relating to the Company's ability to sustain the

distribution of 25 cents per quarter, per share.  The presentation stated:

> On April 12, 2018, following a strategic review of its financial
> profile and distribution policy, the Partnership's Board of Directors
> unanimously approved a plan to reduce the quarterly distribution on
> the Partnership's common units to $0.25 per common unit from
> $0.4225 per common unit, or from $1.69 per common unit to $1.00
> per common unit on an annualized basis. The revised distribution
> level is expected to align the Partnership's cash distributions with
> its capacity to generate cash flow in the long term, strengthen its
> balance sheet and improve its distribution coverage ratio.[5]

(footnote in original).

102.     This statement was materially false and misleading when made because the revised

quarterly distribution levels did not align with the Company's ability to generate cash flow in the

long term.  Defendants knew that the statement was false, or acted with reckless disregard to its

truth or falsity, because Defendants knew that Dynagas was already receiving reduced revenue

from its charter contract on the *Ob River* and, beginning in August, it would receive substantially

---

[5] Coverage ratio is the distributable cash flow available for distribution in proportion to actual cash distributed.

less revenue from its charter contract on the *Arctic Aurora*.  Defendants further knew that these unfavorable terms would, by agreement, continue for years into the future such that its capacity to generate cash flow in the long term did not align with the distribution of 25 cents per quarter, per share.

103.    The presentation also included a slide showing continuous employment of the *Ob River* and the *Arctic Aurora*, each with a single charterer, through the end of 2021, and which stated: "Long Term Contracts Provide Stable, Visible Cash Flows."  *See infra* Figure 3.

104.    This slide was misleading because it omitted the fact that Dynagas had agreed to accept a substantially lower rate for the *Arctic Aurora* beginning in August of 2018, and a substantially lower rate for the *Ob River* which was ***already in effect***.

**Figure 3**



105.     By way of contrast, in prior years, after the Company announced that another of its ships, the *Clean Force*, had entered a new charter contract to begin in 2015 immediately upon the completion of its then-current charter, the Company explicitly stated that the new contract was on more favorable terms, gave an estimate of the increased revenue, and distinguished the new contract on an analogous slide with a red box and bold white lettering on a dark field.  *See infra* Figure 4.

**Figure 4**



### H.   July 27, 2018:  Dynagas Is Forced to Reveal That the *Ob River* Is Employed at a Lower Rate, but Again Assures Investors the Distribution Is Safe

106.   On July 27, 2018, Dynagas issued a press release discussing its second quarter 2018 financial results.  The press release disclosed that the Company's earnings were lower than the previous quarter, lower than the second quarter of 2017, and lower than analysts' expectations.

107.   To explain the Company's reduced earnings, the press release stated that earnings were impacted by: "the completion of the multiyear charter contract with Gazprom for the *Ob River* in April 2018 and the subsequent employment of the vessel with the same company at a lower rate of hire reflecting a longer charter term of ten years."

108.   Defendants Dynagas, Lauritzen and Gregos still did not disclose that the *Arctic Aurora* would also be chartered for a lower rate of hire, beginning mere days later.  Notably, the contract for the *Arctic Aurora* going forward had been consistently described by the Company as a "***direct continuation*** of the current charter with Statoil," unlike the contract for the *Ob River*, which had not been described as a continuation.

109.   Defendants Dynagas, Lauritzen and Gregos also continued to falsely assure investors that the 25-cents-per-share distribution was sustainable for the long term. On a conference call with investors later that day (July 27, 2018), Gregos repeated the substance of the misstatement. On that call (Dynagas's Second Quarter 2018 earnings call), Gregos represented that the current dividend payout (representing a substantial yield) was sustainable based on expected cash flow from the subject contracts.  Gregos said:

> I think the maintaining this [distribution] we've already achieved that with our previous distribution realignment, I mean, *if you look at our cash flows, they're supported, the distribution is supported by our current cash flow profile for quite a long time*.

110.   This statement was materially false and misleading when made because Dynagas's distribution was not supported by its cash flow profile, given that yet another of its six LNG tanker ships was scheduled to begin a new contract  at a substantially reduced charter rate.

111.   This statement was further materially false and misleading when made because it omitted that, as Gregos has subsequently admitted, he and Lauritzen and Dynagas knew at the time that the distribution could only be supported by the issuance of new securities.

**I.     Dynagas Sells Series B Preferred Units Pursuant to Offering Materials That Contain Misstatements about the *Arctic Aurora***

112.   In an effort to conceal the Company's falling revenue and otherwise dire financial condition, Dynagas rushed to sell securities to unwary investors before the truth about its long-term contracts was revealed.  Dynagas found itself unable to issue new common stock at acceptably high prices because the market had not improved as its senior management had hoped.  However, Dynagas did sell 2.2 million Series B Preferred Units in the Offering.

113.   The October 18, 2018 final prospectus supplement (which is part of the Offering Materials) twice falsely referred to the *Arctic Aurora's* new charter as a "direct continuation" of the prior charter.  Specifically, it stated that on "August 2, 2018, the *Arctic Aurora* was delivered

38

to Statoil under a time charter contact with a firm period of three years +/- 30 days. This charter is in direct continuation of the vessel's previous charter with Statoil. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates." It further stated that "[o]n December 20, 2017, we entered into a new three-year charter agreement with Statoil for the employment of the *Arctic Aurora*. The new Statoil charter is expected to commence in the third quarter of 2018 in direct continuation of the vessel's current charter with Statoil (interrupted only by the vessel's mandatory statutory class five- year special survey and dry- docking) and will have a firm period of about 3 years +/- 30 days. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates." This statement was false because the new contract was not a direct continuation of the current charter but rather an entirely new contract on less favorable terms. It was further misleading in that it mentioned the possibility of escalated rates in the future but omitted the present reality of a reduced rate.

114.    The October 18, 2018 final prospectus supplement omitted the material fact that the new three-year charter for the *Arctic Aurora* provided significantly less revenue than the prior charter had provided and, thus, would not generate enough revenue to maintain the distributions at their present levels or at all, and created an impression that assured investors that cash flows from Dynagas's charters would support the then-current distribution rate.

115.    The fact that the new charter for the *Arctic Aurora* provided significantly less revenue than the prior charter was a material fact that was necessary in order to make the statement made about the "direct continuation" of the charter, in the light of the circumstances under which it was made, not misleading. As such, its omission from the Prospectus rendered the Prospectus false and misleading.

116.    The final prospectus supplement is deemed part of and included in the December

21, 2017 shelf registration statement pursuant to Item 512(a) of Regulation S-K and consistent

with SEC Rules 430B and 430C.

117.    Also, Dynagas's Registration Statement violated the mandates of Item 303 of SEC

Regulation S-K because it failed to disclose that the new charter for the *Arctic Aurora* provided

significantly less revenue than the prior charter.  Regulation S-K requires the filer of a registration

statement to:

> Describe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income from
> continuing operations.

17 CFR § 229.303(a)(3)(ii).

118.    A contract (charter here) defines the parties' future performance obligations and

duties.  By its very nature, it creates the known future trends concerning revenues earned/owed

under it, performance obligations and what, in the future, would constitute a breach.

119.    Therefore, Regulation S-K required that the Registration Statement disclose the

"known trend" of lower revenues under the very terms of the contract known to the contracting

parties.  The failure to do so rendered the Registration Statement materially false and misleading.

120.    The October 18, 2018 final prospectus supplement also incorporated by reference

those "Risk Factors" stated in the Company's Form 20-F for the Fiscal Year ended December 31,

2017, reproduced below:

> If any of our charters is terminated, we may be unable to re-deploy
> the related vessel on terms as favorable to us as our current charters,
> or at all. If we are unable to re-deploy a vessel for which the charter
> has been terminated, we will not receive any revenues from that
> vessel, and we may be required to pay ongoing expenses necessary
> to maintain the vessel in proper operating condition.  Any of these
> factors may decrease our revenue and cash flows.  Further, the loss
> of any of our charterers, charters or vessels, or a decline in charter
> hire under any of our charters, could have a material adverse effect

on our business, results of operations, financial condition and ability
to make distributions to our unitholders.

121.    In addition to being inadequate, the risk factors were themselves false and
misleading because they falsely implied that the *Arctic Aurora* had not **already** been employed at
a reduced charter rate, impacting the Company's ability to make distributions.  The reduced rate
for the *Arctic Aurora* had already been agreed to and, indeed, the *Arctic Aurora* had already been
delivered into the new contract.

122.    Thus, what the Offering Materials portrayed as merely a future, possible risk was,
in fact, a present, certain reality.

**J.      Dynagas Is Forced to Reveal the *Arctic Aurora* Is Also Employed under
a New Charter Contract at a Substantially Lower Rate**

123.    On November 15, 2018, Dynagas issued a press release discussing its third quarter
2018 financial results.  The earnings that the Company reported for the third quarter were lower
than its earnings for the second quarter, lower than its earnings for the third quarter of 2017, and
lower than analysts' expectations.

124.    In the press release, when explaining the disappointing financial results for the third
quarter of 2018, the Company revealed **for the first time** that the *Arctic Aurora's* current long-
term charter contract was not a direct continuation of its prior contract on substantially similar
terms, but rather a new contract that provided substantially less revenue to Dynagas.  Specifically,
in explaining the factors that impacted Dynagas's earnings, Defendant Lauritzen was quoted as
stating that "two of our vessels, the *Arctic Aurora* and the *Ob River*, commenced employment
under extended charter contracts with their respective charterers at **lower rates compared with the
previous charter contracts**."

125.    Although Dynagas had paid the expected 25-cent distribution in October, on a
conference call the following day, Gregos declined to confirm that the distribution was supported

41

by the Company's contracts, and suggested that the Company was re-evaluating the level of quarterly distribution, in response to a direct question:

> [Analyst]: And I guess lastly, is there any – with the whole 250 million kind of still outstanding for refinancing that, but obviously all of your vessels, like you said, fully contracted for many years. Is there any concerns, fears, questions about the current level of the distribution?
>
> [Gregos]: Well, listen, I mean, I can only give you a general answer here. I mean, we are reviewing how to maximize value going forward. As I said, the refinancing of our notes is a high priority, but we also are concerned that we're getting a little to no credit for the current distribution. And our current equity yield has kind of hinted our ability to grow. So we will be looking at how distribution can be used to improve the equity value overtime.

126.   This response from Gregos was in stark contrast to his and Lauritzen's assurances on the previous two earnings calls (in May and July) in which they readily assured investors that the distribution was sustainable based on the Company's cash flow profile, and that the distribution would only be threatened by unexpected and extreme scenarios.

127.   On this news, the price of Dynagas securities declined.  For example, the price of Dynagas common stock dropped from $7.76 per share to close at $6.69 on November 16, 2018.

128.   Indeed, the market understood that Dynagas's distribution to holders of its common stock was in serious doubt, given the less favorable long-term contracts on two of Dynagas's ships and the CFO's sudden refusal to confirm that the quarterly distributions were supported just three months after he assured investors that they were supported by the Company's cash flow.  As one analyst wrote in an article for *Seeking Alpha*, published on November 19, 2018, with respect to Dynagas common stock, "further distribution cuts could be on their way."

129.   In the weeks following the November 15th announcement, the price of Dynagas securities continued to slide, and its common stock closed at $4.08 on November 28, 2018.

**K.     Dynagas Slashes Its Distribution by 75% and Admits Its Cash Flow Profile Did Not Support the Prior Distribution**

130.    On Friday, January 25, 2019, Dynagas issued a press release announcing that the Company would cut its quarterly distribution another 75% – from 25 cents per share to 6.25 cents per share.

131.    Lauritzen explained that this drastic reduction was "necessary in order to retain more of the cash generated from the Partnership's long term contracts to maintain a steady cash balance." In substance, Lauritzen therefore admitted that the 25-cents-per-share distribution was not supported by the Company's cash flow profile.

132.    On this news, the price of Dynagas securities fell further.  For example, the price of Dynagas common stock fell from $4.02 per share at close on Friday, January 25, 2019 to $2.88 per share at close on Monday, January 28, 2019 – a drop of nearly 30%, and the price of Series A Preferred Units fell more than 10% in the same time.

**L.     Dynagas Further Reveals the Impact of the Fraud, and Gregos Admits Defendants Dynagas, Lauritzen and Gregos Had *Never* Expected the Company's Cash Flow to Sustain the 25-Cent Distribution**

133.    On March 21, 2019, after the market closed, Dynagas issued a press release concerning the Company's fourth quarter 2018 financial results. This was the first time that the Company released financial results for a quarter in which both the *Arctic Aurora* and the *Ob River* had operated under the new, less lucrative charter contracts throughout the entire quarter. Dynagas's press release reflected quarterly losses of approximately four cents per share, significantly worse than analysts' expectations.  *See, e.g.* Akanksha Bakshi, *Dynagas LNG Partners LP Misses by $0.11, Misses on Revenue*, March 21, 2019.

134.    Although Dynagas's performance missed analysts' expectations, management was not surprised.  Lauritzen stated in the release:

43

> Our reported earnings for the fourth quarter ended December 31,
> 2018 were in line with our expectations.  Compared to the same
> period in 2017, our fourth quarter earnings were impacted by the
> following occurrences:  (i) the decrease in revenues as a result of the
> *Arctic Aurora* and the *Ob River* commencing employment under
> extended charter contracts with their respective charterers at lower
> rates compared with the previous charter contracts.

135.    The following morning, Dynagas held a conference call with investors, which was the first such conference call since the January 25, 2019 announcement that the distribution to shareholders would be decreased.

136.    On that call, Lauritzen and Gregos were asked to explain why the distribution had been cut despite the assurances throughout 2018 that it would not be.

137.    Specifically, one caller asked: "And then just one more on the level of the distribution cut.  You mentioned a disconnect between the equity price and what's going on with the company's underlying operations. So I was curious, maybe what's changed in the rationale for the degree of the cut this time around versus the earlier cut back in April 2018?"

138.    After an extended and uncomfortable pause, and in a self-conscious and defensive tone, Gregos answered in relevant part: "So when we did our previous cut, we have assumed that the MLP market broadly would improve going forward and enable us and other MLPs to issue cheap equity.  Whereas, that didn't happen, and that is the reason why we had to make a second cut and a more severe cut that goes hand-in-hand and enables us to discuss a wide range of refinancing options."

139.    By giving this answer, Gregos ***explicitly admitted*** and unequivocally revealed that the prior statements by Defendants Dynagas, Lauritzen and Gregos described herein were ***knowingly false and misleading when they were made***:

> (a)    By this answer, Gregos admitted and revealed that Defendants
> Dynagas, Lauritzen and Gregos had known since at least April 2018 that they would
> need to issue equity in order to sustain the 25-cent distribution level, despite their

44

assurances that the quarterly distribution could be sustained for the foreseeable future by the Company's "current cashflow profile."

(b)     Gregos's answer further admitted and revealed that Defendants Dynagas, Lauritzen and Gregos had known since at least April 2018 that contingencies other than "extreme scenarios," including the simple failure of the securities markets to improve sufficiently, threatened the Company's ability to maintain the 25-cent distribution level.

(c)     Gregos's answer further admitted and revealed that Defendants Dynagas, Lauritzen and Gregos had – since at least April 2018 – expected the diminution of the Company's financial performance and had known that this diminution would necessitate the reduction in the distribution to shareholders unless market conditions improved, and new equity issued at favorable pricing.

140.    Dynagas did not pay *any* distribution to holders of its common stock for the second quarter of 2019.

141.    On September 19, 2019, the Company announced that it had entered into a five-year loan agreement in order to refinance its senior secured loan scheduled to come due on October 30, 2019, and to refinance its senior unsecured notes.  Dynagas further announced that, pursuant to its the new loan agreement, it is prohibited from paying a distribution to shareholders during the term of the agreement, notwithstanding that its partnership agreement requires such distributions as stated in the IPO Prospectus.  This has effectively eliminated any distributions to holders of Dynagas common stock until 2025, at the earliest.

## V.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

142.    As alleged herein, numerous facts raise a strong inference that Defendants knew the true facts concerning Dynagas's cash flow profile and the sustainability of its distribution. Because scienter is not an element of Plaintiffs' claims under the Securities Act, the allegations set forth in this section pertain only to Plaintiffs' claims under the Exchange Act.

143.    Defendant Gregos has publicly admitted that statements by himself, Lauritzen and Dynagas in 2018 to the effect that Dynagas's then-current cash flow profile supported its

distribution for years to come, and that only extreme and unforeseen scenarios could threaten the distribution, were knowingly false when made. Gregos admitted that at the time those statements were made, he, Lauritzen and Dynagas intended to support the distribution by selling more equity. Given that this sort of Ponzi scheme would be less attractive to investors than an investment in a business that was actually profitable, Gregos, Lauritzen and Dynagas were motivated to tell investors the latter, even though they knew the former was true.

144.    The timing of the December 21, 2017 registration statement on the day after *Arctic Aurora* was committed to a less favorable contract also supports the inference that Dynagas, Lauritzen and Gregos knew that the distributions could not be supported by the Company's revenue and intended to prop them up by selling securities.

145.    Additionally, as the CEO and CFO of Dynagas, Lauritzen and Gregos, respectively, were each necessarily aware of the essential terms of the new long-term contracts entered into by Dynagas for two of its six LNG tanker ships because such contracts are central to the operation and financial viability of the Company. By virtue of their senior positions, Lauritzen and Gregos each were involved in the evaluation and negotiation of the new contracts. In addition, Lauritzen and Gregos routinely reference their own individual and collective visibility into the terms of Dynagas's revenue sources, especially its long-term charter contracts, on investor conference calls.

146.    Dynagas was aware of the terms of its new, long-term charter contracts because it is a signatory to the contracts, and because such contracts are central to the operation and financial viability of the Company.

147.    Defendants Dynagas, Lauritzen and Gregos were motivated to make the misstatements alleged herein, and to conceal the negative information about Dynagas's new contracts and inability to sustain the distribution, to support the Offering at a favorable price, and

to support an offering of additional equity and/or debt securities at favorable prices.   Indeed, Dynagas even registered additional equity early in 2018, which it has been unable to sell.

148.   Defendant Lauritzen was further motivated to deliver continued financial benefits to Dynagas Holding and Prokopiou, and to maintain the apparent success of the scheme due to his family relationship with Prokopiou as Prokopiou's son-in-law.   Indeed, Lauritzen might reasonably expect to eventually inherit Dynagas Holding, and/or Prokopiou's other assets or a substantial portion thereof, given that Prokopiou is a close relative thirty years his senior.

149.   Dynagas Holding controlled Dynagas through its total ownership of Dynagas GP, its large ownership stake in Dynagas itself and its historical relationship with Dyanagas's senior management.   From 2014 through 2015, Dynagas Holding had "dropped down" three LNG tanker ships and has long suggested that it would "drop down" additional LNG tanker ships, as it has publicly stated on investor calls, in investor presentations and in SEC filings.

150.   As soon as the new, less favorable contract for the *Arctic Aurora* was signed, both Dynagas and Dynagas Holding sought to sell Dynagas securities to the public.   Indeed, on December 21, 2017 Dynagas filed a shelf registration statement, effective January 12, 2018, for up to $750 million worth of securities, which – if the market price remained high – would allow Dynagas to sustain its quarterly distribution (at the expense of new investors) despite its lack of profitability going forward.   In addition to the contemplated sale of securities by Dynagas, Dynagas Holding itself prepared to raise more than $180 million by selling a portion of its own Dynagas common stock to the public, as indicated and explicitly authorized by the same shelf registration statement.   Dynagas Holding therefore sought to benefit directly from the higher price of common stock with respect to these shares, because a higher share price would provide Dynagas Holding with more cash for its shares, immediately upon sale.

47

151.     Additionally, Dynagas Holding contemplated that it would sell up to three more ships to Dynagas in 2018.  A higher price of Dynagas's stock at the time of those drop downs and the attendant securities sales would mean that fewer shares would need to issue to finance the transaction, thereby reducing the dilution of Dynagas Holding's ownership.  Put another way, by inflating the price of Dynagas common stock, Dynagas Holding could cause Dynagas to obtain the same cash (which it could thereafter siphon back through drop downs and other self-dealing) with less dilution of Dynagas Holding's ownership stake.

152.     Dynagas Holding was therefore highly motivated to cause Defendants Dynagas, Lauritzen and Gregos to make the misstatements and omissions of material fact alleged herein to inflate the price of Dynagas common stock throughout 2018.

153.     Further, the formal legal structure of Dynagas Holding's relationship with Dynagas shielded Dynagas Holding from some of the potential risks wrought by the misstatements.

154.     Dynagas sold $55 million worth of a new series of preferred common units (Series B) in the Offering.  Defendants knew, by virtue of their sophistication and understanding of basic finance and economic principles, that negative information about the company – including the reduced revenue expected from the *Arctic Aurora's* "direct continuation" of its charter with Statoil and the Company's inability to sustain the distribution to holders of common stock – would prevent investors from purchasing the preferred common units at the price offered.  Defendants were therefore motivated to make the material misstatements and omissions described herein.

155.     Furthermore, Dynagas management was focused throughout 2018 on its efforts to refinance debt that would mature in 2019.  Defendants Dynagas, Lauritzen and Gregos have each stated publicly that those efforts were ongoing throughout most of 2018.  (Although those efforts were ultimately successful, they led to a complete elimination of the distribution – the feature that

48

had historically attracted investors to Dynagas stock).  Defendants Dynagas, Lauritzen and Gregos were motivated to make the material misstatements and omissions described herein because such misstatements and omissions gave the appearance of stability and profitability to potential lenders, including potential purchasers of Dynagas bonds, who would therefore be more likely to offer debt refinancing, or to offer debt refinancing at a more favorable rate.

156.    It had been clear to Defendants Dynagas, Lauritzen and Gregos since before April 2018 that contingencies other than "extreme scenarios," threatened the Company's ability to maintain the 25-cent distribution and that the diminution in the Company's financial performance necessitated a reduction in the distribution to shareholders unless market conditions improved and new equity issued at favorable pricing.  Defendants knew the current cash flow could never sustain the distribution.

157.    Yet, while Defendants Dynagas and Dynagas Holding profited from their misstatements, members of the Class lost tens of millions of dollars.

## VI.    LOSS CAUSATION

158.    Because loss causation is not an element of Plaintiffs' claims under the Securities Act, the allegations set forth in this section pertain only to Plaintiffs' claims under the Exchange Act.

159.    Defendants' misrepresentations and omissions of material fact alleged above artificially inflated the price of Dynagas securities during the Class Period.

160.    The artificial inflation created by Defendants' misrepresentations and omissions was removed from the prices of Dynagas's securities in direct response to information revealed in the disclosures alleged above, through which facts that partially corrected Defendants' prior

misrepresentations and omissions of material fact were revealed and/or the risks concealed by such misrepresented and omitted material facts partially materialized.

161.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.  Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and other Class members would not have purchased or otherwise acquired Dynagas securities, or would not have purchased or otherwise acquired securities at the artificially inflated prices that they paid, or would not have purchased call options or sold put options on the terms that they did. It was also entirely foreseeable to Defendants that misrepresenting and concealing these material facts would artificially inflate the price of Dynagas securities and that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Dynagas securities to decline.

162.   The economic loss, *i.e.* damages, suffered by Plaintiffs and other Class members directly resulted from Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's securities when the truth was revealed, and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.  As a result of the previously misrepresented and concealed material information and risks that were disclosed and/or realized on November 15, 2018, November 16, 2018, January 25, 2019 and March 21, 2019, and the corresponding substantial declines in the price of Dynagas stock as the market absorbed this information, Plaintiffs and other Class members have suffered economic loss.

## VII.   CLASS ACTION ALLEGATIONS

163.    This class action is brought on behalf of all individuals and entities who purchased Dynagas securities during the December 21, 2017 through March 21, 2019 Class Period, except Defendants and their affiliates.

164.    The Class is so numerous that joinder of all members is impracticable.  As of the close of business on January 31, 2019, approximately 35 million shares of Dynagas common stock were outstanding.  Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

165.    Questions of law and fact are common to the Class, including, among others: (i) whether certain Defendants violated the Exchange Act; (iii) whether certain Defendants violated the Securities Act; and (iii) whether and to what extent Defendants' conduct harmed Plaintiffs and other Class members.

166.    There is a well-defined community of interests in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)      Whether Defendants Dynagas, Lauritzen and Gregos, Prokopiou, and the Controlling Entity Defendants violated the Exchange Act;

(b)      Whether Defendants violated the Securities Act;

(c)      Whether Defendants omitted and/or misrepresented material facts;

(d)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct caused the Class members to sustain damages; and

(g)     The extent of damages sustained by Class members and the appropriate measure of damages.

167.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

168.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

169.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

170.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were

made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading based on then-existing conditions, and/or the forward-looking statement was authorized or approved by an executive officer of Dynagas who knew that the statement was false when made.

## IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

171.   Because reliance is not an element of Plaintiffs' claims under the Securities Act, the allegations set forth in this section pertain only to Plaintiffs' claims under the Exchange Act.

172.   At all relevant times, the market for Dynagas securities was efficient for the following reasons, among others:

> (a)   Dynagas stock and preferred units met the requirements for listing, and were listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;
>
> (b)   As a regulated issuer, Dynagas filed periodic reports with the SEC and the NYSE;
>
> (c)   Dynagas regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> (d)   Dynagas was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

173.   As a result of the foregoing, the market for Dynagas's securities reasonably promptly digested current information regarding Dynagas from all publicly available sources and reflected such information in the price of Dynagas's securities.   All purchasers of Dynagas

securities during the Class Period suffered similar injury through their purchase of Dynagas securities at artificially inflated prices, and a presumption of reliance applies.

174.     A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X.     CAUSES OF ACTION PURSUANT TO THE EXCHANGE ACT

### COUNT I

**On Behalf of Plaintiffs and the Class Against Defendants Dynagas, Lauritzen and Gregos for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

175.     Plaintiffs repeat and reallege each and every allegation set forth above (other than disclaimers of fraud) as if fully set forth herein.

176.     During the Class Period, Defendants Dynagas, Lauritzen and Gregos carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other Class members to purchase Dynagas securities and/or call options referencing Dynagas securities at artificially inflated prices and/or sell put options referencing Dynagas securities at artificially deflated prices.

177.     Defendants Dynagas, Lauritzen and Gregos: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Dynagas's securities in

violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

178.    Defendants Dynagas, Lauritzen and Gregos, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the long-term contracts for the *Ob River* and the *Arctic Aurora* and Dynagas's resulting inability to sustain its quarterly distribution.

179.    During the Class Period, Defendants Dynagas, Lauritzen and Gregos made the false statements specified above, which they knew to be false or misleading, or recklessly disregarded the truth or falsity of, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

180.    Defendants Dynagas, Lauritzen and Gregos had actual knowledge of the falsity of their misrepresentations and the misleading nature of their omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants Dynagas, Lauritzen and Gregos engaged in this misconduct to conceal the unfavorable terms of the contracts on the *Ob River* and the *Arctic Aurora* and Dynagas's resulting inability to sustain its distribution.

181.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dynagas securities.  Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid or purchased call options or sold put options on the terms that they did, or would not have transacted at all, had they been aware that the market prices for Dynagas securities had been artificially inflated by Dynagas's, Lauritzen's and Gregos's fraudulent course of conduct.

182.     As a direct and proximate result of Dynagas's, Lauritzen's and Gregos's wrongful conduct, Plaintiffs and the other Class members suffered economic loss and damages in connection with their respective purchases of the Company's securities, purchases of call options or sales of put options on Dynagas securities during the Class Period as the prior artificial inflation in the price of Dynagas securities was removed over time.

183.     By virtue of the foregoing, Defendants Dynagas, Lauritzen and Gregos violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**On Behalf of Plaintiffs and the Class Against Defendant Dynagas for Violations of Section 20A of the Exchange Act**

184.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein (other than disclaimers of fraud).  This count is predicated upon Dynagas's liability for making untrue statements and omissions of material fact related to the long-term contracts for the *Arctic Aurora* and Dynagas's resulting inability to sustain its distribution, and its scheme or artifice to defraud by funding distributions to existing shareholders by way of new investment.

185.     Dynagas possessed material nonpublic information about Dynagas's long-term charter contract for the *Arctic Aurora* and its inability to sustain its quarterly dividend based on its cash flow profile at the time of the Offering.

186.     Dynagas was prohibited from selling Dynagas securities while in possession of such material nonpublic information, a prohibition it violated by selling 2.2 million Series B Preferred Units during the Offering for $55 million (less underwriting fees and discounts) at prices that later disclosures, beginning less than a month later, demonstrated to be inflated.

187.     By reason of such conduct, Dynagas is liable under Section 20A of the Exchange Act to any Class member who purchased Dynagas's  securities contemporaneously with Dynagas's

October 2018 sales of Series B Preferred Units, including lead Plaintiff FNY and Plaintiff Braun.

188. Dynagas is also liable under Section 20A of the Exchange Act to any Class member who transacted in options referencing Dynagas securities contemporaneously with and directionally opposite to Dynagas's October 2018 sales of Series B Preferred Units.

189. Contemporaneously with Dynagas's sales, lead plaintiff FNY purchased Dynagas common stock and plaintiff Irving Braun purchased Dynagas Series B Preferred Units. Upon information and belief, hundreds or thousands of other Class members also purchased Dynagas securities or transacted in options referencing Dynagas securities contemporaneously with Dynagas's October 2018 sales in the Offering. As alleged in this Complaint, at the time of sales by Dynagas and purchases by Plaintiffs FNY, Braun and other Class members, the price of Dynagas securities was inflated because FNY, Braun and the investing public did not know that the long-term contract for the *Arctic Aurora* had been renewed at a substantially lower rate and that Dynagas was therefore unable to sustain its distribution.

190. Section 20A of the Exchange Act provides that

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

191. Dynagas sold Series B Preferred Units in the Offering while in possession of material nonpublic information about the long-term contract for the *Arctic Aurora* and Dynagas's resulting inability to sustain its distribution. Consequently, Dynagas is liable pursuant to Section 20A of the Exchange Act to any Plaintiff or Class member who purchased Dynagas securities, or

sold put options referencing Dynagas securities, contemporaneously with Dynagas's sales in the Offering.

## COUNT III

**On Behalf of Plaintiffs and the Class Against Defendants Dynagas GP, Dynagas Holding and Prokopiou for Violations of Section 20(a) of the Exchange Act**

192.    Plaintiffs incorporates each and every allegation set forth above (other than disclaimers of fraud) as if fully set forth herein.

193.    Defendant Prokopiou and the Controlling Entity Defendants acted as controlling persons of Dynagas within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

194.    Dynagas GP is, and was at all relevant times, the general partner of Dynagas. Dynagas GP therefore had the ability to control Dynagas and did control Dynagas with respect to the acts alleged herein.

195.    Dynagas Holding is the sole owner of Dynagas GP and owns 44% of Dynagas.  By virtue of its complete ownership of the General Partner, Dynagas Holding had the ability to control Dynagas, and did control Dynagas with respect to the acts alleged herein.  In addition, its large ownership interest and its historical relationship with Dynagas – including its actions in placing Lauritzen on the board and in the position of CEO, and Gregos (who previously served as commercial manager for Dynacom Tankers Management Ltd, which has ownership that overlaps with that of Dynagas Holding) as CFO – further enabled Dynagas Holding to exercise control over Dynagas.

196.    Prokopiou, had the ability to control Dynagas, Gregos and Lauritzen due to: (i) his position as chairman of Dynagas's board, (ii) his historical role as the Company's founder, (iii) his ownership of Dynagas Holding, and (iv) his status as the patriarch of the Prokopiou family, head

of the Prokopiou shipping empire, and father-in-law of Dynagas's CEO.  Prokopiou did control

Dynagas, Gregos and Lauritzen with respect to the acts alleged herein.

197.    By virtue of their high-level positions, participation in and/or awareness of the

Company's operations, direct involvement in the day-to-day operations of the Company, and/or

intimate knowledge of the Company's actual performance, and their power to control the

materially false and misleading public statements about Dynagas during the Class Period,

Defendant Prokopiou and the Controlling Entity Defendants had the power and ability to control

the actions of Dynagas and its officers and did in fact control the actions of Dynagas and its

officers.  By reason of such conduct, Defendant Prokopiou and the Controlling Entity Defendants

are liable pursuant to Section 20(a) of the Exchange Act.

## XI.    CAUSES OF ACTION PURSUANT TO THE SECURITIES ACT

### COUNT IV

**On Behalf of Plaintiff Braun and Other Class Members Against Defendant
Dynagas, the Director and Officer Defendants and the Underwriter Defendants for
Violations of Section 11 of the Securities Act**

198.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein, with the exception of any that could be construed as alleging fraud, scheme,

motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or other Class

members.  This Section 11 claim does not sound in fraud and Plaintiffs expressly disavow and

disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this

claim, which does not have scienter or fraudulent intent as required elements. To the extent that

these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are

incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter

or intentional conduct to defraud Plaintiffs or other Class members.  This count is predicated upon

Defendants' liability for making untrue statements and omissions of material fact in the Offering Materials.

199.    This count is brought against Dynagas, the Director and Officer Defendants and the Underwriter Defendants pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, on behalf of all class members who purchased or otherwise acquired Series B Preferred Units in or traceable to the offering or pursuant or traceable to the Registration Statement and were thereby damaged.  This count is based solely on claims of strict liability and/or negligence under the Securities Act.

200.    As set forth above, the Registration Statement, which incorporates the Prospectus, contained untrue, false and/or misleading statements of material fact, omitted material facts which were necessary to make those statements not misleading, and failed to disclose required material information, as set forth above.  In particular, the Registration Statement falsely stated that the *Arctic Aurora's* current long-term charter contract was in direct continuation of the vessel's previous charter with Statoil and omitted the material fact that the new charter contained less favorable terms, such that the Company would no longer be able to sustain its quarterly distribution based on its revenue. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

201.    Dynagas is the registrant of the Offering and, as issuer of the shares, it is strictly liable to Plaintiffs and to the Class members who purchased Series B Preferred Units in or traceable to the Offering or pursuant or traceable to the Registration Statement for the materially untrue statements and omissions that appeared in or were omitted from the Registration Statement.

202.    The Director and Officer Defendants each signed the December 21, 2017 prospectus incorporated into the Registration Statement as directors and/or officers of Dynagas

and are liable for the Offering made pursuant to such registration statement. By virtue of their signing of the Registration Statement and the authorization of the Prospectus pursuant to the Registration Statement, they issued, caused to be issued and participated in the Registration Statement. The Director and Officer Defendants are also deemed to have signed the October 18, 2018 final prospectus supplement because Item 512(a) of Regulation S-K requires a shelf registrant to agree that, consistent with SEC Rules 430B and 430C, information in prospectus supplements is deemed part of and included in the applicable registration statement as of specified dates.

203.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein. The Defendants failed to conduct a reasonable investigation and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misleading.

204.    Each of the Director and Officer Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statement. These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true and not misleading, and that there were no omissions of any material fact. Accordingly, these Defendants acted negligently, and are liable to Plaintiffs and the other Class members who purchased or otherwise acquired the Dynagas Series B Preferred Units in or traceable to the Offering.

205.    The Underwriter Defendants were underwriters for the Offering. As alleged above, the Underwriter Defendants purchased, sold, and distributed the Series B Preferred Units to the

investing public.  As such, the Underwriter Defendants are statutory underwriters pursuant to 15 U.S.C. 77b(a)(11).

206.    Each of the Underwriter Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statement. The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true and not misleading, and that there were no omissions of any material fact. Accordingly, the Underwriter Defendants acted negligently, and are liable to Plaintiffs and the other Class members who purchased or otherwise acquired the Series B Preferred Units in or traceable to the Offering.

207.    Plaintiff Braun and other Class members purchased Dynagas Series B Preferred Units issued under or traceable to the Registration Statement.

208.    Plaintiff Braun and other Class members did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained in the Registration Statement when they purchased or otherwise acquired the Series B Preferred Units of Dynagas.

209.    Plaintiff Braun and other Class members who purchased Series B Preferred Units pursuant or traceable to the Registration Statement have sustained damages and are entitled to damages pursuant to 15 U.S.C. § 77k(e), as they either sold these shares at prices below the Offering prices or still held shares as of March 21, 2019, when the prices and trading value of the Series B Preferred Units were below the Offering prices.

210.    By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

## COUNT V

**On Behalf of Plaintiff Braun and Other Class Members Against Dynagas and the Underwriter Defendants for Violations of Section 12(a)(2) of the Securities Act**

211.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct by the Defendants to defraud Plaintiffs or other Class members.  This Section 12 claim does not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or other Class members.  This count is predicated upon the Underwriter Defendants' liability as statutory sellers pursuant to the Prospectus.

212.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and all other Class members who purchased Dynagas Series B Preferred Units in the Offering and against Dynagas and the Underwriter Defendants.

213.    Defendant Dynagas was a seller, offeror, and/or solicitor of sales of the Series B Preferred Units offered pursuant to the Offering Materials in the Offering.

214.    Defendant UBS was a seller, offeror, and/or solicitor of sales of the Series B Preferred Units offered pursuant to the Prospectus in the Offering.

215.    Defendant Stifel was a seller, offeror, and/or solicitor of sales of the Series B Preferred Units offered pursuant to the Prospectus in or traceable to the Offering.

216.    Defendant Morgan Stanley was a seller, offeror, and/or solicitor of sales of the Series B Preferred Units offered pursuant to the Offering Materials in the Offering.

217.    Defendant B. Riley was a seller, offeror, and/or solicitor of sales of the Series B Preferred Units offered pursuant to the Prospectus in or traceable to the Offering.

218.    Each of the Underwriter Defendants sold Dynagas Series B Preferred Units pursuant to the Prospectus directly to Plaintiff Braun and/or other Class members.  Defendant Dynagas sold its Series B Preferred Units to Plaintiff Braun and/or other Class members through the Underwriter Defendants.  Plaintiff Braun bought Series B Preferred Units from Underwriter Defendant B. Riley or its duly authorized agent in the Offering pursuant to the Prospectus.

219.    The Underwriter Defendants transferred title to Dynagas Series B Preferred Units to Plaintiff Braun and other Class members who purchased such Units in the Offering and transferred title of such Dynagas Series B Preferred Units to other underwriters and/or broker-dealers that sold those Units as agents for the Underwriter Defendants. The Underwriter Defendants also solicited the purchase of Dynagas Series B Preferred Units in the Offering by Plaintiffs and/or Class members who purchased in the Offering by means of the Prospectus, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interests and the interests of Dynagas, including but not limited to earning commissions on the sale of Dynagas Series B Preferred Units in the Offering.  Dynagas paid the Underwriter Defendants $1,732,500, or about .79 cents per Unit, in discounts and commissions.

220.    The Prospectus contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

221.    Plaintiff Braun and other Class members who purchased Dynagas Series B Preferred Units from the Underwriter Defendants and/or their duly authorized agents in the Offering made such purchases pursuant to the materially untrue and misleading Prospectus, and

64

did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

222.    Plaintiff Braun and other Class members who purchased the Dynagas Series B Preferred Units in the Offering from the Underwriter Defendants and/or their duly authorized agents pursuant to the Prospectus suffered substantial damages as a result of the untrue statements and omissions of material facts therein, as they either sold these Units at prices below the Offering prices or still held such Units as of the date of this Complaint, when the prices and trading value of the Series B Preferred Units are below the Offering prices.

223.    Plaintiff Braun and other Class members who purchased Dynagas Series B Preferred Units in the Offering pursuant to the Prospectus and still hold those Units have sustained substantial damages as a result of the untrue statements of material facts and omissions contained therein, for which they hereby elect to rescind and tender their Series B Preferred Units to the Underwriter Defendants in return for the consideration paid and interest thereon.  Those Class members who have already sold their Series B Preferred Units acquired in the Offering pursuant to the materially untrue and misleading Offering Materials are entitled to damages from Dynagas and the Underwriter Defendants.

224.    Plaintiff Braun and other Class members who purchased the Dynagas Series B Preferred Units pursuant to the Prospectus are entitled to damages from Dynagas and the Underwriter Defendants.

225.    By virtue of the foregoing, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

**COUNT VI**

**On Behalf of Plaintiff Braun and Other Class Members Against the Controlling Entity Defendants and the Director and Officer Defendants for Violations of Section 15 of the Securities Act**

226.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, with the exception of any that could be construed as alleging fraud, recklessness or intentional misconduct.  This Section 15 claim does not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, motive, scienter or intentional conduct as part of this claim, which does not have scienter or fraudulent intent as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter or intentional conduct to defraud Plaintiffs or other Class members. This count is predicated upon Defendants' liability for making false and materially misleading statements in the Offering Materials.

227.     This Count is asserted against the Controlling Entity Defendants and the Director and Officer Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all Class members who purchased or otherwise acquired Dynagas units issued pursuant to the Offering Materials.

228.     At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Prokopiou, at the time of the filing of the Registration Statement and the Offering, served as chairman of the board of directors. Defendant Lauritzen, at the time of the filing of the Registration Statement and the Offering, served as Dynagas's CEO and a member of its board.  Defendant Gregos, at the time of the filing of the Registration Statement and the Offering, served as Dynagas's CFO. The Director and Officer Defendants approved the Offering and reviewed and approved the Registration Statement and

66

Prospectus. Prokopiou and the Controlling Entity Defendants exercised control over Dynagas through their financing of the Company, significant share ownership of the Company during the Class Period and having their own senior executives, and executives over which they exercised control, on the Dynagas board of directors during the Class Period.

229.    By reason of their control over primary violators of the Securities Act (Dynagas, Lauritzen, Gregos, Vlahoulis, Rodopoulos, and Dedegian), the Controlling Entity Defendants and Prokopiou were able to: (i) gain access to all Dynagas reports, agendas and other information available to Defendants Lauritzen, Gregos, Vlahoulis, Rodopoulos, and Dedegian; (ii) participate in the preparation and dissemination of the materially misstated Offering Materials through Defendants Lauritzen, Gregos, Vlahoulis, Rodopoulos, and Dedegian ; and (iii) otherwise exercise control over Dynagas's public filings and Offerings.

230.    The Director and Officer Defendants and the Controlling Entity Defendants, prior to and at the time of the Offering, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Dynagas's business affairs, including the Offering.

231.    At all relevant times herein, the Director and Officer Defendants were controlling persons of the Partnership within the meaning of §15 of the Securities Act. Both before and after the Offering, Lauritzen and Gregos were executive officers of the Company and participated its day-to-day operations. The Director and Officer Defendants had the power to influence, and did so influence, the Company's unlawful actions in connection with the Offering alleged herein.

232.    As directors and/or officers of a company engaging in the Offering of its securities, the Director and Officer Defendants had a duty to disseminate accurate and truthful information with respect to Dynagas's business, financial condition and results of operations. These

Defendants participated in the preparation and dissemination of the Offering Materials, and otherwise participated in the process necessary to conduct the Offering.  Because of their positions of control and authority as directors and/or senior officers of Dynagas, these Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information and failed to disclose material facts.

233.    By reason of the aforementioned conduct, the Controlling Entity Defendants and the Director and Officer Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Dynagas is liable under Sections 11 and 12 of the Securities Act, to Plaintiff Braun and other Class members who purchased or otherwise acquired Series B Preferred Units issued pursuant to the Offering Materials.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and other Class members against Dynagas, Lauritzen, Gregos, Prokopiou and the Controlling Entity Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Exchange Act, in an amount to be proven at trial, including interest thereon;

C.    Awarding compensatory damages in favor of Plaintiff Braun and other Class members against all Defendants for their violations of the Securities Act, jointly and severally to the extent permitted by law, in an amount to be proven at trial, including interest thereon;

D.    Declaring that those Class members who continue to hold Dynagas Series B Preferred Units have the right to rescind their purchases of Dynagas Series B Preferred Units from Dynagas and the Underwriter Defendants and ordering that Dynagas and the Underwriter

Defendants accept the return of all tendered Dynagas Series B Preferred Units in exchange for the purchase price paid plus interest;

E.      Declaring that (i) Defendants Dynagas, Lauritzen and Gregos violated Section 10(b) of the Exchange Act as well as Rule 10b-5 promulgated thereunder; (ii) that Defendant Dynagas violated Section 20A of the Exchange Act; (iii) that Defendant Prokopiou and the Controlling Entity Defendants violated Section 20(a) of the Exchange Act; (iv) that Dynagas, the Director and Officer Defendants and the Underwriter Defendants violated Section 11 of the Securities Act; (v) that Dynagas and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act; and (vi) that the Controlling Entity Defendants and the Director and Officer Defendants violated Section 15 of the Securities Act.

F.      Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## XIII.  <u>JURY DEMAND</u>

Plaintiffs respectfully demand a trial by jury on all issues so triable.

DATED:  September 26, 2019                    Respectfully Submitted,

*/s/ Andrew J. Entwistle*
Andrew J. Entwistle
Robert N. Cappucci
Brendan J. Brodeur
Sean M. Riegert
Rebecca H. Arnall
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
aentwistle@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com
sriegert@entwistle-law.com
rarnall@entwistle-law.com

*Counsel for Plaintiffs FNY Partners Fund
LP, Mario Epelbaum, Scott Dunlop and
Irving Braun and Lead Counsel for the
Class*

Curtis V. Trinko
**LAW OFFICES OF CURTIS V. TRINKO**
39 Sintsink Drive West
First Floor
Port Washington, New York 11050
Telephone: (212) 490-9550
Facsimile: (212) 986-0158
ctrinko@trinko.com

*Additional Counsel for Plaintiff Irving
Braun*

70