**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DYNAGAS LNG PARTNERS LP SECURITIES LITIGATION | No. 1:19-cv-04512 (AJN) <br><br> ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF THE DYNAGAS ENTITY DEFENDANTS AND THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ...................................................................................................1

BACKGROUND ....................................................................................................................4

    A. The Parties ..............................................................................................................4

    B. Dynagas' Business and LNG Carrier Acquisitions ................................................4

    C. Before the Class Period, Dynagas Discloses that It Entered Into New Charters
       for Two of Its LNG Carriers .....................................................................................5

       1. *Ob River* Long-Term Charter Agreement ........................................................5

       2. *Arctic Aurora* Long-Term Charter Agreement..................................................6

    D. Dynagas Files a Shelf Registration Statement .......................................................7

    E. Dynagas Reduces Its Quarterly Distribution to Align the Level with Long-
       Term Cash Flow........................................................................................................8

    F. Dynagas Sells Series B Preferred Units...................................................................9

    G. Responding to Shifting Conditions in the Debt Capital Markets, Dynagas
       Further Reduces the Quarterly Distribution............................................................10

    H. End of the Class Period..........................................................................................12

    I. Plaintiffs' Claims ...................................................................................................13

ARGUMENT ......................................................................................................................14

    I. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 10(B)
      AND RULE 10B-5 ...................................................................................................14

      A. The Complaint Does Not Adequately Allege a False or Misleading Statement
         Regarding the New Charter Agreements .................................................................15

        1. Dynagas Disclosed the New Charter Rate for the *Ob River* .......................16

        2. The New Charter Rate for the *Arctic Aurora* Was Reasonably Available to
           Investors ....................................................................................................20

      B. The Amended Complaint Does Not Adequately Allege Any False or
         Misleading Statement Regarding the Sustainability of the Distribution ...................22

        1. Plaintiffs' Contention That Dynagas' Predictions Were Unachievable When
           Made Is Unsupported By Any Well-Pled Factual Allegation .................................23

        2. Plaintiffs Fail Plausibly to Allege the Falsity of Management's Statements of
           Opinion Regarding the Distribution ...........................................................25

        3. The Company's Forward-Looking Statements Are Protected Under the
           PSLRA Safe Harbor ..................................................................................26

      C. Plaintiffs Fail to Plead Any Facts Giving Rise to an Inference of Scienter,
         Much Less the Requisite "Strong Inference"..........................................................28

1.  Plaintiffs' Motive and Opportunity Allegations Are Insufficient ............................28

2.  Plaintiffs' Allegations of Conscious Misbehavior or Recklessness Are Insufficient.................................................................................................31

II.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20A .................35

III. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)...............36

IV. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11, 12(a)(2), OR 15 OF THE SECURITIES ACT .......................................................37

**CONCLUSION** ........................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175 (D. Conn. 2014) ....................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................4

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .............2, 15, 28, 36

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................19

*Brady v. Top Ships Inc.*, 2019 WL 3553999 (E.D.N.Y., Aug. 5, 2019) .......................................39

*Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996) ..........................................29

*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ..........................5, 16, 19

*Doron Precision Systems, Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) ........................................20

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009).........................................29, 36

*Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) ...........................37, 38

*Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882 (E.D. La. 2014) .....................................16

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ...........................................36

*Gissin v. Endres*, 739 F. Supp. 2d 488 (S.D.N.Y. 2010) ...................................28

*Goplen v. 51Job, Inc.*, 453 F. Supp. 2d 759 (S.D.N.Y. 2006) ................................23

*Gould v. Windstar Communications, Inc.*, 692 F.3d 148 (2d. Cir. 2012)....................................31

*Greene v. United States*, 79 F.3d 1348 (2d Cir. 1996)..................................24

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*, 2019 WL 4601644 (S.D.N.Y. Sept. 20, 2019)..............................25, 26, 29

*Holland v. JPMorgan Chase Bank, N.A.*, 2019 WL 4054834 (S.D.N.Y. Aug. 28, 2019) ..............................................20

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Group, P.L.C.*, 783 F.3d 383 (2d Cir. 2015)........................................15

*In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............31, 37

*In re Avon Products, Inc. Securities Litigation*, 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009), *report adopted at* 2009 WL 10698359 (Mar. 18, 2009)...................................19

*In re Bear Stearns Cos., Securities, Derivative, & ERISA Litigation*, 763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................................................35

*In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ........................................................................................19

*In re Centerline Holding Co. Securities Litigation*, 380 F. App'x 91 (2d Cir. 2010) .....................................................................................................19

*In re EDAP TMS S.A. Securities Litigation*, 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) ...................................................................................................32

*In re Emex Corp. Securities Litigation*, 2002 WL 31093612 (S.D.N.Y. Sept. 18, 2002) ....................................................................................................30

*In re Express Scripts Holding Co. Securities Litigation*, 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ................................................................................16

*In re GeoPharma, Inc. Securities Litigation*, 411 F. Supp. 2d 434 (S.D.N.Y. 2006)...................32

*In re JP Morgan Auction Rate Securities (ARS) Marketing Litigation*, 2014 WL 4953554 (S.D.N.Y. Sept. 30, 2014) .............................................................16

*In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ....................................................................................................30

*In re Lehman Bros. Mortgage-Backed Securities Litigation*, 650 F.3d 167 (2d Cir. 2011) ....................................................................................................40

*In re Lone Pine Resources, Inc.*, 2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014).........................40

*In re Loral Space & Communications Ltd. Securities Litigation*, 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ...........................................................................23, 24

*In re MBIA, Inc. Securities Litigation*, 700 F. Supp. 2d 566 (S.D.N.Y. 2010)............................19

*In re Progress Energy, Inc. Securities Litigation*, 371 F. Supp. 2d 548 (S.D.N.Y. 2005) ....................................................................................................17

*In re PXRE Group, Ltd., Securities Litigation*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) ....................................................................................................30

*In re Refco, Inc. Securities Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) .............................35

*In re Rockwell Medical, Inc. Securities Litigation*, 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018)..........................................................................................................19

*In re Salomon Analyst Level 3 Litigation*, 350 F. Supp. 2d 477 (S.D.N.Y. 2004) .................23, 24

*In re Sanofi Securities Litigation*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)...................................................26, 27

*In re Seadrill Ltd. Securities Litigation*, 2016 WL 3461311 (S.D.N.Y. June 20, 2016) ....................................................................................................................15

*In re Supercom Inc. Securities Litigation*, 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ....................................................................................................................25

*In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ....................................................................................................................35

*In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir. 1993) .....................................19

*In re Top Tankers, Inc. Securities Litigation*, 528 F. Supp. 2d 408 (S.D.N.Y. 2007) ....................................................................................................................39

*In re UBS AG Securities Litigation*, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).....................32

*In re UBS Auction Rate Securities Litigation*, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ...................................................................................................................16

*In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016)..........................................23

*In re Zyprexa Products Liability Litigation*, 549 F. Supp. 2d 496 (E.D.N.Y. 2008)....................19

*Jackson National Life Insurance Co. v. Merrill Lynch & Co.*, 32 F.3d 697 (2d Cir. 1994) ...................................................................................................................35

*Kahn v. Wien*, 842 F. Supp. 667 (E.D.N.Y. 1994).................................................................18, 20

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) .....................................................................29, 31

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .........................................16

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .........................................................17

*Landow v. Wachovia Securities, LLC*, 966 F. Supp. 2d 106 (E.D.N.Y. 2013).............................18

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006).............................36

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007)................................................14

*Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019)...................................24

*Levitt v. J.P. Morgan Securities, Inc.*, 710 F.3d 454 (2d Cir. 2013)......................................19, 22

*Livingston v. Cablevision Systems Corp.*, 966 F. Supp. 2d 208 (E.D.N.Y. 2013)........................19

*Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015).........................................................................32

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) .....................................................19, 22

*Micholle v. Ophthotech Corp.*, 2019 WL 4464802 (S.D.N.Y. Sept. 18, 2019)............................34

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*, 2010 WL
     1473288 (S.D.N.Y. Mar. 29, 2010) ................................................................................40

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .................................................................. *passim*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
     135 S. Ct. 1318 (2015)................................................................................................25, 38

*P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004).......................................27

*Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233 (S.D.N.Y. 2015).............................................39

*Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004)..........................23, 33

*Police & Fire Retirement System of Detroit v. La Quinta Holdings Inc.*, 2017 WL
     4082482 (S.D.N.Y. Aug. 24, 2017) ................................................................................20

*Renner v. Chase Manhattan Bank*, 2000 WL 781081 (S.D.N.Y. June 16, 2000) ........................30

*Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002) ............................................................................39

*Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................20

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .....................................................................21, 32

*S. Cherry St., L.L.C. v. Hennessee Group L.L.C.*, 573 F.3d 98 (2d Cir. 2009) .....................29, 31

*Silsby v. Icahn*, 17 F. Supp. 3d 348 (S.D.N.Y. 2014) ...................................................................29

*Slayton v. American Express Co.*, 604 F.3d 758 (2d Cir. 2010)......................................27, 28, 33

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33
     F. Supp. 3d 401 (S.D.N.Y. 2014) ................................................................................36

*Staehr v. Hartford Financial Services Group Inc.*, 547 F.3d 406 (2d Cir. 2008)..................16, 18

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103 (2d
     Cir. 2005) ................................................................................................................18, 20

*Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000)..............................................39

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir. 1999) ......................................................23

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015).....................................19, 22, 32

*Tabak v. Canadian Solar Inc.*, 549 F. App'x 24 (2d Cir. 2013) ......................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...........................................2, 28

*Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010)......................................................19

*Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)................................................................................25

*United States v. Teicher*, 987 F.2d 112 (2d Cir. 1993) ...................................................................36

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156
    (S.D.N.Y. 2015)............................................................................................................................20

*Werner v. Werner*, 267 F.3d 288 (3d Cir. 2001)........................................................................18, 20

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011).........................................................16

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. § 77k..................................................................................................................................38

15 U.S.C. § 77*l*.................................................................................................................................38

15 U.S.C. § 77o..................................................................................................................................40

15 U.S.C. § 78t-1 ...............................................................................................................................35

15 U.S.C. § 78u-4 ...................................................................................................................1, 15, 28

15 U.S.C. § 78u-5 ..............................................................................................................................26

Defendants Dynagas LNG Partners LP ("Dynagas," the "Company," or the "Partnership"), Dynagas GP, LLC, and Dynagas Holding Ltd. (collectively, the "Dynagas Entity Defendants"), UBS Securities LLC ("UBS"), Stifel, Nicolaus & Company, Incorporated ("Stifel"), Morgan Stanley & Co. LLC ("Morgan Stanley"), and B. Riley FBR, Inc. ("B. Riley," and collectively with UBS, Stifel and Morgan Stanley, the "Underwriter Defendants") submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws, Dkt. 50 (the "Complaint"), in its entirety pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).[1]

## SUMMARY OF ARGUMENT

Dynagas is an owner and operator of high specification liquefied natural gas ("LNG") carriers.  During the putative class period (the "Class Period"), which spans from December 21, 2017 through March 21, 2019, Dynagas owned and operated six tanker ships designed to transport LNG.  Since its initial public offering ("IPO") in 2013 and until recently, the Company had paid a quarterly distribution to its shareholders (sometimes referred to as "unitholders") of at least 25 cents per share.  However, Dynagas has always made clear in its SEC filings that its ability to pay a quarterly distribution was contingent upon many factors, including factors outside of the Company's control.  *See, e.g.*, Ex. 1 (Mar. 20, 2017 Form 20-F), at 4-10 (listing risk factors that could affect the distribution).[2]

---

[1] Plaintiffs bring claims against the Underwriter Defendants exclusively under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") in connection with the Registration Statement and Prospectuses filed with the Securities and Exchange Commission ("SEC") regarding Dynagas' October 2018 offering of 2.2 million Series B Preferred Units (the "Offering").

[2] All exhibits referenced herein ("Ex.") are attached to the Declaration of Jeremy T. Adler, filed herewith.  Defendants reference various SEC filings and public statements, upon which Plaintiffs

Despite these repeated warnings, Plaintiffs try to fashion securities fraud claims out of the Company's reasonable business decision in January 2019 to reduce its distribution.  Plaintiffs do not (nor could they) allege that the Company guaranteed a certain level of quarterly distribution. Instead, Plaintiffs challenge two types of statements: (1) statements concerning the Company's new long-term charter contracts for two of its vessels—the *Ob River* and the *Arctic Aurora*; and (2) statements of the Company's belief that it could maintain its quarterly distribution level based on then-existing circumstances.  But Plaintiffs fail adequately to allege that any challenged statement was false or misleading at the time it was made, or that any defendant made any false or misleading statement with the requisite level of scienter.

*First*, Plaintiffs incorrectly assert that the challenged statements regarding Dynagas' new charter agreements were false or misleading because Dynagas allegedly failed to disclose that those agreements had lower daily rates than the agreements they replaced.  However, Dynagas disclosed either that the new rates would be lower or information from which an investor could easily determine that fact.  Moreover, none of the statements at issue said or implied anything about charter rates, and therefore could not have been misleading.

*Second*, the challenged statements regarding the sustainability of the distribution amount are non-actionable statements of opinion or forward-looking statements protected by the PSLRA safe harbor.  The mere fact that the Company was ultimately forced to reduce and then eliminate the distribution says nothing about whether the Company truly believed that the distribution

---

rely, or which they reference in the Complaint, or of which the Court may take judicial notice. *See infra* nn. 16, 18-20, 22; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (on motion to dismiss, court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, . . . documents known to the plaintiff and upon which it relied in bringing the suit.").

amount was sustainable at the time of the challenged statements, *before* the downturn of the debt capital market.  Beyond hindsight, the Complaint does not allege any well-pleaded facts suggesting that any defendant expressed an opinion that was not truly held based on information available at the time the statement was made.

*Third*, Plaintiffs' Exchange Act claims fail for the additional reason that the Complaint does not allege facts that raise a strong inference of scienter.  Plaintiffs have not adequately alleged that the individuals responsible for making the challenged statements (or Dynagas itself) had a motive and opportunity to engage in fraud.  They instead allege only generic corporate motives that do not give rise to a compelling inference of scienter.  Nor have Plaintiffs adequately alleged that these individuals acted consciously or recklessly, because the Complaint fails to provide any well-pleaded facts (such as confidential witness statements or internal documents) suggesting that any defendant knew or had access to any information inconsistent with the Company's public statements.  On the contrary, the Company's disclosures regarding the new charter rates rebut any inference of fraudulent intent.  These disclosures defeat Plaintiffs insider trading claim as well.

*Fourth*, Plaintiffs' failure to allege any false or misleading statements is fatal to their claims under the Securities Act against Dynagas and the Underwriter Defendants based on alleged misstatements and omissions in the Company's Registration Statement and Prospectuses. The Court should dismiss those claims as well on the same basis.

For these and other reasons set out below, the Court should dismiss the Complaint with prejudice.

## BACKGROUND[3]

### A.     The Parties

Defendant Dynagas is a shipping company based in Monaco.  Compl. ¶ 35.  Dynagas is

organized as a limited partnership, is listed on the New York Stock Exchange under the ticker

symbol "DLNG," and trades common stock, Series A Preferred Units, and Series B Preferred

Units.  *Id.* ¶ 36.  During the putative Class Period, the Company owned and operated six carriers

designed to transport LNG.  *Id.* ¶¶ 4, 35.  Defendant Dynagas Holding Ltd. is a corporation

wholly owned by the family of George J. Prokopiou, who served as Chairman of Dynagas'

Board of Directors.  *Id.* ¶ 37, 41.  The family wholly owns and operates several other LNG

carriers.  *Id.* ¶ 37.  Dynagas Holding wholly owns Defendant Dynagas GP—the general partner

of the Company since its inception—and directly owns 43.9% of the Company.  *Id.* ¶¶ 38-39.[4]

Defendants UBS, Stifel, Morgan Stanley and B. Riley all served as underwriters of the

Company's October 2018 Offering.  *Id.* ¶¶ 49-52.

### B.     Dynagas' Business and LNG Carrier Acquisitions

Upon its inception in May 2013, Dynagas purchased three LNG carriers owned by

Dynagas Holding through "drop down" transactions funded by debt and equity issued by

Dynagas.  *Id.* ¶¶ 57, 60.  Those LNG carriers were already employed on long-term charter

contracts, thus providing Dynagas with predictable revenue.  *Id.* ¶ 60.

---

[3] The moving Defendants accept the well-pleaded factual allegations of the Complaint as true
solely for the purposes of this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
Defendants do not concede the truth of any such allegations and specifically reserve their rights
to contest the truth and accuracy of any allegations in the Complaint.

[4] The Complaint also asserts claims against various directors and officers of Dynagas (the
"Individual Defendants").  To date, Plaintiffs have not served the Complaint on the Individual
Defendants.

On November 13, 2013, Dynagas completed its IPO, through which it raised approximately $225 million.  *Id.* ¶ 61.  According to its IPO Prospectus, Dynagas' partnership agreement required it to distribute its "available cash" to stockholders on a quarterly basis as defined therein, and Dynagas announced its intention to make a minimum quarterly distribution of $0.365 per unit.[5]  *Id.* ¶ 63.  Between 2014 and 2017, Dynagas made quarterly distributions to holders of its common stock of at least $0.365 per unit.  *Id.* ¶ 64.

Over the course of 2014 and 2015, Dynagas conducted another three "drop down" transactions whereby Dynagas Holding sold Dynagas three more LNG carriers already committed to long-term charter contracts.  *Id.* ¶ 67.  Since the end of 2015, Dynagas has owned six LNG carriers, all of which it acquired from Dynagas Holding.  *Id.*  Dynagas sought to keep its entire fleet employed on long-term charter contracts and therefore negotiated new long-term contracts for each ship as its current charter contract was set to expire.  *Id.* ¶¶ 69-72.

## C.    Before the Class Period, Dynagas Discloses that It Entered Into New Charters for Two of Its LNG Carriers

### 1.    *Ob River* Long-Term Charter Agreement

On March 31, 2016, Dynagas announced that it had extended its current charter for the *Ob River* LNG carrier until May 1, 2018, and that it had entered into a new 10-year contract for the *Ob River* with the same charterer, to commence immediately upon the expiration of the prior charter.  *Id.* ¶ 70.  At the same time, Dynagas announced its new 15-year charter for another

---

[5] The Company's Partnership Agreement defines "available cash" as, *inter alia*, "the sum of . . . all cash and cash equivalents of the Partnership Group."  Ex. 2 (Nov. 12, 2013 IPO Prospectus) at Appendix A: Partnership Agreement at 2.  The IPO Prospectus also details that "In determining the amount of cash available for distribution, our board of directors approves the amount of cash reserves to set aside. . . ."  *Id.* at 44.  Plaintiffs incorporate this document in the Complaint by referencing this concept and the document itself.  *See* Compl. ¶¶ 2, 63, 141; *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991) (incorporating a stock purchase agreement that plaintiffs relied in bringing the suit).

LNG carrier, the *Lena River*, and disclosed in its filing with the SEC that the two new contracts

increased the Partnership's contracted revenue backlog from $586.2 million to $1.2 billion.  *Id*. ¶

71; Ex. 4 (Mar. 31, 2016 Form 6-K) at PDF p. 4.[6]

On the Company's December 6, 2017 quarterly investor conference call (approximately

two weeks before the start of the Class Period), Michael Gregos, the Company's Chief Financial

Officer, Compl. ¶ 43, disclosed that the new charter rate for the *Ob River* was lower than the

current rate: "In Q2 2018, the *Ob River* will enter its new 10-year contract with Gazprom at a

rate which will be about **35% lower than the current contract rate**."  Ex. 5 (Dec. 6, 2017

investor call transcript) at 5 (emphasis added).  Securities analysts disseminated this information

even further into the market.  For example, Wells Fargo reported that the "*Ob River*'s ~$85k/day

Gazprom charter ends this month and resets into a new 10-year Gazprom contract (with rates that

are roughly 34% lower)."  Ex. 6 (Apr. 23, 2018 Wells Fargo report) at 2.  Dynagas again

disclosed the *Ob River*'s reduced charter rate in the Company's July 27, 2018 press release.  *See*

Compl. ¶¶ 106-07.

         2.     *Arctic Aurora* **Long-Term Charter Agreement**

On December 20, 2017, Dynagas entered into a new three-year charter contract for the

*Arctic Aurora* LNG carrier with the same entity to which it was already chartered.  *Id*. ¶ 81.[7]

The Company described the new charter as being in "direct continuation" of the ship's current

charter.  *Id.* ¶¶ 76, 81, 84. 113.  The Company's December 21, 2017 and February 15, 2018 press

---

[6] A contract revenue backlog is calculated "by multiplying the contractual daily hire rate by the expected number of days committed under the contracts."  *See, e.g.*, Ex. 3 (May 17, 2018 Form 6-K) at PDF p. 8 n.3.  Thus, the backlog represents all revenues Dynagas expects to collect in the future from its already-signed, fixed-rate contracts.

[7] Plaintiffs mistakenly state that the new *Arctic Aurora* charter was for approximately 10 years, Compl. ¶ 72; as they acknowledge elsewhere in the Complaint, the new charter was for a three-year term.  *See id.* ¶¶ 9, 76, 81, 84, 113.

releases, as well as the Company's October 18, 2018 prospectus, all prominently described the charter agreement as being a "new" agreement. Ex. 7 (Dec. 21, 2017 Form 6-K) at PDF p. 4; Ex. 8 (Feb. 16, 2018 Form 6-K) at PDF p. 4; Ex. 9 (Oct. 18, 2018 Prospectus) at 11.

Before the new charter commenced, Dynagas disclosed to investors—in a February 15, 2018 presentation that the Company published on its website—that the *Arctic Aurora* charter "increases the Partnership's contracted revenue backlog by $61 million" over three years. Ex. 10 (Feb. 15, 2018 Presentation) at 3. Multiple analysts recognized and understood that this disclosure signified that the new charter rate for the *Arctic Aurora* was lower than the prior rate. *See* Ex. 11 (Feb. 16, 2018 Morgan Stanley report) at 1 ("According to management, DLNG increased the contract backlog by ~$61 [million] over the charters [sic] firm period, suggesting a charter rate of ~$56 [thousand per day],[8] nearly 28% below current charter rate."); Ex. 12 (Feb. 16, 2018 Wells Fargo report) at 1 ("While rates are undisclosed, our calculation (based on increased backlog) implies rates in the low $50's (down from ~$78.5k/day).").[9]

### D. Dynagas Files a Shelf Registration Statement

On December 21, 2017, about the time that its existing shelf registration was expiring, Dynagas filed a shelf registration statement permitting it to issue new securities. Compl. ¶ 75.[10] In the prospectus attached to and incorporated into the shelf registration statement, Dynagas

---

[8] The daily rate can be determined by dividing the contract backlog by (365 x [the number of years of the contract]).

[9] While investors already knew about the reduced charter rates as a result of the above-described earlier disclosures, the Company's November 15, 2018 press release reiterated that both the *Arctic Aurora* and the *Ob River* had "commenced employment under extended charter contracts with their respective charterers at lower rates compared with the previous charter contracts." Compl. ¶ 124

[10] Plaintiffs identify the filing of the registration statement on December 21, 2017 as the start of the Class Period. *Id.* at 1, ¶ 163.

again stated that the *Arctic Aurora*'s new long-term charter contract would be "in direct continuation" of the vessel's current charter and would have a firm period of three years. *See id.* ¶¶ 75-76. The registration statement did not state the rate of the new contract or how it compared to the previous charter rate. *See generally* Ex. 13 (Dec. 21, 2017 Form F-3). Dynagas made similar statements about the new *Arctic Aurora* charter being in direct continuation of the current charter in its February 15, 2018 press release. Compl. ¶ 84. Again, this press release did not state either the new or the old charter rate. *See generally* Ex. 8 (Feb. 16, 2018 Form 6-K).

### E.   Dynagas Reduces Its Quarterly Distribution to Align the Level with Long-Term Cash Flow

On a February 16, 2018 investor conference call, Tony Lauritzen (Dynagas' Chief Executive Officer) disclosed that the Company was in the process of reviewing the then-current distribution level. *Id.* ¶¶ 42, 87. Mr. Lauritzen stated that "it's an ongoing analysis," and that "we would like to end up with a distribution coverage of above one-times which is sustainable for the longer term."[11]   *Id.* ¶ 87. He also noted his expectation that this would be "sustainable for the longer term" because of the nature of the Company's "long-term contracts" and "very good visibility of what our cash flows will look like." *Id.*

On April 18, 2018, two months after cautioning of the potential for an adjustment in its distribution level, Dynagas announced that it was reducing its quarterly distribution to common stockholders to $0.25 per share. *Id.* ¶ 89. In the Company's press release, Mr. Lauritzen stated that the Partnership "believes that the new distribution level . . . aligns the Partnership's cash flows with our cash payment obligations," "expect[s it] to . . . enhance our liquidity, strengthen

---

[11] "Distribution coverage ratio" is a measure of the cash flow available for distribution in proportion to actual cash distributed. *See* Ex. 3 (May 17, 2018 Form 6-K) at PDF p. 4. A coverage ratio above 1.0x indicates sufficient cash flow to cover the current distribution level.

our balance sheet and improve our distribution coverage ratio," and "believe[s] the new distribution level is viable on an actual cash basis." *Id.*

Over the next few months, Dynagas made similar statements to investors regarding the expected distribution level.  For example, on May 17, 2018, Mr. Lauritzen repeated management's view that the distribution reduction was necessary to align the distribution level with the Company's capacity to generate cash flow, *id.* ¶ 92, and Mr. Gregos stated that "distribution policy reflects the board[']s and management expectations and is not based on scenarios which are unlikely to materialize," *id.* ¶ 93.  In response to a question from an analyst, Mr. Gregos reiterated his belief that "for the foreseeable future this distribution, as I mentioned before[,] is sustainable." *Id.* ¶¶ 96, 98.  Similarly, on a July 27, 2018 investor call, Mr. Gregos said that he thought that Dynagas had achieved the ability to "maintain[] this [distribution]" after "our previous distribution realignment" and that "the distribution is supported by our current cash flow profile for quite a long time." *Id.* ¶ 109.  Indeed, consistent with these expectations, Dynagas was able to sustain the quarterly distribution at $0.25 per share through the remainder of 2018. *Id.* ¶¶ 125, 130.

F.      **Dynagas Sells Series B Preferred Units**

In October 2018, Dynagas sold 2.2 million Series B Preferred Units in the Offering, the proceeds of which the Company earmarked for "among other things, the repayment of indebtedness, including the Partnership's outstanding [unsecured, non-amortizing] Notes due on October 30, 2019."  Compl. ¶ 112; Ex. 9 (Oct. 18, 2018 Final Pro. Supp.) at S-13.  The Underwriter Defendants all served as underwriters for the Offering.  Compl. ¶¶ 49-52.

The October 18, 2018 final prospectus supplement, which Dynagas filed with the SEC as part of the offering materials, contains many of the same statements discussed above about the *Arctic Aurora*'s new charter.  Compl. ¶¶ 113-15.  The prospectus also incorporated by reference

the "Risk Factors" stated in the Company's Form 20-F for Fiscal Year 2017, including the numerous Risk Factors that could affect the Company's ability to continue paying the distribution at current levels. *See infra* 10-11.

### G.     Responding to Shifting Conditions in the Debt Capital Markets, Dynagas Further Reduces the Quarterly Distribution

Throughout 2018, Dynagas repeatedly discussed its need to refinance its unsecured, non-amortized notes and warned investors that the Company was unsure that it would be able to do so given the volatility in the global financial markets and the deterioration of the debt capital market. The Company also tied this uncertainty to its ability to maintain the quarterly distribution at its current level. On a February 16, 2018 investor call, and in the accompanying presentation, Mr. Gregos stated, "This year, we expect to focus on the refinancing of our unsecured note, which is maturing in October 2019." Ex. 14 (Feb. 16, 2018 investor call transcript) at 6; Ex. 10 (Feb. 15, 2018 presentation) at 8. The Company warned that its "expectations, beliefs or projections" could be impacted by the "availability of financing and refinancing." Ex. 8 (Feb. 16, 2018 Form 6-K) at "Forward-Looking Statement"; Ex. 3 (May 17, 2018 Form 6-K) at "Forward-Looking Statement." Most notably, in its year-end Form 20-F filing for the 2017 Fiscal Year, Dynagas warned that "we cannot be certain that financing will be available to the extent required" and that if the Company was unable "to service our current or future indebtedness, we will be forced to take actions *such as reducing or eliminating distributions to our unitholders*." Ex. 15 (Mar. 9, 2018 Form 20-F) at 22, 31 (emphasis added).[12]

---

[12] *See also id.* at 33 ("If we are unable to refinance the 2019 Notes prior to maturity, we may not have sufficient funds to repay the 2019 Notes at maturity and . . . our ability to continue as a going concern could be put into doubt.").

Consistent with those warnings, as the debt capital market deteriorated in the fall of 2018, Dynagas disclosed that it was "currently performing a review of all of our refinancing options taking into account, among other things, our financial and growth objectives" because of its intention to "refinance [its] $250 million unsecured notes due in October 2019." Ex. 16 (Nov. 20, 2018 Form 6-K) at PDF p. 6. On its November 16, 2018 investor conference call, Dynagas confirmed a shift in its thinking about the sustainability of the distribution level. In response to an analyst question about the current level of the distribution, Mr. Gregos stated:

> I mean, we are reviewing how to maximize value going forward. As I said, the refinancing of our notes is a high priority but we also are concerned that we're getting a little to no credit for the current distribution and our current equity yield has kind of [hindered] our ability to grow. So we will be looking at how distribution can be used to improve equity value over time.

Compl. ¶ 125; *see also* Ex. 17 (Nov. 16, 2018 investor call transcript) at 7. On the same call, Dynagas repeatedly stated that its immediate focus was "the refinancing of our notes," for which it was "exploring a number of alternatives" and "keeping all of [its] options open." Ex. 17 (Nov. 16, 2018 investor call transcript) at 5, 6.

Based on these disclosures and warnings, analysts understood (and further disseminated to the market) that the Company's expectations concerning its ability to maintain its distribution at the current level were contingent on refinancing the notes with similar non-amortizing unsecured notes. *See, e.g.*, Ex. 18 (Feb. 16, 2018 Stifel report) at 1 ("Assuming DLNG is able to . . . refinance their bonds coming due next year . . . we believe the partnership could maintain current distribution levels."); Ex. 19 (Downtown Investment Advisory, "Dynagas Equity Is Stuck But The Bonds Look Good," *Seeking Alpha* (Nov. 19, 2018)) at 3 (acknowledging that the distribution "may be at further risk if the refinancing of the bonds requires a much higher interest rate"); Ex. 20 (Dec. 12, 2018 Morgan Stanley report) at 1 (warning that the Company's "ability

11

to continue paying its $1.00 dividend [was] under pressure as the uncertainty about the refinancing of the $250m unsecured notes has escalated").

Ultimately, consistent with the Company's previous disclosures about potential adjustments to the distribution, on January 25, 2019 Dynagas announced a reduction in the quarterly distribution to $0.0625 per share.  Compl. ¶¶ 15, 130.  The Company stated that the reduction was necessary in order "to retain more of the cash generated from the Partnership's long-term contracts to maintain a steady cash balance and to facilitate the refinancing of the Partnership's $250 million notes which mature on October 30, 2019."  Ex. 21 (Jan. 25, 2019 Form 6-K) at PDF p. 4.  The Company also warned unitholders that the level of future distributions would be subject to "the final terms of the refinancing of the Notes, including the level of indebtedness incurred (if any) or new securities issued (if any) by the Partnership in connection with such refinancing."  *Id.*

**H.     End of the Class Period**

On March 21, 2019, Dynagas released its Q4 2018 and fiscal year 2018 financial results. The Company noted that its quarterly results were impacted by "the decrease in revenues as a result of the *Arctic Aurora* and the *Ob River* commencing employment under extended charter contracts . . . at lower rates compared with the previous charter contracts," the off-hire days of another one of the Company's vessels (which had scheduled maintenance during the quarter), and "the increase in U.S. Libor which increased the interest and finance costs of our Term Loan B."  *See* Compl. ¶¶ 133-34; Ex. 22 (Mar. 22, 2019 Form 6-K) at PDF p. 5.[13]  The Company repeated that its "main focus is on the refinance of our $250 million unsecured notes due in

---

[13] The March 21, 2019 quarterly earnings press release marks the end of the Class Period. Compl. ¶ 163.

October 2019," and stated that while it "cannot provide any assurance of the outcome, we are currently working on various refinancing options."  Ex. 22 (Mar. 22, 2019 Form 6-K) at PDF p. 6.

On a conference call the following day, Mr. Gregos explained that, when reducing the distribution level in April 2018, management had "assumed that the MLP ["master limited partnership"][14] market broadly would improve going forward and enable us and other MLPs to issue cheap equity," but that improvement had not occurred.  Compl. ¶ 138.  Mr. Gregos explained that the Company believed that reducing the distribution was necessary "to facilitate the refinance of the partnership's $250 million notes," that the "more severe cut . . . goes hand-in-hand and enables us to discuss a wide range of refinancing options," and that the distribution going forward "will depend on the outcome of the refinancing of the notes."  Ex. 23 (Mar. 22, 2019 investor call transcript) at 4-9.

Dynagas did not pay a distribution to unitholders for the second quarter of 2019 and entered a five-year loan agreement to refinance its senior secured loan and senior unsecured notes on September 19, 2019, the terms of which prohibit the Company from paying a distribution to shareholders for its duration.  Compl. ¶¶ 140-41.

I.      **Plaintiffs' Claims**

Plaintiffs commenced this action on May 16, 2019 and filed the Amended Complaint on September 26, 2019.  The Class Period begins on December 21, 2017 (the date Dynagas filed its shelf registration statement and prospectus) and ends on March 21, 2019 (the date of the Company's Q4 2018 earnings press release).  *Id.* at 1, ¶ 163.

---

[14] A master limited partnership is a legal structure permitted in the real estate and natural resources sectors.  MLPs are required to distribute all available cash to unitholders and provide tax benefits because profits are taxed only when investors receive distributions.

Plaintiffs assert a claim under Section 10(b) and Rule 10b-5 of the Exchange Act against Dynagas (Count I), alleging that the challenged statements regarding the new charters for the *Arctic Aurora* and *Ob River* and the Company's ability to sustain the level of its quarterly distribution were false and misleading, or misleading by omission. *Id.* ¶¶ 175-77.  Plaintiffs also assert a claim against Dynagas under Section 20A of the Exchange Act (Count II) for allegedly selling shares while in possession of material non-public information. *Id.* ¶¶ 184-91.  Plaintiffs assert claims under Sections 11 and 12(a)(2) of the Securities Act against both Dynagas and the Underwriter Defendants (Counts IV and V) on the ground that the Registration Statement and Prospectuses filed in connection with the Offering purportedly contained misstatements or omissions. *Id.* ¶¶ 185-86, 191, 200-01, 220.  Finally, Plaintiffs assert control person claims under Section 20(a) of the Exchange Act (Count III) and Section 15 of the Securities Act (Count VI) against Dynagas GP and Dynagas Holding. *Id.* ¶¶ 193-97, 227-32.[15]

## ARGUMENT

**I.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 10(B) AND RULE 10B-5**

"To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege that [a defendant] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of [his] injury.'" *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007) (citation omitted).  An omission or misstatement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available"

---

[15] Plaintiffs also assert certain of these claims against the Individual Defendants; to date, Plaintiffs have not served these defendants.

to the market.  *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., P.L.C.*, 783 F.3d 383, 390 (2d Cir. 2015) (citation omitted).

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be pled with particularity.  To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted).  Additionally, the PSLRA requires a private litigant to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  The PSLRA also imposes a heightened scienter requirement, demanding that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).  Allegations premised on "distorted inferences and speculations" do not suffice.  *ATSI*, 493 F.3d at 104 (citation omitted).

### A.    The Complaint Does Not Adequately Allege a False or Misleading Statement Regarding the New Charter Agreements

The Complaint alleges that certain statements that the Company made about the long-term charter agreements for the *Ob River* and the *Arctic Aurora* were misleading because the statements did not specify the charter rates or explain that the new rates were lower than the prior rates for these vessels. Compl. ¶¶ 2, 7, 9, 10, 76-77, 79-86, 103, 104, 108, 113-15, 120-22.  But the Company did, in fact, disclose either that the new rates were lower or information from which investors could readily determine that fact.  Simply put, "[t]here can be no omission where the allegedly omitted facts are disclosed."  *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at

15

*9 (S.D.N.Y. June 20, 2016) (citing *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 131-32 (2d Cir. 2011)); *see also In re JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*, 2014 WL 4953554, at *8 (S.D.N.Y. Sept. 30, 2014) (no actionable misstatements when "the activity complained of was adequately disclosed to the market"); *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at *18 (S.D.N.Y. June 10, 2010) ("Plaintiffs cannot premise a claim of securities fraud under Section 10(b) on conduct and risks that were previously disclosed to the investing public."). Furthermore, the challenged statements made no mention of rates at all, and therefore could not have been misleading for failing to discuss information that was otherwise available to investors.

### 1.  Dynagas Disclosed the New Charter Rate for the *Ob River*

Two weeks before the start of the Class Period, on its December 6, 2017 investor conference call, Dynagas disclosed:  "In Q2 2018, the *Ob River* will enter its new 10-year contract with Gazprom **at a rate which will be about 35% lower than the current contract rate**."  Ex. 5 (Dec. 6, 2017 investor call transcript) at 5 (emphasis added).  Given this clear disclosure (which Plaintiffs tellingly omit from their Complaint), the Complaint's allegations that Dynagas misled investors regarding the new *Ob River* charter are meritless.[16]  Once disclosed,

---

[16] Defendants cite various investor conference call transcripts throughout this memorandum, not for their truth but for the fact of the disclosures contained within.  *See Staehr v. Hartford Fin. Servs. Grp. Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008).  The Court may take judicial notice of investor conference call transcripts where, as here, they are not "subject to varying interpretations."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999-1000 (9th Cir. 2018) (citation omitted); *see also In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *1 n.1 (S.D.N.Y. Aug. 1, 2017); *Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 901 (E.D. La. 2014) ("Applying Rule 201, numerous district courts have taken judicial notice of earnings call transcripts when the parties did not dispute the accuracy of their contents.").  Notably, Plaintiffs' investigation included the review of "transcripts and recordings of Dynagas investor conference calls," the Company's investor conference call transcripts were publicly available, and Plaintiffs cite no less than six different investor call transcripts in the Complaint.  *See* Compl. at 1-2 & ¶¶ 8, 10-11, 13-14, 16, 78, 85, 87, 92, 93, 95, 96, 98, 101-05, 109, 125, 135-39; *Cortec Indus.*, 949 F.2d 42, 47–48 (2d Cir. 1991) (incorporating documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit).

information remains in the market and need not be repeated.  *See Abuhamdan v. Blyth, Inc.*, 9 F.

Supp. 3d 175, 195 (D. Conn. 2014) (defendant "had no duty to disclose the allegedly omitted

information in light of information it had *already* disclosed" (emphasis added)); *In re Progress*

*Energy, Inc. Sec. Litig.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) (there was "no omission

where the allegedly omitted facts [were] disclosed" before the class period).

Additionally, investors could readily determine the *Ob River*'s charter rate based on the

figures Dynagas regularly disclosed in its quarterly SEC filings.[17]  For example, an investor

could calculate the daily charter rate for the *Ob River* under its prior charter as follows:  Dynagas

disclosed the contract backlog for the *Ob River* in the IPO Prospectus as $122.4 million with an

end date of September 2017.  Ex. 2 (Nov. 12, 2013 IPO Prospectus) at 102.[18]  The amount of that

backlog ($122.4 million) divided by the number of days remaining on the contract

(approximately 1432) yields a day rate of approximately $85,500.  Similarly, an interested

person could determine the new charter rate for the *Ob River* as follows: In its 6-K filed with the

SEC on March 31, 2016, Dynagas announced that the new ten-year contract for *Ob River* and the

fifteen-year contract for *Lena River* had increased the contract backlog from $586.2 million to

---

[17] Every quarter, in its SEC Form 6-K filing, Dynagas reports numerous metrics by which interested parties can track the Company's financial results, including net income, distributable cash flow, contracted revenue backlog, average remaining contract duration, contracted time charter coverage, and adjusted EBITDA.  *See, e.g.*, Ex. 8 (Feb. 16, 2018 Form 6-K) at PDF pp. 3, 5-7.

[18] Defendants cite various required SEC filings throughout this memorandum, including 20-F year end reports, registration statements, and prospectuses.  The Court may take judicial notice of required SEC filings as facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (quoting Fed. R. Evid. 201(b)(2)).  The Complaint repeatedly references many of these documents. *See* Compl. ¶¶ 7, 21, 23, 63-64, 75-76, 79, 113-17, 120, 141.

$1.2 billion.  Ex. 4 (Mar. 31, 2016 Form 6-K) at PDF p. 4.[19]  Consequently, based on the $613.8

million ($1.2 billion minus $586.2 million) in increased backlog, an investor could estimate the

implied average daily charter rate for these two new charters at $67,266 ($613.8 million divided

by 12.5 years, divided by two vessels, divided by 365 days), a substantial decrease from the

previous daily rate.  The disclosure of this information from which an interested party can

calculate the relevant charter rates defeats any claim of material omission.  *See Starr ex rel.*

*Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 111 (2d Cir. 2005) ("requiring a

stockholder to perform the two-minute multiplication to ascertain the fee is not an omission for

which the law gives redress" (alterations incorporated) (citation omitted)); *Kahn v. Wien*, 842 F.

Supp. 667, 675 (E.D.N.Y. 1994) (no material omission when information was disclosed "from

which the reasonable investor could perform the simple mathematical calculations necessary to

determine the [facts at issue]"); *accord Werner v. Werner*, 267 F.3d 288, 300 (3d Cir. 2001) (no

material omission even though shareholders would need to employ equation to compute omitted

information from available information).

Analyst reports reflect that the market knew of the lower charter rate—whether through

the Company's direct disclosure or through analysts' calculations.  For example, Wells Fargo

reported that the "*Ob River*'s ~$85k/day Gazprom charter ends this month and resets into a new

10-year Gazprom contract (with rates that are roughly 34% lower)."  Ex. 6 (Apr. 23, 2018 Wells

---

[19] Defendants cite various press releases filed with the SEC on Form 6-K throughout this
memorandum.  The Court may take judicial notice of press releases filed with the SEC for the
fact of the disclosure and the presence of the information in the market.  *See, e.g.*, *Staehr*, 547
F.3d at 425-26; *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 119 (E.D.N.Y. 2013).  In
addition, Plaintiffs reference many of these press releases in the Complaint. *See* Compl. ¶¶ 8-9,
13, 15, 70-71, 81, 83-84, 89, 91, 106-07, 123-24, 130-31, 133-34, 141.

Fargo report) at 2.[20]

But even if Dynagas had not disclosed the charter rate for the *Ob River*, Plaintiffs fail to

allege any statements that created a duty to make such a disclosure.  An omission is not

actionable absent an underlying duty to disclose.  Here, a duty to disclose could arise only if the

challenged statements implied something about contract rates such that it was misleading to omit

them.[21]  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *Stratte-McClure v.*

*Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454,

465 (2d Cir. 2013).  "[I]t is by now axiomatic that 'a corporation is not required to disclose a fact

merely because a reasonable investor would very much like to know that fact.'"  *Thesling v.*

*Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010) (summary order) (quoting *In re Time*

*Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see Basic Inc. v. Levinson*, 485 U.S.

224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading . . . .").  Dynagas'

announcement of the signing of a new contract did not imply anything about the rate of hire and

therefore the Company had no duty to disclose the new rate.  *See In re Centerline Holding Co.*

*Sec. Litig.*, 380 F. App'x 91, 93-94 (2d Cir. 2010) (summary order) (defendants were under no

duty to disclose plans to transform their business model); *In re Rockwell Med., Inc. Sec. Litig.*,

2018 WL 1725553, at *10 (S.D.N.Y. Mar. 30, 2018) ("[I]t is well settled that a corporation is not

---

[20] Defendants cite various analyst reports throughout this memorandum.  The Court can take judicial notice of the analyst reports offered, not for the truth of their content, but as corroboration of the market's understanding.  *See Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 217 n.3 (E.D.N.Y. 2013); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 575 & n.7 (S.D.N.Y. 2010); *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *24 & n.10 (S.D.N.Y. Feb. 23, 2009), *report adopted at* 2009 WL 10698359 (Mar. 18, 2009); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161 n.7 (S.D.N.Y. 2008); *In re Zyprexa Prods. Liability Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008).  Additionally, Plaintiffs stated that their investigation relied on "research reports by securities and financial analysts."  Compl. at 2; *see Cortec Indus.*, 949 F.2d at 47-48.

[21] The duty that Plaintiffs allege Item 303 created is addressed separately.  *See infra* Section IV.

required to reveal all facts on a subject just because it reveals a single fact." (internal quotation marks omitted)); *Police & Fire Ret. Sys. of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *9 (S.D.N.Y. Aug. 24, 2017) (faulting plaintiff for failing to identify any affirmative statement that would be misleading without further disclosures); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject . . . .").

### 2. The New Charter Rate for the *Arctic Aurora* Was Reasonably Available to Investors

As with the *Ob River*, the new charter rate for the *Arctic Aurora* was reasonably available to investors from the data Dynagas disclosed.  In a May 2014 SEC filing, the Company disclosed that, under the charter with which the *Arctic Aurora* was acquired, Dynagas expected "that the *Arctic Aurora* Acquisition [would] generate annual gross revenues of approximately $28.3 million," which corresponds to a rate of $77,534 per day.  *See* Ex. 24 (May 15, 2014 Form 6-K) at PDF p. 4.  Investors also could determine the rate under the new charter:  The Company's February 15, 2018 investor presentation, available on Dynagas' website, stated that the new *Arctic Aurora* charter "increases the Partnership's contracted revenue backlog by $61 million" over three years.  Ex. 10 (Feb. 15, 2018 presentation) at 3; *see also* Ex. 14 (Feb. 16, 2018 investor call transcript) at 4.[22]  Dividing that backlog figure by the number of days in the three-year charter yields a rate of $55,707 per day.  *See Starr*, 412 F.3d at 111; *Kahn*, 842 F. Supp. at 675; *accord Werner*, 267 F.3d at 300.

---

[22] The Court may take judicial notice of publicly available investor presentations, where, as here, they are offered for the fact of the disclosures contained within and the authenticity of the materials is not in dispute.  *See, e.g.*, *Holland v. JPMorgan Chase Bank, N.A.*, 2019 WL 4054834, at *3 (S.D.N.Y. Aug. 28, 2019); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166-67 (S.D.N.Y. 2015); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006).

Here again, multiple analysts assessed the Company's disclosures, readily estimated the charter rate for the *Arctic Aurora*, and recognized that it was lower than the prior rate: "According to management, DLNG increased the contract backlog by ~$61m over the charter's firm period, suggesting a charter rate of ~$56kpd, nearly 28% below current charter rate."  Ex. 11 (Feb. 16, 2018 Morgan Stanley report) at 1; *see also* Ex. 12 (Feb. 16, 2018 Wells Fargo report) at 1 ("our calculation (based on increased backlog) implies rates in the low $50k's (down from ~$78.5k/day).").

Separately, Plaintiffs contend that by describing the *Arctic Aurora*'s new charter as being "in direct continuation" of its old charter, Dynagas misleadingly suggested that there was no change in the charter rate.  As an initial matter, Dynagas' multiple prominent descriptions of the contract as "new" belie that allegation.  *See* Ex. 7 (Dec. 21, 2017 Form 6-K) at PDF p. 4 ("Dynagas LNG Partners LP Enters Into *New* Long-Term Time Charter for the LNG Carrier Arctic Aurora" (emphasis added)); Ex. 13 (Dec. 21, 2017 Form F-3) at 10; Ex. 8 (Feb. 16, 2018 Form 6-K) at PDF p. 4 (*Arctic Aurora* started on a "*new* long-term time charter contract." (emphasis added)); Ex. 9 (Oct. 18, 2018 Prospectus) at 11.[23]

In any event, in context, the phrase "direct continuation" clearly referred to the absence of any gap in time between the contracts, *not* the monetary rate of hire.  *See Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) ("The test for whether a statement is materially misleading . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." (internal quotation marks omitted)); Ex. 7 (Dec. 21, 2017 Form 6-K) at

---

[23] *See supra* nn. 18-19.  Plaintiffs also incorporate all four documents into the Complaint by reference.  Compl. ¶¶ 81, 83 (Dec. 21, 2017 press release); *id.* ¶¶ 8, 84, (Feb. 15, 2018 press release); *id.* ¶¶ 113-15 (Oct. 18, 2018 Prospectus); *id.* ¶¶ 7, 75, 76, 79, 116, 144, 150 (December 21, 2017 Form F-3).

PDF p. 4 ("The Extended Charter is expected to commence in the third quarter of 2018 in direct continuation of the Current Charter (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of about 3 years +/- 30 days."); Ex. 8 (Feb. 16, 2018 Form 6-K) at PDF p. 4 (employing the same language).  In other words, the new charter would continue as soon as the old one expired, with no gap in use of the vessel.  Given this context, no reasonable investor would have understood the phrase "in direct continuation" as making any representation about the new charter rate, especially considering that the market clearly understood from other information the Company disclosed that the new charter rate was lower.[24]

Apart from Plaintiffs' mischaracterization of the phrase "direct continuation," they identify no affirmative statement that could create a duty to disclose additional information about the new charter for the *Arctic Aurora*.  As stated above, without reason to believe the challenged statements even addressed the hire rates, any alleged omission is not actionable.  *See Matrixx*, 563 U.S. at 44; *Stratte-McClure*, 776 F.3d at 101; *Levitt*, 710 F.3d at 465.

### B.   The Amended Complaint Does Not Adequately Allege Any False or Misleading Statement Regarding the Sustainability of the Distribution

Plaintiffs next allege that certain defendants made false or misleading statements by stating their belief that the $0.25 per share quarterly distribution was "sustainable" and "viable on an actual cash basis."[25]  According to Plaintiffs, Dynagas knew that its expected cash flow could not support the distribution once the new charters for the *Ob River* and *Arctic Aurora* came

---

[24] Meanwhile, Dynagas expressly warned that "[h]ire rates for LNG carriers may fluctuate substantially," and that "[h]ire rates at a time when we may be seeking new charters may be lower than the hire rates at which our vessels are currently chartered." Ex. 1 (Mar. 20, 2017 Form 20-F) at 20; *see also* Ex. 15 (Mar. 9, 2018 Form 20-F) at 18.

[25] These statements include the statements alleged in Paragraphs 8, 9, 10, 11, 12, 87, 88, 89, 90, 91, 93, 94, 97, 99, 102, and 111 of the Complaint.

into effect.  However, the statements at issue are all non-actionable statements of opinion,

forward-looking statements, or some combination of these.  Plaintiffs have failed to plead facts

suggesting that the Company's projections were unachievable at the time Dynagas made them or

that the opinion statements did not reflect truly held opinions (as would be required to make

them actionable).  Moreover, Dynagas accompanied these forward-looking statements with

meaningful cautionary language that brings them within the PSLRA safe harbor.

### 1.     Plaintiffs' Contention That Dynagas' Predictions Were Unachievable When Made Is Unsupported By Any Well-Pled Factual Allegation

The mere fact that the Company's predictions about the sustainability of the distribution

turned out to be wrong is not sufficient to turn them into actionable misstatements.  *See Podany*

*v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias*

*Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)) ("The Second Circuit has firmly rejected this

'fraud by hindsight' approach.").  Plaintiffs must allege specific facts showing that the

projections were unachievable *at the time* they were made and may not rest on naked conclusions

based on hindsight.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) ("Fraud

depends on the state of events when a statement is made, not on what happens later." (citation

omitted)); *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 491, 498 (S.D.N.Y. 2004)

(plaintiffs failed to identify "objective facts or data" to show predictions of future success were

false or misleading); *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *12

(S.D.N.Y. Feb. 27, 2004) (dismissing complaint lacking "specific allegations" making it

"impossible" for company "eventually to meet [its] projections").

Here, Plaintiffs do not allege any such particularized contemporaneous facts.  *See Goplen*

*v. 51Job, Inc.*, 453 F. Supp. 2d 759, 769-70 (S.D.N.Y. 2006) (noting lack of documents or

meetings showing that financial projections were misleading).  Instead, Plaintiffs simply assert

(as though it were self-evident) that, because Dynagas would receive reduced revenue from the *Arctic Aurora* and *Ob River* charters, its current distribution level was not sustainable. Compl. ¶ 97. Plaintiffs conspicuously offer no analysis of why that would be so—in other words, why the loss of a particular amount of revenue going forward would make it impossible to maintain the distribution. This is insufficient. *See Lefkowitz v. Synacor, Inc.*, 2019 WL 4053956, at *7-9 (S.D.N.Y. Aug. 28, 2019); *In re Salomon*, 350 F. Supp. 2d at 498; *In re Loral Space*, 2004 WL 376442, at *12.

Further, Plaintiffs' argument ignores that—as the Company disclosed—future distributions would *not* necessarily come exclusively from cash generated from operations. For example, the Company's Form 20-F, filed on March 20, 2017, provided that "Our Partnership Agreement allows us to make working capital borrowings to pay distributions. Accordingly, if we have available borrowing capacity, we can make distributions on all our units even though cash generated by our operations may not be sufficient to pay such distributions." *See* Ex. 1 (Mar. 20, 2017 Form 20-F) at 15.[26] Plaintiffs nowhere allege that Dynagas had somehow lost its ability to borrow capital at the time of the challenged statements. Dynagas' ability to fund the distribution amount from sources other than cash generated from operations defeats Plaintiffs' speculative claim that it was implausible for Dynagas to believe that it could sustain the distribution given the decrease in charter revenues.

---

[26] Plaintiffs allege that the statements indicating that the new distribution level was "viable on an actual cash basis" were false or misleading because the Company purportedly knew that its existing cash flow would not support the distribution. Compl. ¶ 9. But "cash basis" does not refer to the ability to make payments entirely from cash revenues. Instead, it is an accounting method that accounts for cash when it is received, not when it is accrued. *See Greene v. United States*, 79 F.3d 1348, 1350 (2d Cir. 1996) (explaining "cash basis").

**2.    Plaintiffs Fail Plausibly to Allege the Falsity of Management's
Statements of Opinion Regarding the Distribution**

Nearly all the challenged statements regarding the distribution are statements of opinion.

*See, e.g.*, Compl. ¶¶ 8, 87 ("[W]e *would like to* end up with a distribution coverage of above one-

times which is sustainable for the longer term"); ¶ 9 ("[W]e *believe* the new distribution level is

viable on an actual cash basis"); ¶ 11 (new distribution "based on expectations which are

*reasonable*"); ¶ 89 ("[W]e *believe* the new distribution level is viable on an actual cash basis"); ¶

93 ("[D]istribution policy reflects the board[']s and management *expectations* and is not based

on scenarios which are unlikely to materialize."); ¶ 109 ("I *think* . . . the distribution is supported

by our current cash flow profile for quite a long time") (emphases added); *see Omnicare, Inc. v.

Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1325-26 (2015) (noting

that an opinion is a belief, a view, or a sentiment which the mind forms of persons or things,

often marked by statements such as "I believe," and that opinions do not imply certainty); *In re

Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *13 (S.D.N.Y. Oct. 10, 2018) (statements of

expectations about the future constitute statements of opinion).

To allege sufficiently that a statement of opinion was misleading, a plaintiff must allege

with particularity that "(1) the speaker does not hold the belief . . . professed; (2) the facts

supplied in support of the belief professed are untrue; or (3) the speaker omits information that

makes the statement misleading to a reasonable investor."  *Hawaii Structural Ironworkers

Pension Trust Fund v. AMC Entm't Holdings, Inc.*, 2019 WL 4601644, at *11 (S.D.N.Y. Sept.

20, 2019) (citation omitted); s*ee also Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (noting

that meeting the standard set by *Omnicare* is "no small task for an investor").

Plaintiffs offer no confidential witness statements, contemporaneous internal documents,

or other well-pleaded facts to support a claim that Defendants did not sincerely believe these

25

statements when they made them.  Nor do Plaintiffs offer support for their conclusion that Dynagas "knew" that its revenue would not sustain a distribution of 25 cents per quarter, or $1.00 annually, other than insufficient allegations (with no quantitative analysis whatever) that the Company agreed to lower charter rates for two of its vessels.  Compl. ¶¶ 8, 9, 11, 12, 88, 90, 94, 97, 99, 102, 111.  Such boilerplate pleading does not satisfy the heightened pleading standard applicable to statements of opinion.

### 3. The Company's Forward-Looking Statements Are Protected Under the PSLRA Safe Harbor

Under the PSLRA safe harbor, a forward-looking statement is not actionable if it (i) is identified as such and accompanied by "meaningful cautionary statements;" or (ii) is immaterial; or (iii) the plaintiff fails to prove such statement was said by person with actual knowledge that it was false or misleading.  15 U.S.C. § 78u-5(c); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Hawaii Structural*, 2019 WL 4601644, at *14.

Several of the challenged statements regarding the distribution are forward-looking. Plaintiffs challenge Mr. Gregos' statement on the May 17, 2018 earnings call that the distribution was sustainable for "the foreseeable future," Compl, ¶¶ 10, 96, and his July 27, 2018 earnings call statement that he thought "the distribution is supported by our current cash flow profile for quite a long time," *id.* ¶¶ 11, 109.  Notwithstanding Plaintiffs' general and conclusory assertion to the contrary, s*ee id.* ¶ 170, these statements fall squarely within the PSLRA's safe harbor for forward-looking statements because Dynagas accompanied them with "meaningful cautionary statements" identifying key risks.  15 U.S.C. § 78u-5(c).

Dynagas began both earnings calls with the announcement that the call would "contain[] certain forward-looking statements within the meaning of the safe harbor provision of the Private

Securities Litigation Reform Act of 1995[,]" and that such statements involve risks and uncertainties more fully disclosed in the Company's SEC filings.  Ex. 25 (May 17, 2018 investor call transcript) at 4; Ex. 26 (July 27, 2018 investor call transcript) at 4.  In press releases filed with the SEC on the same day as these calls, the Company cautioned investors that the forward-looking statements "are based upon various assumptions," which are "inherently subject to significant uncertainties and contingencies which are difficult or impossible to predict," and that some of the factors that "could cause actual results to differ materially from those discussed in the forward-looking statements" include the "availability of financing and refinancing . . . [and] the amount of cash available for distribution."  Ex. 3 (May 17, 2018 Form 6-K) at "Forward-Looking Statement"; Ex. 27 (July 27, 2018 Form 6-K) at "Forward-Looking Statement."

These cautionary statements included "meaningful cautionary language" within the meaning of the PSLRA because they "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement[s]."  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 771 (2d Cir. 2010).  Indeed, in referencing both the availability of financing and the amount of cash available for distributions, these cautionary statements identified *exactly* the factors that allegedly ultimately caused events to diverge from the Company's predictions.  *See* Ex. 8 (Feb. 16, 2018 Form 6-K) at "Forward-Looking Statement"; Ex. 3 (May 17, 2018 Form 6-K) at "Forward-Looking Statement."  This cautionary language is not boilerplate and "relate[s] directly to that by which the plaintiffs claim to have been misled."[27]  *P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004)

---

[27] Alternatively, as set forth in greater detail below, Plaintiffs have not alleged sufficiently that these forward-looking statements were made by a person with actual knowledge of their falsity. *See infra* Section I.C.2.  This failure provides an independent ground for applying the PSLRA safe harbor.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 529.

(citation omitted); *see also Slayton*, 604 F.3d at 772; *Gissin v. Endres*, 739 F. Supp. 2d 488, 508-10 (S.D.N.Y. 2010).  Accordingly, the challenged forward-looking statements from the May 17, 2018 and July 27, 2018 conference calls fall within the PSLRA's safe-harbor provision.[28]

### C.    Plaintiffs Fail to Plead Any Facts Giving Rise to an Inference of Scienter, Much Less the Requisite "Strong Inference"

The PSLRA requires that Plaintiffs allege particularized facts giving rise to a "strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Specifically, a plaintiff must allege either "facts (1) showing the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  For an inference to be strong it must be "'cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 324).

Here, the Complaint is devoid of the types of factual allegations often present in cases where courts find this heightened pleading standard satisfied, *i.e.* those involving concrete personal motives or those drawing on information found in internal documents or supplied by confidential witnesses.  Plaintiffs instead rely only on rhetoric, conclusions, and hindsight allegations that do not adequately plead scienter for any of the statements at issue, under either a motive and opportunity or recklessness theory.

### 1.    Plaintiffs' Motive and Opportunity Allegations Are Insufficient

Motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (citation omitted).

---

[28] There is no merit to Plaintiffs' claims that the cautions are inadequate because the risk had already materialized.  As explained above, Plaintiffs offer no analysis whatsoever that the decrease in the two ships' charter rates necessarily meant that the Company would be unable to make future distributions. *See supra* Section I.B.1.

Plaintiffs must allege that individual defendants "benefitted in some concrete and personal way from the purported fraud." *Id.* at 307-08. Most typically, securities plaintiffs plead motive by alleging that "corporate insiders . . . make a misrepresentation in order to sell *their own shares* at a profit." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis added). It is insufficient to allege merely that insiders sought to achieve goals "possessed by virtually all corporate insiders, such as the desire to . . . sustain the appearance of corporate profitability." *S. Cherry St., L.L.C. v. Hennessee Grp. L.L.C.*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted).

Notably, Plaintiffs do not allege any stock sales by individual defendants or any other concrete personal benefits. Instead, the Complaint puts forward three alternative motive theories that, whether considered separately or collectively, fail to support a strong inference of fraudulent intent.

*First*, Plaintiffs allege that the Company made false statements in order to facilitate the sale of its securities or refinance its debt at favorable prices. Compl. ¶¶ 143-47, 155-56. These allegations do not create a strong inference of scienter because the desire to maintain a high stock price is a generic motive attributable to all corporate officials. *See Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001); *Novak*, 216 F.3d at 307-08. So too is the alleged motive to give "the appearance of stability and profitability to potential lenders." Compl. ¶ 155; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("motive to maintain the appearance of corporate profitability" is not sufficiently concrete for scienter); *Hawaii Structural*, 2019 WL 4601644, at *16 ("[A] desire to complete a successful public offering is not a concrete benefit sufficient to demonstrate motive" (citation omitted)); *Silsby v. Icahn*, 17 F. Supp. 3d 348, 365 (S.D.N.Y. 2014) (alleged desire "to capture value for [their Company] and its shareholders" and induce

29

creditors to restructure various loans were too generic to allege motive); *see also Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28 (2d Cir. 2013) (summary order); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009); *In re Emex Corp. Sec. Litig.*, 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002).

*Second,* Plaintiffs allege that Mr. Lauritzen was motivated to deliver financial benefits to Dynagas' parent company (Dynagas Holding) and its principal owner (Mr. Prokopiou) because he is Mr. Prokopiou's son-in-law and "might reasonably expect to eventually inherit Dynagas Holding." Compl. ¶ 148. This is pure speculation: The mere family relationship does not establish that Mr. Lauritzen is likely to inherit Dynagas Holding much less that any such possibility had anything to do with his statements. Nor does the Complaint plead any actual facts suggesting that the alleged fraud financially benefited Dynagas Holding or Mr. Prokopiou. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) (finding no scienter where plaintiff offered only conclusory allegations); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) ("Generalized allegations of intent to maintain lucrative business relationships and to establish new ones do not set forth a motive for scienter purposes."); *Renner v. Chase Manhattan Bank*, 2000 WL 781081, at *10, 13 (S.D.N.Y. June 16, 2000) (rejecting motive allegations that were "mere conjecture[]").

*Third,* Plaintiffs allege that Dynagas Holding had a motive to inflate the Company's stock price because it contemplated selling its own common stock as part of the December 2017 shelf registration, Compl. ¶ 150, or to reduce the dilutive effect of Dynagas' contemplated purchase of additional vessels that would be financed through the sale of Dynagas equity, *id.* ¶ 151. As an initial matter, Plaintiffs have not pleaded any specific facts establishing that Dynagas Holding

was in any way responsible for, involved in, or had control over, the challenged statements.[29]
Instead, they offer only a generalized insufficient assertion that Dynagas Holding "controlled"
Dynagas through its large ownership stake and its historical relationship with Dynagas'
management. *Id.* ¶ 149.  In any event, Plaintiffs' allegations about Dynagas Holding's purported
motives are implausible.  Plaintiffs do not allege that Dynagas Holding ever sold shares to the
public as part of the shelf registration (or otherwise).  Plaintiffs' theory, unsupported by any
factual allegation, that Dynagas Holding orchestrated a 15-month-long fraud in order to sell
securities at inflated prices, but then never sold its shares, is far-fetched.  These allegations also
fail to identify—as they must—any concrete benefits to any individual.  *See Novak*, 216 F.3d at
307-08.

### 2.    Plaintiffs' Allegations of Conscious Misbehavior or Recklessness Are Insufficient

Where Plaintiffs (as here) have failed to establish motive, they may still plead scienter by
identifying circumstances indicating conscious behavior or recklessness, "though the strength of
the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (citation
omitted).  Alleging conscious misbehavior "requires a showing of deliberate illegal behavior,"
*Gould v. Windstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d. Cir. 2012), while recklessness
requires "conscious recklessness" or "a state of mind *approximating actual intent*, and *not
merely a heightened form of negligence*," *S. Cherry St.*, 573 F.3d at 109 (quoting *Novak*, 216
F.3d at 312).  To qualify as reckless, conduct must have been "highly unreasonable" and "an
extreme departure from the standards of ordinary care to the extent that the danger was either

---

[29] While Plaintiffs allege that Mr. Lauritzen (Dynagas' CEO) serves as the General Manager of
Dynagas Holding (Compl. ¶ 42), that is not the case.  *See* Ex. 2 (Nov. 12, 2013 IPO Prospectus)
at 176.

known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (citation omitted).  Plaintiffs do not meet this high bar.

As demonstrated above, Dynagas disclosed that the new daily charter rate for the *Ob River* was lower than the prior rate during a December 6, 2017 conference call, and disclosed information from which investors could (and analysts did) reach this same conclusion for the *Arctic Aurora*'s new charter.  The Company's disclosure of this information—precisely the information the Complaint alleges Dynagas withheld from the public—rebuts any inference of fraudulent intent.  As the Second Circuit has held, "such disclosure is flatly inconsistent with an intent to mislead investors." *Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015) (summary order); *see also Rombach*, 355 F.3d at 176; *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2012); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006).  Nor have Plaintiffs established a compelling inference that the Company acted recklessly by not repeating that information each time it discussed the new charter agreements— which it had no duty to do.  The more plausible inference (and the only one the record supports) is that Dynagas reasonably believed that it had sufficiently disclosed the information about the charter rates to the market, and that the market understood that information.[30]  *See In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *11 (S.D.N.Y. Sept. 14, 2015) (defendants were not obligated to reproduce information contained in publicly available reports because additional instances of disclosure would not have altered total mix of information available to market).

---

[30] Plaintiffs' allegations that Dynagas, Lauritzen and Gregos were aware of the essential terms of the new long-term contracts, Compl. ¶¶ 145-46, do not alter the scienter analysis given the information Dynagas disclosed about these contracts.  Moreover, their alleged awareness of the terms of the contract is entirely beside the point.  Plaintiffs offer no well-pleaded allegations that they knew any statement about the contracts was false when made, *see infra* at 33-34, or that they acted with a state of mind "approximat[ing] actual intent to mislead investors" in omitting information, *see Stratte-McClure*, 776 F.3d at 106-07.

With respect to the challenged statements concerning the sustainability of the quarterly distribution, these statements were either statements of opinion or forward-looking statements. *See supra* Section I.B.  Plaintiffs can adequately plead scienter as to such statements only through factual allegations sufficient to support a compelling inference that a defendant *knew* his statements to be false and *intended* to mislead investors at the time.  *See Podany*, 318 F. Supp. 2d at 154 ("[A] material misstatement of *opinion* is by its nature a false statement, not about the objective world, but about the defendant's own belief."); *Slayton*, 604 F.3d at 773 (the scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact and requires "proof of knowing falsity" (citation omitted)).  Plaintiffs aver that "numerous" unspecified facts they allege in the Complaint support an inference that the Company knew some—also unspecified—"true facts" concerning the sustainability of its distribution.[31]  Compl. ¶ 142.  As demonstrated above, that argument is pure hindsight:  The mere fact that a projection does not come to pass does not establish that any defendant knew the projection to be unachievable at the time Dynagas made it, and Plaintiffs do not offer a single well-pleaded factual allegation (*e.g.*, no witnessed discussions or internal documents) that any defendant had such knowledge.  *See supra* Section I.B.2.

Unable to allege contemporaneous facts, Plaintiffs seek to bolster their conclusory assertion of scienter by pointing to a single remark—a statement by a Company executive[32] on a

---

[31] Plaintiffs allege that the Company's filing of the registration statement on December 21, 2017—one day after entering into the new charter agreement for the *Arctic Aurora*—supports an inference of scienter because it allegedly demonstrates that Dynagas, Lauritzen and Gregos knew that the new charter agreement would not support the distribution.  Compl. ¶ 144.  But the Company did not issue equity pursuant to the registration statement until October 2018, nearly eight months after it disclosed information from which investors could (and analysts did) calculate the new charter rate.

[32] Plaintiffs allege that Mr. Gregos made the statement, but the transcript reflects that it was Mr. Lauritzen.  The identity of the speaker is immaterial for purposes of the instant motion.

March 22, 2019 investor call concerning the possible issuance of "cheap equity"—that Plaintiffs claim supports their theory that the Company knew all along that it could not support a quarterly distribution of 25 cents per share without issuing additional equity. But this post-Class Period statement cannot plausibly establish scienter for statements made over a dynamic 16-month period. Moreover, nothing about that statement suggests that Dynagas intended to pay the distribution from the proceeds of new equity issuances, even as of the date of the statement, as Plaintiffs allege.[33] Just over two months before the first distribution reduction, Mr. Gregos told investors that, "Looking across the capital structure, we believe we have outstanding access to credit and preferred equity markets in order to fund potential dropdowns. However, the reduced price of our common units has raised our cost of equity to the point where we currently do not consider it as a source of expansion capital." *See* Ex. 14 (Feb. 16, 2018 investor call transcript) at 6. Now, on March 22, 2019, the executive was simply explaining that the Company had not been able to utilize the equity markets to refinance its unsecured notes.

Ultimately, far more compelling than the inference Plaintiffs ask this Court to draw from this remark about an alleged Ponzi scheme (Compl. ¶ 143) is the inference that the Company did not anticipate disruptions in the equity and debt capital markets, and based its forecasts on the reasonable assumption that it would be able to refinance its debt on similar terms (or otherwise

---

[33] On the contrary, the context of the statement demonstrates that the Company was merely considering *all* of its financing options (both debt and equity) because its $250 million in unsecured notes was set to mature in October 2019. *See* Ex. 23 (Mar. 22, 2019 investor call transcript) at 7 (in response to question about Company's debt refinance, stating "we're looking at various options across the capital structure"); *id.* (Company reduced distribution to enable it "to discuss a wide range of refinancing options"). The Complaint selectively quotes this transcript. Compl. ¶¶ 16, 135-39. The Court may take judicial notice of the rest of the transcript to provide the full context. *See Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *10 n.11 (S.D.N.Y. Sept. 18, 2019); *see also supra* n.16.

34

obtain financing through the equity market) at the appropriate time.  Plaintiffs have failed to plead the conscious misbehavior or reckless conduct required to establish scienter.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20A

Section 20A creates a private right of action against any person who engages in insider trading in violation of the Exchange Act.  15 U.S.C. § 78t-1(a).  In order to state a claim under Section 20A, plaintiffs must (1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the securities at issue "contemporaneously" with plaintiff.  *In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 487, 508 (S.D.N.Y. 2011); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 665 (S.D.N.Y. 2007); *see also Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (the "language of § 20A makes clear that . . . Congress sought to alter the remedies available in insider trading cases, and *only* in insider trading cases" (citation omitted)).

Here, Plaintiffs have not pled a predicate insider trading violation because they have not alleged adequately that the Company possessed any material nonpublic information when it sold shares as part of the secondary offering or that the Company acted with scienter.[34]  An insider trading violation "occurs when a trade is conducted in 'knowing possession' of material nonpublic information."  *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993).  As discussed above, Dynagas disclosed that the new charter rates were lower or information from which investors could (and analysts did) reach that conclusion.  As a result, Plaintiffs cannot plausibly allege that information about the new charter rates was nonpublic or that the Company

---

[34] Additionally, Defendants have found no cases in which courts have held a corporate *issuer*— as distinct from *individuals*—liable as an insider under Section 20A.

"knowingly" traded based on purportedly nonpublic information that it had already disclosed. Dynagas also disclosed that the sustainability of its distribution was contingent upon refinancing its unsecured notes.  In light of these disclosures, Plaintiffs have not alleged any information about the distribution that could plausibly be deemed nonpublic and have not established a strong inference of scienter for any such trading.  *See supra* Section I.C.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)

Plaintiffs assert claims under Section 20(a) of the Exchange Act for control person liability against Dynagas GP and Dynagas Holding.  In order to plead a "control person" claim under Section 20(a), a plaintiff must plead: (1) a primary violation by the controlled person, (2) control of the primary violator by the controlling person, and (3) that the controlling person was a culpable participant in the alleged fraud in some meaningful sense.  *See ATSI*, 493 F.3d at 108; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000).  The Complaint fails to allege adequately a claim under 20(a) for two independent reasons.

*First*, as discussed above, the Complaint fails to plead a primary violation of the Exchange Act.  As a result, it also fails to plead a violation of Section 20(a).  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 207; *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 736 (S.D.N.Y. 2018).

*Second*, even if Plaintiffs had adequately alleged an underlying violation, their Section 20(a) claim would still fail because the Complaint does not allege any particularized facts demonstrating that Dynagas GP or Dynagas Holding were culpable participants in the alleged fraud.  To plead culpable participation, a plaintiff must allege "particularized facts of the controlling person's conscious misbehavior or recklessness."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246-47 (S.D.N.Y. 2006).  Plaintiffs must allege "specific facts from which the Court might conclude that [the controlling entity] culpably participated in the fraud."

36

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014) (dismissing 20(a) claim for failure to allege specific facts demonstrating culpable participation).  Here, the Complaint does not allege *any* facts suggesting that Dynagas GP or Dynagas Holding were in any way involved with preparing the challenged statements.  Instead, Plaintiffs merely allege that "Dynagas Holding wholly owns Dynagas GP and directly owns 43.9% of Dynagas," and that "Dynagas GP and Dynagas Holding exercise control over Dynagas through an Omnibus Agreement [that] specifies under which conditions vessels may be acquired and operated, [and] contains detailed voting and distribution rights."  Compl. ¶¶ 39-40.  But those allegations go to whether Dynagas Holding and Dynagas GP purportedly control Dynagas, not whether they were culpable participants in the alleged fraud.  Because the alleged contractual rights have nothing to do with the alleged fraud, and because Plaintiffs have not alleged that Dynagas Holding and Dynagas GP had any role in making the statements at issue, Plaintiffs have not alleged adequately culpable participation with regard to either entity.

## IV.  THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11, 12(a)(2), OR 15 OF THE SECURITIES ACT.[35]

The Court should dismiss Plaintiffs' Securities Act claims for many of the same reasons that compel dismissal of the Exchange Act claims, as the Securities Act claims rely on a subset of the same alleged statements or omissions that are neither false nor materially misleading.

"Section 11 imposes liability on issuers and other signatories of a registration statement that 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading.'" *Fait v. Regions*

---

[35] Plaintiffs assert claims against the Underwriter Defendants under Sections 11 and 12(a)(2) of the Securities Act, exclusively in connection with the Registration Statement and Prospectuses for the October 2018 Offering.  All other misstatements or omissions that are alleged in the Amended Complaint are not bases for liability against the Underwriter Defendants.

*Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011) (quoting 15 U.S.C. § 77k(a)).  Further, Section

12(a)(2) of the Securities Act is "roughly parallel" to Section 11, imposing liability "under

similar circumstances with respect to, *inter alia*, prospectuses."  *Fait*, 655 F.3d at 109 (quotation

omitted); *see* 15 U.S.C. § 77*l*(a)(2).  Whether a statement is "misleading" depends on the

objective "reasonable investor."  *Omnicare*, 135 S. Ct. at 1327.

Plaintiffs claim that it was misleading for Dynagas to state in the Registration Statement

that the *Arctic Aurora*'s new charter was in "direct continuation" of the previous charter absent a

disclosure that the new charter contained less favorable terms.  Compl. ¶¶ 7, 76, 200, 220.  Yet,

as explained above, the Registration Statement clearly labeled the charter as "new," and used the

phrase "direct continuation" to signify the absence of any gap in time between the contracts

(including reference to an interruption for the ship's mandatory survey and dry-docking), not its

payment terms.  Ex. 13 (Dec. 21, 2017 Form F-3) at 10.  For the reasons explained above, *supra*

Section I.A, these statements—which made no reference to either the existing charter rate or the

new charter rate—were neither false nor misleading.[36]

---

[36] Plaintiffs do not specifically plead that Defendants violated the Securities Act by allegedly failing to disclose the lower rate for the *Ob River* in the Registration Statement and Prospectus Supplement, but to the extent that Plaintiffs suggest such an argument, the allegations in the Complaint and the SEC filings cited therein refute it. Plaintiffs concede that the Company disclosed that the new *Ob River* charter agreement was at a lower rate in the July 27, 2018 Form 6-K, which Dynagas filed with the SEC months before the October 2018 secondary offering. *See* Compl. ¶ 107.  The Registration Statement and Prospectus Supplement incorporated by reference all subsequent 6-K filings.  *See* Ex. 27 (July 27, 2018 Form 6-K) at 2 ("The information contained in this Report on Form 6-K . . . is hereby incorporated by reference into the Partnership's registration statement on Form F-3."); Ex. 13 (Dec. 21, 2017 Form F-3) at 2 ("We incorporate by reference into this prospectus . . . all subsequent current reports on Form 6-K furnished prior to the termination of this offering that we identify in such current reports as being incorporated by reference into the registration statement of which this prospectus is a part.").  As a result, any alleged omission about the *Ob River* could not possibly serve as the basis for Plaintiffs' Securities Act claims.

Plaintiffs also allege that Dynagas misled investors by omitting information from the

Prospectus about the *Arctic Aurora*'s new charter rate and the reduced revenue that would flow

from that contract compared to the prior charter.  *See* Compl. ¶¶ 114-15.  But as explained above,

the new charter rate for the *Arctic Aurora* was reasonably available to investors from the data

Dynagas disclosed.  *See supra* Section I.A.2; *see also supra* n.37 (noting that the Prospectus

incorporates by reference all subsequent 6-K filings).   Plaintiffs do not cite any statement in the

Registration Statement or Prospectuses that would create a duty to disclose additional

information about the *Arctic Aurora* charter rate.  *See supra* Section I.A.2.[37]

Nor can Plaintiffs salvage their claim by reaching for Item 303 of SEC Regulation S-K,

which requires the filer of a registration statement to describe "known trends or uncertainties . . .

that the registrant reasonably expects will have a material favorable or unfavorable impact on net

. . . revenues."  Compl. ¶ 117 (quoting 17 C.F.R. § 229.303(a)(3)(ii)).  Item 303 does not apply to

Dynagas, a foreign private issuer.  *See Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 244-45

(S.D.N.Y. 2015); *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007);

*see also Brady v. Top Ships Inc.*, 2019 WL 3553999, at *12 (E.D.N.Y., Aug. 5, 2019).  Thus,

even assuming *arguendo* that information about the future charter rate for the *Arctic Aurora* was

not otherwise available to investors and that this rate would have a material unfavorable impact

on Dynagas' overall revenues, such an omission is not actionable absent a legal duty to disclose,

and Item 303 does not impose such a duty on Dynagas.  *See Resnik v. Swartz*, 303 F.3d 147, 154

---

[37] Plaintiffs also attempt to paint one of the "risk factors" in Dynagas' 2016 annual report, and incorporated by reference in the December 21, 2017 Prospectus, as misleading absent disclosures of all of the charter hire rates.  Compl. ¶¶ 79-80.  But a reasonable investor would not interpret such a speculative statement of risk—that "a decline in charter hire . . . could have a material adverse effect on our business"—as implying that none of Dynagas' future charter hire rates have declined.  *See Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 310 (S.D.N.Y. 2000) (rejecting plaintiffs' argument that defendant's future warnings were misleading because the contingencies had occurred).

(2d Cir. 2002).  Because Plaintiffs fail to plead any actionable misstatement or omission within the Registration Statement or Prospectuses, their claims under Section 11 and 12(a)(2) both fail. *See In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *6 (S.D.N.Y. Mar. 27, 2014) ("Because the Complaint fails to allege that Defendants made a material misrepresentation or omission under Section 11, it likewise fails to state a claim under Section 12(a)(2).").[38]

Finally, to plead a cause of action under Section 15 of the Securities Act, a plaintiff must allege both an underlying violation of Section 11 or 12 and that the defendant exercised the requisite control.  *See* 15 U.S.C. § 77o; *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185-86 (2d Cir. 2011).  Because Plaintiffs do not adequately allege an underlying violation of Section 11 or 12(a)(2), their Section 15 claim also fails.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint in its entirety, with prejudice.

---

[38] To the extent the Plaintiffs' purported class includes after-market purchasers, they would lack standing to assert a claim under Section 12(a)(2) against the Defendants.  *See, e.g.*, *New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010) ("The Complaint alleges only that Plaintiff purchased Certificates 'pursuant and traceable to' the Offering Documents. . . . This, however, is insufficient to assert standing for Section 12 claims.").

Dated: New York, New York
　　　　December 5, 2019

                                 Respectfully submitted,

                                 /s/ Michael G. Bongiorno
                                 Michael G. Bongiorno
                                 Jeremy T. Adler
                                 Wilmer Cutler Pickering Hale and Dorr LLP
                                 7 World Trade Center
                                 250 Greenwich Street
                                 New York, NY 10007
                                 Tel: (212) 230-8800
                                 Fax: (212) 230-8888
                                 michael.bongiorno@wilmerhale.com
                                 jeremy.adler@wilmerhale.com

                                 Peter J. Kolovos
                                 Wilmer Cutler Pickering Hale and Dorr LLP
                                 60 State Street
                                 Boston, MA 02109
                                 Tel: (617) 526-6000
                                 Fax: (617) 526-5000
                                 peter.kolovos@wilmerhale.com

                                 Mark J. Hyland
                                 Bruce G. Paulsen
                                 Seward & Kissel LLP
                                 One Battery Park Plaza
                                 New York, NY 10004
                                 Tel: (212) 574-1200
                                 hyland@sewkis.com
                                 paulsen@sewkis.com

                                 *Attorneys for Defendants Dynagas LNG*
                                 *Partners LP, Dynagas GP, LLC, and Dynagas*
                                 *Holding Ltd.*

/s/ Scott D. Musoff
Scott D. Musoff
Michael D. Moritz
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com
michael.moritz@skadden.com

*Attorneys for Defendants UBS Securities LLC, Morgan Stanley & Co. LLC, Stifel, Nicolaus & Company, Incorporated, and B. Riley FBR, Inc.*