# EXHIBIT 15

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**
**FORM 20-F**

[_] REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE

SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2017

OR

[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES

EXCHANGE ACT OF 1934

For the transition period from _____ to _____

OR

[_] SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report:

Commission file number: **001-36185**

**DYNAGAS LNG PARTNERS LP**
(Exact name of Registrant as specified in its charter)

**Republic of the Marshall Islands**
(Jurisdiction of incorporation or organization)

**23, Rue Basse, 98000 Monaco**
(Address of principal executive offices)
**Michael Gregos**
23, Rue Basse, 98000 Monaco
Tel. +377 99996445
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common units representing limited partnership interests** | **New York Stock Exchange** |
| **6.25% Senior Notes Due 2019** | **New York Stock Exchange** |
| **9.00% Series A Cumulative Redeemable Preferred Units** | **New York Stock Exchange** |
| Title of class | Name of exchange on which registered |

Securities registered or to be registered pursuant to Section 12(g) of the Act:  **None**
Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: **None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

**35,490,000 Common Units**
**3,000,000 9.00% Series A Cumulative Redeemable Preferred Units**
**35,526 General Partner Units**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

[ ] Yes                                                                [X] No

If this report is an annual report or transition report, indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

[ ] Yes                                                                [X] No

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

[X] Yes                                                                [ ] No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months

[X] Yes                                                                [ ] No

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer  [ ]                          Accelerated filer  [X]
Non-accelerated filer  [ ]                          Smaller reporting company  [ ]
(Do not check if a smaller reporting company)

Indicate by check mark which basis of accounting the Registrant has used to prepare the financial statements included in this filing:

[X]  U.S. GAAP

[ ]  International Financial Reporting Standards as issued by the International Accounting Standards Board

[ ]  Other

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow.

[ ]  Item 17

[ ]  Item 18

If this is an annual report, indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

[ ] Yes                                                                [X] No

**PRESENTATION OF INFORMATION IN THIS ANNUAL REPORT**

This Annual Report on Form 20-F for the year ended December 31, 2017, or the Annual Report, should be read in conjunction with the consolidated financial statements and accompanying notes included in this Annual Report. Unless the context otherwise requires, references in this Annual Report to "Dynagas LNG Partners," the "Partnership," "we," "our" and "us" or similar terms refer to Dynagas LNG Partners LP and its wholly-owned subsidiaries, including Dynagas Operating LP. Dynagas Operating LP owns, directly or indirectly, a 100% interest in the entities that own the LNG carriers in our fleet that we refer to as our "Fleet". References in this Annual Report to "our General Partner" refer to Dynagas GP LLC, the general partner of Dynagas LNG Partners LP. References in this Annual Report to our "Sponsor" are to Dynagas Holding Ltd. and its subsidiaries other than us or our subsidiaries and references to our "Manager" refer to Dynagas Ltd., which is wholly owned by the chairman of our Board of Directors, Mr. Georgios Prokopiou. References in this Annual Report to the "Prokopiou Family" are to our Chairman, Mr. Georgios Prokopiou, and certain members of his family.

All references in this Annual Report to us for periods prior to our initial public offering, or IPO, on November 18, 2013 refer to our predecessor companies and their subsidiaries, which are former subsidiaries of our Sponsor that had interests in the *Clean Energy*, the *Ob River* and the *Amur River*, collectively our "Initial Fleet" or the "Sponsor Controlled Companies".

All references in this prospectus to "Shell", "Gazprom", "Statoil", "Yamal" and "PetroChina" refer to Royal Dutch Shell Plc, Gazprom Marketing and Trading Singapore Pte Ltd, Statoil ASA, Yamal Trade Pte. Ltd. and PetroChina International (Singapore) Pte. Ltd., respectively, and certain of their respective subsidiaries or affiliates, who are our current or prospective charterers.

Unless otherwise indicated, all references to "U.S. dollars," "dollars" and "$" in this prospectus are to the lawful currency of the United States. We use the term "LNG" to refer to liquefied natural gas, and we use the term "cbm" to refer to cubic meters in describing the carrying capacity of our vessels.

References herein to the "Omnibus Agreement" refer to the Omnibus Agreement, as amended and as currently in effect, with our Sponsor. The Omnibus Agreement provides us with the right to acquire from our Sponsor certain identified vessels. Our Sponsor owns, directly or indirectly, 100% of the equity interests of the entities that own these four identified LNG carriers, the *Clean Ocean*, the *Clean Planet*, the *Clean Horizon* and the *Clean Vision*, which we refer to throughout this Annual Report as the "Initial Optional Vessels." Our Sponsor also owns a minority ownership interest in five entities that currently own two 172,000 cubic meter ARC7 LNG carriers, the *Boris Vilkitsky* and the *Fedor Litke*, and three hulls, Hull 2427, Hull 2428 and Hull 2429, respectively, including the related charters or other agreements relating to the operation or ownership of such LNG carriers or hulls. We refer to these vessels (either on the water or under construction) throughout this Annual Report as the "Additional Optional Vessels," and together with the Initial Optional Vessels, as the "Optional Vessels." Pursuant to the Omnibus Agreement, we have the right but not the obligation, subject to certain terms and conditions, to acquire our Sponsor's applicable ownership interest in the Optional Vessels, which is our Sponsor's full or minority ownership interest in these vessel-owning subsidiaries.

The "Yamal LNG Project" refers to the LNG production terminal on the Yamal Peninsula in Northern Russia. The terminal consists of three LNG trains with a total capacity of 16.5 million metric tons of LNG per year, that will require ice-class designated vessels to transport LNG from this facility, and for which two of the vessels in our Fleet, and each of the Optional Vessels have been contracted. The Yamal LNG Project is a joint venture between NOVATEK (50.1%), TOTAL E&P Yamal (20%), China National Oil & Gas Exploration and Development Corporation (CNODC) (20%) and Yaym Limited (9.9%). Please see "Item 4. Information on the Partnership—B. Business Overview."

i

## FORWARD-LOOKING STATEMENTS

This Annual Report contains certain forward-looking statements (as such term is defined in Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act) concerning future events and our operations, performance and financial condition, including, in particular, the likelihood of our success in developing and expanding our business. Statements that are predictive in nature, that depend upon or refer to future events or conditions, or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates," "projects," "forecasts," "will," "may," "potential," "should," and similar expressions are forward-looking statements. These forward-looking statements reflect management's current views only as of the date of this Annual Report and are not intended to give any assurance as to future results. As a result, unitholders are cautioned not to rely on any forward-looking statements.

Forward-looking statements appear in a number of places in this Annual Report and include statements with respect to, among other things:

- LNG market trends, including charter rates, factors affecting supply and demand, and opportunities for the profitable operations of LNG carriers;

- our anticipated growth strategies;

- the effect of a worldwide economic slowdown;

- potential turmoil in the global financial markets;

- fluctuations in currencies and interest rates;

- general market conditions, including fluctuations in charter hire rates and vessel values;

- changes in our operating expenses, including drydocking and insurance costs and bunker prices;

- forecasts of our ability to make cash distributions on the units or any increases or decreases in our cash distributions;

- our future financial condition or results of operations and our future revenues and expenses;

- the repayment of debt and settling of interest rate swaps (if any);

- our ability to make additional borrowings and to access debt and equity markets;

- planned capital expenditures and availability of capital resources to fund capital expenditures;

- our ability to maintain long-term relationships with major LNG traders;

- our ability to leverage our Sponsor's relationships and reputation in the shipping industry;

- our ability to realize the expected benefits from our vessel acquisitions;

- our ability to purchase vessels from our Sponsor in the future, including the Optional Vessels;

- our continued ability to enter into long-term time charters;

- our ability to maximize the use of our vessels, including the re-deployment or disposition of vessels no longer under long-term time charters;

- future purchase prices of newbuildings and secondhand vessels and timely deliveries of such vessels;

ii

- our ability to compete successfully for future chartering opportunities and newbuilding opportunities (if any);

- acceptance of a vessel by its charterer;

- termination dates and extensions of charters;

- the expected cost of, and our ability to comply with, governmental regulations, maritime self-regulatory organization standards, as well as standard regulations imposed by our charterers applicable to our business;

- availability of skilled labor, vessel crews and management;

- our anticipated incremental general and administrative expenses as a publicly traded limited partnership and our fees and expenses payable under the fleet management agreements and the administrative services agreement with our Manager;

- the anticipated taxation of our Partnership and distributions to our unitholders;

- estimated future maintenance and replacement capital expenditures;

- our ability to retain key employees;

- customers' increasing emphasis on environmental and safety concerns;

- potential liability from any pending or future litigation;

- potential disruption of shipping routes due to accidents, political events, piracy or acts by terrorists;

- future sales of our common units in the public market;

- our business strategy and other plans and objectives for future operations; and

- other factors detailed in this Annual Report and from time to time in our periodic reports.

Forward-looking statements in this Annual Report are estimates reflecting the judgment of senior management and involve known and unknown risks and uncertainties. These forward-looking statements are based upon a number of assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which are beyond our control. Actual results may differ materially from those expressed or implied by such forward-looking statements. Accordingly, these forward-looking statements should be considered in light of various important factors, including those set forth in this Annual Report under the heading "Item 3. Key Information—D. Risk Factors."

We undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of these factors. Further, we cannot assess the effect of each such factor on our business or the extent to which any factor, or combination of factors, may cause actual results to be materially different from those contained in any forward-looking statement.

We make no prediction or statement about the performance of our units or our debt securities. The various disclosures included in this Annual Report and in our other filings made with the Securities and Exchange Commission, or the SEC, that attempt to advise interested parties of the risks and factors that may affect our business, prospects and results of operations should be carefully reviewed and considered.

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| PART I. | | 1 |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 1 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 1 |
| ITEM 3. | KEY INFORMATION | 1 |
| ITEM 4. | INFORMATION ON THE PARTNERSHIP | 39 |
| ITEM 4A. | UNRESOLVED STAFF COMMENTS | 72 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 72 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 89 |
| ITEM 7. | MAJOR UNITHOLDERS AND RELATED PARTY TRANSACTIONS | 92 |
| ITEM 8. | FINANCIAL INFORMATION | 100 |
| ITEM 9. | THE OFFER AND LISTING. | 103 |
| ITEM 10. | ADDITIONAL INFORMATION | 104 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 113 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 114 |
| PART II | | 114 |
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 114 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 114 |
| ITEM 15. | CONTROLS AND PROCEDURES | 114 |
| ITEM 16. | [RESERVED] | 115 |
| ITEM 16A. | AUDIT COMMITTEE FINANCIAL EXPERT | 115 |
| ITEM 16B. | CODE OF ETHICS | 116 |
| ITEM 16C. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 116 |
| ITEM 16D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 116 |
| ITEM 16E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 116 |
| ITEM 16F. | CHANGE IN REGISTRANTS' CERTIFYING ACCOUNTANT | 117 |
| ITEM 16G. | CORPORATE GOVERNANCE | 117 |
| ITEM 16H. | MINE SAFETY DISCLOSURE | 117 |
| PART III | | 117 |
| ITEM 17. | FINANCIAL STATEMENTS | 117 |
| ITEM 18. | FINANCIAL STATEMENTS | 118 |
| ITEM 19. | EXHIBITS | 118 |

# Pages Omitted

**Risks Relating to our Partnership**

**Our Fleet consists of only six LNG carriers. Any limitation in the availability or operation of these vessels could have a material adverse effect on our business, results of operations and financial condition and could significantly reduce or eliminate our ability to pay distributions on our common units or preferred units.**

Our Fleet consists of only six LNG carriers. If any of our vessels is unable to generate revenues as a result of off-hire time, early termination of the time charter in effect or failure to secure new charters at charter hire rates as favorable as our average historical rates or at all, our future liquidity, cash flows, results of operations, and ability to make quarterly and other distributions to our common and preferred unitholders could be materially adversely affected. The *Yenisei River* and the *Lena River* are expected to be redelivered to us under their current charters at the earliest in July and September 2018, respectively, following which these vessels are expected to commence employment under their new 15-year charters with Yamal within six months and one year delivery windows starting from January 1, 2019 and July 1, 2019, respectively. We expect that these delivery windows will be narrowed, subject to our agreement with Yamal. Following the redelivery of *Lena River* and the *Yenisei River* to us from their current charterers and until such vessels commence employment under the Yamal charters discussed above, we expect to operate these two vessels in the spot market, which is volatile, highly competitive and subject to significant price fluctuations. If we are unable to employ these vessels in the spot market following the expiration of the existing charters and until the commencement of the new Yamal charters, we will not receive any revenues from those vessels during that time, and we will be required to pay expenses necessary to maintain the vessels in proper operating condition and to service the debt secured by these vessels.

**We currently derive all our revenue and cash flow from a limited number of charterers and the loss of any of these charterers could cause us to suffer losses or otherwise adversely affect our business.**

We have derived, and believe we will continue to derive, all of our revenues from a limited number of charterers, such as Gazprom, Statoil and Yamal. For the year ended December 31, 2017, during which we derived our operating revenues from four charterers, Gazprom accounted for 72%, Statoil accounted for 19%, Shell accounted for 6% and PetroChina accounted for 3% of our total revenues. All of the charters for our Fleet have fixed terms, but may be terminated early due to certain events, such as a charterer's failure to make charter payments to us because of financial inability, disagreements with us or otherwise. The ability of each of our counterparties to perform its obligations under a charter with us will depend on a number of factors that are beyond our control and may include, among other things, general economic conditions, the condition of the LNG shipping industry, prevailing prices for natural gas and the overall financial condition of the counterparty. Should a counterparty fail to honor its obligations under an agreement with us, we may be unable to realize revenue under that charter and could sustain losses, which could have a material adverse effect on our business, financial condition, cash flows, results of operations and ability to pay distributions to our unitholders.

In addition, a charterer may exercise its right to terminate its charter if, among other things:

- the vessel suffers a total loss or is damaged beyond repair;

- we default on our obligations under the charter, including prolonged periods of vessel off-hire;

- war or hostilities significantly disrupt the free trade of the vessel;

- the vessel is requisitioned by any governmental authority; or

- a prolonged force majeure event occurs, such as war or political unrest, which prevents the chartering of the vessel.

In addition, the charter payments we receive may be reduced if the vessel does not perform according to certain contractual specifications. For example, charter hire may be reduced if the average vessel speed falls below the speed we have guaranteed or if the amount of fuel consumed to power the vessel exceeds the guaranteed amount.

Furthermore, in depressed market conditions, our charterers may no longer need a vessel that is then under charter or may be able to obtain a comparable vessel at lower rates. As a result, charterers may seek to renegotiate the terms of their existing charter agreements or avoid their obligations under those contracts. If our charterers fail to meet their obligations to us or attempt to renegotiate our charter agreements, it may be difficult to secure substitute employment for such vessel, and any new charter arrangements we secure may be at lower rates.

4

If any of our charters is terminated, we may be unable to re-deploy the related vessel on terms as favorable to us as our current charters, or at all. If we are unable to re-deploy a vessel for which the charter has been terminated, we will not receive any revenues from that vessel, and we may be required to pay ongoing expenses necessary to maintain the vessel in proper operating condition.  Any of these factors may decrease our revenue and cash flows.  Further, the loss of any of our charterers, charters or vessels, or a decline in charter hire under any of our charters, could have a material adverse effect on our business, results of operations, financial condition and ability to make distributions to our unitholders.

**In 2018, our three tri-fuel diesel electric (TFDE) propulsion system vessels are scheduled to be dry-docked which will require significant expenditures and may result in loss of revenue.**

Dry-dockings of our vessels require significant expenditures and result in loss of revenue as our vessels are off-hire during the dry-docking period. Any significant increase in either the number of off-hire days or in the costs of any repairs or investments carried out during the dry-docking period could have a material adverse effect on our profitability and our cash flows. Given the potential for unforeseen issues arising during dry-docking, we may not be able to predict accurately the time required to dry-dock any of our vessels. If one or more of our vessels is dry-docked longer than expected or if the cost of repairs is greater than budgeted, our results of operations and our cash flows, including cash available for distribution to unitholders, could be adversely affected.

In the second and third quarters of 2018, our three tri-fuel diesel electric (TFDE) propulsion system vessels, the *Arctic Aurora*, the *Yenisei River* and the *Lena River,* are scheduled to be dry-docked. The dry-docking of the TFDE vessels will require a longer time than the dry-docking of our three steam turbine vessels in 2017 and we expect the costs to be higher. Due to the small size of our Fleet, any delay in the completion time of the dry-dockings or overrun of costs caused by additional days of work could have a material adverse effect on our business, results of operations and financial condition and could significantly reduce or eliminate our ability to pay distributions on our common or preferred units.

**The failure to consummate or integrate acquisitions, including acquisitions of the Optional Vessels from our Sponsor, in a timely and cost-effective manner, or at all, could have an adverse effect on our business, our expected plans for growth and on financial condition and results of operations.**

Acquisitions that expand our Fleet are an important component of our business strategy.  Our current drop-down pipeline is composed solely of the Optional Vessels. Pursuant to the Omnibus Agreement and certain extension agreements with our Sponsor, we have the option, but not the obligation, to purchase from our Sponsor: (i) the *Clean Horizon* and the *Clean Vision* until December 31, 2018 (ii) the *Clean Ocean* and the *Clean Planet* until March 31, 2018, and (iii) the 49% equity interests held by our Sponsor on the Additional Optional Vessels, which consist of the *Boris Vilkitsky* and the *Fedor Litke, which* were delivered in the fourth quarter of 2017, and first quarter of 2018, respectively, and three vessels that are currently under construction until the first quarter of 2019. We may also mutually agree with our Sponsor, with the approval of our Conflicts Committee to extend, or further extend, as applicable each purchase option exercise period, however, there is no assurance that our Sponsor will grant an extension requested by us.

Our growth strategy is therefore dependent on a continuing relationship with our Sponsor and other factors related to that relationship, some of which are beyond our control including our ability to (i) maintain a drop-down pipeline of existing or newbuild vessels from our Sponsor, or (ii) obtain the required consents from lenders and charterers for the acquisition of vessels from our Sponsor.

Furthermore, we will not be obligated to purchase any of the Optional Vessels at the applicable determined price, and, accordingly, we may not complete the purchase of any of such vessels. Moreover, if we are able to agree on a price with our Sponsor, there are no assurances that we will be able to obtain adequate financing on terms that are acceptable to us or that the financing assumed will on favorable terms to us.

We believe that other acquisition opportunities with our Sponsor and third-parties may arise from time to time, and any such acquisition could be significant. Any acquisition of a vessel or business may not be profitable at or after the time of acquisition and may be cash flow negative or may not generate sufficient cash flow to justify the investment. In addition, our acquisition growth strategy exposes us to risks that may harm our business, financial condition, results of operations and ability to make cash distributions to our unitholders, including risks that we may:

- fail to realize anticipated benefits, such as new customer relationships, cost-savings or cash flow enhancements;

5

- be unable to attract, hire, train or retain qualified shore and seafaring personnel to manage and operate our growing business and Fleet;

- decrease our liquidity by using a significant portion of available cash or borrowing capacity to finance acquisitions;

- significantly increase our interest expense or financial leverage if we incur additional debt to finance acquisitions;

- incur or assume unanticipated liabilities, losses or costs associated with the business or vessels acquired; or

- incur other significant charges, such as impairment of goodwill or other intangible assets, asset devaluation or restructuring charges.

Such acquisition and investment opportunities may not result in the consummation of a transaction. In addition, we may not be able to obtain acceptable terms for the required financing for any such acquisition or investment that arises. We cannot predict the effect, if any, that any announcement or consummation of an acquisition would have on the trading price of our common units or preferred units.

Our future acquisitions could present a number of risks, including the risk of incorrect assumptions regarding the future results of acquired vessels or businesses or expected cost reductions or other synergies expected to be realized as a result of acquiring vessels or businesses, the risk of failing to successfully and timely integrate the operations or management of any acquired vessels or businesses and the risk of diverting management's attention from existing operations or other priorities. We may also be subject to additional costs related to compliance with various international laws in connection with such acquisition. If we fail to consummate and integrate our acquisitions, including the acquisitions of the Optional Vessels from our Sponsor, in a timely and cost-effective manner, or at all, our business, plans for future growth, financial condition, results of operations and cash available for distribution could be adversely affected.

**We may be subject to certain risks with respect to our acquisition, or potential acquisition, of our Sponsor's ownership interest in the Additional Optional Vessels.**

If we acquire any or all of our Sponsor's 49% ownership interest in the Additional Optional Vessels pursuant to the terms and subject to the conditions of the Omnibus Agreement it is expected that we will own such vessels jointly with Sinotrans Shipping LNG Limited, or Sinotrans, and China LNG Shipping (Holdings) Limited, or China LNG Shipping, and we will become party to the shareholders' agreement which governs this joint venture relationship. We will not own a majority of the ownership interests in the entities that own the Additional Optional Vessels and, as such, we may not be able to exercise control over such entities or the Additional Optional Vessels. In addition, while we expect that the vessel owning entities will distribute all of their available cash to us and their other holders, we cannot guarantee whether such entities will do so, if at all.

Furthermore, all of the Additional Optional Vessels are employed or are contracted to be employed by Yamal in the Yamal LNG Project. Accordingly, such vessels have or are expected to have highly specialized technical specifications to meet the requirements for the Yamal LNG Project and will have limited redeployment prospects to operate as conventional trading LNG carriers if the Yamal charters do not eventually materialize or are terminated for any reason outside our control. To the extent these vessels are no longer employed under the Yamal LNG Project, we may lose our option to purchase our Sponsor's ownership interest in these vessels under the Omnibus Agreement, and further, if such contracts are terminated after we have acquired such ownership interest, we may be unable to re-charter or sell these vessels without making significant capital expenditures to reformat these vessels for trading in other markets, if possible. The occurrence of any of these events could have a material adverse effect on our business, financial condition, results of operations and cash flows, and ability distribute cash to our unitholders.

**Our Sponsor may be unable to service its debt requirements and comply with the provisions contained in the credit agreements secured by the Optional Vessels. If our Sponsor fails to perform its obligations under its debt agreements or any other agreement relating to the Optional Vessels, our business and expected plans for growth may be materially affected.**

Our Sponsor may be unable to fulfill its obligations under its debt and other agreements that are secured by or relate to the Optional Vessels. Failure on behalf of our Sponsor to perform its obligations under its debt, including paying scheduled installments and complying with certain covenants, may constitute an event of default under these secured loan agreements. If an event of default occurs under these loan agreements, our Sponsor's lenders could accelerate the outstanding loans and declare all amounts borrowed due and payable. In this case, if our Sponsor is unable to obtain a waiver or amendment or does not otherwise have enough cash on hand to repay the outstanding borrowings, its lenders may, among other things, foreclose their liens on the Optional Vessels. In addition, if our Sponsor fails to perform its obligations under other agreements governing the Optional vessels, we might not be able to take delivery of such Optional Vessels at all. In these cases, we may not be able to exercise our rights under the Omnibus Agreement to acquire the Optional Vessels, which would likely have a material adverse effect on our business and our expected plans for growth.

6

In addition, since our Sponsor is a private company and there is little or no publicly available information about it, we or an investor could have little advance warning of potential financial or other problems that might affect our Sponsor that could have a material adverse effect on us.

**We are subject to certain risks with respect to our contractual counterparties, and failure of such counterparties to perform their obligations under such contracts could cause us to sustain significant losses, which could have a material adverse effect on our business, financial condition, results of operations and cash flows.**

We have entered into, and may enter in the future, contracts, charters, newbuilding and conversion contracts with shipyards, debt agreements with financial institutions and other counterparts, interest rate swaps, foreign currency swaps, equity swaps and other agreements. Such agreements subject us to counterparty risks. The ability of each of our counterparties to perform its obligations under a contract with us will depend on a number of factors that are beyond our control and may include, among other things, general economic conditions and the overall financial condition of the counterparty. Should a counterparty fail to honor its obligations under agreements with us, we could sustain significant losses, which could have a material adverse effect on our business, financial condition, results of operations and cash flows. Please also see "—We currently derive all our revenue and cash flow from a limited number of charterers and the loss of any of these charterers could cause us to suffer losses or otherwise adversely affect our business."

**We may not have sufficient cash from operations following the establishment of cash reserves and payment of fees and expenses to enable us to pay distributions on our common units and our Series A Preferred Units.**

Our Board of Directors makes determinations regarding the payment of distributions in its sole discretion and in accordance with our Partnership Agreement and applicable law, and there is no guarantee that we will continue to make distributions to our unitholders in the same amount that we have in prior quarters or at all in the future. In addition, the markets in which we operate our vessels are volatile and we cannot predict with certainty the amount of cash, if any, that will be available for distribution in any period. We may not have sufficient cash from operations to pay at least the minimum quarterly distribution of $0.365 per unit on our common units and may therefore pay distributions in a lower amount or not all. The amount of cash we can distribute on our common and preferred units principally depends upon the amount of cash we generate from our operations, which may fluctuate from quarter to quarter based on the risks described in this section, including, among other things:

- the rates we obtain from our charters;

- the level of our operating costs, such as the cost of crews and insurance;

- the continued availability of natural gas production;

- demand for LNG;

- supply of LNG carriers;

- prevailing global and regional economic and political conditions;

- currency exchange rate fluctuations; and

- the effect of governmental regulations and maritime self-regulatory organization standards on the conduct of our business.

In addition, the actual amount of cash available for distribution to our unitholders will depend on other factors, including:

- the level of capital expenditures we make, including for maintaining or replacing vessels, building new vessels, acquiring secondhand vessels and complying with regulations;

- the number of unscheduled off-hire days for our Fleet and the timing of, and number of days required for, scheduled dry-docking of our vessels;

- our debt service requirements and restrictions on distributions contained in our debt instruments;

- the level of debt we will incur to fund future acquisitions, including the Optional Vessels that we have the right (but not the obligation) to acquire from our Sponsor, pursuant to the terms and subject to the conditions of the Omnibus Agreement (defined below). See "Item 7. Major Unitholders and Related Party Transactions—B. Related Party Transactions";

- fluctuations in interest rates;

- fluctuations in our working capital needs;

7

- variable tax rates;

- our ability to make, and the level of, working capital borrowings;

- the performance of our subsidiaries and their ability to distribute cash to us; and

- the amount of any cash reserves established by our Board of Directors.

The amount of cash we generate from our operations may differ materially from our profit or loss for the period, which will be affected by non-cash items. We may also incur expenses or liabilities or be subject to other circumstances in the future that reduce or eliminate the amount of cash that we have available for distributions.  As a result of this and the other factors mentioned above, we may make cash distributions during periods when we record losses and may not make cash distributions during periods when we record earnings.

**Our future growth depends on our ability to expand relationships with our existing charterers, establish relationships with new charterers and obtain new time charter contracts, for which we will face substantial competition from established companies with significant resources and potential new entrants.**

Although we have secured an estimated contract backlog of $1.48 billion for the vessels in our Fleet as of the date of this Annual Report, one of our principal objectives is to enter into additional multi-year time charters upon the expiration or early termination of our existing charter arrangements, and we may also seek to enter into additional multi-year time charter contracts in connection with an expansion of our Fleet. The process of obtaining multi-year charters for LNG carriers is highly competitive and generally involves an intensive screening procedure and competitive bids, which often extends for several months. We believe LNG carrier time charters are awarded based upon a variety of factors relating to the ship and the ship operator, including:

- size, age, technical specifications and condition of the ship;

- efficiency of ship operation and reputation for operation of highly specialized vessels;

- LNG shipping experience and quality of ship operations;

- shipping industry relationships and reputation for customer service;

- technical ability and reputation for operation of highly specialized ships;

- quality and experience of officers and crew;

- safety record;

- the ability to finance ships at competitive rates and financial stability generally;

- relationships with shipyards and the ability to get suitable berths;

- its willingness to assume operational risks;

- construction management experience, including the ability to obtain on-time delivery of new ships according to customer specifications; and

- competitiveness of the bid in terms of overall price.

8

We expect substantial competition for providing marine transportation services for potential LNG projects from a number of experienced companies, including other independent ship owners as well as state-sponsored entities and major energy companies that own and operate LNG carriers and may compete with independent owners by using their fleets to carry LNG for third-parties. Some of these competitors have significantly greater financial resources and larger fleets than we have. A number of marine transportation companies, including companies with strong reputations and extensive resources and experience, have entered the LNG transportation market in recent years, and there are other ship owners and managers who may also attempt to participate in the LNG market in the future. This increased competition may cause greater price competition for time charters. As a result of these factors, we may be unable to expand our relationships with existing charterers or to obtain new time charter contracts on a profitable basis, if at all, which could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distributions to our unitholders.

**Any charter termination would likely have a material adverse effect on our business, financial condition, results of operations and cash flows.**

Our vessels are employed with a limited number of charterers. Our existing and future charterers have the right to terminate our current or future charters in certain circumstances, such as loss of the ship or damage to it beyond repair, defaults by us in our obligations under the charter, or off-hire beyond allowances contained in the charter agreement.

A termination right under one vessel's time charter would not automatically give the charterer the right to terminate its other charter contracts with us. However, a charter termination could materially affect our relationship with the customer and our reputation in the LNG shipping industry, and in some circumstances the event giving rise to the termination right could potentially impact multiple charters that we have entered with the same charterer. Accordingly, the existence of any right of termination could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distribution to our common and preferred unitholders.

**Our future capital needs are uncertain and we may need to raise additional funds in the future.**

We believe that our cash flows from operations, amounts available for borrowings under out credit facilities and our cash balance will be sufficient to meet our existing liquidity requirements for at least the next 12 months from the date of this Annual Report. However, we may need to raise additional capital to maintain, replace and expand the operating capacity of our Fleet, to fund our operations or to refinance our indebtedness. Our future funding requirements will depend on many factors, including the cost and timing of vessel acquisitions, the cost of retrofitting or modifying existing ships as a result of technological advances, changes in applicable environmental or other regulations or standards, customer requirements or otherwise. Our ability to obtain bank financing or to access the capital markets for future offerings may be limited by our financial condition at the time of any such financing or offering, as well as by adverse market conditions that are beyond our control.

Obtaining additional funds on acceptable terms may not be possible. If we raise additional funds by issuing equity or equity-linked securities, our unitholders may experience dilution or reduced distributions per unit. Debt financing, if available, may involve covenants restricting our operations or our ability to incur additional debt or to pay distributions. Any debt or additional equity financing raised may contain unfavorable terms to us or our unitholders. If we are unable to raise adequate funds, we may have to liquidate some or all of our assets, or delay, reduce the scope of, or eliminate some or all of our fleet expansion plans. Any of these factors could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distributions to our common and preferred unitholders.

**We may be unable to make or realize expected benefits from acquisitions, which could have an adverse effect on our expected plans for growth.**

Any acquisition of a vessel or business may not be profitable to us at or after the time we acquire it and may be cash flow negative or may not generate cash flow sufficient to justify our investment. In addition, our acquisition growth strategy exposes us to risks that may harm our business, financial condition and operating results, including risks that we may:

- fail to realize anticipated benefits, such as new customer relationships, cost-savings or cash flow enhancements;

- be unable to hire, train or retain qualified shore and seafaring personnel to manage and operate our growing business and fleet;

9

- decrease our liquidity by using a significant portion of our available cash or borrowing capacity to finance acquisitions;

- significantly increase our interest expense or financial leverage if we incur additional debt to finance acquisitions;

- incur or assume unanticipated liabilities, losses or costs associated with the business or vessels acquired; or

- incur other significant charges, such as impairment of intangible assets, asset devaluation or restructuring charges.

If we acquire secondhand vessels, as opposed to newbuildings, we may be exposed to additional risks. Unlike newbuildings, secondhand vessels typically do not carry warranties as to their condition.  While we generally inspect secondhand vessels prior to purchase, such an inspection would normally not provide us with as much knowledge of a vessel's condition as we would possess if it had been built for us and operated by us during its life.  Repairs and maintenance costs for secondhand vessels are difficult to predict and may be substantially higher than for vessels we have operated since they were built.  These costs could decrease our cash flow and reduce our liquidity and could have an adverse effect on our expected plans for growth.

**The control of our General Partner may be transferred to a third-party without unitholder consent.**

Our General Partner may transfer its General Partner interest to a third-party in a merger or in a sale of all or substantially all of its assets without the consent of the unitholders.  In addition, our Partnership Agreement does not restrict the ability of the members of our General Partner from transferring their respective membership interests in our General Partner to a third-party.

**Our Sponsor and its affiliates may compete with us.**

Pursuant to the Omnibus Agreement with our Sponsor and our General Partner, our Sponsor and its affiliates (other than us, and our subsidiaries) generally have agreed, for the term of the Omnibus Agreement, not to acquire, own, operate or contract for any LNG carriers acquired or placed under contracts with an initial term of four or more years. The Omnibus Agreement, however, contains significant exceptions which include, among other things, the owning and operating of the Optional Vessels that may allow our Sponsor or any of its affiliates to compete with us, which could harm our business. Our Sponsor and its affiliates may compete with us, subject to the restrictions contained in the Omnibus Agreement, and could own and operate LNG carriers under charters of four years or more that may compete with our vessels if we do not acquire such vessels when they are offered to us pursuant to the terms of the Omnibus Agreement.

See "Item 7. Major Unitholders and Related Party Transactions—B. Related Party Transactions."

**Mr. Tony Lauritzen, our Chief Executive Officer, Mr. Michael Gregos, our Chief Financial Officer, and certain other officers do not devote all of their time to our business, which may hinder our ability to operate successfully.**

Mr. Tony Lauritzen, our Chief Executive Officer, Mr. Michael Gregos, our Chief Financial Officer, and certain other officers who perform executive officer functions for us, are not required to work full-time on our affairs and are involved in other business activities with our Sponsor and its affiliates, which may result in their spending less time than is appropriate or necessary to manage our business successfully. Based solely on the anticipated relative sizes of our Fleet and the fleet owned by our Sponsor and its affiliates over the next twelve months, we estimate that Mr. Lauritzen, Mr. Gregos, and certain other officers may spend a substantial portion of their monthly business time on our business activities and their remaining time on the business of our Sponsor and its affiliates. However, the actual allocation of time could vary significantly from time to time depending on various circumstances and needs of the businesses, such as the relative levels of strategic activities of the businesses. As a result, there could be material competition for the time and effort of our officers who also provide services to our General Partner's affiliates, which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

10

**Unitholders have limited voting rights, and our Partnership Agreement restricts the voting rights of our unitholders that own more than 4.9% of our common units.**

Unlike the holders of common stock in a corporation, holders of common units have only limited voting rights on matters affecting our business. We hold a meeting of the limited partners every year to elect one or more members of our Board of Directors that are eligible for reelection and to vote on any other matters that are properly brought before the meeting. Common unitholders are entitled to elect only three of the five members of our Board of Directors. The elected directors are reelected on a staggered basis and serve for three year terms. Our General Partner has the right to appoint the remaining two directors and set the terms for which those directors will serve. The Partnership Agreement also contains provisions limiting the ability of unitholders to call meetings or to acquire information about our operations, as well as other provisions limiting the unitholders' ability to influence the manner or direction of management. Unitholders have no right to elect our General Partner, and our General Partner may not be removed except by a vote of the holders of at least 66 2/3% of the outstanding common units, including any units owned by our General Partner, our Sponsor and their respective affiliates, voting together as a single class.

Our Partnership Agreement further restricts unitholders' voting rights by providing that if any person or group owns beneficially more than 4.9% of any class of units then outstanding, any such units owned by that person or group in excess of 4.9% may not be voted on any matter and will not be considered to be outstanding when sending notices of a meeting of unitholders, calculating required votes (except for purposes of nominating a person for election to our board), determining the presence of a quorum or for other similar purposes under our Partnership Agreement, unless required by law. The voting rights of any such unitholders in excess of 4.9% will effectively be redistributed *pro rata* among the other common unitholders holding less than 4.9% of the voting power of all classes of units entitled to vote. Our General Partner, its affiliates, including our Sponsor, and persons who acquired common units with the prior approval of our Board of Directors will not be subject to this 4.9% limitation except with respect to voting their common units in the election of the elected directors.

**Our Partnership Agreement limits the duties our General Partner and our directors and officers may have to our unitholders and restricts the remedies available to unitholders for actions taken by our General Partner or our directors and officers.**

Our Partnership Agreement provides that our Board of Directors has the authority to oversee and direct our operations, management and policies on an exclusive basis. The Partnership Act states that a member or manager's "duties and liabilities may be expanded or restricted by provisions in the Partnership Agreement." As permitted by the Partnership Act, our Partnership Agreement contains provisions that reduce the standards to which our General Partner and our directors and our officers may otherwise be held by Marshall Islands law. For example, our Partnership Agreement:

- provides that our General Partner may make determinations or take or decline to take actions without regard to our or our unitholders' interests. Our General Partner may consider only the interests and factors that it desires, and it has no duty or obligation to give any consideration to any interest of, or factors affecting us, our affiliates or our unitholders. Decisions made by our General Partner will be made by its sole owner. Specifically, our General Partner may decide to exercise its right to make a determination to receive common units in exchange for resetting the target distribution levels related to the incentive distribution rights, call right, pre-emptive rights or registration rights, consent or withhold consent to any merger or consolidation of the Partnership, appoint certain of our directors or vote for the election of any director, vote or refrain from voting on amendments to our Partnership Agreement that require a vote of the outstanding units, voluntarily withdraw from the Partnership, transfer (to the extent permitted under our Partnership Agreement) or refrain from transferring its units, the general partner interest or incentive distribution rights or vote upon the dissolution of the Partnership;

- provides that our directors and officers are entitled to make other decisions in "good faith," meaning they reasonably believe that the decision is in our best interests;

- generally provides that affiliated transactions and resolutions of conflicts of interest not approved by the conflicts committee of our Board of Directors, or our Conflicts Committee, and not involving a vote of unitholders must be on terms no less favorable to us than those generally being provided to or available from unrelated third-parties or be "fair and reasonable" to us and that, in determining whether a transaction or resolution is "fair and reasonable," our Board of Directors may consider the totality of the relationships between the parties involved, including other transactions that may be particularly advantageous or beneficial to us; and

11

- provides that neither our General Partner nor our officers or our directors will be liable for monetary damages to us, our members or assignees for any acts or omissions unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that our General Partner, our directors or officers or those other persons engaged in actual fraud or willful misconduct.

In order to become a member of our Partnership, a common unitholder is required to agree to be bound by the provisions in the Partnership Agreement, including the provisions discussed above.

**Fees and cost reimbursements, which our Manager will determine for services provided to us, will be substantial, will be payable regardless of our profitability and will reduce our cash available for distribution to our unitholders.**

Our Manager, which is wholly-owned by Mr. Georgios Prokopiou, is responsible for the commercial and technical management of the vessels in our Fleet pursuant to the Management Agreements. We currently pay our Manager a fee of $2,898 per day for each vessel for providing our vessel owning subsidiaries with technical, commercial, insurance, accounting, financing, provisions, crewing and bunkering services. In addition we pay our Manager a commercial management fee equal to 1.25% of the gross charter hire and the ballast bonus, which is the amount paid to the shipowner as compensation for all or part of the cost of positioning the vessel to the port where the vessel will be delivered to the charterer. We incurred an aggregate expense of approximately $8.0 million in connection with the commercial and technical management of our Fleet for the year ended December 31, 2017.

The management fee increases by 3% annually unless otherwise agreed, between us, with approval of our Conflicts Committee, and our Manager. The management fees payable for the vessels may be further increased if our Manager has incurred material unforeseen costs of providing the management services, by an amount to be agreed between us and our Manager, which amount will be reviewed and approved by our Conflicts Committee.

We have further entered into an executive services agreement, or the Executive Services Agreement, with our Manager, pursuant to which our Manager provides us with the services of our executive officers, who report directly to our Board of Directors. Under the Executive Services Agreement, our Manager is entitled to an executive services fee of €538,000 per annum, for the initial five year term, which expires in November 2018, payable in equal monthly installments. After the expiration of the firm period, the Executive Services Agreement will automatically be renewed for successive five year terms unless terminated earlier. As of December 31, 2017, we incurred approximately $0.6 million in connection with this agreement.

Pursuant to an administrative services agreement, or the Administrative Services Agreement, our Manager also provides us with certain administrative and support services for which we currently pay a monthly fee of $10,000, plus all related costs and expenses. As of December 31, 2017, we incurred $0.1 million in connection with this agreement.

For a description of our Management Agreements, Executive Services Agreement and Administrative Services Agreement, see "Item 7. Major Unitholders and Related Party Transactions—B. Related Party Transactions." The fees and expenses payable pursuant to the Management Agreements, Executive Services Agreement and the Administrative Services Agreement will be payable without regard to our financial condition or results of operations. The payment of such fees could adversely affect our ability to pay cash distributions to our unitholders.

**Our Partnership Agreement contains provisions that may have the effect of discouraging a person or group from attempting to remove our current management or our General Partner and even if public unitholders are dissatisfied, they will be unable to remove our General Partner without our Sponsor's consent, unless our Sponsor's ownership interest in us is decreased; all of which could diminish the trading price of our common units.**

Our Partnership Agreement contains provisions that may have the effect of discouraging a person or group from attempting to remove our current management or our General Partner.

- The unitholders are unable to remove our General Partner without its consent because our General Partner and its affiliates, including our Sponsor, own sufficient units to be able to prevent its removal. The vote of the holders of at least 66 2/3% of all outstanding common units voting together as a single class is required to remove our General Partner. Our Sponsor currently owns 15,595,000 of our common units, representing approximately 43.9% of the outstanding common units.

12

- Common unitholders are entitled to elect only three of the five members of our Board of Directors. Our General Partner in its sole discretion appoints the remaining two directors.

- Election of the three directors elected by unitholders is staggered, meaning that the members of only one of three classes of our elected directors are selected each year. In addition, the two directors appointed by our General Partner serve until a successor is duly appointed by the General Partner.

- Our Partnership Agreement contains provisions limiting the ability of unitholders to call meetings of unitholders, to nominate directors and to acquire information about our operations as well as other provisions limiting the unitholders' ability to influence the manner or direction of management.

- Unitholders' voting rights are further restricted by the Partnership Agreement provision providing that if any person or group owns beneficially more than 4.9% of any class of units then outstanding, any such units owned by that person or group in excess of 4.9% may not be voted on any matter and will not be considered to be outstanding when sending notices of a meeting of unitholders, calculating required votes (except for purposes of nominating a person for election to our board), determining the presence of a quorum or for other similar purposes under our Partnership Agreement, unless required by law. The voting rights of any such unitholders in excess of 4.9% will effectively be redistributed *pro rata* among the other common unitholders holding less than 4.9% of the voting power of all classes of units entitled to vote. Our General Partner, its affiliates and persons who acquired common units with the prior approval of our Board of Directors are not be subject to this 4.9% limitation except with respect to voting their common units in the election of the elected directors.

- There are no restrictions in our Partnership Agreement on our ability to issue additional equity securities.

The effect of these provisions may be to diminish the price at which the common units will trade.

**You may not have limited liability if a court finds that unitholder action constitutes control of our business.**

As a limited partner in a partnership organized under the laws of the Marshall Islands, you could be held liable for our obligations to the same extent as a General Partner if you participate in the "control" of our business. Our General Partner generally has unlimited liability for the obligations of the Partnership, such as its debts and environmental liabilities, except for those contractual obligations of the Partnership that are expressly made without recourse to our General Partner. In addition, the limitations on the liability of holders of limited partner interests for the obligations of a limited partnership have not been clearly established in some jurisdictions in which we do business.

**We can borrow money to pay distributions, which would reduce the amount of credit available to be used in connection with the operation of our business.**

Our Partnership Agreement allows us to make working capital borrowings to pay distributions. Accordingly, if we have available borrowing capacity, we can make distributions on all our units even though cash generated by our operations may not be sufficient to pay such distributions. Any working capital borrowings by us to make distributions will reduce the amount of working capital borrowings we can make for operating our business. For more information, see "Item 5. Operating and Financial Review and Prospects."

**We are dependent on our affiliated Manager for the management of our Fleet and for the provision of executive management and financial support services.**

We subcontract the commercial and technical management of our Fleet, including crewing, maintenance and repair pursuant to management agreements, or the Management Agreements, with our affiliated Manager for the commercial and technical management of our Fleet. The loss of our Manager's services or its failure to perform its obligations to us could materially and adversely affect the results of our operations. In addition, our Manager provides us with significant management, administrative, executive, financial and other support services.

13

In addition, our ability to enter into new charters and expand our customer relationships depends largely on our ability to leverage our relationship with our Manager and its reputation and relationships in the shipping industry. If our Manager suffers material damage to its reputation or relationships, it may harm our ability to:

- renew existing charters upon their expiration;

- obtain new charters;

- successfully interact with shipyards;

- obtain financing on commercially acceptable terms;

- maintain access to capital under the Sponsor credit facility; or

- maintain satisfactory relationships with suppliers and other third-parties.

Our business will be harmed if our Manager fails to perform these services satisfactorily, if they cancel their agreements with us or if they stop providing these services to us. Our operational success and ability to execute our growth strategy will depend significantly upon the satisfactory performance of these services by our Manager and the reputation of our Manager.

**Our current time charters and certain of our debt agreements prevent us from changing our Manager.**

Our ability to change the Manager of the vessels in our Fleet to another affiliated or third-party manager, is prohibited, without prior written consent, by provisions in our current time charters, the terms of our Term Loan B and the Manager's Undertaking delivered by the Manager in connection with the Term Loan B. In addition, we cannot assure you that future debt agreements or time charter contracts with our existing or new lenders or charterers, respectively, will not contain similar provisions.

**Since our Manager is a privately held company and there is little or no publicly available information about it, an investor could have little advance warning of potential financial and other problems that might affect our Manager that could have a material adverse effect on us.**

The ability of our Manager to continue providing services for our benefit will depend in part on its own financial strength. Circumstances beyond our control could impair our Manager's financial strength, and because it is privately held, it is unlikely that information about its financial strength would become public unless our Manager began to default on its obligations. As a result, an investor in our common units might have little advance warning of problems affecting our Manager, even though these problems could have a material adverse effect on us.

**Our Manager may be unable to attract, provide and retain key management personnel, which may negatively impact the effectiveness of our management and our results of operation.**

Our success depends to a significant extent upon the abilities and the efforts of our executive officers, whose services are provided to us by our Manager pursuant to an Executive Services Agreement. While we believe that we have an experienced management team, the loss or unavailability of one or more of our senior executives for any extended period of time could have an adverse effect on our business and results of operations.

**A shortage of qualified officers and crew could have an adverse effect on our business and financial condition.**

LNG carriers require a technically skilled officer staff with specialized training. As the world LNG carrier fleet continues to grow, the demand for technically skilled officers and crew has been increasing. If we or our third-party vessel Manager is unable to employ technically skilled staff and crew, we will not be able to adequately staff our vessels. A material decrease in the supply of technically skilled officers or an inability of our Manager to attract and retain such qualified officers could impair our ability to operate, or increase the cost of crewing our vessels, which would materially adversely affect our business, financial condition and results of operations and significantly reduce our ability to pay quarterly distributions to our common and preferred unitholders.

**We are a holding company, and our ability to make cash distributions to our unitholders will be limited by the value of investments we currently hold and by the distribution of funds from our subsidiaries.**

We are a holding company whose assets mainly consist of equity interests in our subsidiaries. As a result, our ability to make cash distributions to our unitholders will depend on the performance of our operating subsidiaries. If we are not able to receive sufficient funds from our subsidiaries, we will not be able to pay distributions unless we obtain funds from other sources. We may not be able to obtain the necessary funds from other sources on terms acceptable to us.

14

**We are an "emerging growth company" and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our common units less attractive to investors.**

We are an "emerging growth company" as defined in the JOBS Act. We will continue to be deemed an "emerging growth company" until the earliest of the last day of (i) the fiscal year of during which we had total annual gross revenues of $1 billion or more, (ii) the last day of the fiscal year following the fifth anniversary of our IPO, or December 31, 2018, (iii) the date in which, during the previous 3-year period, we have issued more than $1.0 billion in non-convertible debt, or (iv) the date on which we will be deemed to be a large accelerated filer. Until the time when we cease to be an "emerging growth company," we are exempt from having our independent auditor assess our internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act. We cannot predict if investors will find our common units less attractive because we rely on this exemption. If some investors find our common units less attractive as a result, there may be a less active trading market for our units and our unit price may be more volatile.

**Our ability to grow and to meet our financial needs may be adversely affected by our cash distribution policy.**

Our cash distribution policy, which is consistent with our Partnership Agreement, requires us to distribute all of our available cash (as defined in our Partnership Agreement) each quarter. As a result, we do not expect to accumulate significant amounts of cash. Accordingly, our growth may not be as fast as businesses that reinvest their available cash to expand ongoing operations.

In determining the amount of cash available for distribution, our Board of Directors approves the amount of cash reserves to set aside, including reserves for future maintenance and replacement capital expenditures distributions relating to our Series A Preferred Units and common units, working capital and other matters. We may also rely upon external financing sources, including commercial borrowings, to fund our capital expenditures. Accordingly, to the extent we do not have sufficient cash reserves or are unable to obtain financing, our cash distribution policy, including the distributions we make with respect to our Series A Preferred Units, may significantly impair our ability to meet our financial needs or to grow.

**Due to our lack of diversification, adverse developments in our LNG shipping business could reduce our ability to make distributions to our unitholders.**

We rely exclusively on the cash flow generated from our LNG carriers. Due to our lack of diversification, an adverse development in the LNG shipping industry could have a significantly greater impact on our financial condition and results of operations than if we maintained more diverse assets or lines of businesses.

**We may experience operational problems with vessels that reduce revenue and increase costs.**

LNG carriers are complex and their operation is technically challenging. Marine transportation operations are subject to mechanical risks and problems. Operational problems may lead to loss of revenue or higher than anticipated operating expenses or require additional capital expenditures. Any of these results could harm our business, financial condition, results of operations and ability to make cash distributions to our unitholders.

**Upon the expiration of the subordination period on January 23, 2017, the subordinated units converted into common units and now participate pro rata with other common units in distributions of available cash.**

During the subordination period, which we define elsewhere in this Annual Report, the common units had the right to receive distributions of available cash from operating surplus in an amount equal to the minimum quarterly distribution of $0.365 per unit, plus any arrearages in the payment of the minimum quarterly distribution on the common units from prior quarters, before any distributions of available cash from operating surplus were to be made on the subordinated units. Distribution arrearages did not accrue on the subordinated units. The purpose of the subordinated units was to increase the likelihood that during the subordination period there would be available cash from operating surplus to be distributed on the common units. On January 23, 2017, upon our payment to unitholders of the quarterly distribution in respect of the fourth quarter of 2016, the conditions set forth in the Partnership Agreement for the conversion of the subordinated units were satisfied and the subordination period expired. At the expiration of the subordination period, the 14,985,000 subordinated units owned by our Sponsor converted into common units on a one-for-one basis and now participate pro rata with other common units in distributions of available cash. Upon the conversion and as of the date of this Annual Report, our Sponsor owns 15,595,000 common units, or approximately 43.9% of our outstanding common units.

See "Item 8. Financial Information—A. Consolidated Statements and Other Financial Information—Our Cash Distribution Policy."

15

**Actions taken by our Board of Directors may affect the amount of cash available for distribution to unitholders.**

The amount of cash that is available for distribution to unitholders is affected by decisions of our Board of Directors regarding such matters as:

- the amount and timing of asset purchases and sales;

- cash expenditures;

- borrowings;

- estimates of maintenance and replacement capital expenditures;

- the issuance of additional units; And

- the creation, reduction or increase of reserves in any quarter.

In addition, borrowings by us and our affiliates do not constitute a breach of any duty owed by our General Partner or our directors to our unitholders, including borrowings that have the purpose or effect of enabling our General Partner or its affiliates to receive distributions or incentive distribution rights.

For example, in the event we have not generated sufficient cash from our operations to pay the minimum quarterly distribution on our common units, our Partnership Agreement permits us to borrow funds, which would enable us to make this distribution on all outstanding units.

Our Partnership Agreement provides that we and our subsidiaries may borrow funds from our General Partner and its affiliates. Our General Partner and its affiliates may not borrow funds from us or our subsidiaries.

### Risks Relating to Our Industry

**Our future growth and performance depends on continued growth in LNG production and demand for LNG and LNG shipping.**

A complete LNG project includes production, liquefaction, storage, regasification and distribution facilities, in addition to the marine transportation of LNG. Increased infrastructure investment has led to an expansion of LNG production capacity in recent years, but material delays in the construction of new liquefaction facilities could constrain the amount of LNG available for shipping, reducing vessel utilization. While global LNG demand has continued to rise, it has risen at a slower pace than previously predicted and the rate of its growth has fluctuated due to several factors, including the global economic crisis and continued economic uncertainty, fluctuations in the price of natural gas and other sources of energy, the continued acceleration in natural gas production from unconventional sources in regions such as North America and the highly complex and capital intensive nature of new or expanded LNG projects, including liquefaction projects. Continued growth in LNG production and demand for LNG and LNG shipping could be negatively affected by a number of factors, including, without limitation:

- increases in interest rates or other events that may affect the availability of sufficient financing for LNG projects on commercially reasonable terms;

- increases in the cost of natural gas derived from LNG relative to the cost of natural gas generally;

- increases in the production levels of low-cost natural gas in domestic natural gas consuming markets, which could further depress prices for natural gas in those markets and make LNG uneconomical;

- increases in the production of natural gas in areas linked by pipelines to consuming areas, the extension of existing, or the development of new pipeline systems in markets we may serve, or the conversion of existing non-natural gas pipelines to natural gas pipelines in those markets;

- decreases in the consumption of natural gas due to increases in its price, decreases in the price of alternative energy sources or other factors making consumption of natural gas less attractive;

16

- any significant explosion, spill or other incident involving an LNG facility or carrier;

- infrastructure constraints such as delays in the construction of liquefaction facilities, the inability of project owners or operators to obtain governmental approvals to construct or operate LNG facilities, as well as community or political action group resistance to new LNG infrastructure due to concerns about the environment, safety and terrorism;

- labor or political unrest or military conflicts affecting existing or proposed areas of LNG production or regasification;

- decreases in the price of LNG, which might decrease the expected returns relating to investments in LNG projects;

- new taxes or regulations affecting LNG production or liquefaction that make LNG production less attractive; or

- negative global or regional economic or political conditions, particularly in LNG consuming regions, which could reduce energy consumption or its growth.

Reduced demand for LNG and LNG shipping or any reduction or limitation in LNG production capacity, could have a material adverse effect on our ability to secure future multi-year time charters upon expiration or early termination of our current charter arrangements, or for any new ships we acquire, which could harm our business, financial condition, results of operations and cash flows, including cash available for distribution to our unitholders.

**Fluctuations in overall LNG demand growth could adversely affect our ability to secure future time charters.**

According to Drewry Shipping Consultants Ltd., or Drewry, LNG trade has started to increase during 2016 and 2017, mainly driven by the demand from China and India. In 2017, LNG trade grew by 13% due to the sizeable growth in imports by the major LNG importing countries. In particular, Chinese LNG imports increased 53% year over year to about 38.3 million tons in 2017 as the country has been shifting from coal to gas for industrial uses and heating purposes. Additionally, India's LNG imports grew 7% year over year to 17.7 million tons in 2017. In 2016, global LNG trade recorded growth of 2% year over year to 253 million tons whereas Chinese LNG imports strengthened 31% year over year. However, demand from the key Asian importers, Japan and South Korea, has been stagnant as a change in priorities has marked a shift back to nuclear energy and coal-based power plants. In addition, demand from European countries has also dwindled in recent years, and lower crude oil prices have further weakened LNG demand. Fluctuating demand along with economic uncertainty could hurt our ability to secure future-term charters.

**We may have more difficulty entering into multi-year time charters in the future if an active spot LNG shipping market continues to develop.**

One of our principal strategies is to enter into additional LNG carrier long-term time charters. Most shipping requirements for new LNG projects continue to be provided on a multi-year basis, though the level of spot voyages and time charters of less than 24 months in duration has grown in the past few years. If an active spot market continues to develop, we may have increased difficulty entering into multi-year time charters upon expiration or early termination of our current charters or for any vessels that we acquire in the future, and, as a result, our cash flow may be less stable. In addition, an active spot LNG market may require us to enter into charters based on changing market prices, as opposed to contracts based on a fixed rate, which could result in a decrease in our cash flow in periods when the market price for shipping LNG is depressed which may lead to insufficient funds to cover our financing and other costs for our vessels.

**Demand for LNG shipping could be significantly affected by volatile natural gas prices and the overall demand for natural gas.**

Gas prices are volatile and are affected by numerous factors beyond our control, including but not limited to the following:

- worldwide demand for natural gas;

- the cost of exploration, development, production, transportation and distribution of natural gas;

17

- expectations regarding future energy prices for both natural gas and other sources of energy;

- the level of worldwide LNG production and exports;

- government laws and regulations, including but not limited to environmental protection laws and regulations;

- local and international political, economic and weather conditions;

- political and military conflicts; and

- the availability and cost of alternative energy sources, including alternate sources of natural gas in gas importing and consuming countries.

Seasonality in demand, peak-load demand, and other short-term factors such as pipeline gas disruptions and maintenance schedules of utilities affect charters of less than two years and rates. In general, reduced demand for LNG, LNG carriers or LNG shipping would have a material adverse effect on our future growth and could harm our business, results of operations and financial condition.

**Hire rates for LNG carriers may fluctuate substantially. If rates are lower when we are seeking a new charter, our revenues and cash flows may decline.**

Our ability from time to time to charter or re-charter any vessel at attractive rates will depend on, among other things, the prevailing economic conditions in the LNG industry. Hire rates for LNG carriers may fluctuate over time as a result of changes in the supply-demand balance relating to current and future vessel capacity. This supply-demand relationship largely depends on a number of factors outside our control. The LNG charter market is connected to world natural gas prices and energy markets, which we cannot predict. A substantial or extended decline in demand for natural gas or LNG could adversely affect our ability to re-charter our vessels at acceptable rates or to acquire and profitably operate new vessels. Hire rates for newbuildings are correlated with the price of newbuildings. Hire rates at a time when we may be seeking new charters may be lower than the hire rates at which our vessels are currently chartered. If hire rates are lower when we are seeking a new charter, our revenues and cash flows, including cash available for distributions to our unitholders, may decline, as we may only be able to enter into new charters at reduced or unprofitable rates or we may have to secure a charter in the spot market, where hire rates are more volatile. Prolonged periods of low charter hire rates or low vessel utilization could also have a material adverse effect on the value of our assets.

**Vessel values may fluctuate substantially and, if these values are lower at a time when we are attempting to dispose of vessels, we may incur a loss.**

Factors that influence vessel values include:

- prevailing economic conditions in the natural gas and energy markets;

- a substantial or extended decline in demand for LNG;

- increases in the supply of vessel capacity;

- the size and age of a vessel; and

- the cost of retrofitting or modifying secondhand vessels, as a result of technological advances in vessel design or equipment, changes in applicable environmental or other regulations or standards, customer requirements or otherwise.

18

As our vessels age, the expenses associated with maintaining and operating them are expected to increase, which could have an adverse effect on our business and operations if we do not maintain sufficient cash reserves for maintenance and replacement capital expenditures. Moreover, the cost of a replacement vessel would be significant. If a charter terminates, we may be unable to re-deploy the affected vessels at attractive rates and, rather than continue to incur costs to maintain and finance them, we may seek to dispose of them. Our inability to dispose of vessels at a reasonable value could result in a loss on their sale and adversely affect our ability to purchase a replacement vessel, results of operations and financial condition and ability to pay minimum quarterly or other distributions to our unitholders.

**An oversupply of ships or delays or abandonment of planned projects may lead to a reduction in the charter hire rates we are able to obtain when seeking charters in the future.**

According to Drewry, during the period from 2011 to January 2018, the global fleet of LNG carriers grew from 360 to 456 vessels due to the construction and delivery of new LNG carriers and low levels of vessel demolition. Only 16 LNG carriers, representing 3.5% of the LNG vessels currently in service, have an Ice Class 1A and ice-class 1A super designation or equivalent rating, according to Drewry.

Although the global newbuilding orderbook dropped sharply in 2008, 2009 and 2010, ordering activity increased in 2011 and 2012 in light of Fukushima nuclear disaster. According to Drewry, a total of 56 LNG carrier newbuilding orders were placed in 2011 and 34 in 2012. In 2013 and 2014 ordering activity remained firm and a total of 100 newbuild orders were placed. New orders declined in 2015 to 32, followed by only 7 new orders placed in 2016. In 2017, 14 new LNG orders were placed. As of January 31, 2018, the newbuilding orderbook consisted of 111 vessels with a combined capacity of 18.7 million cbm, equivalent to 26.6% of the current global LNG carrier fleet capacity, according to Drewry. The delivery of these newbuildings will be spread out between 2018 and 2021.

According to Drewry, as of January 31, 2018, there were 56 LNG carriers in the size range of 149,000-155,000 cbm in the LNG trading fleet, of which 48 have membrane cargo containment system. There were four LNG carriers in the same size segment on orderbook. However, all of them have moss spherical containment system.

**Further technological advancements and other innovations affecting LNG carriers could reduce the charter hire rates we are able to obtain when seeking new employment and this could adversely impact the value of our assets and our future financial performance.**

The charter rates, asset value and operational life of an LNG carrier are determined by a number of factors, including the vessel's efficiency, operational flexibility and physical life. Efficiency includes speed and fuel economy. Flexibility includes the ability to enter harbors, utilize related docking facilities and pass through canals and straits. Physical life is related to the original design and construction, the ongoing maintenance and the impact of operational stresses on the asset. If more advanced ship designs are developed in the future and new ships are built that are more efficient or more flexible or have longer physical lives than ours, competition from these more technologically advanced LNG carriers could adversely affect the charter hire rates we will be able to secure when we seek to re-charter our vessels upon expiration or early termination of our current charter arrangements and could also reduce the resale value of our vessels. This could also adversely affect our revenues and cash flows, including cash available for distributions to our unitholders.

**If we cannot meet our charterers' quality and compliance requirements we may not be able to operate our vessels profitably which could have an adverse effect on our future financial performance.**

Customers, and in particular those in the LNG industry, have a high and increasing focus on quality and compliance standards with their suppliers across the entire value chain, including the shipping and transportation segment. Our continuous compliance with these standards and quality requirements is vital for our operations. Related risks could materialize in multiple ways, including a sudden and unexpected breach in quality and/or compliance concerning one or more vessels, a continuous decrease in the quality concerning one or more LNG carriers occurring over time. Moreover, continuous increasing requirements from LNG industry constituents can further complicate our ability to meet the standards. Any noncompliance by the Partnership, either suddenly or over a period of time, on one or more LNG Carriers, or an increase in requirements by our charterers above and beyond what we deliver, may have a material adverse effect on our future performance, results of operations, cash flows and financial position.

19

**Exposure to currency exchange rate fluctuations will result in fluctuations in our cash flows and operating results.**

Historically our revenue has been generated in U.S. Dollars, but we incur capital, operating and administrative expenses in multiple currencies, including, among others, the Euro. If the U.S. Dollar weakens significantly, we would be required to convert more U.S. Dollars to other currencies to satisfy our obligations, which would cause us to have less cash available for distribution. Because we report our operating results in U.S. Dollars, changes in the value of the U.S. Dollar also result in fluctuations in our reported revenues and earnings. In addition, under U.S. GAAP, all foreign currency-denominated monetary assets and liabilities such as cash and accounts payable are revalued and reported based on the prevailing exchange rate at the end of the reporting period. This revaluation may cause us to report significant non-monetary foreign currency exchange gains and losses in certain periods.

**An increase in operating expenses, dry-docking costs or bunker costs and other capital expenses could materially and adversely affect our financial performance.**

Our operating expenses and dry-dock capital expenditures depend on a variety of factors including crew costs, provisions, deck and engine stores and spares, lubricating oil, insurance, maintenance and repairs and shipyard costs, many of which are beyond our control and affect the entire shipping industry. Also, while we do not bear the cost of fuel (bunkers) under our time charters, fuel is a significant expense in our operations when our vessels are, for example, moving to or from dry-dock or when off-hire. The price and supply of fuel is unpredictable and fluctuates based on events outside our control, including geopolitical developments, supply and demand for oil and gas, actions by the Organization of the Petroleum Exporting Countries, or OPEC, and other oil and gas producers, war and unrest in oil-producing countries and regions, regional production patterns and environmental concerns. These may increase vessel operating and dry-docking costs further, which could materially and adversely affect our results of operations.

In addition, capital expenditures and other costs necessary for maintaining a vessel in good operating condition generally increase as the age of the vessel increases. Accordingly, it is likely that the operating costs of our vessels and capital expenditures we are required to make will increase in the future which will have a direct impact on our future results or operations and cash flows.

**The operation of LNG carriers is inherently risky, and an incident involving significant loss of or environmental consequences involving any of our vessels could harm our reputation and business.**

Our vessels and their cargoes are at risk of being damaged or lost because of events such as:

- marine disasters;

- piracy;

- environmental accidents;

- bad weather;

- mechanical failures;

- grounding, fire, explosions and collisions;

- human error; and

- war and terrorism.

An accident involving any of our vessels could result in any of the following:

- death or injury to persons, loss of property or environmental damage;

- delays or failure in the delivery of cargo;

- loss of revenues from or termination of charter contracts;

- governmental fines, penalties or restrictions on conducting business;

20

- spills, pollution and the liability associated with the same;

- higher insurance rates; and

- damage to our reputation and customer relationships generally.

Any of these events could result in a material adverse effect on our business, financial condition and operating results. If our vessels suffer damage, they may need to be repaired. The costs of vessel repairs are unpredictable and can be substantial. We may have to pay repair costs that our insurance policies do not cover. The loss of earnings while these vessels are being repaired, as well as the actual cost of these repairs, would decrease our results of operations. If any of our vessels is involved in an accident with the potential risk of environmental consequences, the resulting media coverage could have a material adverse effect on our business, results of operations and cash flows, which in turn could weaken our financial condition and negatively affect our ability to pay distributions to our unitholders.

**Our insurance may be insufficient to cover losses that may occur to our property or result from our operations.**

The operation of LNG carriers is inherently risky. Although we carry protection and indemnity insurance consistent with industry standards, all risks may not be adequately insured against, and any particular claim may not be paid. Any claims covered by insurance would be subject to deductibles, and since it is possible that a large number of claims may be brought, the aggregate amount of these deductibles could be material. Certain of our insurance coverage is maintained through mutual protection and indemnity associations, and as a member of such associations we may be required to make additional payments over and above budgeted premiums if member claims exceed association reserves. We may be unable to procure adequate insurance coverage at commercially reasonable rates in the future. For example, more stringent environmental regulations have led in the past to increased costs for, and in the future may result in the lack of availability of, insurance against risks of environmental damage or pollution. A marine disaster could exceed our insurance coverage, which could harm our business, financial condition and operating results. Any uninsured or underinsured loss could harm our business and financial condition. In addition, our insurance may be voidable by the insurers as a result of certain of our actions, such as our vessels failing to maintain certification with applicable maritime self-regulatory organizations.

Changes in the insurance markets attributable to terrorist attacks may also make certain types of insurance more difficult for us to obtain. In addition, upon renewal or expiration of our current policies, the insurance that may be available to us may be significantly more expensive than our existing coverage.

**Our vessels may suffer damage and we may face unexpected costs and off–hire days.**

In the event of damage to our owned vessels, the damaged vessel would be off-hire while it is being repaired, which would decrease our revenues and cash flows, including cash available for distributions to our unitholders. In addition, the costs of vessel repairs are unpredictable and can be substantial. In the event of repair costs that are not covered by our insurance policies, we may have to pay such repair costs, which would decrease our earnings and cash flows.

**Volatile economic conditions may adversely impact our ability to obtain financing or refinance our future credit facilities on acceptable terms, which may hinder or prevent us from operating or expanding our business.**

Global financial markets and economic conditions have been, and continue to be, volatile. This volatility has negatively affected the general willingness of banks and other financial institutions to extend credit, particularly in the shipping industry, due to the historically volatile asset values of vessels. As the shipping industry is highly dependent on the availability of credit to finance and expand operations, it has been and may continue to be negatively affected by this decline in lending. A weak state of global financial markets and economic conditions might adversely impact our ability to issue additional equity at prices that will not be dilutive to our existing unitholders or preclude us from issuing equity at all.

21

Also, as a result of concerns about the stability of financial markets generally and the solvency of counterparties specifically, the cost of obtaining money from the credit markets has increased as many lenders have increased interest rates, enacted tighter lending standards, refused to refinance existing debt at all or on terms similar to current debt and reduced, and in some cases ceased, to provide funding to borrowers. Due to these factors, we cannot be certain that financing will be available to the extent required, or that we will be able to refinance our future credit facilities, on acceptable terms or at all. If financing or refinancing is not available when needed, or is available only on unfavorable terms, we may be unable to meet our obligations as they come due or we may be unable to enhance our existing business, complete the acquisition of newbuildings (if any) and additional vessels or otherwise take advantage of business opportunities as they arise.

As of the date of this Annual Report, we have not secured any financing in connection with the potential acquisition of the remaining Initial Optional Vessels or the Additional Optional Vessels from our Sponsor since it is uncertain if and when such purchase options will be exercised, if at all. Our Sponsor has secured financing for the Initial Optional Vessels and, our Sponsor together with its joint venture partners, have secured financing for the Additional Optional Vessels.  In the event we acquire any or all of such Optional Vessels in the future, we may enter into agreements with our Sponsor to novate these loan agreements to us, subject to the satisfaction of certain conditions. Any such novation would be subject to each respective lender's consent. We may also seek to enter into new financing arrangements.

**A cyber-attack could materially disrupt our business.**

Our business operations could be targeted by individuals or groups seeking to sabotage or disrupt our information technology systems and networks, or to steal data. A successful cyber-attack could materially disrupt our operations, including the safety of its operations, or lead to unauthorized release of information or alteration of information on its systems. Any such attack or other breach of our information technology systems could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distributions to our unitholders.

**Compliance with safety and other requirements imposed by classification societies may be very costly and may adversely affect our business.**

The hull and machinery of every commercial LNG carrier must be classed by a classification society. The classification society certifies that the vessel has been built and maintained in accordance with the applicable rules and regulations of that classification society. Moreover, every vessel must comply with all applicable international conventions and the regulations of the vessel's flag state as verified by a classification society. Finally, each vessel must successfully undergo periodic surveys, including annual, intermediate and five-year special surveys performed under the classification society's rules.

If any vessel does not maintain its class, it will lose its insurance coverage and be unable to trade, and the vessel's owner will be in breach of relevant covenants under its financing arrangements. Failure to maintain the class of one or more of our vessels could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distributions to our unitholders.

**The LNG shipping industry is subject to substantial environmental and other regulations, which may significantly limit our operations or increase our expenses.**

Our operations are materially affected by extensive and changing international, national, state and local environmental laws, regulations, treaties, conventions and standards which are in force in international waters or in the jurisdictional waters of the countries in which our vessels operate and in the countries in which our vessels are registered. These requirements relate to complying with applicable legislation and minimizing our environmental footprint (of our operations both onboard and ashore). We expect to incur substantial expenses in complying with these requirements, including, but not limited to, costs relating to air emissions including greenhouse gases, sulfur emissions, the management of ballast waters, maintenance and inspection, development and implementation of emergency procedures and insurance coverage. We could also incur substantial costs, including clean-up costs, civil and criminal penalties and sanctions, the suspension or termination of operations and third-party claims as a result of violations of, or liabilities under, such laws and regulations.

22

In addition, these requirements can affect the resale value or useful lives of our vessels, require a reduction in cargo capacity, necessitate vessel modifications or operational changes or restrictions or lead to decreased availability of insurance coverage for environmental matters. They could further result in the denial of access to certain jurisdictional waters or ports or detention in certain ports. We are required to obtain governmental approvals and permits to operate our vessels and also to maintain environmental manuals and plans. Delays in obtaining such governmental approvals may increase our expenses, and the terms and conditions of such approvals could materially and adversely affect our operations.

Additional laws and regulations may be adopted in the future that could limit our ability to do business or increase our operating costs, which could materially and adversely affect our business. For example, new or amended legislation relating to ship recycling, sewage systems, emission control (including emissions of greenhouse gases) as well as ballast water treatment and ballast water handling may be adopted. The United States has enacted legislation and regulations that require more stringent controls of air and water emissions from ocean-going ships. Such legislation or regulations may require additional capital expenditures or operating expenses (such as increased costs for low-sulfur fuel or costs related to the installation of scrubbers for cleaning exhaust gas) in order for us to maintain our vessels' compliance with international and/or national regulations. We also may become subject to additional laws and regulations or any new legislation that may come into effect if we enter new markets or trades.

We also believe that the heightened environmental, quality and security concerns of insurance underwriters, regulators and charterers will generally lead to additional regulatory requirements, including enhanced risk assessment and security requirements as well as greater inspection and safety requirements on all LNG carriers in the marine transportation market. These requirements are likely to add incremental costs to our operations, and the failure to comply with these requirements may affect the ability of our vessels to obtain and, possibly, collect on, insurance or to obtain the required certificates for entry into the different ports where we operate.

Some environmental laws and regulations, such as the U.S. Oil Pollution Act of 1990, or OPA, provide for potentially unlimited joint, several, and/or strict liability for owners, operators and demise or bareboat charterers for oil pollution and related damages. OPA applies to discharges of any oil from a ship in U.S. waters, including discharges of fuel and lubricants from an LNG carrier, even if the ships do not carry oil as cargo. Vessels are required to carry onboard a ship-specific non-tank vessel response plan to address contingencies relating to discharges of any oil. In addition, many states in the United States bordering on a navigable waterway have enacted legislation providing for potentially unlimited strict liability without regard to fault for the discharge of pollutants within their waters. We also are subject to other laws and conventions outside the United States that provide for an owner or operator of LNG carriers to bear strict liability for pollution, such as the Convention on Limitation of Liability for Maritime Claims of 1976, or the "London Convention."

Some of these laws and conventions, including OPA and the London Convention, may include limitations on liability. However, the limitations may not be applicable in certain circumstances, such as where a spill is caused by a vessel owner's or operators' intentional or reckless conduct. The 2010 Deepwater Horizon oil spill has resulted in additional regulatory initiatives, including the raising of liability caps under OPA. On February 24, 2014, the U.S. Bureau of Ocean Energy Management, or BOEM, proposed a rule increasing the limits of liability for off-shore facilities under OPA based on inflation, effective in January 2015. In April 2016, the U.S. Bureau of Safety and Environmental Enforcement, or BSEE, announced a new Well Control Rule; however, pursuant to orders by the U.S. President in early 2017, BSEE announced in August 2017 that this rule would be revised.

Compliance with OPA and other environmental laws and regulations also may result in vessel owners and operators incurring increased costs for additional maintenance and inspection requirements, the development of contingency arrangements for potential spills, obtaining mandated insurance coverage and meeting financial responsibility requirements.

Please see "Item 4. Information on the Partnership—B. Business Overview—Environmental and Other Regulations."

23

**Climate change and greenhouse gas restrictions may adversely impact our operations and markets.**

Due to concern over the risks of climate change, a number of countries and the International Maritime Organization, or IMO, have adopted, or are considering the adoption of, regulatory frameworks to reduce greenhouse gas emission from ships. These regulatory measures may include adoption of cap and trade regimes, carbon taxes, increased efficiency standards and incentives or mandates for renewable energy. Although emissions of greenhouse gases from international shipping currently are not subject to the Kyoto Protocol to the United Nations Framework Convention on Climate Change, or the "Kyoto Protocol", a new treaty may be adopted in the future that includes additional restrictions on shipping emissions to those already adopted under the International Convention for the Prevention of Marine Pollution from Ships (MARPOL), and some countries have made voluntary pledges to control the emissions of greenhouse gasses. For example, the 2015 United Nations Convention on Climate Change Conference in Paris resulted in the Paris Agreement, which entered into force on November 4, 2016. While the Paris Agreement does not directly limit greenhouse gas emissions from shipping, the EU made various commitments to reduce overall greenhouse gas emissions from its member states by 2020. On June 1, 2017, the U.S. President announced that it is withdrawing from the Paris Agreement. The timing and effect of such action has yet to be determined. The IMO's Marine Environment Protection Committee, or MEPC, has already approved two sets of mandatory requirements to address greenhouse gases from ships: the Energy Efficiency Design Index, or EEDI, and the Ship Energy Efficiency Management plan, or SEEMP. At MEPC 70 and MEPC 71, a draft outline of the structure of the initial strategy for developing a comprehensive IMO strategy on reduction of greenhouse gas emissions from ships was approved. In accordance with this roadmap, initial IMO strategy for reduction of greenhouse gas emissions needs to be developed by MEPC 72, which will be held in April 2018. The IMO may implement market-based mechanisms to reduce greenhouse gas emissions from ships at the upcoming MEPC session. Compliance with future changes in laws and regulations relating to climate change could increase the costs of operating and maintaining our vessels and could require us to install new emission controls, as well as acquire allowances, pay taxes related to our greenhouse gas emissions, or administer and manage a greenhouse gas emissions program. Revenue generation and strategic growth opportunities may also be adversely affected.

Adverse effects upon the oil and gas production industry relating to climate change, including growing public concern about the environmental impact of climate change, may also have an effect on demand for our services. For example, increased regulation of greenhouse gases or other concerns relating to climate change may reduce the demand for oil and gas in the future or create greater incentives for use of alternative energy sources. Any long-term material adverse effect on the oil and gas production industry could have significant financial and operational adverse impacts on our business that we cannot predict with certainty at this time.

Please see "Item 4. Information on the Partnership—B. Business Overview—Environmental and Other Regulations."

**We operate our vessels worldwide, which could expose us to political, governmental and economic instability that could harm our business.**

Because we operate our vessels worldwide in the geographic areas where our charterers do business, our operations may be affected by changing economic, political and governmental conditions in the countries where our vessels operate, where they are registered, or where our charterers are located. Moreover, we operate in a sector of the economy that is likely to be adversely impacted by the effects of political conflicts, including the current political instability in the Middle East and other geographic countries and areas, geopolitical events such as Brexit, terrorist or other attacks, and war (or threatened war) or international hostilities, such as those between the United States and North Korea. In addition, we may be affected, either directly, or indirectly by continuing political tension in Europe between Russia and the Ukraine following Russia's annexation of Crimea through our customer Gazprom and our prospective customer Yamal, which are both based in Russia. Economic, political and governmental conditions in these and other regions have from time to time resulted in military conflicts, terrorism, attacks on ships, mining of waterways, piracy and other efforts to disrupt shipping. Future hostilities or other political instability in the geographic regions where we operate or may operate could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distributions to our unitholders. In addition, our business could also be harmed by tariffs, trade embargoes and other economic sanctions by the United States or other countries against countries in the Middle East, Southeast Asia, Russia or elsewhere as a result of terrorist attacks, hostilities or diplomatic or political pressures that limit trading activities with those countries.

**The smuggling of drugs or other contraband onto our vessels may lead to governmental claims against us.**

We expect that our vessels will call in ports where smugglers may attempt to hide drugs and other contraband on vessels, with or without the knowledge of crew members. To the extent our vessels are found with contraband, whether inside or attached to the hull of our vessels and whether with or without the knowledge of any of our crew, we may face governmental or other regulatory claims that could have an adverse effect on our business, financial condition, results of operations, cash flows, and ability to pay dividends.

24

**Failure to comply with the U.S. Foreign Corrupt Practices Act and other anti-bribery legislation in other jurisdictions could result in fines, criminal penalties, contract terminations and an adverse effect on our business.**

We may operate in a number of countries throughout the world, including countries known to have a reputation for corruption. We are committed to doing business in accordance with applicable anti-corruption laws and have adopted a code of business conduct and ethics which is consistent and in full compliance with the U.S. Foreign Corrupt Practices Act of 1977. We are subject, however, to the risk that we, our affiliated entities or our or their respective officers, directors, employees and agents may take actions determined to be in violation of such anti-corruption laws, including the U.S. Foreign Corrupt Practices Act. Any such violation could result in substantial fines, sanctions, civil and/or criminal penalties, curtailment of operations in certain jurisdictions, and might adversely affect our business, results of operations or financial condition. In addition, actual or alleged violations could damage our reputation and ability to do business. Furthermore, detecting, investigating, and resolving actual or alleged violations is expensive and can consume significant time and attention of our senior management.

**Terrorist attacks, international hostilities and piracy could adversely affect our business, financial condition, results of operations and cash flows.**

The threat of future terrorist attacks around the world and continuing instability in the Middle East and elsewhere continue to cause economic uncertainty in the global financial markets and may affect our business, financial condition, results of operations and cash flows. In addition, LNG facilities, shipyards, ships, pipelines and gas fields could be targets of future terrorist attacks or piracy. Terrorist attacks, or the perception that LNG facilities and LNG carriers are potential terrorist targets, could materially and adversely affect expansion of LNG infrastructure and the continued supply of LNG. Further, any such attacks could lead to, among other things, bodily injury or loss of life, as well as damage to the ships or other property, increased vessel operating costs, including insurance costs, reductions in the supply of LNG and the inability to transport LNG to or from certain locations. Terrorist attacks, war or other events beyond our control that adversely affect the production, storage or transportation of LNG to be shipped by us could entitle our charterers to terminate our charter contracts in certain circumstances, which would harm our cash flows and our business. We may not be adequately insured to cover losses from these incidents. In addition, crew costs, including those due to employing onboard security guards, could increase in such circumstances. Any of these occurrences could have a material adverse impact on our business, financial condition and results of operations.

**Acts of piracy on ocean-going vessels could adversely affect our business.**

Acts of piracy have historically affected ocean-going vessels trading in regions of the world such as the South China Sea and in the Gulf of Aden off the coast of Somalia. Acts of piracy could, in the future, result in harm or danger to the crews that man our vessels. In addition, if these piracy attacks result in regions in which our vessels are deployed being characterized by insurers as "war risk" zones or Joint War Committee "war and strikes" listed areas, premiums payable for such coverage could increase significantly and such insurance coverage may be more difficult to obtain. In addition, crew costs, due to employing onboard security guards, could increase in such circumstances. We may not be adequately insured to cover losses from these incidents, which could have a material adverse effect on us. In addition, detention hijacking, involving the hostile detention of a vessel, as a result of an act of piracy against our vessels, or an increase in cost, or unavailability of insurance for our vessels, could have a material adverse impact on our business, financial condition and results of operations.

25

**The vessels we own or manage could be required by our charterers' instructions to call on ports located in countries that are subject to restrictions imposed by the United States and other governments.**

Although no vessels operated by us have called on ports located in countries subject to sanctions and embargoes imposed by the U.S. government and countries identified by the U.S. government as state sponsors of terrorism, such as Iran, Sudan and Syria, in the future our vessels may call on ports in these countries from time to time on our charterers' instructions. The U.S. sanctions and embargo laws and regulations vary in their application, as they do not all apply to the same covered persons or proscribe the same activities, and such sanctions and embargo laws and regulations may be amended or strengthened over time. In 2010, the U.S. enacted the Comprehensive Iran Sanctions Accountability and Divestment Act, or CISADA, which expanded the scope of the Iran Sanctions Act. Among other things, CISADA expands the application of the prohibitions to companies such as ours and introduces limits on the ability of companies and persons to do business or trade with Iran when such activities relate to the investment, supply or export of refined petroleum or petroleum products. In addition, in 2012, President Obama signed Executive Order 13608 which prohibits foreign persons from violating or attempting to violate, or causing a violation of any sanctions in effect against Iran or facilitating any deceptive transactions for or on behalf of any person subject to U.S. sanctions. Any persons found to be in violation of Executive Order 13608 will be deemed a foreign sanctions evader and will be banned from all contacts with the United States, including conducting business in U.S. dollars. Also in 2012, President Obama signed into law the Iran Threat Reduction and Syria Human Rights Act of 2012, or the Iran Threat Reduction Act, which created new sanctions and strengthened existing sanctions. Among other things, the Iran Threat Reduction Act intensifies existing sanctions regarding the provision of goods, services, infrastructure or technology to Iran's petroleum or petrochemical sector. The Iran Threat Reduction Act also includes a provision requiring the President of the United States to impose five or more sanctions from Section 6(a) of the Iran Sanctions Act, as amended, on a person the President determines is a controlling beneficial owner of, or otherwise owns, operates, or controls or insures a vessel that was used to transport crude oil from Iran to another country and (1) if the person is a controlling beneficial owner of the vessel, the person had actual knowledge the vessel was so used or (2) if the person otherwise owns, operates, or controls, or insures the vessel, the person knew or should have known the vessel was so used. Such a person could be subject to a variety of sanctions, including exclusion from U.S. capital markets, exclusion from financial transactions subject to U.S. jurisdiction, and exclusion of that person's vessels from U.S. ports for up to two years.

On November 24, 2013, the P5+1 (the United States, United Kingdom, Germany, France, Russia and China) entered into an interim agreement with Iran entitled the "Joint Plan of Action" ("JPOA"). Under the JPOA it was agreed that, in exchange for Iran taking certain voluntary measures to ensure that its nuclear program is used only for peaceful purposes, the U.S. and EU would voluntarily suspend certain sanctions for a period of six months.

On January 20, 2014, the U.S. and E.U. indicated that they would begin implementing the temporary relief measures provided for under the JPOA. These measures included, among other things, the suspension of certain sanctions on the Iranian petrochemicals, precious metals, and automotive industries from January 20, 2014 until July 20, 2014. The JPOA was subsequently extended twice.

On July 14, 2015, the P5+1 and the EU announced that they reached a landmark agreement with Iran titled the Joint Comprehensive Plan of Action Regarding the Islamic Republic of Iran's Nuclear Program (the "JCPOA"), which is intended to significantly restrict Iran's ability to develop and produce nuclear weapons for 10 years while simultaneously easing sanctions directed toward non-U.S. persons for conduct involving Iran, but taking place outside of U.S. jurisdiction and does not involve U.S. persons. On January 16, 2016 ("Implementation Day"), the United States joined the EU and the UN in lifting a significant number of their nuclear-related sanctions on Iran following an announcement by the International Atomic Energy Agency ("IAEA") that Iran had satisfied its respective obligations under the JCPOA.

U.S. sanctions prohibiting certain conduct that is now permitted under the JCPOA have not actually been repealed or permanently terminated at this time. Rather, the U.S. government has implemented changes to the sanctions regime by: (1) issuing waivers of certain statutory sanctions provisions; (2) committing to refrain from exercising certain discretionary sanctions authorities; (3) removing certain individuals and entities from OFAC's sanctions lists; and (4) revoking certain Executive Orders and specified sections of Executive Orders. These sanctions will not be permanently "lifted" until the earlier of "Transition Day," set to occur on October 20, 2023, or upon a report from the IAEA stating that all nuclear material in Iran is being used for peaceful activities. On October 13, 2017, the U.S. President announced he would not certify Iran's compliance with the JCPOA. This did not withdraw the U.S. from the JCPOA or reinstate any sanctions. However, the President must periodically review sanctions waivers and his refusal to do so could result in the reinstatement of certain sanctions suspended under the JCPOA.

26

Although we believe that we have been in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance, there can be no assurance that we will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations. Any such violation could result in fines, penalties or other sanctions that could severely impact our ability to access U.S. capital markets and conduct our business, and could result in some investors deciding, or being required, to divest their interest, or not to invest, in us. In addition, certain institutional investors may have investment policies or restrictions that prevent them from holding securities of companies that have contracts with countries identified by the U.S. government as state sponsors of terrorism. The determination by these investors not to invest in, or to divest from, our common units may adversely affect the price at which our common units trade. Moreover, our charterers may violate applicable sanctions and embargo laws and regulations as a result of actions that do not involve us or our vessels, and those violations could in turn negatively affect our reputation. In addition, our reputation and the market for our securities may be adversely affected if we engage in certain other activities, such as entering into charters with individuals or entities in countries subject to U.S. sanctions and embargo laws that are not controlled by the governments of those countries, or engaging in operations associated with those countries pursuant to contracts with third-parties that are unrelated to those countries or entities controlled by their governments. Investor perception of the value of our common units may be adversely affected by the consequences of war, the effects of terrorism, civil unrest and governmental actions in these and surrounding countries. In addition, charterers and other parties that we have previously entered into contracts with regarding our vessels may be affiliated with persons or entities that are now or may soon be the subject of sanctions imposed by the U.S. and/or the EU or other international bodies in 2014 in response to recent events relating to Russia, Crimea and the Ukraine. If we determine that such sanctions require us to terminate existing contracts or if we are found to be in violation of such sanctions, we may suffer reputational harm and our results of operations may be adversely affected.

**Governments could requisition our vessels during a period of war or emergency, resulting in loss of earnings.**

The government of a jurisdiction where one or more of our vessels are registered could requisition for title or seize our vessels. Requisition for title occurs when a government takes control of a vessel and becomes its owner. Also, a government could requisition our vessels for hire. Requisition for hire occurs when a government takes control of a vessel and effectively becomes the charterer at dictated charter rates. Generally, requisitions occur during a period of war or emergency, although governments may elect to requisition ships in other circumstances. Although we would expect to be entitled to government compensation in the event of a requisition of one or more of our vessels, the amount and timing of payments, if any, would be uncertain. A government requisition of one or more of our vessels would result in off-hire days under our time charters and may cause us to breach covenants in debt agreements, and could have a material adverse effect on our business, financial condition, results of operations and cash flows, including cash available for distribution to our unitholders.

**Maritime claimants could arrest our vessels, which could interrupt our cash flows.**

Crew members, suppliers of goods and services to a vessel, shippers of cargo and other parties may be entitled to a maritime lien against a vessel for unsatisfied debts, claims or damages. In many jurisdictions, a claimant may seek to obtain security for its claim by arresting a vessel through foreclosure proceedings. The arrest or attachment of one or more of our vessels could interrupt our cash flow and require us to pay large sums of money to have the arrest or attachment lifted. In addition, in some jurisdictions, such as South Africa, under the "sister ship" theory of liability, a claimant may arrest both the vessel which is subject to the claimant's maritime lien and any "associated" vessel, which is any vessel owned or controlled by the same owner. Claimants could attempt to assert "sister ship" liability against a vessel in our Fleet for claims relating to another of our vessels.

**We may be subject to litigation that could have an adverse effect on us.**

We may in the future be involved from time to time in litigation matters. These matters may include, among other things, contract disputes, personal injury claims, environmental claims or proceedings, toxic tort claims, employment matters and governmental claims for taxes or duties as well as other litigation that arises in the ordinary course of our business. We cannot predict with certainty the outcome of any claim or other litigation matter. The ultimate outcome of any litigation matter and the potential costs associated with prosecuting or defending such lawsuits, including the diversion of management's attention to these matters, could have an adverse effect on us and, in the event of litigation that could reasonably be expected to have a material adverse effect on us, could lead to an event of default under our credit facilities.

27

**Risks Relating to our Common Units**

**The price of our common units may be volatile.**

The price of our common units may be volatile and may fluctuate due to factors including:

- our payment of cash distributions to our unitholders;

- actual or anticipated fluctuations in quarterly and annual results;

- fluctuations in the seaborne transportation industry, including fluctuations in the LNG carrier market;

- mergers and strategic alliances in the shipping industry;

- changes in governmental regulations or maritime self-regulatory organization standards;

- shortfalls in our operating results from levels forecasted by securities analysts; announcements concerning us or our competitors;

- the failure of securities analysts to publish research about us, or analysts making changes in their financial estimates;

- general economic conditions;

- terrorist acts;

- future sales of our units or other securities;

- investors' perception of us and the LNG shipping industry;

- the general state of the securities market; and

- other developments affecting us, our industry or our competitors.

Securities markets worldwide are experiencing significant price and volume fluctuations. The market price for our common units may also be volatile. This market volatility, as well as general economic, market or political conditions, could reduce the market price of our common units in spite of our operating performance.

**Increases in interest rates may cause the market price of our common units to decline.**

An increase in interest rates may cause a corresponding decline in demand for equity investments in general. Any such increase in interest rates or reduction in demand for our common units resulting from other relatively more attractive investment opportunities may cause the trading price of our common units to decline.

**Unitholders may have liability to repay distributions.**

Under some circumstances, unitholders may have to repay amounts wrongfully returned or distributed to them. Under the Partnership Act, we may not make a distribution to our unitholders if the distribution would cause our liabilities to exceed the fair value of our assets. Marshall Islands law provides that for a period of three years from the date of the impermissible distribution, limited partners who received the distribution and who knew at the time of the distribution that it violated Marshall Islands law will be liable to the limited partnership for the distribution amount. Assignees who become substituted limited partners are liable for the obligations of the assignor to make contributions to the Partnership that are known to the assignee at the time it became a limited partner and for unknown obligations if the liabilities could be determined from the Partnership Agreement. Liabilities to partners on account of their partnership interest and liabilities that are non-recourse to the partnership are not counted for purposes of determining whether a distribution is permitted.

**We may issue additional equity securities, including securities senior to the common units, without the approval of our common unitholders, which would dilute the ownership interests of the common unitholders.**

We may, without the approval of our common unitholders, issue an unlimited number of additional units or other equity securities. In addition, we may issue an unlimited number of units that are senior to the common units in right of distribution, liquidation and voting. These sales could also impair our ability to raise additional capital through the sale of our equity securities in the future. The issuance by us of additional common units or other equity securities of equal or senior rank may have the following effects:

- our existing unitholders' proportionate ownership interest in us will decrease;

- the amount of cash available for distribution per unit may decrease;

- the relative voting strength of each previously outstanding unit may be diminished; and

- the market price of our common units may decline.

**We have been organized as a limited partnership under the laws of the Marshall Islands, which does not have a well-developed body of partnership law.**

We are organized in the Republic of the Marshall Islands, which does not have a well-developed body of case law or bankruptcy law and, as a result, unitholders may have fewer rights and protections under Marshall Islands law than under a typical jurisdiction in the United States. Our partnership affairs are governed by our Partnership Agreement and by the Partnership Act. The provisions of the Partnership Act resemble the limited partnership laws of a number of states in the United States, most notably Delaware. The Partnership Act also provides that it is to be applied and construed to make it uniform with the Delaware Revised Uniform Partnership Act and, so long as it does not conflict with the Partnership Act or decisions of the Marshall Islands courts, interpreted according to the non-statutory law (or case law) of the State of Delaware. There have been, however, few, if any, court cases in the Marshall Islands interpreting the Partnership Act, in contrast to Delaware, which has a fairly well-developed body of case law interpreting its limited partnership statute. Accordingly, we cannot predict whether Marshall Islands courts would reach the same conclusions as the courts in Delaware. For example, the rights of our unitholders and the fiduciary responsibilities of our General Partner under Marshall Islands law are not as clearly established as under judicial precedent in existence in Delaware. As a result, unitholders may have more difficulty in protecting their interests in the face of actions by our General Partner and its officers and directors than would unitholders of a similarly organized limited partnership in the United States. Further, the Republic of the Marshall Islands does not have a well-developed body of bankruptcy law. As such, in the case of a bankruptcy of our Partnership, there may be a delay of bankruptcy proceedings and the ability of unitholders and creditors to receive recovery after a bankruptcy proceeding.

**We are a "foreign private issuer" under New York Stock Exchange, or the NYSE, rules, and as such we are entitled to exemption from certain corporate governance standards of the NYSE applicable to domestic companies, and holders of our common units may not have the same protections afforded to unitholders of companies that are subject to all of the NYSE corporate governance requirements.**

We are a "foreign private issuer" under the securities laws of the United States and the rules of the NYSE. Under the securities laws of the United States, "foreign private issuers" are subject to different disclosure requirements than U.S. domiciled registrants, as well as different financial reporting requirements. Under the NYSE rules, a "foreign private issuer" is subject to less stringent corporate governance requirements. Subject to certain exceptions, the rules of the NYSE permit a "foreign private issuer" to follow its home country practice in lieu of the listing requirements of the NYSE.

A majority of our directors qualify as independent under the NYSE director independence requirements. However, we cannot assure you that we will continue to maintain an independent board in the future. In addition, we may have one or more non-independent directors serving as committee members on our compensation committee. As a result, non-independent directors may among other things, participate in fixing the compensation of our management, making share and option awards and resolving governance issues regarding our Partnership.

Accordingly, in the future holders of our common units may not have the same protections afforded to shareholders of companies that are subject to all of the NYSE corporate governance requirements.

For a description of our corporate governance practices, please see "Item 6. Directors, Senior Management and Employees."

29

**Because we are organized under the laws of the Marshall Islands, it may be difficult to serve us with legal process or enforce judgments against us, our directors or our management.**

We are organized under the laws of the Marshall Islands, and substantially all of our assets are located outside of the United States. In addition, our directors and officers generally are or will be non-residents of the United States, and all or a substantial portion of the assets of these non-residents are located outside the United States. As a result, it may be difficult or impossible for holders of our common units to bring an action against us or against these individuals in the United States if they believe that their rights have been infringed under securities laws or otherwise. Even if holders of our common units are successful in bringing an action of this kind, the laws of the Marshall Islands and of other jurisdictions may prevent or restrict them from enforcing a judgment against our assets or the assets of our directors or officers.

**Our Partnership Agreement designates the Court of Chancery of the State of Delaware as the sole and exclusive forum, unless otherwise provided for by Marshall Islands law, for certain litigation that may be initiated by our unitholders, which could limit our unitholders' ability to obtain a favorable judicial forum for disputes with the Partnership.**

Our Partnership Agreement provides that, unless otherwise provided for by Marshall Islands law, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for any claims that:

- arise out of or relate in any way to the Partnership Agreement (including any claims, suits or actions to interpret, apply or enforce the provisions of the Partnership Agreement or the duties, obligations or liabilities among limited partners or of limited partners to us, or the rights or powers of, or restrictions on, the limited partners or us);

- are brought in a derivative manner on our behalf;

- assert a claim of breach of a fiduciary duty owed by any director, officer or other employee of us or our General Partner, or owed by our General Partner, to us or the limited partners;

- assert a claim arising pursuant to any provision of the Partnership Act; or

- assert a claim governed by the internal affairs doctrine.

regardless of whether such claims, suits, actions or proceedings sound in contract, tort, fraud or otherwise, are based on common law, statutory, equitable, legal or other grounds, or are derivative or direct claims. Any person or entity purchasing or otherwise acquiring any interest in our common units shall be deemed to have notice of and to have consented to the provisions described above. This forum selection provision may limit our unitholders' ability to obtain a judicial forum that they find favorable for disputes with us or our directors, officers or other employees or unitholders.

**Provisions in our organizational documents may have anti-takeover effects.**

Our Partnership Agreement contains provisions that could make it more difficult for a third-party to acquire us without the consent of our Board of Directors. These provisions require approval of our Board of Directors and prior consent of our General Partner.

These provisions could also make it difficult for our unitholders to replace or remove our current Board of Directors or could have the effect of discouraging, delaying or preventing an offer by a third-party to acquire us, even if the third-party's offer may be considered beneficial by many unitholders. As a result, unitholders may be limited in their ability to obtain a premium for their common units.

30

**Risks Relating to our Indebtedness**

**Our debt levels could limit our liquidity and flexibility in obtaining additional financing and in pursuing other business opportunities.**

As of December 31, 2017, we had total outstanding long-term debt of $727.6 million, consisting of amounts outstanding under our $480.0 million senior secured term loan which we entered into in May 2017, or the Term Loan B, and our 2019 Notes. In addition, we have the ability to borrow an additional $30 million under our interest free $30 million revolving credit facility with our Sponsor, or the $30 Million Revolving Credit Facility. We expect that a large portion of our cash flow from operations will be used to repay the principal and interest on our outstanding indebtedness.

Our current indebtedness and future indebtedness that we may incur could affect our future operations, as a portion of our cash flow from operations will be dedicated to the payment of interest and principal on such debt and will not be available for other purposes. Covenants contained in our debt agreements may affect our flexibility in planning for, and reacting to, changes in our business or economic conditions, limit our ability to dispose of assets or place restrictions on the use of proceeds from such dispositions, withstand current or future economic or industry downturns and compete with others in our industry for strategic opportunities, and limit our ability to obtain additional financing for working capital, capital expenditures, acquisitions, general corporate and other purposes and our ability to make distributions to our unitholders. In addition, any downgrade of our credit ratings could, among other things, adversely affect the availability of other new financing on favorable terms, if at all, and could increase our cost of borrowing which could materially affect our business, financial condition and results of operations.

Our ability to service our debt will depend upon, among other things, our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, some of which are beyond our control. If our operating results are not sufficient to service our current or future indebtedness, we will be forced to take actions such as reducing or eliminating distributions to our unitholders, reducing or delaying our business activities, acquisitions, investments or capital expenditures, selling assets, restructuring or refinancing our debt, or seeking additional equity capital or bankruptcy protection. We may not be able to effect any of these remedies on satisfactory terms, or at all.

**We may be unable to comply with covenants in our debt agreements or any future financial obligations that impose operating and financial restrictions on us.**

Certain of our existing and future debt agreements, which may be secured by mortgages on our vessels, impose and will impose certain operating and financial restrictions on us, mainly to ensure that the outstanding amount of the debt agreement does not exceed a certain percentage of the aggregate fair market value of the mortgaged vessel(s) under the applicable credit facility. For example, our Term Loan B, which is secured by, among other, first priority mortgages on the six vessels in our Fleet, requires maintenance of a loan to value ratio that does not exceed a specified percentage. Should our charter rates or vessel values materially decline in the future, we may seek to obtain waivers or amendments from our lenders with respect to such financial ratios and covenants, or we may be required to take action to reduce our debt or to act in a manner contrary to our business objectives to meet any such financial ratios and satisfy any such financial covenants. Events beyond our control, including changes in the economic and business conditions in the shipping markets in which we operate, may affect our ability to comply with these covenants. We cannot assure you that we will meet these ratios or satisfy these covenants or that our lenders will waive any failure to do so or amend these requirements.

In addition, certain of our debt agreements require us to satisfy certain other financial covenants, including maintenance of minimum free cash levels, minimum debt service coverage ratio, minimum net worth and a maximum leverage ratio.

The operating restrictions contained in our existing and future debt agreements may prohibit or otherwise limit our ability to, among other things:

- obtain additional financing, if necessary, for working capital, capital expenditures, acquisitions or other purposes on favorable terms, or at all;

- make distributions to unitholders when an event of default exists, as applicable;

- incur additional indebtedness, create liens or issue guarantees;

- charter our vessels or change the terms of our existing charter agreements;

- sell, transfer or lease our assets or vessels or the shares of our vessel-owning subsidiaries;

31

- make investments and capital expenditures;

- reduce our partners' capital; and

- undergo a change in ownership or Manager.

A breach of any of the covenants in, or our inability to maintain the required financial ratios under, our current or future debt agreements would prevent us from borrowing additional money under such debt agreements and could result in a default thereunder. Therefore, we may need to seek permission from our lenders in order to engage in some actions. Our lenders' interests may be different from ours and we may not be able to obtain our lenders' permission when needed. This may limit our ability to pay distributions, including the minimum quarterly distributions on our common units and quarterly distributions on our Series A Preferred Units, finance our future operations or capital requirements, make acquisitions or pursue business opportunities.

Events of default under the Term Loan B include, among other things, the following:

- failure to pay any principal, interest, fees, expenses or other amounts when due;

- failure to observe any other agreement, security instrument, obligation or covenant beyond specified cure periods in certain cases;

- default under other indebtedness;

- an event of insolvency or bankruptcy;

- failure of any representation or warranty to be materially correct; and

- a change of control whereby the Partnership or its affiliates no longer hold, indirectly or directly, 100% of the interests in Arctic LNG Carriers.

A violation of any of the provisions contained in our existing or future debt agreements may constitute an event of default under such debt agreement, which, unless cured or waived or modified by our lenders, provides our lenders with the right to, among other things, declare the outstanding debt, together with accrued interest and other fees, to be immediately due and payable, or to require us to post additional collateral, enhance our equity and liquidity, increase our interest payments, pay down our indebtedness to a level where we are in compliance with our loan covenants, sell vessels in our Fleet, reclassify our indebtedness as current liabilities and accelerate our indebtedness and foreclose their liens on our vessels and the other assets securing the credit facilities, which would impair our ability to continue to conduct our business.

See "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources."

**Our subsidiaries conduct the substantial majority of our operations and own our operating assets, and the right to receive payments on our 2019 Notes is structurally subordinated to the rights of the lenders of our subsidiaries.**

Our subsidiaries conduct the substantial majority of our operations and own our operating assets. As a result, our ability to make required payments on our 2019 Notes depends in part on the operations of our subsidiaries and our subsidiaries' ability to make distributions to us. To the extent our subsidiaries are unable to distribute, or are restricted from distributing, funds to us, we may be unable to fulfill our obligations under our 2019 Notes. Our subsidiaries are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay amounts due on our 2019 Notes or to make funds available for that purpose. Our 2019 Notes are not be guaranteed by any of our subsidiaries or any other person.

The rights of holders of our 2019 Notes are structurally subordinated to the rights of our subsidiaries' lenders. A default by a subsidiary under its debt obligations would result in a block on distributions from the affected subsidiary to us. Our 2019 Notes are effectively junior to all existing and future liabilities of our subsidiaries. In the event of a bankruptcy, liquidation or reorganization of any of our subsidiaries, creditors of our subsidiaries will generally be entitled to payment of their claims from the assets of those subsidiaries before any assets are made available for distribution to us.

**Our 2019 Notes are unsecured obligations and are subordinated to our secured debt.**

Our 2019 Notes are unsecured and therefore are effectively subordinated to any secured debt we maintain or may incur to the extent of the value of the assets securing the debt. In the event of a bankruptcy or similar proceeding involving us, the assets that serve as collateral will be available to satisfy the obligations under any secured debt before any payments are made on our 2019 Notes. As of December 31, 2017, we had $477.6 million of outstanding secured indebtedness. We will continue to have the ability to incur additional secured debt, subject to limitations in our credit facilities and the indenture governing our 2019 Notes. In addition, our 2019 Notes mature on October 30, 2019. If we are unable to refinance the 2019 Notes prior to maturity, we may not have sufficient funds to repay the 2019 Notes at maturity and if we cannot demonstrate our ability to refinance the 2019 Notes prior to their intended maturity our ability to continue as a going concern could be put into doubt.

**Your investment in our 2019 Notes is subject to our credit risk.**

Our Notes are unsecured general obligations of ours and are not, either directly or indirectly, an obligation of any third party. Any payment to be made on our 2019 Notes, including the return of the principal amount at maturity or any redemption date, as applicable, depends on our ability to satisfy our other debt obligations as they come due. As a result, our actual and perceived creditworthiness may affect the market value of our 2019 Notes and, in the event we were to default on our obligations, you may not receive the amounts owed to you under the terms of our Notes.

**We may not have the ability to raise the funds necessary to purchase our 2019 Notes as required upon a change of control, and our existing and future debt may contain limitations on our ability to purchase our 2019 Notes.**

Following the occurrence of a change of control event, as such is defined in the 2019 Notes indenture and supplement thereto, holders of our 2019 Notes have the right, at their option, to require us to purchase their Notes for cash. A change of control may also constitute an event of default or prepayment under, and result in the acceleration of the maturity of, our then existing indebtedness. We cannot assure you that we will have sufficient financial resources, or will be able to arrange financing, to pay the change of control purchase price in cash with respect to any 2019 Notes surrendered by holders for purchase upon a change of control. In addition, restrictions in our then existing credit facilities or other indebtedness, if any, may not allow us to purchase the 2019 Notes upon a change of control. Our failure to purchase the 2019 Notes upon a change of control when required would result in an event of default with respect to the 2019 Notes which could, in turn, constitute a default under the terms of our other indebtedness. If the repayment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and purchase the 2019 Notes and this could materially affect our financial condition.

**Some significant restructuring transactions may not constitute a change of control, in which case we would not be obligated to offer to purchase our 2019 Notes.**

Following the occurrence of a change of control event, as such is defined in the 2019 Notes indenture and supplement thereto, holders of our 2019 Notes will have the right, at their option, to require us to purchase their Notes for cash. However, the change of control provisions will not afford protection to holders of our 2019 Notes in the event of certain transactions that could adversely affect the 2019 Notes. For example, certain recapitalizations, refinancings or restructurings would not constitute a change of control requiring us to repurchase the 2019 Notes. In the event of any such transaction, holders of the 2019 Notes would not have the right to require us to purchase their Notes, even though each of these transactions could increase the amount of our indebtedness, or otherwise adversely affect our capital structure or any credit ratings, thereby adversely affecting holders of the 2019 Notes.

**Risks Relating to our Series A Preferred Units**

**Our Series A Preferred Units are subordinate to our indebtedness, and the interests of holders of Series A Preferred units could be diluted by the issuance of additional preferred units, including additional Series A Preferred Units, and by other transactions.**

Our Series A Preferred Units are subordinated to all of our existing and future indebtedness. The payment of principal and interest on our debt reduces cash available for distributions and therefore, our ability to pay distributions on, redeem at our option or pay the liquidation preference on our Series A Preferred Units in liquidation or otherwise may be subject to prior payments due to the holders of our indebtedness.

33

# Pages Omitted