# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

IN RE DYNAGAS LNG PARTNERS LP
SECURITIES LITIGATION

No. 19-cv-04512 (AJN)

**ORAL ARGUMENT REQUESTED**

**LEAVE TO FILE EXCESS PAGES
GRANTED DECEMBER 3, 2019**

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DYNAGAS ENTITY DEFENDANTS' AND THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

    A.    Dynagas Holding Enticed Investors with Dynagas's Large
          Distributions............................................................................................. 2

    B.    When Dynagas Became Unable to Support Its Distribution with its
          Cash Flow, The Company Schemed to Hide the Truth from New
          Investors through a *Ponzi*-Like Scheme ...................................................... 4

    C.    Dynagas Lied about its Ability to Sustain Distributions with Cash
          Flow and Concealed the Reduction in Dynagas's Revenue ...................... 5

          1.    Misstatements and Omissions Concerning Dynagas's
               Cashflow and its Ability to Support Distributions.......................... 5

          2.    Misstatements and Omissions Concerning the Charter
               Contracts ..................................................................................... 6

    D.    Dynagas Raised $55 Million by Issuing New Securities in October
          2018 Pursuant to a False and Misleading Prospectus ............................... 8

    E.    The Scheme Was Revealed and this Action Commenced ......................... 9

STANDARD..................................................................................................... 10

ARGUMENT .................................................................................................... 11

THE EXCHANGE ACT CLAIMS (SECTIONS 10(b), 20A and 20(a)) ..................... 11

    I.    Dynagas's Statements About Its Cash Flow and Its Ability to Support the
        Distribution Are Actionable Under Section 10(b) ................................... 12

    A.    Dynagas's Statements About Its Cash Flow Were Misstatements of
          Fact........................................................................................................ 12

          1.    The Challenged Statements Were Demonstrably False............... 12

          2.    The Alleged Misstatements Were Formulated and
               Reasonably Understood As Statements of Fact ............................ 13

          3.    Investors Reasonably Construed "Cash Flow" to Exclude
               Proceeds of Contemplated Investment.......................................... 15

i

4.     Even if the Misstatements Were "Opinions," They Would Still Be Actionable ...................................................................... 16

B.     Dynagas's Misstatements About Its Cash Flow Are Not Protected by the PSLRA's Safe-Harbor for Forward-Looking Statements ............. 17

1.     The Misstatements Falsely Described Existing Conditions, Both in Form and Substance ........................................................ 17

2.     Any Forward-Looking Elements in the Misstatements are "Severable" From the Present Elements ....................................... 19

3.     Even if the Misstatements About Dynagas's Cash Flow and Distribution Were Forward Looking, They Would Still Be Actionable ..................................................................................... 20

II.     Dynagas's Misstatements and Omissions About Its Charter Rates are Actionable Under Section 10(b), and Their Truth-on-the-Market Defense is Flawed ................................................................................................... 23

A.     Dynagas Was Obligated to Disclose the Reduction to the Charter Rates ..................................................................................................... 23

1.     Dynagas's Affirmative Statements About the Charter Contracts Gave Rise to A Duty to Disclose the Rate Reductions ................................................................................... 23

2.     The Context Surrounding Defendants' Misstatements Rendered them More Misleading ................................................. 26

3.     SEC Regulations Required Dynagas to Disclose the Imminent Loss of Revenue Due to Charter Rate Reduction ......... 27

B.     Defendants Failed To Disclose the Reduced Charter Rates and Their Truth on the Market Defense Is Flawed and, in any Event, Premature .................................................................................................. 28

1.     Data Scattered Among Available Sources Does Not Sufficiently Disclose the Charter Rates of *Arctic Aurora* or *Ob River*. .................................................................................. 28

2.     Lauritzen's Pre-Class-Period Statement about *Ob River's* Rate Reduction Is Insufficient ...................................... 29

3.     Defendants' Statements About Dynagas's Charter Rates In Fact Misled the Market ................................................................ 30

III.     The Complaint Adequately Alleges Scienter ...................................... 31

A.      Standard ................................................................................................. 31

B.      The Complaint Adequately Pleads Scienter Through Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ("Second Prong") Because Defendants Knew or had Access to Information Suggesting that Their Public Statements were not Accurate ................................................................................. 32

C.      The Complaint also Pleads Scienter by Alleging Motive and Opportunity ("First Prong") ...................................................................... 34

D.      Defendants' "Innocent Explanations" are Unavailing ............................ 35

1.      Defendants' Purported "Competing Innocent Explanation" Regarding the Sustainability of the Distribution Is not Innocent and is not Supported by the Facts ................................. 35

2.      Defendants Purported "Competing Innocent Explanation" Regarding the Charter Rates Is Legally Insufficient and is not More Cogent and Compelling the Inference of Conscious Deception .................................................................... 35

IV.     Plaintiffs Have Stated A Claim Under Section 20A Against Dynagas ............... 36

V.      Plaintiffs Have Stated A Claim Under Section 20(a) Against Dynagas Holding and Dynagas GP ........................................................................................ 38

THE SECURITIES ACT CLAIMS (SECTIONS 11, 12(a)(2) AND 15) .................................. 39

CONCLUSION .......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................. 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................. 11

*Basile v. Valeant Pharm. Int'l, Inc.*,
    No. SACV 14-2004-DOC (JCGx), 2015 WL 7352005 (C.D. Cal. Nov. 9, 2015) .......... 37

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................. 11

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)............... 19

*City of Roseville Emps' Ret. Sys. v. Energy Solutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)........................................................... 30, 39

*CompuDyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006)................................................................. 38

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    No. 18-CV-7796(VEC), 2020 WL 248729, (S.D.N.Y. Jan. 15, 2020).......................... 38

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989).................................................................................... 33

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
    2019 WL 4600934 (S.D.N.Y. Sept. 23, 2019)............................................... 38, 39

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)............................................................................................. 11

*ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................................ 32

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)......................................................................... passim

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006)................................................................................ 11

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
    No. 18-cv-00299 (AJN), 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019) ....................... 32

*In re Am. Realty Capital Props., Inc. Litig.*,
2019 WL 2082508 (S.D.N.Y. May 10, 2019) ............................................................ 29

*In re Bear Stearns Co., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................... 21

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) ........................................................ 18, 22, 39

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017) ...................................................... 17, 25, 32

*In re Carter–Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000) ..................................................................................... 36

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
No. CV H-14-3428, 2017 WL 2599327 (S.D. Tex. June 15, 2017) ......................... 37

*In re Columbia Sec. Litig.*,
155 F.R.D. 466 (S.D.N.Y. 1994) ............................................................................. 28

*In re Comverse Tech., Inc. Sec. Litig.*,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) ..................................................................... 30

*In re EDAP TMS S.A. Sec. Litig.*,
No. 14 Civ. 6069 (LGS), 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015) .................. 36

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012) ..................................................................... 28

*In re General Electric Co. Securities Litigation*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012) ............................................................... 22, 23

*In re Interpublic Sec. Litig.*,
No. 02 Civ. 6527(DLC), 2003 WL 21250682 (S.D.N.Y. May 29, 2003) ................... 34

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..................................................................... 30

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019) ..................................................................... 39

*In re Oxford Health Plans, Inc.*,
187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................... 14, 37

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................................... 21

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    No. 03 CIV.3111 RWS, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ............................ 20

*In re Salix Pharm., Ltd.*,
    No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................ 18, 21

*In re Valeant Pharm. Int'l, Inc., Sec. Litig.*,
    No. 15-7658 (MAS)(LHG), 2019 WL 2724075 (D.N.J. June 30, 2019) ........................ 37

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................................ 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011) ................................................................ 20

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ................................................................ 19, 20, 25

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ................................................................ 11

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010) ................................................................ 20

*Kahn v. Wien*,
    842 F. Supp. 667 (E.D.N.Y. 1994) ................................................................ 29

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990) ................................................................ 24, 26, 27

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014) ................................................................ 23

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) ................................................................ 39

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................ passim

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ................................................................ 26

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ................................................................ 36

*Sgalambo v. McKenzie*,
    739 F. Supp. 2d 453 (S.D.N.Y. 2010) ................................................................ 19

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)............................................................ 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................... 31

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................... 16, 17

*United States v. O'Hagan*,
    521 U.S. 642 (1997)...................................................................... 37

**Statutes**

15 U.S.C. § 78u................................................................... 11, 17, 20

**Rules**

17 C.F.R. § 229.303(a)(3)(ii).......................................................... 27

17 C.F.R. § 240.10b–5(b).............................................................. 25

Fed. R. Civ. P. 9(b)...................................................................... 11

**Other Authorities**

*Guidance Regarding MD&A*,
    Exchange Act Release No. 8350 (Dec. 19, 2003)........................... 27

H.R. Rep. No. 73-85 (1933)............................................................ 40

Court-appointed lead plaintiffs FNY Partners Fund LP ("FNY"), Mario Epelbaum and Scott Dunlop (collectively, "Lead Plaintiffs"), and plaintiff Irving Braun (together with Lead Plaintiffs, "Plaintiffs"), submit this memorandum in opposition to the Dynagas Entity Defendants' and the Underwriter Defendants' Motion to Dismiss ("Motion," Dkt. No. 73) Plaintiffs' Amended Class Action Complaint, dated September 26, 2019 (Dkt. No. 50) (the "Complaint").

## PRELIMINARY STATEMENT

The Complaint presents an extraordinarily strong securities fraud case because the corporate defendant's top executives have unequivocally admitted that their material statements of existing fact were false, ***and that they knew those statements to be false when they made them***.

Specifically, Dynagas LNG Partners LP ("Dynagas" or the "Company") and its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") falsely and repeatedly stated in 2018 that the Company's then-current cash flow profile "definitely" supported a quarterly distribution to shareholders of 25 cents per share of common stock[1] then and for "years" to come.[2] In reality, Dynagas concealed the fact that the long-term charter contracts for two of its six ships, *Arctic Aurora* and *Ob River*, had been renewed at substantially lower rates, causing a 15% drop in the Company's revenue such that Dynagas became unprofitable and therefore unable to support the distribution with its cash flow.

Knowing the distribution could not be supported by its diminished cash flow, Dynagas and its top management schemed to issue new securities on the strength of their false statements and to use the proceeds from those sales to pay the distribution, akin to a *Ponzi* scheme. To further that scheme, Dynagas registered an additional $750 million of new securities. The scheme collapsed

---

[1] Dynagas's common units representing limited partner interests are referred to as "shares" of "common stock."

[2] Dynagas also said the distribution was supported for the "long term" and "for the foreseeable future." *See* Appendix A hereto ("App. A"), which fully quotes the misstatements discussed herein, at Nos. 8, 9, 12, 13.

when Dynagas was only able to sell $55 million worth of preferred units (the "October 2018 Offering")—barely enough to pay the distribution through the third quarter of 2018. As a result, Dynagas was forced to cut the distribution just one quarter after it had last assured investors that "the distribution is supported by our current cash flow profile for quite a long time." When asked to explain, a senior Dynagas executive publicly admitted that Dynagas had intended throughout 2018 to support the distribution with the proceeds of stock sales, ***not cash flow***, and that this plan would work only if the market for Dynagas shares improved. The price of Dynagas's common stock fell nearly 80% in the wake of the revelations that Dynagas had lied about its charter rates and, relatedly, about the Company's cash flow profile and ability to support the distributions that caused investors to invest in Dynagas in the first place. Plaintiffs brought this action to recover the losses they suffered as a result of Dynagas's scheme.[3]

Defendants now offer an array of lame *post-hoc* excuses and strawman arguments in an effort to escape liability for their violations of the Securities Exchange Act of 1934 (the "Exchange Act"), each of which should be rejected for reasons set forth below.

## STATEMENT OF FACTS

### A. Dynagas Holding Enticed Investors with Dynagas's Large Distributions

Dynagas Holding is a privately-owned corporation based in Monaco and incorporated in the Marshall Islands, which owns and operates liquified natural gas ("LNG") tanker ships. ¶¶ 4, 23.[4] In 2013, Dynagas Holding created Dynagas as a public subsidiary, for the purpose of extracting capital from the United States financial markets. ¶¶ 4, 23-25. Dynagas Holding

---

[3] Plaintiffs brought this action on behalf of themselves and all other persons or entities that, during the period from December 21, 2017 through March 21, 2019, inclusive (the "Class Period"), purchased or otherwise acquired Dynagas securities, purchased or otherwise acquired call options on Dynagas securities or sold or otherwise transferred put options on Dynagas securities, excluding all Defendants (the "Class").

[4] "¶ __" herein refers to the corresponding paragraph in the Complaint (Dkt. No. 50).

immediately installed its owner (Defendant George J. Prokopiou ("Prokopiou")) as the chairman of Dynagas's board of directors, and its General Manager (Defendant Tony Lauritzen ("Lauritzen")) as Dynagas's CEO, positions which they continue to hold to this day. ¶¶ 41, 42.

Dynagas has been an extremely profitable venture for Dynagas Holding and Prokopiou,[5] who sold six tanker ships to Dynagas in transactions that Dynagas funded through public investment. ¶ 23. Dynagas paid full market value for the ships using the money it raised from the public. ¶¶ 57, 59. But Dynagas Holding retained approximately half of its stake in Dynagas, meaning it was paid full price for the ships, but still owned an indirect 50% interest in them and was therefore able to take half of the large distributions it caused Dynagas to pay from 2013 until 2018. ¶ 25. Dynagas Holding also caused Dynagas to use a Dynagas Holding affiliate to manage the Dynagas fleet, so that part of Dynagas's "costs" were effectively paid to Dynagas Holding. Thus, the funds raised from the public investment in Dynagas were siphoned to Dynagas Holding through a variety of related-party transactions and distributions. ¶ 1. Indeed, from 2013 to 2018, Dynagas Holding received approximately $1 billion in cash from Dynagas. ¶¶ 25, 58. *See* Appendix B hereto ("App. B") No. 1; *see also* Appendix C hereto ("App. C") for a graphical summary of certain key allegations, arranged chronologically as a timeline.

Investors in the United States were encouraged to invest in Dynagas with promises of large quarterly distributions and repeated assurances from management that such distributions could be sustained based on Dynagas's profits. ¶¶ 1, 63. Dynagas, Laritzen and Dynagas CFO, Defendant Michael Gregos ("Gregos"), regularly touted the stability and transparency of Dynagas's revenue stream and explained in quarterly investor presentations that its "stable, visible" cash flow was provided by long-term charter contracts with reliable counterparties. ¶¶ 10, 103. From 2013

---

[5] Dynagas Holding is owned by Defendant Prokopiou's family, which includes Dynagas CEO Lauritzen. ¶¶ 1, 148.

through 2017, Dynagas consistently paid quarterly distributions of at least 36.5 cents per share. ¶ 64. This large, consistent distribution made Dynagas stock attractive to investors, and analysts who covered the stock highlighted the distribution as a key feature of the investment thesis. ¶¶ 1, 5.

### B. When Dynagas Became Unable to Support Its Distribution with its Cash Flow, The Company Schemed to Hide the Truth from New Investors through a *Ponzi*-Like Scheme

In late 2017 and into early 2018, Dynagas conducted an internal financial review and concluded that it would no longer be able to pay its historically generous distribution. ¶¶ 6, 75, 89, 101. A major reason was the fact that—unbeknownst to investors—the charter contracts on two of its six tanker ships were set to expire in 2018 and Dynagas had agreed to new long-term charter contracts for those ships at substantially reduced rates. ¶¶ 6, 9-10, 99. Following the completion of the review, Dynagas cut the quarterly distribution to 25 cents-per-share, which was still more than the Company's revenue could sustain. ¶ 89. However, Dynagas understood that a further cut in the distribution would deter public investment in Dynagas and interrupt the stream of money from the investing public (through Dynagas) to Dynagas Holding. ¶ 59. Dynagas and its senior management therefore devised a *Ponzi*-like scheme to issue new equity to support the otherwise unsustainable distribution payments to existing investors, and to this end filed a registration statement allowing Dynagas to issue up to $750 million in new securities. ¶¶ 7, 75. Of course, Dynagas and its management did not disclose this plan to either existing or new investors.

To enable their scheme, Dynagas and its CEO and CFO told investors the lie that is at the center of this action: that the Company's then-current cash flow profile supported the 25-cent distribution. Dynagas was able to mislead investors about a severe reduction to the charter rate with respect to one of Dynagas's six tanker ships, *Arctic Aurora*, and failed to adequately disclose a similar reduction with respect to another, *Ob River*. Instead, investors were led to believe that both tanker ships were employed at their prior rate, in "direct continuation" and "extension" of

their existing contracts. These rate changes slashed Dynagas's overall revenue by 15% and rendered Dynagas's cash flow unable to support the 25-cent distribution (*See* App. B No. 4)—all facts known to Dynagas at the time it registered hundreds of millions of dollars in new securities in December 2017 and months before it made a series of misrepresentations regarding its cash flow's ability to support distributions.

### C. Dynagas Lied about its Ability to Sustain Distributions with Cash Flow and Concealed the Reduction in Dynagas's Revenue

#### 1. Misstatements and Omissions Concerning Dynagas's Cashflow and its Ability to Support Distributions

On April 18, 2018, Dynagas announced its new quarterly distribution of 25 cents per quarter per share in a press release that assured investors that further cuts would not be necessary, in statements linking the distribution to the Company's cash flow.[6] But, as stated above, Dynagas knew the distribution could not be paid from cash flows and instead schemed to pay it to existing investors by raising money from new investors. ¶¶ 12, 74, 94.

Dynagas then escalated the deception by making explicit what was implied by its prior written press release. On a May 17, 2018 conference call with investors, Gregos was asked: "So now that the distribution is more aligned with the suitable cash flow, do you feel like this current level is pretty easily sustainable in the coming quarters and years?" Gregos responded:

> *Yeah, definitely*. What we want to achieve was this alignment. And as *for the foreseeable future this distribution, as I mentioned before is sustainable*. Basically, the expectations that we have on the market, there are some moving parts . . . *But under a reasonable scenarios [sic]; yes, definitely this distribution is sustainable*.

¶ 96; App. A No 12. This statement was false and misleading because the distribution was not

---

[6] The press release stated that the new distribution "aligns the Partnership's cash flows with our cash payment obligations." ¶ 89; *see also* App. A No. 8. The press release further stated: "we believe the new distribution level is viable on an actual cash basis since it reduces the Partnership's current need to utilize existing cash reserves to fund distributions to unitholders." *Id.*

"aligned" with the Company's cash flow, but rather would need to be paid out of proceeds from new investment. ¶ 75. On the same call, Lauritzen was asked for an example of a scenario that would threaten the distribution. ¶ 98; App. A No. 11. He repeated language only about "extreme scenarios," and still did not mention that the distribution depended on new investment. *Id*. Analysts cited management's statements and commented that the distribution was maintainable.[7]

Three months later, during the next earnings conference call with investors, Dynagas escalated further, with Gregos stating: "Of course, you ask how do you envision maintaining the distribution. I think the maintaining this [distribution] ***we've already achieved that*** with our previous distribution realignment, I mean, if you look at our cash flows, they're supported, ***the distribution is supported by our current cash flow profile for quite a long time***." ¶ 109; App. A at 14. This statement was false and misleading because it (1) falsely stated that no further action was required to maintain the distribution, (2) falsely stated that the distribution could be sustained based on the Company's cash flow profile, and (3) misleadingly omitted that new investment would be required in order to pay the distribution going forward. Never during the Class Period did Dynagas say that the distribution depended on the sale of new securities.

### 2. Misstatements and Omissions Concerning the Charter Contracts

On December 20, 2017, while its internal financial review was ongoing, Dynagas entered into a new multi-year charter contract for *Arctic Aurora* with the same entity to which it was then chartered (Statoil ASA ("Statoil"), now called Equinor). ¶¶ 6, 72. This charter was set to begin in the third quarter of 2018, shortly after the expiration of the prior charter, but would provide a

---

[7] *See* Credit Suisse February 20, 2018 (reporting Dynagas's "Long-Term Story Very Much Intact"); Maxim Report May 17, 2018 ("The distribution coverage ratio of 1.08x was higher than our 1.02x forecast, and marked a return back above 1.0x since 1Q17. The annualized $1.00 distribution is currently yielding 12.4%, which we believe is safe through our forecast period."); Jeffries Report July 27, 2018 ("Management said the distribution is "safe" at current levels, and we expect it may even be increased in 2H19 after all the long-term charters have commenced."). Declaration of Andrew J. Entwistle, submitted herewith ("Entwistle Decl."), Exs. A, B and C.

substantially lower rate to Dynagas than what Dynagas was receiving at the time. ¶¶ 72, 75. The following day, Dynagas issued a press release, which was also filed with the Securities and Exchange Commission ("SEC") and which stated:

> The Partnership has entered into a new three year charter agreement with Statoil ASA ("Statoil") for the employment of the Arctic Aurora, its 2013-built, 155,000 cubic meter, tri-fuel diesel engine, ice class LNG carrier (the "Extended Charter"). The Arctic Aurora is currently, and has been since 2013, on charter to Statoil (the "Current Charter"). **The Extended Charter is expected to commence in the third quarter of 2018 in direct continuation of the Current Charter** (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of about 3 years +/- 30 days. ***Statoil will have the option to extend the Extended Charter by two consecutive 12-month periods at escalated rates.***

¶ 81; App. A No. 1; Entwistle Decl., Ex. D (emphasis added).

This statement was false and misleading because it falsely stated that the new contract was an "extended charter" in "direct continuation of the current charter" when in fact it was a new contract on terms so unfavorable that it would reduce Dynagas's revenue by approximately 7%. App. B No. 3.

Also on December 21, 2017, Dynagas filed with the SEC a registration statement and prospectus for up to $750 million in new securities. While the registration statement noted the charter contract for *Arctic Aurora*, it omitted any indication that the rate would be reduced to a degree that would cause Dynagas's revenue to fall by 7%—a fact Dynagas knew at the time of filing. App. A No. 2. The substance of these misstatements was repeated in an earnings release dated February 15, 2018, accompanied by language touting Dynagas's "success" in securing the "extended" charter and converting the parenthetical on which Defendants now rely to an independent clause. App. A No. 4. These statements each omitted that *Arctic Aurora* was committed to a lower charter rate.

During the same period, the Company concealed that another of its ships, *Ob River*, was also committed to a lower charter rate beginning in the second quarter of 2018.[8] Collectively, the renegotiation of the charter terms for *Arctic Aurora* and *Ob River* reduced Dynagas's revenue by approximately 15%. App. B No. 4.

### D. Dynagas Raised $55 Million by Issuing New Securities in October 2018 Pursuant to a False and Misleading Prospectus

By the fourth quarter of 2018, both *Ob River* and *Arctic Aurora* were employed and operating at their substantially reduced rates, and Dynagas's earnings were negative. ¶¶ 73, 107, 124. Understanding that their plan to entice new investment depended on Dynagas's apparent ability to pay a consistently high distribution, Dynagas began selling securities pursuant to the shelf-registration statement it had filed in December 2017. ¶ 150. In this regard, Dynagas conducted an Initial Public Offering ("IPO") of 2.2 million Series B Preferred Units in the October 2018 Offering. Dynagas issued $55 million in that offering, enough to make up the shortfall, pay its distribution to Dynagas Series A Preferred Unitholders, and still pay the 25-cent distribution to its common stockholders. App. B No. 5.

The October 2018 offering was underwritten by the Underwriter Defendants[9] and made pursuant to a registration statement and prospectus which repeated in substance the misstatements from the December 21, 2017 registration statement and prospectus, and incorporated Dynagas's

---

[8] The contract was entered prior to the December 21, 2017 start of the Class Period. In addition to failing to disclose *Ob River's* reduced rate, Defendants' affirmatively misrepresented the contract with a presentation slide showing *Ob River's* charter as a continuous line through 2028. This is contrasted with a similar slide from 2015 which conspicuously called out the fact that another Dynagas ship's charter had been renewed at a higher rate. ¶¶ 104-5; App. A. No. 15. "Section 10(b) of the Exchange Act bars conduct 'involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive.'" *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Dynagas did not describe the *Ob River's* new contract as a "direct continuation," even though it was with the same charterer and commenced upon the expiration of the prior charter. ¶ 108.

[9] The "Underwriter Defendants" are, collectively, UBS Securities LLC, Stifel, Nicolaus & Company, Incorporated, Morgan Stanley & Co. LLC, and B. Riley FBR, Inc.

2017 annual report, filed March 9, 2018. ¶ 12; Entwistle Decl., Exs. E, F. These offering materials omitted the *Arctic Aurora's* rate reduction, despite the fact that, by then, the new rate was in effect. ¶ 121; App. A No. 2.

Notably, in the October 2018 Offering, Dynagas issued only about 7% of the $750 million worth of securities it had registered. The inability to sell the remaining $695 million worth of securities at an acceptable price thwarted Dynagas's *Ponzi*-like scheme to continue to hide the truth about *Arctic Aurora's* reduced charter rate. ¶¶ 16, 138-39.

### E.  The Scheme Was Revealed and this Action Commenced

On November 15, 2018, Dynagas issued a press release discussing its third quarter 2018 financial results. ¶¶ 13, 123. The earnings that the Company reported for the third quarter were lower than its earnings for the second quarter, lower than its earnings for the third quarter of 2017, and lower than analysts' expectations. ¶ 123. In the press release, when explaining the disappointing financial results for the third quarter of 2018, the Company revealed **for the first time** that *Arctic Aurora's* current long-term charter contract was not a direct continuation of its prior contract on substantially similar terms, but rather a new contract that provided a far lower rate, and therefore, significantly less revenue to Dynagas. ¶ 124. App. A No. 18.

On a conference call the following day, Dynagas tacitly indicated to the market that the distribution was in jeopardy.[10] The price of Dynagas common stock slid from $7.76 per share to $4.08 per share in the wake of these revelations. ¶¶ 127-29. Indeed, on January 25, 2019, Dynagas announced the reduction of its distribution to $.0625 per share, resulting in a further 30% decline

---

[10] An analyst asked Gregos whether there were concern about Dynagas's ability to pay the distribution going forward given that the fleet was fully contracted for many years. ¶ 125.  Gregos declined to confirm that the distribution was supported by the Company's cash flow.  *Id*.  Some analysts correctly inferred that the distribution was in jeopardy. ¶ 128; Berenberg Report November 16, 2018 ("[W]e expect [the Company's] upcoming debt maturities, softer charter-rollovers and lack of spot exposure in a firming rate environment to pressure DLNG's near-term distribution coverage and performance.") Entwistle Decl., Ex. G.

in the price of Dynagas's common stock. ¶¶ 130-32. The final corrective disclosure came on Dynagas's March 21, 2019 announcement of disappointing earnings for the fourth quarter of 2018, which reflected the full impact of the reduced charter rates for *Ob River* and *Arctic Aurora* and which fell short of consensus analyst expectations. Dynagas's stock price fell 79% between November 14, 2018 and March 21, 2019.[11]

The following day, on March 22, 2019, Defendant Gregos made an extraordinary admission during a conference call with investors. Gregos admitted that, even as of April 2018, Dynagas had intended to sustain the distribution through the issuance of equity, and that the plan failed because the market did not thereafter improve as they had expected. Gregos explained:

> When we did our previous [distribution] cut, we had assumed that the MLP market broadly would improve going forward, and enable us and other MLPs to issue cheap equity, whereas, that didn't happen. And that is a reason why we had to make a second cut and a more severe cut . . . .

¶ 138; Entwistle Decl., Ex. H. Thus, Gregos not only contradicted Dynagas's numerous Class-Period statements to the effect that the Company's cash flow supported the 25-cent distribution, he admitted that he and Lauritzen ***knew*** that this was not true "when [they] did [their] previous cut," in April of 2018. This lawsuit followed.[12]

## STANDARD

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court accepts the truth of the

---

[11] After the end of the Class Period, Dynagas eliminated the distribution altogether until 2024, and its stock currently trades at around $2 per share, one-ninth of the price at which it was issued in its 2013 IPO. Entwistle Decl., Ex. I.

[12] The initial complaint in this action was filed on May 16, 2019 and asserted claims under: (i) Section 10(b) against Dynagas, Lauritzen and Gregos; and (ii) under Section 20(a) against Dynagas Holding, Dynagas's general partner, Dynagas GP LLC ("Dynagas GP"), and Dynagas's chairman and founder, George Prokopiou. Following the Court's appointment of lead plaintiffs and further investigation, Plaintiffs filed the operative Complaint on September 26, 2019, which alleged an expanded Class Period and against Dynagas under: (iii) Section 20A. The Complaint also alleges claims under the Securities Act related to the October 2018 Offering, specifically: (iv) Section 11 against Dynagas, Gregos, Dynagas's directors and the Underwriter Defendants; (v) under Section 12(a)(2) against Dynagas and the Underwriter Defendants; and (vi) under Section 15 against Dynagas Holding, Dynagas GP, and all individual defendants.

facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). A complaint must set forth "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning that the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

A complaint alleging securities fraud pursuant to Section 10(b) of the Exchange Act is subject to two heightened pleading standards. <u>First</u>, the complaint must satisfy Rule 9(b), which requires that it "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). <u>Second</u>, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)).

## ARGUMENT
## THE EXCHANGE ACT CLAIMS (SECTIONS 10(b), 20A and 20(a))

To state a claim under Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). By their Motion, Defendants challenge only the first two of these elements (misstatement/omission and scienter), and their arguments fail

for the reasons discussed below.

## I. Dynagas's Statements About Its Cash Flow and Its Ability to Support the Distribution Are Actionable Under Section 10(b)

The Complaint faithfully quotes statements by Dynagas and its executives throughout the Class Period in which management told investors the Company's current cash flow profile had the ability to support a 25-cent-per-quarter-per-share distribution. Defendants now misconstrue these statements as opinions, but this argument fails because the misstatements in question were statements of mathematical fact.

Defendants also seek refuge in the PSLRA's safe harbor for "forward-looking" statements, but their arguments fail because: (1) the misstatements at issue were about the Company's current condition, in form and substance; (2) any forward-looking element of the misstatements is severable under Second Circuit law; and (3) even if the statements were considered forward looking, they would still be actionable.

### A. Dynagas's Statements About Its Cash Flow Were Misstatements of Fact

#### 1. The Challenged Statements Were Demonstrably False

Together, the alleged misstatements related to Dyangas's cash flow tell a single, unified lie: Dynagas's known fixed revenue (less known fixed costs) provided enough cash to pay investors a distribution of 25 cents per share. Whether Dynagas's cash flow profile could support a distribution of a certain level was a question of arithmetic fact derived from existing contracts— a fact Dynagas touted repeatedly as transparent, predictable, and stable. ¶ 65; App. A No.15. Dynagas answered this question falsely on two investor calls. ¶¶ 96-97, 109-110; App. A. Nos. 7, 12, 14. Dynagas's revenue was essentially fixed for years to come, because its fleet was fully committed to long-term charter contracts. On the other side of its ledger, Dynagas's ordinary operating costs are essentially fixed: it has a long-term services contract with its general partner

(owned by Dynagas Holding), its charterers pay all tolls and other variable expenses, and regular maintenance is scheduled and largely predictable.[13]

The simple fact here is that Dynagas went out of its way to assure investors of the stability, transparency and predictability of its cash flows over long periods of time by confirming revenue and costs were tied directly to long term charter and operating contracts and cash flow was therefore easily calculated. Defendants did this because they knew investors' appetite for Dynagas equity was dependent entirely on the sustainability of the distribution. By concealing a 15% reduction in charter contract revenues Dynagas concealed the fact of the reduced revenues and misrepresented that the Company's cash flow would be sufficient to pay shareholders 25 cents per share out of cash flows. In fact, the two rate reductions from the new *Artic Aurora* and *Ob River* contracts collectively cost Dynagas $19 million per year. App. B No. 4. This $19 million sum would be enough to pay the 25-cent quarterly distribution to all public shareholders (who collectively own 20 million shares of Dynagas common stock) for years to come. Defendants' criticisms notwithstanding, causation—like the materiality and falsity of their factual misstatements and omissions—is established as a matter of simple math. Such "a determinate, verifiable statement" is not an "opinion." *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015) ("*Omnicare*"). This is particularly true where, as here, Defendants have admitted that the reason its financial results deteriorated was the lower rate for the *Artic Aurora* and *Ob River* contracts, to which it committed before the Class Period. ¶ 124; App. A No.18.

### 2. The Alleged Misstatements Were Formulated and Reasonably Understood As Statements of Fact

Defendants argue that "nearly all" of Dynagas's statements are phrased as opinions because

---

[13] The Company routinely touted the predictable nature of its cash flow from charter contracts. ¶ 65. App. A No. 15.

each colloquy includes phrases such as "I think" somewhere in the vicinity of the statement. As an initial matter, Defendants ignore that the key misstatements either lack phrases such as "I think," or attach them to other statements in the colloquy. For example, Gregos stated in response to a question: "as for the foreseeable future this distribution, as I mentioned before is sustainable." And, referring to another key misstatement, Defendants deceptively quote Gregos as saying: "I think . . . the distribution is supported by our current cash flow profile for quite a long time." Def. Mem. at 25.[14] But Gregos actually made the operative misstatement of fact as a separate thought without any qualifier, and even indicated that any observer with access to the cash flow information would draw the same conclusion (which makes sense because math is not opinion based). Gregos, in fact, said:

> Of course, you ask how do you envision maintaining the distribution. I think the maintaining this [distribution] we've already achieved that with our previous distribution realignment, ***I mean, if you look at our cash flows, they're supported, the distribution is supported by our current cash flow profile for quite a long time***."

¶ 11; App. A No. 14. Indeed, Defendants' only authority on this point, *Omnicare,* notes that "some sentences that begin with opinion words like 'I believe' contain embedded statements of fact."

*Omnicare* illustrates this point as follows:

> Suppose the CEO in our running hypothetical said: "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access." That statement may be read to affirm not only the speaker's state of mind, as described above, but also an underlying fact: that the company uses a patented technology.

575 U.S. at 185. Similarly here, Gregos's statement quoted above "may be read to affirm . . . an underlying fact: that the" distribution was supported by the cash flow profile. *See also In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("It is disingenuous to suggest that

---

[14] "Def. Mem." refers to Defendants' memorandum in support of their Motion, Dkt. No. 74.

factual assertions are puffery and opinion that no reasonable investor could reasonably rely on for their truth simply because [defendant] claims only to have stated that it believes in their truth. . . . . . . inserting the word 'belief' before stating, 'The fundamentals of our business remain strong," [and] "our business remains profitable,' . . . does not change the assertive nature of the statements.")

### 3. Investors Reasonably Construed "Cash Flow" to Exclude Proceeds of Contemplated Investment

Defendants also argue spuriously that their statements about cash flow were not false because, at the time, Dynagas's "current cash flow profile" in early 2018 included any amount of debt or equity that the Company might later issue to fund its distribution. This argument depends on the false premise that "cash flow" should be understood to include proceeds of new debt or equity, which is inconsistent with common usage and analysts' understanding and, in any event, is not appropriately decided on a motion to dismiss.

As alleged in the Complaint, the Company and its management regularly used "cash flow" to mean cash derived from the Company's only source of revenue, charter contracts. For example:

- The 2013 IPO prospectus states: "We derive all our revenue and cash flow from two charterers . . . ." The Company's annual reports filed in 2018 and 2019 contain similar language.  Entwistle Decl. Exs. F, I and J.

- The Company gave quarterly presentations—including presentations released contemporaneously with the misstatements at issue—which stated that "**contracts** provide cash flow," and advertised that cash flow was therefore stable and predictable. ¶¶ 10, 103

- the day before Gregos made his first misstatement about cash flow profile and its ability to sustain the distribution, the Company filed a Form 6-K that defined distributable cash flow as not including the proceeds of new debt and equity.[15]

- the Company publicly reported its "cash flow" for 2018 without including the $55 million it raised in the October 2018 offering.[16]

---

[15] Entwistle Decl., Ex. K at 17 (last page).

[16] Dynagas Form 20-F, filed April 24, 2019, Entwistle Decl. Ex. J.

Defendants do not provide an example where Dynagas (or anyone else) referred to the proceeds of new debt or equity as part of a company's "cash flow." To the extent that Defendants dispute the meaning of cash flow apparent from Dynagas's filings and their other statements over the years, that dispute must be resolved in Plaintiffs' favor on a motion to dismiss. *See Ganino*, 228 F.3d at 164-65 (whether fees were "income" was a question of fact that could not be resolved on a motion to dismiss).

### 4. Even if the Misstatements Were "Opinions," They Would Still Be Actionable

Statements of opinion or belief are actionable under Section 10(b) where: (1) the speaker did not hold the belief professed; (2) the supporting facts supplied were untrue; or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 189). Only one of these conditions need be met, but here, all three are.

Regarding the <u>first</u> prong, the Complaint alleges that Gregos did not believe that the then-current cash flow profile could support the distribution. In support, Plaintiffs offer a Gregos's own admission that Dynagas intended to issue new equity to fund the distribution rather than supporting it with cash flow. The Complaint also alleges that the CEO and the CFO actually knew that the cash flow did not support the distribution because this could be determined mathematically and Dynagas had just completed a financial review which examined the sustainability of the cash flow. *See Omnicare*, 575 U.S. at 184 (expressions of opinions not genuinely held are actionable).

Regarding the <u>second</u> prong, the supporting facts were untrue. Even if the Court were to agree with Defendants' false premise that the misstatements were a "prediction" (that the distribution would be paid), the supporting fact supplied (that the current cash flow profile could support such a distribution) was false for the reasons discussed in Section I.B.3, *supra*.

Regarding the <u>third</u> prong, each and every of Dynagas's statements regarding the sustainability of the distribution omitted material facts whose omission made the statements misleading to a reasonable investor, including: (i) Dynagas's fixed costs exceeded its fixed revenue; (ii) Dynagas intended to sustain the distribution through the issuance of cheap equity (or debt); and (iii) the plan would only work if the market improved. These omitted facts conflict with what a reasonable investor would take from Dynagas's statements: that, at *status quo*, the Company would generate enough revenue to keep paying the distribution after paying its fixed costs, which conflicts with the information omitted.[17]

### B. Dynagas's Misstatements About Its Cash Flow Are Not Protected by the PSLRA's Safe-Harbor for Forward-Looking Statements

Defendants argue that "several of the challenged statements regarding the distribution are forward-looking," and thus fall within the PSLRA's safe harbor. Def. Mem. at 26 (citing 15 U.S.C. § 78u-5(c)). This argument fails because: (1) the misstatements were not forward looking; (2) any forward-looking elements are severable from the misstatements of present and historical fact; and (3) even if the misstatements were considered forward looking, they do not otherwise fall within the PSRLA's safe harbor.

### 1. The Misstatements Falsely Described Existing Conditions, Both in Form and Substance

The PSLRA's safe harbor does not apply to the alleged misstatements because they were not forward looking. For one thing, they are stated as current and historical facts, using primarily the present (and past) tense. For example, on Dynagas's July 27, 2018 conference call, Gregos's

---

[17] *Omnicare*, 575 U.S. at 189 (statement of opinion actionable where it "omits material facts about the issuer's inquiry into or knowledge" concerning the statement, and "those facts conflict with what a reasonable investor would take from the statement itself." *See also Sanofi*, 816 F.3d at 210 (citing *Omnicare*) ("opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 753–54 (S.D.N.Y. 2017) (citing *Omnicare* and *Sanofi*).

statements included the phrases "already achieved," "they're supported," and "the distribution *is* supported." ¶ 109; App. A No. 14. The statement also omits that Dynagas *at that time* envisioned maintaining the distribution by issuing cheap equity following a market improvement (because it had lost 15% of its revenue due to rate reductions and thus could not support the distribution with cash flow), which would be an economically unsustainable *Ponzi* scheme.

Dynagas's Class-Period statements about the its then-current cash flow profile were also substantively statements of current fact because they concerned the *current* financial profile of the company. This is true for essentially the same reasons that the statements are not opinions: the ability of the cash flow profile to sustain the distribution could be determined by applying arithmetic to current, known quantities, based on then-existing conditions and without reference to future events. Thus, Dynagas's statements about the cash flow profile were statements of current conditions, not "projections."

Defendants point out that the challenged statements referred to distributions that would necessarily be paid to investors *in the future*, which is true, but is also sleight of hand. As stated above, the core misstatement at issue was not that the distribution would be paid, but that the *current* cash flow profile supported it. Further, it is well settled that misstatements about future proceeds are not "forward looking" under the PSLRA when the source of such proceeds has already been compromised. *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016) (statement by company president implying that he expected customers to increase their inventory in the coming quarter(s) despite knowing inventory was "astronomically" higher than past levels was misstatement of present fact).[18]

---

[18] *See also In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 736-37 (S.D.N.Y. 2015) (statement that revenue going forward would be relatively flat was not protected where company had already lost a major contract).

Likewise here, Dynagas had already committed all of its ships—*for years*—to charter contracts that would not support the distribution. This presents an even clearer example of a misstatement of current fact than *Salix*, because in *Salix,* there was at least some chance that customers would increase their stockpiles still further, whereas here, the charter contracts were entirely locked in.

### 2. Any Forward-Looking Elements in the Misstatements are "Severable" From the Present Elements

If the Court determines that the alleged misstatements contain both actionable present elements and forward-looking elements, the case should be allowed to proceed at least with respect to the present elements. *In re Vivendi, S.A. Sec. Litig.* ("*Vivendi I*"), 838 F.3d 223, 245 (2d Cir. 2016).[19] In *Vivendi*, a telecom and entertainment company lied by omission when it concealed the risk that it would not be able to meet its future debt obligations. Prior to the revelation of that risk, the company repeatedly assured investors that it was confident it would meet its future debt obligations based on its existing cash flow. For example, a press release stated that "'[o]wing to its strong free cash flow,' combined with other factors, Vivendi was 'confident of its capacity to meets its anticipated obligations over the next [year].'" *Vivendi I*, 838 F.3d at 237 (alterations in original). This statement was false and misleading because it omitted that the company intended to meet its existing obligations by taking new debt and selling assets, rather than with its cash flow. On appeal from a plaintiffs' verdict rendered in this Court, the Second Circuit affirmed, explaining that "'[a] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements" *Vivendi I*,

---

[19] *See also City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM) (THK), 2013 WL 1197755, at *13 (S.D.N.Y. Mar. 25, 2013) (earnings projections that incorporated sales of failing fashion line were not protected because "'mixed' statements that have both a forward-looking aspect and a representation of present or historical fact are not protected with respect to the latter."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (estimates of future economic output of natural gas wells linked to existing test results were actionable).

838 F.3d at 246 (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010). Therefore, the Second Circuit affirmed the verdict for plaintiffs and explicitly held that this, and other similar statements, were actionable. *Id*. at 251-52, 265. Here, even if Defendants were correct that the statements contain a protected forward-looking element (payment) the present elements (cash flow profile) would still be actionable.

### 3. Even if the Misstatements About Dynagas's Cash Flow and Distribution Were Forward Looking, They Would Still Be Actionable

Even if Dynagas's assurances regarding the sustainability of its dividend—or some of them—were construed as forward-looking, they would be actionable because they do not otherwise fall within the PSLRA's safe harbor.

<u>First</u>, the misstatements on the conference calls are not clearly identified as forward-looking, because they are stated in the present and past tense, as discussed in Section I.B.1, *supra*, and are not otherwise declared to be forward looking. *In re Vivendi Universal, S.A. Sec. Litig.* ("*Vivendi II*"), 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) (facially present and historical statements not protected).

<u>Second</u>, the statements about the distribution are premised on misrepresentations of present fact (the current cash flow profile) bringing them outside the protection of the PSLRA safe harbor. *See In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 CIV.3111 RWS, 2005 WL 225288 at *13 (S.D.N.Y. Feb. 1, 2005).

<u>Third</u>, the statements are not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[20] Defendants argue that the misstatements conference calls were

---

[20] 15 U.S.C. 78u-5(c).  This is the only prong of the PSLRA safe harbor that Defendants invoke.  Def. Mem. at 26.

forward looking, but the only cautionary statement was a generic announcement at the beginning, referring generally to "risks and uncertainties" and directing investors to Dynagas's SEC filings.[21]

This is exactly the sort of the broad cautionary language that this Court routinely rejects as inadequate. *Salix*, 2016 WL 1629341, at *11.[22] In *Salix*, the defendants made generic "cautionary" statements at the beginning of investor conference calls stating that "[a]ctual results might differ materially from those indicated by these forward-looking statements as a result of various important factors, including those discussed in our press releases and SEC filings." *Salix*, 2016 WL 1629341, at *11. The Court held that these boilerplate disclaimers do not bring statements within the PSLRA safe harbor. *Id*. The Court explained that "[d]efendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing." *Id*. Defendants fail to demonstrate that their disclaimer directing investors to "SEC filings" alerted investors to specific risks any better than the disclaimer in *Salix* did. And even if investors were to review ***all*** of Dynagas's SEC filings, as Defendants suggest they should have, Defendants do not identify within those filings any statement linking its ability to pay distributions with its ability to obtain financing, other than the fact that similar phrases both appear within a list of fifteen "important factors." Entwistle Decl., Ex. K.

Fourth, The Court should reject Defendants' PSLRA-safe-harbor argument because the

---

[21] This conference call and the slide presentation of the webcast contain certain contain[s] certain forward-looking statements within the meaning of the safe harbor provision of the [PSLRA]. Investors are cautioned that such forward-looking statements involve risks and uncertainties which may affect Dynagas LNG Partners' business prospects and results of operations. Such risks are more fully disclosed in Dynagas LNG Partners filings with the [SEC].

[22] *see also In re Bear Stearns Co., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil.") (internal quotation and citation omitted*); In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y.1996) ("Cautionary language ... must precisely address the substance of the specific statement or omission that is challenged.") (citation omitted).

purported cautionary language referred to a risk that had already transpired. *BioScrip*, 95 F. Supp. 3d at 736. In *Bioscrip*, on which Defendants rely, the CFO of the corporate defendant stated that its revenue in the upcoming quarter would be flat, despite (allegedly) knowing that a key contract had been terminated. *Id.* The *Bioscrip* defendants argued on a motion to dismiss that this and similar statements were forward-looking and accompanied by meaningful cautionary language. *Id.* at 736-37. Your Honor correctly observed that "[a]s courts in the Second Circuit have advised, '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *Id.* at 736 (citations omitted). Likewise, here, no cautionary words—even if they existed in appropriate form and substance, which they do not—could insulate Dynagas's misstatements and omissions here where, the renegotiation of key contracts at rates that eliminated the Company's profitability and ability to support distributions had already occurred. *Id.*

Finally, Dynagas's statements about the distribution also fall outside the PSLRA's safe harbor because they were tantamount to guarantees. The alleged misstatements regarding the sustainability of Dynagas's distribution are analogous to the situation this Court confronted in *In re General Electric Co. Securities Litigation*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012) (repeated assurances in 2008 and 2009 that its 31-cents-per-quarter-per-share dividend was "safe" and "secure," despite the financial crisis were actionable).[23] As in *General Electric*, "Plaintiff plausibly alleges that a reasonable investor would consider [the CEO]'s statement . . . to be tantamount to a guarantee. Plaintiff reasonably contends that [the CEO]'s statements are misrepresentations of

---

[23] *Compare* Gregos's July 27, 2018 statement: "the new distribution of $0.25 a quarter is safe." Entwistle Decl., Ex. L. Additionally, General Electric's CEO stated in an interview, "The facts of what we've done here, I think, should let investors know that we've got the cash, and we've got the operating model that's going to secure the dividend in this environment." *General Electric*, 857 F. Supp. 2d at 380. *Compare* Gregos's July 27, 2018 statement on a conference call with investors that "the distribution is supported by our current cash flow profile for quite a long time." (¶ 10; App. A No. 14).

present facts," 857 F. Supp. 2d at 388.[24]

## II. Dynagas's Misstatements and Omissions About Its Charter Rates are Actionable Under Section 10(b), and Their Truth-on-the-Market Defense is Flawed

Dynagas concealed from investors *a 15% drop in revenue* by not disclosing that two of its ships had been committed to long-term contracts at drastically reduced rates. Defendants argue they had no duty disclose this information and that they met any such duty with various SEC filings from which investors could derive the rates. Def. Mem. at 15, *et seq*. Defendants' arguments fail.

### A. Dynagas Was Obligated to Disclose the Reduction to the Charter Rates

#### 1. Dynagas's Affirmative Statements About the Charter Contracts Gave Rise to A Duty to Disclose the Rate Reductions

Dynagas frequently spoke to investors about their long-term charter contracts, which constituted the Company's sole source of revenue. ¶¶ 35, 65. Each time the company so spoke on this topic, it had a duty to disclose significant changes to the contracts' essential terms. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth."). Because the rate reductions to *Arctic Aurora* and *Ob River* collectively cut Dynagas's revenue by 15%, and Dynagas spoke on the topic of its charter contracts and the revenue from those contracts—often in the context of sustaining the distribution with cash flow—Dynagas had a duty to disclose the whole truth about these contracts. *Id*.

Moreover, Defendants' arguments notwithstanding, Dynagas did not only speak generally on the topic. Among its statements, the Company specifically discussed *Arctic Aurora's* "extended" contract with Statoil in "direct continuation" of the current charter in their December 21, 2017 prospectus for a shelf registration of new securities and contemporaneous press release.

---

[24] Also as in *General Electric*, where the CEO stated that the company had the "cash" and the "model" to support a specified dividend, here Dynagas provided investors—contemporaneously with the misstatements—with presentations boldly proclaiming that "Long term contracts provide stable, visible cash flows." As in *General Electric*, where the CEO (accurately) said the board of directors had approved the dividend, here the 2013 IPO prospectus announced: "We must distribute all of our cash on hand at the end of each quarter . . ." *See* Entwistle Decl,, Ex. I.

The press release stated:

> The Partnership has entered into a new three year charter agreement with Statoil ASA ("Statoil") for the employment of the Arctic Aurora, its 2013-built, 155,000 cubic meter, tri-fuel diesel engine, ice class LNG carrier (the "Extended Charter"). The Arctic Aurora is currently, and has been since 2013, on charter to Statoil (the "Current Charter"). The Extended Charter is expected to commence in the third quarter of 2018 in direct continuation of the Current Charter (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of about 3 years +/- 30 days. Statoil will have the option to extend the Extended Charter by two consecutive 12-month periods at escalated rates.

¶ 81; Entwistle Decl., Ex. D. The prospectus contained a similar, less-detailed statement. *See* App. A No. 2. ¶ 76; Entwistle Decl. Ex. E.

These statements were literally false because the term "direct continuation" meant the essential terms would be maintained—which was admittedly not the case. Defendants argue, without analysis or citation, that "direct continuation," means only "without interruption," and these statements are therefore literally true. Def. Mem. at 22. But even if Defendants' *post-hoc*, self-serving definition were correct, the statement still implies substantially similar essential terms. As the Second Circuit has observed, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

When the Company spoke regarding the terms of *Arctic Aurora's* contract, it had a duty to disclose a critical fact – that the new the reduced rate was approximately 30% lower than the current rate, which slashed the Company's revenue by 7% annually.[25] That is, the statements,

---

[25] Defendants do not contest that this fact was material, nor could they. The federal courts, including the Second Circuit, have consistently found that a reduction of revenue of 3% or more is material. *See Ganino*, 228 F.3d at 163.

which provide other details about the ship and the charter omit the "elephant in the room." *Braskem*, 246 F. Supp. 3d at 759. A reasonable investor plausibly would take from these statements detailing the terms of the contract's continuation that the charter rate was substantially the same. Therefore, this and similar statements by Dynagas throughout 2018 violated Section 10(b) of the Exchange Act and Rule 10b-5 because they "omit[ted] to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5(b).

Dynagas's statements regarding the terms of *Arctic Aurora's* charter contract were especially misleading in light of the fact that they selectively disclosed positive information, including the fact that the ship would not have extended "down-time" and that the rate could be "escalated" for one or two years at Statoil's option. Such selective disclosure of only positive information renders the statements half-truths, which are prohibited by Section 10(b).[26]

Additionally, the structure of the statements suggests that the charter rate had not materially changed, for the following reasons:

- **The description of the charter contract as a "direct continuation"** implied that, except as otherwise stated, the terms would be the same as the existing contract.
- **The description of the charter contract as an "extended charter"** similarly suggests that the essential terms are substantially similar, except as otherwise stated.
- **The inclusion of the fact that any further extension would be "at escalated rates,"** suggests no change to the current rates, because a possible future change is viewed as less important than an imminent, certain change.

Thus, the affirmative statements that Dynagas made on the topic of charter rates with respect to the terms of the terms of *Arctic Aurora's* charter contract, gave rise to a duty to disclose the fact that *Arctic Aurora* and *Ob River* were committed to long-term charters at significantly

---

[26] *See Vivendi I*, 838 F.3d at 240 ("The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.") (internal quotation omitted).

reduced rates. Thus, like the statements in *McMahan*, this and similar statements, "when read as a whole […] connoted a richer message than that conveyed by a literal reading of the statements."[27]

### 2. The Context Surrounding Defendants' Misstatements Rendered them More Misleading

As Defendants acknowledge, the truth or the falsity of a statement depends on its context (Def. Mem. at 21) (citing *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)). Yet far from exonerating Defendants as they contend, the context provided by both Dynagas's prior statements and concurrent investor presentations rendered Defendants' statements relating to *Arctic Aurora* and *Ob River* more misleading. This context includes:

- Dynagas's press release quoted Lauritzen touting Dynagas's "success[ ] in securing a ten year contract for [*Ob River*] . . . and a three year contract for [*Arctic Aurora*]," suggesting to investors that the contract continuations were a positive development. ¶ 9;

- Dynagas's public statements beginning as early as 2014 created an expectation that *Arctic Aurora* would likely be renewed at equal or higher rates. That is, they "primed the market. For example, in its August 6, 2014 investor presentation, the Company stated that Statoil had the option to extend the charter on *Arctic Aurora* through 2021 at an "escalated rate[ ]"; and

- Additionally, Dynagas had previously conspicuously and repeatedly disclosed the existence of material changes in charter rates when the ships were committed to new charters with the same counterparty.[28]

Defendants also reported to investors that the market for long-term charters was improving, context that suggested that the new charters would be at least as favorable. For example, on an investor conference call on February 16, 2018, Lauritzen stated that long-term charter rates in the industry, generally, were improving, without mentioning that Dynagas had agreed to accept substantially lower rates for *Arctic Aurora* and *Ob River* that year. ¶ 85; *See* App. A No. 5.

---

[27] In *McMahan*, defendants told investors that they would have a right to tender their shares. Although this was literally true, that right had no application in practice. *McMahan,* 900 F.2d at 579.

[28] For instance, when the Company announced that another of its six ships, the *Clean Force*, had entered a new charter contract to begin in 2015 immediately upon the completion of its then-current charter, the Company explicitly stated that the new contract was on more favorable terms, and gave an estimate of the increased revenue. ¶ 105, Figure 4.

Lauritzen's statement and others like it provided context that made the statements about Dynagas's charter contracts and the terms of *Arctic Aurora's* "extended contract" even more misleading to investors. Indeed, Lauritzen's statement was itself a half-truth, because even assuming it was "literally accurate," it was "through [its] context and manner of presentation, [a] device[] which misl[e]d investors." *McMahan,* 900 F.2d at 579.

### 3. SEC Regulations Required Dynagas to Disclose the Imminent Loss of Revenue Due to Charter Rate Reduction

Even if Dynagas had no other legal obligation to disclose the truth about its charter contracts—which it did—it nevertheless had a separate duty to disclose the reduction of its charter rates: (1) when it filed its annual report on March 9, 2018; and (2) when it sold $55 million in securities in the October 2018 Offering, pursuant to the mandates of Item 303 of SEC Regulation S-K, which requires annual reports to "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).[29] Here, where the reduced charter rates would result in an approximately 15% drop in Company's revenue, it qualified as a material unfavorable "known trend or uncertainty" that Dynagas could expect.[30]

---

[29] Defendants incorrectly argue that Dynagas's annual reports are exempt from the requirements of Item 303 because Dynagas is a foreign issuer. The SEC has explained that the relevant disclosure requirements for foreign and domestic issuers are substantially the same. *See Guidance Regarding MD&A*, Exchange Act Release No. 8350 n.1 (Dec. 19, 2003) ("Although the wording of the MD&A requirement in Form 20-F [for foreign issuers] was revised in 1999, the Commission's adopting release noted that we interpret that Item as calling for the same disclosure as Item 303 of Regulation S-K."). Defendants cite *dicta* from two district court opinions, neither of which includes analysis, and a single 2019 opinion from this district which holds in favor of foreign defendants on this point, but which likewise contains no analysis.

[30] *See Ganino*, 228 F.3d at 163 (adopting the rule of thumb "that a 3% to 9% drop [in revenue] may be material depending on the circumstances," but the greater the impact information had on a Company's financial state, the more likely it needed to be disclosed).

**B. Defendants Failed To Disclose the Reduced Charter Rates and Their Truth on the Market Defense Is Flawed and, in any Event, Premature**

**1. Data Scattered Among Available Sources Does Not Sufficiently Disclose the Charter Rates of *Arctic Aurora* or *Ob River*.**

Defendants' claim that the new charter rates for *Ob River* and *Arctic Aurora* were reasonably available to investors, and that two analysts purportedly "estimated the charter rate [] and recognized that it was lower than the prior rate" (Def. Mem. at 20-21), is a thinly veiled truth-on-the-market defense of the type routinely rejected by courts in this Circuit as premature on a motion to dismiss. To prevail on a truth-on-a-market defense, Defendants must show that the truth was conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167. Accordingly, the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Id*; *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 477 (S.D.N.Y. 2012) (same).[31]

In addition to being premature, Defendant's argument is flawed for a variety of reasons:

First, in order to "derive" estimates of the new charter rates, investors would need to look through multiple SEC filings, including filings going back some five years earlier—from 2013 and 2014, 2016 and 2018 (from a filing made two months *after* the first misstatements), to find a series of calculation inputs (because none of those filings contained the actual charter rates). In stark contrast, in the cases Defendants cite on this point, the "inputs" that investors could use were disclosed at the same time and indeed in the very same documents that were alleged to contain omissions.[32]

---

[31] *See also In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482–83 (S.D.N.Y. 1994) ("defendants' burden [of establishing the truth-on-the-market defense is] extremely difficult, perhaps impossible, to meet at the summary judgment stage").

[32] *E.g. Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 111 (2d Cir. 2005) (fee allegedly omitted from consent letter could be calculated by "[s]imply multiplying" two numbers contained in attachments to

**Second**, the tortured methodology that Defendants suggest requires the investor to assume facts not disclosed in any of the filings Defendants reference, including that *Ob River* and another ship are employed at the same daily rate.[33]

**Third**, the calculations required are complex and intricate, unlike the cases Defendants cite. Defendants suggest that investors, after locating inputs scattered through five years of SEC filings and a stale presentation, should have "divided by . . . approximately 1,432," subtracted 613.8, divided by 12.5, divided by 2, divided by 365, divided by 365 (again), divided by approximately 3, divided by 365 again, and then, compared the results. (Def. Mem. at 17-20). *See In re Am. Realty Capital Props., Inc. Litig.*, 2019 WL 2082508, at *2 (S.D.N.Y. May 10, 2019) (rejecting similar arguments and explaining, "even if a careful and sophisticated analysis of ARCP's tables and statements conceivably could have revealed the possible falsity of ARCP's representations, the question is whether the disclosures made information regarding the new methodology 'reasonably available' to shareholders.").

**Fourth**, Defendants' argument is inconsistent with their own pre-lawsuit comments. On Dynagas's March 22, 2019 investor call, an analyst asked Gregos to disclose a charter rate. Gregos said "No, we typically don't disclose the rates . . .". Entwistle Decl., Ex. H.

**Finally**, the market reacted in November 2018 to the actual disclosure of *Arctic Aurora's* rate reduction. *See* Subsection [ ], *infra*.

## 2. Lauritzen's Pre-Class-Period Statement about *Ob River's* Rate Reduction Is Insufficient

Defendants argue that Lauritzen disclosed the reduction of *Ob River's* charter rate (but not

---

the letter (and then by the number of stock certificates held). *Kahn v. Wien,* 842 F. Supp. 667, 675 (E.D.N.Y. 1994) (required only "simple mathematical calculations" based on document attached to the letter containing omission and which were "largely self-evident").

[33] Def. Mem. at 18.  Defendants' methodology "assum[es]" the two ships were employed at the same rate to take the average rate based on a 2016 announcement of the combined impact of those two contracts on Dynagas's "backlog."

*Arctic Aurora's*) on a December 6, 2017 conference call with investors. However, the transcript was not made available on Dynagas's website nor was it filed with the SEC. By contrast, the contemporaneous press release (which was filed with the SEC and maintained on the website), made no mention of the reduced rate. Notably, the rate reduction Lauritzen stated does not match the approximate rate that Defendants now suggest investors could have derived from the 2013 IPO prospectus and other public statements. *See* App. B No. 7. *See Ganino*, 228 F.3d at 167 (rejecting truth on the market defense where omitted information was disclosed in defendants' SEC filings); *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 150 (E.D.N.Y. 2008) (rejecting truth on the market defense despite disclosure in defendant's press release).[34] At a minimum, the rate reduction was not "so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors." *City of Roseville Emps' Ret. Sys. v. Energy Solutions, Inc.*, 814 F. Supp. 2d 395, 415 (S.D.N.Y. 2011).

### 3. Defendants' Statements About Dynagas's Charter Rates In Fact Misled the Market

Defendants' claim that the market was aware of the reduced charter rates "is belied by the precipitous drop in [Dynagas] securities prices that followed immediately after" the information emerged.[35] Defendants offer no alternative explanation for the decline in the company's stock price when the reduced charter rates were disclosed—despite their position that the Court may consider any and all of the Company's SEC filings, press releases and call transcripts, along with analyst reports that may shed light on the market's understanding (Def. Mem. at 16 n. 16; 18 n.

---

[34] Thus, whether the pre-Class-Period limited disclosure of one vessel's approximate charter rate sufficiently informed investors is a question of fact that is more properly resolved on a developed record.

[35] *In re Vivendi Universal, S.A. Sec. Litig.* ("*Vivendi III*"), 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) ("Considering [] the market reaction [] the Court concludes that there are sufficient facts pled to question whether Defendants provided the 'truth-on-the-market' with the 'degree of intensity and credibility' sufficient to counter-balance the allegedly misleading statements.").

19; 19 n. 20). Further, analyst reports largely viewed news of the charter renewals as positive making no mention of the undisclosed adverse new charter rates,[36] while others released guidance that appear premised on the conclusion that the charter rates would not change.[37]

## III. The Complaint Adequately Alleges Scienter

### A. Standard

When determining whether scienter is pled, "courts must, as with any motion to dismiss for failure to plead a claim on which relief may be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Scienter allegations should not be scrutinized in isolation but, instead, they should be assessed together, holistically. *Id*. at 325. Thus, "[t]he inquiry is whether *all* the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 310 (emphasis in original). The inference that defendant acted with scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. Rather, while the "court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" the inferences supporting liability need only be as strong," *Id*. at 310, *i.e.* the tie goes to the plaintiff.

A complaint can establish a strong inference of scienter "by pleading facts showing either (1) that defendant[ ] had the motive and opportunity to commit fraud, or (2) strong circumstantial

---

[36] *See* Entwistle Decl., Ex. M (Maxim Report dated February 15, 2018 ("On a positive note, the company announced a three year charter extension for its 2013-built ice-class LNG carrier, the Arctic Aurora to Statoil ASA. . . . We expect this should remove some near-term earnings overhang related to this vessel.")); *Id*., Ex. N (Maxim Report February 16, 2018 (contrasting vessels, the report stated, "Although DLNG has announced the charter extension for the Arctic Aurora, the Yenisei River, and Lena River will be operating charter-free in 2018-2019"); *see also id.,* Ex. C (Jeffries Report July 27, 2018 ("we expect the distribution may even be increased in 2H19 after all the long-term charters have commenced.")).

[37] ¶ 123. *See* Entwistle Decl., Ex. O (Jeffries Report February 16, 2018). Defendants implicitly challenge the Complaint's allegation that Dynagas's earnings were "lower than analysts' expectations," by selectively citing analysts that predicted earnings below the consensus. A motion to dismiss is not the proper vehicle to resolve such a factual dispute.

evidence of conscious misbehavior or recklessness.'" *Braskem*, 246 F. Supp. 3d at 764 (quoting *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.* ("*ECA*") , 553 F.3d 187, 198 (2d Cir. 2009)). Here, the Complaint pleads scienter primarily through evidence of conscious misbehavior or recklessness, which is examined first in Subsection B (despite being the "second" prong in the caselaw). The Complaint also pleads scienter through motive and opportunity (Subsection C, *infra*), both in the alternative and to further support the inference of conscious misbehavior or recklessness.

### B. The Complaint Adequately Pleads Scienter Through Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ("Second Prong") Because Defendants Knew or had Access to Information Suggesting that Their Public Statements were not Accurate

In the Second Circuit, there are two ways, broadly speaking, for a complaint to satisfy scienter through the second prong, *i.e.* give rise to a strong inference of conscious misbehavior or recklessness.[38] Scienter can be established either (i) by allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate," or (ii) by alleging that that defendants "failed to check information they had a duty to monitor." *Id*.

The Complaint alleges facts showing that, among other things Defendants knew but failed to disclose that *Arctic Aurora* and *Ob River* were employed at substantially lower rates, that those rate reductions would impair Dynagas's revenue by 15%, and that as a result Dynagas's cash flow profile did not support the distribution. Dynagas had just completed a financial review which examined, among other things, the level of distribution that Dynagas could sustain, and on which Lauritzen publicly commented. ¶¶ 6, 75; *see* Entwistle Decl., Ex. P. Additionally, the Complaint quotes a post-Class-Period statement that is reasonably construed as an admission that Dynagas

---

[38] *ECA,* 553 F.3d 187 at 198; *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, No. 18-cv-00299 (AJN), 2019 WL 4601644, at *16 (S.D.N.Y. Sept. 23, 2019).

knew at the time of the statements that the distribution could not be sustained by the cash flow profile and could only be sustained by the sale of new equity to new investors. ¶ 138. Specifically, investors asked Dynagas why it needed to make a second distribution cut, after it had assured investors that it would not need to do so. In response, Gregos admitted, in the presence of Lauritzen, that "[w]hen we did our previous [distribution] cut, we had assumed that the MLP market broadly would improve going forward, and enable us and other MLPs to issue cheap equity, whereas, that didn't happen. And that is a reason why we had to make a second cut and a more severe cut . . . ." *Id*. Thus, the Complaint pleads that Defendants knew facts contradicting their Class-Period statements that: (i) the distribution was supported by the Company's cash flow profile, (ii) that no further action on their part was required to maintain it, and (iii) that only "extreme scenarios" would threaten the distribution. App. A. Nos. 7-9, 11-14. These allegations of actual knowledge are all that is required to plead scienter.

Regarding the misstatements and omissions about the charter rate for *Arctic Aurora* and *Ob River*, the Complaint alleges that Dynagas, through its CEO and CFO, was aware of the essential terms of the Company's long-term charter contracts throughout the Class Period. These allegations include the facts that: (1) Lauritzen and Gregos frequently discussed their efforts to negotiate the terms of charter contracts on investor calls, and (2) Dynagas had just conducted a financial review, with which Lauritzen and Gregos, as CEO and CFO, were familiar. ¶¶ 6, 75. Defendants do not argue that the Complaint does not adequately plead Dynagas's actual awareness of the terms of its charter contracts. Def. Mem. at 32. Defendants also do not suggest that they may have been unaware that the revenue generated by their charter contracts was insufficient to pay Dynagas's fixed costs plus the distribution. Nor can they. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (discussing the core operations doctrine and noting that high-level executives are

presumed to be aware of information significant to the company).

### C. The Complaint also Pleads Scienter by Alleging Motive and Opportunity ("First Prong")

In addition to pleading scienter directly through facts showing actual knowledge (or at least recklessness), the Complaint pleads scienter through Defendants' motive and opportunity. In their Memorandum, Defendants characterize the motive allegations as being applicable to all corporate defendants and all corporate officers. But the Complaint alleges that: (1) Dynagas operated as a conduit for a private family company (Dynagas Holding) to siphon money from investors in the United States to itself; (2) in order to attract such investors, Defendants had promised financial performance the Company could not deliver; (3) Dynagas faced an imminent debt wall (¶ 155); (4) the *Ponzi* scheme would soon unravel without further investment; and (5) Dynagas was planning to acquire more vessels by selling new equity, as it had in the past.

This Court has held that allegations of a pattern and plan to use equity price to support acquisitions can sufficiently allege scienter by motive. *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527(DLC), 2003 WL 21250682, at *10 (S.D.N.Y. May 29, 2003) ("[b]ecause of the inflated stock price, fewer shares of IPG stock had to be issued in connection with stock-for-stock acquisitions. Because fewer shares were issued, IPG suffered less stock dilution.") This motive is alleged here: Defendants sought to avoid diluting Dyngas's stock (and it's private, family-owned parent's stake) in a contemplated acquisition of assets. ¶ 57. That is, if the equity issued at a poor price, his own family's 43% stake in Dynagas would be diluted, offsetting the gains expected in the related-party transactions. ¶ 57.

Additionally, the Complaint explains why the apparent continued success of the Company was important to the CEO for a variety of personal, financial and familial reasons that do not apply to most CEOs of public companies. As alleged and supported by the public record, Dynagas

planned to use some of the $750 million from securities it registered to finance "drop-down" transactions with Dynagas Holding. This was personal to Lauritzen because the company that would receive half of the distributions and all of the proceeds of the dropdown transactions was Dynagas Holding, his father-in-law's company, where he serves as General Manager. ¶¶ 1, 42, 57, 67, 148. Lauritzen's family would thus receive hundreds of millions of dollars if the equity issued, which it otherwise would not receive. Such personal benefits are not common to all or even most corporate executives and are the sort of allegations of personal benefits that suffice to plead scienter based on motive.

### D. Defendants' "Innocent Explanations" are Unavailing

#### 1. Defendants' Purported "Competing Innocent Explanation" Regarding the Sustainability of the Distribution Is not Innocent and is not Supported by the Facts

Regarding the sustainability of the distribution, Defendants ask the Court to infer that "the Company did not anticipate disruptions in the equity and debt capital markets," and assumed that it would obtain sufficient financing. (Def. Mem. at 34-35.) But no disruption to the financial markets appears in the record.[39] More critically, this explanation is not "innocent" at all. More fundamentally, even assuming they believed they would be able to pay the distribution using new equity and/or debt (i.e. run a *Ponzi* scheme), their statements that the ***current cash flow profile*** supported the distribution would still have been knowingly false and misleading when made.

#### 2. Defendants Purported "Competing Innocent Explanation" Regarding the Charter Rates Is Legally Insufficient and is not More Cogent and Compelling the Inference of Conscious Deception

Plaintiffs have plausibly alleged that Defendants deliberately concealed the fact that *Arctic Aurora* and *Ob River* had been committed to drastic rate reductions as follows:

---

[39] To the extent that Defendants reference their own excuses regarding the debt market, these statements cannot be considered for the truth of the matter. Additionally, before the lawsuit, Dynagas admitted that its plan was to issue equity, not debt, a factual discrepancy that must be resolved in Plaintiffs' favor on a motion to dismiss.

- The terms of the new charters were so disadvantageous that Dynagas lost 15% of its revenue and became unprofitable when they went into effect; ¶ 75

- Dynagas filed a registration statement for $750 million worth of securities at the same time the extension of *Arctic Aurora's* charter was announced from which the *Arctic Aurora* and *Ob River's* rate reductions were omitted; ¶ 75.

- Defendants made several statements indicating satisfaction with the new charters and referencing the general improvement in the market for such charters, without acknowledging that Dynagas nevertheless committed to less advantageous contracts; ¶¶ 76-83.

- Despite numerous detailed comments about *Arctic Aurora*'s charter contract in press releases and public filings, Defendants ***never*** mentioned the "elephant in the room," until they needed to explain a substantial decrease in earnings. ¶ 134.

- The omission aided Defendants in concealing Dynagas's inability to sustain its dividend based on cash flow from the charter contracts; ¶ 114; and

- Although Dynagas's third and fourth quarter 2018 earnings met ***management's expectations***, they missed consensus analyst estimates. ¶¶ 123, 133.

These allegations give rise to the inference that Defendants were either deliberately "hiding the ball," regarding the charter rate reductions or recklessly disregarding the likelihood that investors would be misled. [40] Alternatively, even if Defendants *did* somehow believe that various bits of data buried in their filings over the years adequately disclosed such critical developments, this belief would not be reasonable for the reasons discussed in Section II.B.1, *supra*. Defendants cannot defeat scienter by claiming they held an unreasonable belief.[41]

## IV.     Plaintiffs Have Stated A Claim Under Section 20A Against Dynagas

Dynagas's only substantive challenge to the Section 20A claim is that the Complaint does

---

[40] Defendants cite no cases in which a court held both that defendants made omissions of material facts known to them, but that they somehow did not intend to mislead. The case they cite held simply that defendants had not made omissions.  Def. Mem. at 32; *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *11 (S.D.N.Y. Sept. 14, 2015).

[41] "Recklessness" in the context of securities fraud can be established by a standard that resembles common-law gross negligence. *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citing *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) ("In elaborating as to what may constitute recklessness in the context of a private securities fraud action, we have referred to conduct that " 'at the least ... is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. . .'").

not plead a predicate violation of the Exchange Act.[42] But the Complaint pleads Dynagas traded while knowingly in possession of material, nonpublic information. "A plaintiff makes a *prima facie* case that a defendant is liable for insider trading under Section 20A by showing that the defendant was 'aware of the material non-public information' when he made the purchase or sale of the securities."[43] Significantly, no misstatement or omission is required.[44]

Dynagas sold $55 million worth of Series B Preferred Units in October of 2018, approximately one month before it was forced to disclose that *Arctic Aurora* was employed at a drastically reduced charter rate.[45] Dynagas's only substantive defense is that the charter rate purportedly was disclosed (and therefore this information purportedly was not non-public). (Def. Mem. at 35.) This argument fails with respect to the Section 20A claim for the reasons stated in Section II, *supra*, particularly the fact that the stock suffered a significant drop when the information was disclosed in November of 2018. Importantly, this claim does not depend on Dynagas making any misleading statement to the public or having any independent duty to disclose the drastic reduction of *Arctic Aurora's* charter rate.

---

[42] Defendants also state that they "have found no cases in which courts have held a corporate issuer – as distinct from individuals—liable as an insider under Section 20A." But several courts have sustained Section 20A claims against corporate entities *In re Valeant Pharm. Int'l, Inc., Sec. Litig.*, No. 15-7658 (MAS)(LHG), 2019 WL 2724075, at *13 (D.N.J. June 30, 2019); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. CV H-14-3428, 2017 WL 2599327, at *1 (S.D. Tex. June 15, 2017); *Basile v. Valeant Pharm. Int'l, Inc.*, No. SACV 14-2004-DOC (JCGx), 2015 WL 7352005, at *3 (C.D. Cal. Nov. 9, 2015). Nothing in the statutory text or the decisional authority suggests that an issuer cannot be held so liable. Sustaining a 20A claim against the issuer is appropriate here because an ultimate beneficiary of the insider trading was the issuer's privately held parent, which is excluded from the Class.

[43] *Cobalt*, 2017 WL 2599327 at *3; *see also Oxford,* 187 F.R.D. 133 at 143.

[44] *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) ("Trading on such information qualifies as a 'deceptive device' under § 10(b).")

[45] The Complaint alleges that Defendants disclosed on July 27, 2018 (for the first time in a public filing) that the *Ob River* was employed at a reduced charter rate. However, Defendants still did not disclose at that time that the rate was 35% lower than the prior rate, removing 8% of Dynagas's revenue – a reduced rate that will be in effect for ten years.

**V.** **Plaintiffs Have Stated A Claim Under Section 20(a) Against Dynagas Holding and Dynagas GP**

The Complaint adequately alleges that Dynagas Holding and Dynagas GP were culpable participants in the alleged fraud. Plaintiffs have pled a predication of Section 10(b) for reasons discussed in Sections I, II, III, supra, and Defendants have not disputed control. Therefore, the Section 20(a) claim should be sustained.[46]

<u>First</u>, Plaintiffs plead the existence of a principal-agent relationship between a primary 10(b) violator, Defendant Lauritzen, and both of the Controlling Entity Defendants by alleging Lauritzen was the General Manager of Dynagas Holding and a Director of Dynagas GP. ¶ 42.[47] Similar facts are pled regarding Dynagas Holding's 50% interest in Dynagas and its control of the board and operations even to the point of directing that the operations be managed by a Dynagas Holding affiliate. ¶¶ 23, 61, 149, 193-95. Nothing more is required to satisfy the culpable participation standard. *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, No. 18-CV-7796(VEC), 2020 WL 248729, at *23 (S.D.N.Y. Jan. 15, 2020) (Where "the primary violator is an agent," the culpable participation prong "collapses into the second" element and the knowledge of the agent is imputed to the principal, satisfying the culpable participation element.); *see also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("A plaintiff, therefore,

---

[46] To state a claim for control person liability under Section 20(a), the plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. In the Second Circuit, courts "broadly construe the control person provisions as they were meant to expand the scope of liability under the securities laws." *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 2019 WL 4600934, at *19 (S.D.N.Y. Sept. 23, 2019) (citation omitted). The question of control person liability is fact-intensive and is rarely appropriate for resolution on a motion to dismiss. *Id.*

[47] Defendants assert that Lauritzen is not the General Manager of Dynagas Holding (Def. Mem. At 31 n. 29), but he is widely reported to hold the position (Entwistle Decl. Exs. Q, R), the same is alleged in the Complaint (¶ 42) and this dispute must be resolved in Plaintiffs' favor on a Rule 12(b)(6) motion to dismiss. Additionally, Defendants do not claim he is not otherwise an agent of Dynagas Holding.

need only plead an agency relationship with the primary violator acting in the normal course of his or her duties in connection with the alleged fraud to adequately plead control person liability.").[48]

Second, the Complaint contains particularized facts demonstrating that Dynagas Holding and Dynagas GP knew that Dynagas and its CEO and CFO were engaged in fraudulent conduct. *DoubleLine*, 2019 WL 4600934 at *19. In particular, the Complaint alleges that Dynagas Holding was deeply involved in the issuance of shares for its own benefit pursuant to offering materials that contained false and misleading statements concerning the renewal of the *Arctic Aurora* charter contract – the core of Defendants' alleged fraud. ¶ 150. The Complaint likewise alleges Dynagas Holding sought to keep the stock price inflated to prevent the dilution in its share ownership. ¶¶ 151-52. Accordingly, Plaintiffs state a control person claim under Section 20(a).

## THE SECURITIES ACT CLAIMS (SECTIONS 11, 12(a)(2) AND 15)

The only issue before the Court regarding the Securities Act claims is whether the registration statement and prospectus contained at least one misstatement or omission.[49] These claims do not sound in fraud, and do not require that any defendant acted with a particular state of mind. *BioScrip*, 95 F. Supp. 3d at 742. As discussed in Section II.A.1, *supra*, a false statement about the rate to which Dynagas had committed *Arctic Aurora* appeared in the (1) December 21, 2017 Prospectus and (2) October 18, 2018 Final Prospectus Supplement (which are both

---

[48] To the extent that culpable participation imposes a scienter requirement, the Court may "readily attribute[ ] the scienter of management-level employees [e.g. Lauritzen] to corporate defendants [e.g. Dynagas Holding and Dynagas GP]." *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 217 (S.D.N.Y. 2019) (citation omitted).

[49] To state a claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement." *City of Roseville Emps.' Ret. Sys.*, 814 F. Supp. 2d at 424. To establish a claim under Section 12(a)(2), a plaintiff need only allege that the prospectus includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013). Defendants do not challenge the Section 15 claims ground of control (or any grounds other than falsity).

incorporated into the December 21, 2017 registration statement).[50] The registration statement and prospectus omitted that the new charter was at a substantially reduced rate, despite speaking to the possible future escalation of the rate.[51] This omission violated the letter and the spirit of the Securities Act.[52]

Defendants rely on their truth-on-the-market defense with respect to the Securities Act claims (Def. Mem. at 38). Their argument fails for the ***additional*** reason that the prospectus only incorporated subsequent SEC filings, and some of the data on which this argument depends was in prior SEC filings or documents "available on Dynagas's website" that were not incorporated.

Thus, the Complaint alleges violations of Sections 11 and 12(a)(2) and 15.

## CONCLUSION

For the foregoing reasons, the Dynagas Entity Defendants' and Underwriter Defendants' Motion to Dismiss the Amended Class Action Complaint should be denied.

---

[50] The prospectus states: "In December 2017, we entered into a time charter contract with Statoil for the employment of the Arctic Aurora. This charter will be in direct continuation of the vessel's current charter with Statoil (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking) and will have a firm period of three years +/- 30 days. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates." The final prospectus supplement states: on "August 2, 2018, the *Arctic Aurora* was delivered to Statoil under a time charter contact with a firm period of three years +/- 30 days. This charter is in direct continuation of the vessel's previous charter with Statoil. Statoil will have the option to extend the charter term by two consecutive 12-month periods at escalated rates."

[51] As discussed in Section II.A.1, *supra*, the duty to disclose arose from the affirmative statements on the topic and Item 303 of SEC Regulation S-K.

[52] *Omnicare*, 575 U.S. at 192 (*quoting* H.R. Rep. No. 73-85, at 2 (1933))( "Congress adopted § 11 to ensure that issuers 'tell[ ] the whole truth' to investors. For that reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

Dated: February 10, 2020     Respectfully submitted,
      New York, N.Y.

                                    By:   */s/ Andrew J. Entwistle*
                                          Andrew J. Entwistle
                                          Robert N. Cappucci
                                          Brendan J. Brodeur
                                          Sean M. Riegert
                                          Rebecca H. Arnall
                                          ENTWISTLE & CAPPUCCI LLP
                                          299 Park Avenue, 20th Floor
                                          New York, New York 10171
                                          Telephone: (212) 894-7200
                                          Facsimile: (212) 894-7272
                                          Emails:  aentwistle@entwistle-law.com
                                                   rcappucci@entwistle-law.com
                                                   bbrodeur@entwistle-law.com
                                                   sriegert@entwistle-law.com
                                                   rarnall@entwistle-law.com

                                          *Counsel for Lead Plaintiffs FNY Partners Fund
                                          LP, Mario Epelbaum and Scott Dunlop, along
                                          with plaintiff Irving Braun and Lead Counsel for
                                          the Class*