**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DYNAGAS LNG PARTNERS LP SECURITIES LITIGATION | No. 1:19-cv-04512 (AJN) <br><br> ORAL ARGUMENT REQUESTED |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE DYNAGAS ENTITY DEFENDANTS AND THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

ARGUMENT........................................................................................................................1

I.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND
        RULE 10b-5....................................................................................................................1

        A.      The Complaint Does Not Adequately Allege a False or Misleading Statement
                Regarding the New Charter Agreements .................................................................1

        B.      The Complaint Fails Adequately to Allege a False or Misleading Statement
                Regarding the Sustainability of the Distribution ....................................................6

                1.      Plaintiffs Do Not Adequately Allege that Any Projections Were
                        Unachievable When Dynagas Made Them.................................................6

                2.      Plaintiffs Fail Plausibly to Allege the Falsity of Management's
                        Statements of Opinion Regarding the Distribution....................................8

                3.      The Challenged Forward-Looking Statements Are Protected Under
                        the PSLRA Safe Harbor............................................................................11

        C.      Plaintiffs Fail to Plead Any Facts Giving Rise to a Strong Inference of
                Scienter ..................................................................................................................14

                1.      Plaintiffs' Motive and Opportunity Allegations Are Insufficient..............14

                2.      Plaintiffs' Conscious Misbehavior or Recklessness Allegations Are
                        Insufficient ...............................................................................................15

II.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20A .................17

III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)................18

IV.     THE COMPLAINT FAILS TO STATE A SECURITIES ACT CLAIM .........................19

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Basile v. Valeant Pharmaceuticals International, Inc.*,
2015 WL 7352005 (C.D. Cal. Nov. 9, 2015)..................................................................18

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................................................13

*In re Cobalt International Energy, Inc. Securities Litigation*,
2017 WL 2599327 (S.D. Tex. June 15, 2017)................................................................18

*Curry v. Yelp Inc.*,
2015 WL 1849037 (N.D. Cal. April 21, 2015)................................................................4

*Dobina v. Weatherford International Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)...........................................................................15

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..................................................................................14, 15

*In re EDAP TMS S.A. Securities Litigation*,
2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015).................................................................1

*In re Fairway Group Holdings Corp. Securities Litigation*,
2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)...............................................................13

*In re Ferrellgas Partners, L.P., Securities Litigation*,
2018 WL 2081859 (S.D.N.Y. Mr. 30, 2018).................................................................20

*In re First Marblehead Corp. Securities Litigation*,
639 F. Supp. 2d 145 (D. Mass. 2009) .............................................................................4

*In re General Electric Co. Securities Litigation*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012).....................................................................13, 14

*Gissin v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)...........................................................................11

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018).........................................................................9, 10

*Grupo Verzatec S.A. de C.V. v. RFE Investment Partners*,
2019 WL 1437617 (S.D.N.Y. Mar. 29, 2019) ...............................................................19

*In re Incyte Shareholder Litigation*,
2014 WL 707207 (D. Del. Feb. 21, 2014)......................................................................3

*International Association of Heat v. International Business Machines Corp.*,
205 F. Supp. 3d 527 (S.D.N.Y. 2016)....................................................................................11

*In re International Business Machines Corp. Securities Litigation*,
163 F.3d 102 (2d Cir. 1998)....................................................................................................9

*In re Interpublic Securities Litigation*,
2003 WL 21250682 (S.D.N.Y. May 29, 2003) .....................................................................14

*Lucas v. Icahn*,
616 F. App'x 448 (2d Cir. 2015) ...........................................................................................16

*Marsh Group. v. Prime Retail, Inc.*,
46 F. App'x 140 (4th Cir. 2002) ............................................................................................12

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)....................................................................................................2

*Monroe County Employees' Retirement System v. YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................................................4

*In re Neurotrope, Inc. Securities Litigation*,
315 F. Supp. 3d 721 (S.D.N.Y. 2018)......................................................................................4

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)..................................................................................................................9

*In re Salix Pharmaceuticals, Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................................11, 13

*In re Sanofi Securities Litigation*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015).........................................................................................2

*TechnoMarine SA v. Giftports, Inc.*,
758 F.3d 493 (2d Cir. 2014)...................................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................................16

*In re Valeant Pharmaceuticals International, Inc., Securities Litigation*,
2019 WL 2724075 (D.N.J. June 30, 2019) ............................................................................18

*In re Vivendi Universal, S.A. Securities Litigation*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)..............................................................................12, 13

*In re Vivendi, S.A. Securities Litigation*,
838 F.3d 223 (2d Cir. 2016).................................................................................................6, 12

iii

The Dynagas Entity Defendants and the Underwriter Defendants (collectively, "Defendants")[1] submit this reply memorandum in further support of their motion to dismiss. Plaintiffs' Opposition only underscores the fundamental pleading deficiencies in the Complaint.

<strong>ARGUMENT</strong>

**I.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5**

**A.     The Complaint Does Not Adequately Allege a False or Misleading Statement Regarding the New Charter Agreements**

Plaintiffs contend that Dynagas made actionable misstatements or omissions by failing to disclose that the new charter rates for two vessels—the *Ob River* and the *Arctic Aurora*—were lower than existing rates.  But Plaintiffs do not dispute that the Company disclosed (two weeks before the start of the Class Period) that the new charter rate for the *Ob River* was about 35% lower than the current charter rate.  Mem. at 16.  Nor do Plaintiffs dispute that the Company disclosed the increase in the contracted revenue backlog for the *Arctic Aurora*, which investors could have used (and analysts in fact did use) to calculate the new charter rate for that vessel.  *Id.* at 20-21.  Instead, Plaintiffs argue that these disclosures were insufficient because the Company did not repeat them "each time" that it spoke on the topic of its charter contracts and the revenue earned from those contracts.  Opp. at 23.  But the Company was under no obligation to repeat these disclosures.  Contrary to Plaintiffs' suggestion, once Dynagas made its disclosures, that information remained on the market.  *See In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *11 (S.D.N.Y. Sept. 14, 2015) (defendants not obligated to reproduce comprehensive list of

---

[1] "Dynagas Entity Defendants" refers to defendants Dynagas LNG Partners LP ("Dynagas" or the "Company"), Dynagas GP, LLC, and Dynagas Holding Ltd.  "Underwriter Defendants" refers to defendants UBS Securities LLC, Stifel, Nicolaus & Company, Incorporated, Morgan Stanley & Co. LLC, and B. Riley FBR, Inc.

1

adverse events each time they discussed treatment's safety profile); *In re Sanofi Sec. Litig.*, 87 F.

Supp. 3d 510, 547 (S.D.N.Y. 2015) ("Although the complete disclosures were important when

made in the first instance, a reasonable investor would not expect repetition at every opportunity.

And the securities laws do not require such regurgitation; that approach would bury the

shareholders in an avalanche of trivial information.").[2]

Plaintiffs also argue that Defendants' proposed methodology for calculating the day rate

for the new charters would have been too "complex and intricate" for investors to perform.  Opp.

at 29.  But Plaintiffs conflate four different sets of straightforward calculations (one each for the

pre- and post-renegotiation rates for the *Ob River* and *Arctic Aurora*, respectively) and list each

step in those calculations together, divorced from any context, in an attempt to make the

calculations appear complicated.  *Id.*  Estimating the charter rates for the *Arctic Aurora* requires

nothing more than dividing the relevant revenue stream by the number of days covered by that

revenue stream, Mem. at 20, and multiple analysts performed those calculations within a day of

the Company's disclosure of the revenue backlog, *id.* at 21; Ex. 10 at 3 n.1 (explaining how

revenue backlog is calculated).  Although the calculations required to determine the new rate for

the *Ob River* were somewhat more complex because the Company disclosed a combined

increase in the contract backlog for both the *Ob River* and another vessel,[3] the Company

specifically disclosed that the new rate for the *Ob River* "will be about 35% lower than the

---

[2] Contrary to Plaintiffs' assertion, *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), does not hold that issuers must repeat all prior disclosures relevant to an issue to render their statements not misleading.  Rather, it stands for the unremarkable proposition that upon choosing to speak, issuers must speak truthfully.  *Id.* at 250.

[3] While Plaintiffs quibble that the new *Ob River* charter rate estimated in Defendants' opening brief does not precisely match the rate that the Company disclosed later (Opp. at 30), Plaintiffs cannot contest that Dynagas disclosed information sufficient for investors to discern that the new charter rate for the *Ob River* was lower than the prior contract rate.  Mem at 16-18.

2

current contract rate." *See* Mem. at 16.[4]

The Opposition also conflates the elements of falsity and loss causation by suggesting that a drop in Dynagas's stock price somehow demonstrates that the Company's prior statements about the charter rates were misleading. Opp. at 30. This argument reduces to the absurd proposition that allegations of a stock price drop are sufficient to plead falsity. Defendants' decision not to challenge Plaintiffs' theory of loss causation (which ***assumes*** a false statement in the first instance) at the motion to dismiss stage says nothing about whether Plaintiffs have alleged falsity adequately—which, for the reasons discussed above, they have not.[5]

Finally, the Opposition mischaracterizes Defendants' arguments regarding the disclosure of information about the new charter rates as a premature "truth-on-the-market defense." Opp. at 28. The truth-on-the-market defense "presupposes the existence of misleading statements" and addresses whether those statements misled the market in light of other available information. *See In re Incyte S'holder Litig.*, 2014 WL 707207, at \*10 (D. Del. Feb. 21, 2014) ("[T]here can only be a truth on the market defense if the allegations are first sufficient to establish a fraud on the market."). By contrast, Defendants argue here that Dynagas disclosed the allegedly omitted

---

[4] Plaintiffs argue that the Court should disregard this clear disclosure about the new rate for the *Ob River* because the Company did not file the transcript of the conference call at issue with the SEC or make it available on the Company's website. Opp. at 30. But Plaintiffs do not dispute that the conference call was open to the public, that analysts and investors were able to attend the call (and indeed, the transcript lists two analysts as call participants), or that the transcript of the call was publicly available through subscription services. Nor do Plaintiffs dispute the accuracy of the transcript. Therefore, the Court may consider the transcript when assessing Plaintiffs' argument that Defendants failed to disclose the change in the charter rate for the *Ob River*. *See* Mem. at 16 n.16 (citing cases).

[5] Defendants are not required to identify alternative explanations for the alleged stock drop at this stage of the case. Needless to say, Defendants intend to do so later, should that be necessary. For example, the market could have been reacting to other information disclosed in the Company's November 15, 2018 press release, including the Company's third quarter earnings, which were lower than analyst expectations.

3

information, such that there was no misleading statement in the first instance. *See In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 n.75 (D. Mass. 2009) (rejecting attempt to recharacterize similar argument as a truth on the market defense); *see also Curry v. Yelp Inc.*, 2015 WL 1849037, at *6 n.1 (N.D. Cal. April 21, 2015) (same).

Separately, the Opposition fails to establish that Dynagas had a duty to disclose additional information about the new charter rates. Plaintiffs argue that such a duty arose from the Company's description of the new charter for the *Arctic Aurora* as being "in direct continuation of the Current Charter (interrupted only by the vessel's mandatory statutory class five-year special survey and dry-docking)." Opp. at 23-24 (citing Compl. ¶¶ 76, 81). However, that description does not imply anything about the new charter rate for the *Arctic Aurora*.[6] The statement focuses exclusively on the timing of the charter, specifying how long the vessel will be out of commission before beginning the "***new*** three year charter agreement." Ex. 7 (Dec. 21, 2017 Form 6-K). Thus, this statement did not give rise to a duty to disclose information about the new charter rate for the *Arctic Aurora*.[7] Although that information "may be of interest to a reasonable investor, . . . that circumstance alone does not necessitate its disclosure." *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 733 (S.D.N.Y. 2018) (no duty to disclose

---

[6] Plaintiffs do not allege that Dynagas made a similar "in direct continuation" statement with respect to the new *Ob River* charter.

[7] Similarly, no duty to disclose arose from the Company's statements that Statoil had the option to extend the existing charter on the *Arctic Aurora* through 2021 at an escalated rate (Opp. at 26; Compl. ¶ 78), or that it had the option to extend the new charter agreement "by two consecutive 12-month periods at escalating rates" (Opp. at 24). As with the other statements Plaintiffs cite, these statements focused on the duration of the charter contracts, and only tangentially referred to the option charter rates (without disclosing any specific rates) in order to disclose that Statoil had the option to extend the charters. *See Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) ("There is no duty to disclose all information even tangentially related to the subject matter of a statement.").

results of dose study where defendant's press release concerning study "made no reference to a dose response or whether one was expected").[8]

Nor can Plaintiffs fashion a duty to disclose out of the "context" of other Dynagas statements (Opp. at 26-27), as none of this "context" implied that the new charter rates would be unchanged.  When Mr. Lauritzen spoke about the Company's success in securing new charter contracts for the *Ob River* and *Arctic Aurora*, he spoke about the **length** of the contracts, not the charter rates.  Compl. ¶ 9 ("Lauritzen . . . touted Dynagas's recent 'success[] in securing a ten year contract for [*Ob River*] . . . and a three year contract for [the *Arctic Aurora*].'").  Similarly, the disclosure of an estimated revenue increase for a new charter of a different vessel (the *Clean Force*) in no way renders the Company's disclosures about the *Arctic Aurora* and *Ob River* misleading.[9]  Finally, Mr. Lauritzen's statement about improvements he had observed in the industry generally, Opp. at 26 (citing Compl. ¶ 85; Pls' App'x A No. 5), does not fairly suggest that rates increased on all new charters.

---

[8] Plaintiffs also argue that, pursuant to Item 303 of SEC Regulation S-K, the Company had an independent duty to disclose the reduced charter rates in its March 9, 2018 annual report and when it sold securities in the October 2018 offering.  Opp. at 27 & n.29.  But Plaintiffs acknowledge that courts in this district and elsewhere have found that Regulation S-K does not apply to foreign issuers, which are not required to file any form governed by Regulation S-K.  To the extent that Plaintiffs belatedly attempt to argue that Dynagas did not comply with the disclosure requirements of Form 20-F, that argument fails because Dynagas disclosed in its fiscal year 2017 Form 20-F that there had been a downward trend in long term charter rates since 2013.  Ex. 28 (Mar. 9, 2018 Form 20-F) at 88 ("Charter rates for LNG vessels started declining from 2013 as the supply increased more than the increase in demand . . . . Long-term rates (in excess of eight years) for [Dual Fuel Diesel Electric] vessels in 2017 were $70,000 per day unchanged from 2016 but lower than the $ 82,000 per day in 2014.").  Plaintiffs do not even acknowledge this disclosure, let alone explain why it does not sufficiently describe the trend in charter rates that they allege the Company did not adequately disclose.

[9] If anything, a reasonable investor might contrast the Company's statements about the three vessels and conclude that the new *Arctic Aurora* and *Ob River* charters were on less favorable terms than the *Clean Force*.

5

**B.      The Complaint Fails Adequately to Allege a False or Misleading Statement Regarding the Sustainability of the Distribution**

**1.      Plaintiffs Do Not Adequately Allege that Any Projections Were Unachievable When Dynagas Made Them**

The Opposition also fails to identify any well-pleaded facts that would turn the Company's projections concerning the sustainability of the $0.25 per share distribution into actionable misstatements.  Plaintiffs seek to demonstrate that the expected decrease in revenue under the new *Arctic Aurora* and *Ob River* charters (compared to the existing charters for those vessels) would have been sufficient to pay the $0.25 per share distribution for years to come. Opp. at 13.  But that comparison is irrelevant.  The relevant question is whether ***all*** expected revenues and any other sources of funds available to pay the distribution could have been sufficient to maintain the distribution when Dynagas made the challenged statements.  The Opposition is notably silent on that key question.  Unable to plead any facts to show that the projections were false when Dynagas made them, Plaintiffs' argument boils down to impermissible hindsight.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) ("*Vivendi I*") ("Fraud depends on the state of events when a statement is made, not on what happens later.").

Contrary to Plaintiffs' assertion (Opp. at 15), no reasonable investor would have understood that Dynagas expected to fund future distributions exclusively from charter revenues. None of the documents that Plaintiffs cite supports interpreting the term "cash flow" as limited to revenue from charter contracts.  For example, Dynagas stated in its April 18, 2018 Form 6-K (cited in Pls' App'x A, No. 8) that it "believe[d] the new distribution level [was] viable on an actual cash basis since it ***reduce[d]*** the [Company's] ***current need to utilize existing cash reserves to fund distributions to unitholders***." Ex. P at 2 (emphasis added).  Similarly, during its Q1 2018 earnings call (Pls' App'x A, Nos. 9-12), the Company stated that its decision to

6

reduce the distribution was "necessary to align [its] distribution level with its *capacity* to generate cash flow in the long term," and that the Company "had adequate liquidity to cover any short fall and fund the current distribution."  Ex. 25 at 4, 6.  These disclosures—which Plaintiffs fail meaningfully to address—made clear that the distribution would *not* be paid exclusively from charter revenues.

Nor does the Company's ultimate decision to reduce the distribution in January 2019 establish that it was the reduction in charter revenues (as opposed to some other factor or development) that rendered Dynagas unable to maintain the $0.25 per share distribution level. The Company made clear that its ability to maintain the distribution depended on factors other than cash flow.  Even before the start of the Class Period, Dynagas disclosed that the Company's future refinancing needs could adversely affect the future distribution.  For example, in its March 20, 2017 annual report, Dynagas warned that "the actual amount of cash available for distribution to our unitholders will depend on" factors including "our debt service requirements . . . [and] our ability to make, and the level of, working capital borrowings."  Ex. 1 (Mar. 20, 2017 Form 20-F) at 6.  Dynagas reiterated this warning about a year later when it stated that it "may need to raise additional capital to . . . refinance [its] indebtedness," and that the Company's ability to refinance its debt "could have a material adverse effect on our business . . . *including cash available for distributions to our common and preferred unitholders*."[10]  Ex. 15 (Mar. 9, 2018 Form 20-F) at 9 (emphasis added).  Given these disclosures, no reasonable investor would

---

[10] Contrary to Plaintiffs' assertion (Opp. at 6, 33), Dynagas never stated that "no further action" was required to maintain the $0.25 per share distribution going forward.  In light of the Company's repeated disclosures about the need to refinance its debt and the impact that refinancing could have on the distribution, no reasonable investor would have understood the Company's statements to suggest that no further action was needed to maintain the distribution.

have understood that a reduction in charter revenues was the only factor that might prevent the Company from maintaining the distribution.[11]

### 2. Plaintiffs Fail Plausibly to Allege the Falsity of Management's Statements of Opinion Regarding the Distribution

The Opposition argues that the sustainability of the distribution "was a question of arithmetic fact derived from existing contracts," and not a forecast of future performance. Opp. at 12. However, the Company's disclosures directly contradict Plaintiffs' position. Those disclosures make clear that the Company would distribute all of its available cash, which the Company's partnership agreement defined as all cash on hand at the end of the quarter less cash reserves and other amounts needed to conduct the business. *See* Ex. 29 (Oct. 10, 2013 Form F-1) at 79.[12] The Company also disclosed that "the amount of cash we generate from our operations may differ materially from our profit or loss for the period, which may be affected by non-cash items. We may also incur expenses or liabilities . . . that reduce or eliminate the amount of cash that we have available for distribution." Ex. 1 at 6.

The Opposition also asserts that certain challenged statements were not opinions because Defendants did not use the phrase "I think" in close enough proximity to the statements at issue. Opp. at 13-15. But the securities laws do not require issuers to use phrases such as "I think" or

---

[11] Plaintiffs also incorrectly assert that the Company told investors that only "extreme scenarios" might force it to reduce its distribution. Opp. at 6, 33. Plaintiffs take this language out of context. In response to questions about the rates that it might receive on two Yamal charters in the spot market, and whether there were "extreme events that would force you to reduce this distribution, ***based on the development of the spot charter rate environment for [these] vessels***," Ex. 25 at 11 (emphasis added), the Company stated that it did not believe such an "extreme scenario" would occur, but that it was a "longer-term discussion." *Id.*

[12] Exhibits 28 and 29 are attached to the Declaration of Jeremy T. Adler filed herewith. The Court may take judicial notice of both exhibits, which are SEC filings. *See* Mem. at 1 n.2.

"I believe" in order to identify nonactionable opinion statements.[13]  On the contrary, statements

of expectations for the future are considered opinions even absent qualifying language.  *See, e.g.*,

*Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) ("subjective

statements that reflect . . . expectations for the future rather than presently existing, objective

facts" are statements of opinion).  Courts routinely find projections regarding distributions and

their sustainability to be inactionable statements of opinion for this reason.  *See, e.g.*, *In re Int'l*

*Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (projections about future ability

to pay dividends are predictions, not guarantees).

The Opposition also asserts that even if the challenged projections were statements of

opinion, they are nevertheless actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr.*

*Indus. Pension Fund*, 575 U.S. 175 (2015), because the speaker (1) allegedly did not believe the

statements, (2) provided supporting facts that were not true, and/or (3) omitted information

necessary to make the statement of opinion not misleading.  Opp. at 16-17.[14]  In support,

Plaintiffs rely on a Company executive's statements late in the Class Period explaining that

Dynagas reduced its distribution because it ultimately was unable to issue "cheap equity" and

needed "to discuss a wide range of refinancing options" related to its outstanding debt

obligations.[15]  Opp. at 10, 16; Ex. H at 4.  From this statement, Plaintiffs ask the Court to infer

---

[13] While Plaintiffs identify two challenged opinions that the speaker did not immediately preface with "I think" (Opp. at 14), those statements either were in response to a question about the speaker's belief or contained "I think" earlier in the sentence.

[14] Plaintiffs make similar claims in response to Defendants' arguments that certain challenged statements are inactionable forward-looking statements.  *See* Opp. at 20-22.

[15] Plaintiffs also assert (Opp. at 4, 16) that the Company knew that the distribution was unsustainable because it allegedly had just completed a financial review of the sustainability of its cash flow.  But Plaintiffs do not allege any well-pleaded facts about the results of this review,

9

that Dynagas intended to use the proceeds from an equity offering to pay the distribution, and in turn, that Defendants never believed their earlier statements that the distribution was sustainable from cash flow.  Opp. at 16-17.

Plaintiffs' theory fails on its first step, however, because the executive never said (as Plaintiffs suggest) that Dynagas intended to use the proceeds from the equity offering to pay the $0.25 per share distribution.  In context, the statement clearly indicated that the inability to issue equity limited Dynagas's refinancing options, and that the difficulty the Company experienced refinancing its debt was what required it to reduce the distribution further.  *See* Ex. H at 4 ("[A]nd that is the reason why we had to make a second cut and a more severe cut that goes hand in hand and enables us to discuss a wide range of refinancing options."); *see also* Ex. H at 3 ("We believe the reduction in the cash distribution . . . was necessary . . . to facilitate the refinancing of the Partnership's $250 million notes which we discussed earlier.").  Indeed, the Company had previously warned investors that its refinancing needs could affect the amount of the distribution.  *See supra* at 7-8.  Plaintiffs do not offer a single additional fact, statement, document, or confidential witness to support their theory that the Company intended to use the proceeds of an equity offering to fund the distribution, much less that this demonstrates that Defendants knew at the time they made any challenged statement that the distribution was not sustainable.[16]

_____

or even that the review concluded that future cash flows could not sustain the $0.25 per share distribution.

[16] Plaintiffs' assertion that Dynagas offered false statements of fact to support the opinion that the distribution was sustainable (Opp. at 16) fails because Plaintiffs do not identify any such false statements.  The statement that "the current cash flow profile could support such a distribution" is itself an opinion and not a fact offered in support of some other opinion.  *See Gregory*, 297 F. Supp. 3d at 406 (statements regarding expectations for the future are opinions).

### 3. The Challenged Forward-Looking Statements Are Protected Under the PSLRA Safe Harbor

The Opposition also fails to establish that the statements that Dynagas made during the May 17, 2018 and July 27, 2018 earnings calls about the sustainability of the distribution are not entitled to protection under the PSLRA safe harbor. Opp. at 17-18. The Opposition does not even address the portions of the challenged May 17, 2018 statement that make clear that the statement was an expression of the Company's "expectations" based on "reasonable scenarios." Compl. ¶ 96; Pls' App'x A No. 12; *see also* Ex. 25 at 10. And Plaintiffs cherry pick present-tense language from the July 27, 2018 earnings call, while omitting the portion of the response that made clear that the Company's plans for the future were contingent upon its ability to refinance its unsecured, non-amortizing notes. Ex. 26 at 10.

Plaintiffs' assertion that the challenged statements reflected facts regarding the Company's then-current financial profile (Opp. at 18) does not change the forward-looking nature of these statements. *See Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) (statement about company's ability to fund future investments based on "current expectation of cash flows from operations" was a projection); *Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 537 (S.D.N.Y. 2016) (statement that company was "on track" to meet future projection "does not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor").[17] "The PSLRA explicitly defines forward-looking statements as including 'a projection of . . . dividends,' and any statement relating to

---

[17] *In re Salix Pharms., Ltd.* is not to the contrary. There, the statements at issue related to a projection that customer inventories of a drug would return to typical levels. 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016). The court found that the projections were actionable because they implied a present (and false) fact, namely that current inventories were lower than normal. *Id.* There is no similar false implied fact here.

such a projection." *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146-47 (4th Cir. 2002) (quoting 15 U.S.C. § 78u-5(i)(1)(A)).[18]

Plaintiffs also argue that even if the challenged statements were forward-looking, they are nevertheless actionable. These arguments also fail. First, Plaintiffs argue that the "present elements" allegedly embedded within the projections can be "sever[ed]" from the forward-looking statements. Opp. at 19. However, Plaintiffs do not suggest which statements the Court should sever.[19] And in any event, as explained *supra* at 6-10, the Complaint does not adequately allege any false statement or purported fact whose omission rendered any statement misleading.

Plaintiffs next argue that the statements were not "clearly identified as forward-looking, because they are stated in the present and past tense [and] not otherwise declared to be forward-looking." Opp. at 20. But the statements were clearly forward-looking in context, even if they included some present-tense language. *See* Compl. ¶¶ 10, 96 ("***And as for the foreseeable future this distribution***, as I mentioned before is sustainable."); ¶ 11 ("[T]he distribution is ***supported*** by our current cash flow profile ***for quite a long time***.") (emphasis added)). Plaintiffs also ignore that, at the start of each earnings call at issue, Dynagas announced that it would be making forward-looking statements during the call. *See* Mem. at 26-27.[20]

---

[18] Similarly, there is no merit to Plaintiffs' claim that the forward-looking statements are actionable because they are purportedly "premised on misrepresentations of present fact (the current cash flow profile)." Opp. at 20. Plaintiffs fail to identify a single misrepresentation about the Company's current cash flows, and the Company's projection that its cash flow would support future distributions was necessarily forward-looking.

[19] Unlike in *Vivendi I*, where Vivendi referenced its "very strong balance sheet" and "very strong 2000 results" in addition to making statements about its growth targets, 838 F.3d at 246, Plaintiffs here do not allege that the Company embedded any statements about its current finances in its projections about the sustainability of the distribution.

[20] Contrary to Plaintiffs' assertion (Opp. at 20), *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011), does not stand for the proposition that a forward-looking statement becomes actionable if it includes present tense language. Rather, the court simply held

Plaintiffs proceed to argue that the challenged forward-looking statements made during investor calls were not accompanied by meaningful cautionary language because Dynagas only referred investors to the warnings in its SEC filings, without repeating those warnings during the calls. Opp. at 20-21. But courts routinely find that referring investors to SEC filings is a sufficient manner of conveying cautionary language to investors. *See, e.g.*, *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *17 (S.D.N.Y. Aug. 19, 2015); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 n.1 (S.D.N.Y. Mar. 25, 2013).[21]

Plaintiffs also contend that the cautionary language in Dynagas's SEC filings was insufficient because it warned of risks that had already transpired—specifically, that "the renegotiation of key contracts at rates that eliminated the Company's profitability and ability to support distributions had already occurred." Opp. at 21-22. This argument fails because Plaintiffs have not adequately alleged that Dynagas was unable to maintain the $0.25 per share distribution at the time it made any challenged statement. *See supra* at 6-10.

Finally, Plaintiffs assert that Dynagas's forward-looking statements are actionable because the challenged statements were "tantamount to guarantees." Opp. at 22. However, Dynagas's projection that the distribution was sustainable is a far cry from the statement at issue in *In re General Electric Co. Sec. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012). In *General*

---

that statements "whose misleading nature can be verified at the time they are made" are actionable. *See id.* at 569. As explained above, Plaintiffs fail to plead facts that demonstrate Defendants knew, at the time Dynagas made its projections, that the $0.25 per share distribution could not be sustained in the future.

[21] To the extent *In re Salix Pharms., Ltd.*, 2016 WL 1629341, stands for the proposition that reference on an investor call to cautionary language in an issuer's SEC filings is insufficient under the safe harbor, the decision is entirely at odds with the weight of authority in this district (and elsewhere), and if adopted more broadly, would fundamentally re-work issuers' practices with respect to such calls.

*Electric*, the court found that a reasonable investor could have interpreted the Company's statement that investors "can count on" a great dividend as a guarantee. *Id.* at 380, 388. Here, by contrast, Dynagas specifically warned that the distribution was not guaranteed and articulated factors that could lead to its reduction. *See supra* at 7-8.

### C. Plaintiffs Fail to Plead Any Facts Giving Rise to a Strong Inference of Scienter

#### 1. Plaintiffs' Motive and Opportunity Allegations Are Insufficient

In arguing motive and opportunity (Opp. at 34-35), Plaintiffs largely rehash generic corporate motive allegations (*e.g.*, the desire to maintain a high stock price to raise capital and attract investors, or to avoid the dilutive effect of planned transactions) that fail to give rise to the required strong inference of scienter. *See* Mem. at 29-31.[22] While the Opposition seeks to establish that Mr. Lauritzen (Dynagas's CEO) had a "personal, financial and familial" motive to overstate the Company's prospects because Dynagas planned to use proceeds from an equity offering to acquire vessels from Dynagas Holding—a company owned by Mr. Lauritzen's father-in-law (Opp. at 34)—this theory fails because Plaintiffs have not alleged that Mr. Lauritzen had any stake in Dynagas Holding. Mem. at 30-31. As a result, Plaintiffs have not plausibly alleged that the Company's alleged plan to acquire vessels from Dynagas Holding created a concrete personal benefit for Mr. Lauritzen. In any event, the contemplated use of proceeds from an equity offering to purchase assets is not the type of concrete personal benefit that would establish a motive and opportunity.[23]

---

[22] Plaintiffs also argue, without further explanation, that they have pleaded motive and opportunity because Dynagas was purportedly engaged in a Ponzi scheme that "would soon unravel without further investment." Opp. at 34. As discussed *supra* at 9-10, the Complaint does not allege any facts establishing that Dynagas was engaged in such a scheme.

[23] Plaintiffs' reliance on *In re Interpublic Sec. Litig.*, 2003 WL 21250682, at *10 (S.D.N.Y. May 29, 2003) (Opp. at 34), is misplaced. In *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), the Second Circuit called into question the

### 2.   Plaintiffs' Conscious Misbehavior or Recklessness Allegations Are Insufficient

Plaintiffs' allegations of conscious misbehavior and recklessness also fail. With respect to the challenged statements concerning the distribution, Plaintiffs rely almost entirely on an executive's statements during a March 22, 2019 investor call concerning the Company's inability to issue cheap equity and its need "to discuss a wide range of refinancing options" related to its outstanding debt obligations. *See* Opp. at 32-33. Plaintiffs suggest that this statement was an admission that Dynagas knew all along that its cash flows did not support the $0.25 per share distribution, and that the Company instead intended to pay the distribution from cash raised through a sale of equity. The executive said nothing of the sort, however. *See supra* at 9-10.

As explained above, the Opposition also fails to establish that the Defendants misled investors regarding the new charter rates for the *Arctic Aurora* and *Ob River*, much less that the Defendants did so intentionally or recklessly. As set forth in Defendants' opening brief, the Company's disclosures (1) that the new charter rate for the *Ob River* was lower than the prior rate, and (2) of information from which investors could (and analysts did) reach this same conclusion for the new *Arctic Aurora* charter, rebut any inference of fraudulent intent. Mem. at 32. Plaintiffs offer no response to this argument,[24] essentially conceding (as they must) that the

---

finding in *In re Interpublic* that a "sustained growth-by-acquisition strategy" could establish motive. *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243 n.63 (S.D.N.Y. 2012). In *ECA*, the Second Circuit held that a plaintiff must establish some greater, "extremely contextual" link between the acquisitions and the misstatements to plead scienter because "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired, or to acquire another." 909 F. Supp. 2d at 201 & n.6. Plaintiffs have not alleged that requisite connection here.

[24] Instead, Plaintiffs repeat the Complaint's allegations that the Company's CEO and CFO must have been aware of the terms of the new charter contracts and the revenue those charters would generate. Opp. at 33-34. But, as explained in Defendants' opening brief, these allegations do not establish an intent to mislead in light of the Company's disclosures. Mem. at 32 n.30.

15

Company's disclosures are "flatly inconsistent with an intent to mislead investors." *Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015).

The balance of Plaintiffs' scienter argument takes issue with Defendants' articulation of competing explanations for their actions that are more plausible than an inference of conscious deception. In each case, Plaintiffs fail to demonstrate that the inference of an intent to deceive is the more cogent and compelling of the competing inferences. For example, with respect to the challenged statements regarding the distribution, Plaintiffs assert that the Court should simply ignore the plausible inference that the Defendants offered (namely, that Dynagas did not anticipate disruptions in the equity and debt capital markets (Mem. at 34-35)) because the state of the financial markets at the time is not in the record. Opp. at 35. But under the PSLRA, Plaintiffs have the burden to plead a theory of scienter that is "at least as compelling as any opposing inference." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs do not (and cannot) offer any support for the proposition that a defendant must develop a factual record to establish a more compelling inference, and such a burden would render meaningless the PSLRA's scienter pleading requirements. The inference that Dynagas based its statements on reasonable assumptions that did not anticipate market disruptions remains far more compelling than the inference that Dynagas somehow supposedly admitted to engaging in a Ponzi scheme.

With respect to the alleged omissions regarding the new charter rates, Plaintiffs simply rehash their allegations that Defendants purportedly were "hiding the ball." Opp. at 36. But Plaintiffs do not explain how this inference is plausible given Dynagas's disclosures regarding the new charters (*supra* at 1-2), let alone as cogent and compelling as the inference that Dynagas

16

reasonably believed that it had disclosed sufficient information about the charter rates to the market, and that the market understood that information.  Mem. at 32.[25]

## II.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20A

Plaintiffs' attempt to hold Dynagas liable for insider trading under Section 20A of the Exchange Act for issuing preferred shares in October 2018 is both factually and legally flawed. First, the Opposition fails to establish that the reduced rate for the *Arctic Aurora* was material non-public information at the time of the October 2018 share issuance.  As Defendants explained in their opening brief, the Company disclosed information in February 2018 from which investors could (and analysts did) determine that the new charter rate for the *Arctic Aurora* was lower than the prior rate.  Mem. at 7, 35-36.  Indeed, several analysts included the new charter rate for the *Arctic Aurora* in their February 2018 reports, which served to further disseminate this information to the market.  Mem. at 7 (citing Exs. 11, 12).  Plaintiffs' only response is that Dynagas's stock price fell on November 15, 2018 when Dynagas repeated its disclosure of the lower charter rate for the *Arctic Aurora*.  Opp. at 37.  But, as discussed *supra* at 3 n.5, Dynagas disclosed its quarterly financial results on the same date.[26]

Second, the Opposition does not identify a single case in which a court permitted a Section 20A claim to proceed against a corporate issuer based on trading of its own securities.

---

[25] Plaintiffs suggest that it was unreasonable for Dynagas to believe that its disclosures were sufficient to inform the market about the new charters.  Opp. at 36.  But the fact that several analysts used the information Dynagas disclosed to report that the new charter rates were lower (Mem. at 18-19, 21) undercuts Plaintiffs' argument.

[26] Plaintiffs concede that the Company disclosed (on July 27, 2018) that the new rate for the *Ob River* was lower than the existing rate.  Opp. at 37 n.45.  While Plaintiffs suggest that Dynagas should have disclosed additional information about the new *Ob River* charter at that time (*id.*), Plaintiffs rest their Section 20A claim on the alleged nondisclosure regarding the new *Arctic Aurora* charter rate, not the new *Ob River* charter rate.  Opp. at 37.

Although the Opposition cites cases in which courts permitted Section 20A claims to proceed against corporate entities, Opp. at 37 n.42, those cases all involve claims asserted against entities that allegedly transacted in ***another*** company's securities.  *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075 (D.N.J. June 30, 2019) (Section 20A claims against hedge funds, not issuer); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327 (S.D. Tex. June 15, 2017) (Section 20A claims against control persons, not issuer); *Basile v. Valeant Pharms. Int'l, Inc.*, 2015 WL 7352005 (C.D. Cal. Nov. 9, 2015) (Section 20A claims against company attempting to acquire issuer and its affiliates, not issuer).  Plaintiffs' inability to identify a single case in which a court has applied Section 20A to a corporate issuer based on trading of its own securities confirms that the section does not apply in this circumstance.

## III.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)

As set forth in Defendants' opening brief, Plaintiffs must allege control *and* culpable participation by the alleged controlling persons to state a Section 20(a) claim for control person liability.  Mem. at 36-37.[27]  The Opposition fails to establish that Dynagas GP or Dynagas Holding were culpable participants in the alleged fraud.  Unable to cite any well-pleaded facts suggesting that either entity was involved in the preparation of the challenged statements, Plaintiffs instead argue that those entities were culpable participants because Mr. Lauritzen (Dynagas's CEO) was allegedly also the General Manager of Dynagas Holding and a Director of Dynagas GP.[28]  But Mr. Lauritzen's alleged roles at these other entities are irrelevant.  Plaintiffs

---

[27] As Plaintiffs acknowledge, they also must plead a primary violation to state a Section 20(a) claim.  Opp. at 38 n.46.  Plaintiffs' failure to do so for the reasons stated *passim* is an additional ground on which the Court can dismiss Plaintiffs' Section 20(a) claims.

[28] While Plaintiffs cite third-party articles that mistakenly refer to Mr. Lauritzen as the General Manager of Dynagas Holding, as set forth in Defendants' opening brief (Mem. at 31 n.29) that is not the case.

18

do not allege any facts suggesting that he was acting within the scope of his employment at any entity other than Dynagas when he made the challenged statements. *See Grupo Verzatec S.A. de C.V. v. RFE Investment Partners*, 2019 WL 1437617, at \*9 (S.D.N.Y. Mar. 29, 2019) (dismissing control person claims against majority shareholder because plaintiffs failed adequately to allege that individual defendant, who served as executive of both corporate defendant and majority shareholder, engaged in alleged conduct "in the normal course of [his] duties owed to the [majority shareholder]"). The mere fact that Mr. Lauritzen was affiliated with multiple entities is insufficient to plead culpable participation by those entities.[29]

The Opposition also argues (without support) that Dynagas Holding and Dynagas GP were culpable participants because they purportedly "knew that Dynagas and its CEO and CFO were engaged in fraudulent conduct." Opp. at 39. But the Opposition does not identify a single allegation to support this assertion. It merely refers to allegations that Dynagas Holding was authorized to sell certain of its shares by a shelf registration statement that Dynagas filed, *id.* (citing Compl. ¶ 150), and that it sought to keep the price of Dynagas stock high to prevent dilution in its share ownership, *id.* (citing Compl ¶¶ 151-52). Neither allegation is sufficient to plead culpable participation, and Plaintiffs do not cite any authority to the contrary.

## IV.    THE COMPLAINT FAILS TO STATE A SECURITIES ACT CLAIM

The Opposition confirms that Plaintiffs' Securities Act claim rests on the allegedly false or misleading statements in the Prospectus and Final Prospectus Supplement about the new charter for the *Arctic Aurora*. Opp. at 39-40 & n.50. As explained above, Plaintiffs fail to establish that there was anything misleading about the Company's statement that the new charter

---

[29] Plaintiffs also assert that "[s]imilar facts are pled regarding Dynagas Holding's 50% interest in Dynagas and its control of the board and operations," Opp. at 38, but fail to explain how these relationships constitute a principal-agent relationship or culpable participation.

19

for the *Arctic Aurora* was "in direct continuation of the vessel's previous charter" (*supra* at 4-5), or its disclosure that Statoil had an option to extend the new charter at "escalated rates" (*supra* at 4 n.7).  Furthermore, as explained *supra* at 5 n.8, Regulation S-K did not create an independent duty to disclose the new rate because Regulation S-K does not apply to foreign issuers, and Plaintiffs have not adequately alleged that Dynagas failed to disclose any information required by Form 20-F.[30]

**CONCLUSION**

For the foregoing reasons and those set forth in Defendants' opening brief, the Court should dismiss the Amended Class Action Complaint in its entirety, with prejudice.[31]

---

[30] Defendants are not making a truth-on-the-market defense, as explained *supra* at 3-4.

[31] The Opposition does not seek leave to amend, and the Court should deny any belated request for leave to amend because the Opposition offers no reason to believe that Plaintiffs could rehabilitate their deficient pleading if given another opportunity.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint."); *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *20 (S.D.N.Y. Mar. 30, 2018) ("[T]he Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss."), *aff'd*, 764 F. App'x 127 (2d Cir. 2019).

Dated: New York, New York
     March 18, 2020

                          Respectfully submitted,


                          /s/ Michael G. Bongiorno
                          Michael G. Bongiorno
                          Jeremy T. Adler
                          WILMER CUTLER PICKERING HALE
                              AND DORR LLP
                          7 World Trade Center
                          250 Greenwich Street
                          New York, NY 10007
                          Tel: (212) 230-8800
                          Fax: (212) 230-8888
                          michael.bongiorno@wilmerhale.com
                          jeremy.adler@wilmerhale.com

                          Peter J. Kolovos
                          WILMER CUTLER PICKERING HALE
                              AND DORR LLP
                          60 State Street
                          Boston, MA 02109
                          Tel: (617) 526-6000
                          Fax: (617) 526-5000
                          peter.kolovos@wilmerhale.com

                          Mark J. Hyland
                          Bruce G. Paulsen
                          SEWARD & KISSEL LLP
                          One Battery Park Plaza
                          New York, NY 10004
                          Tel: (212) 574-1200
                          Fax: (212) 480-8421
                          hyland@sewkis.com
                          paulsen@sewkis.com

                          *Attorneys for Defendants Dynagas LNG*
                          *Partners LP, Dynagas GP, LLC, and*
                          *Dynagas Holding Ltd.*

/s/ Scott D. Musoff
Scott D. Musoff
Michael D. Moritz
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com
michael.moritz@skadden.com

*Attorneys for Defendants UBS Securities LLC, Morgan Stanley & Co. LLC, Stifel, Nicolaus & Company, Incorporated, and B. Riley FBR, Inc.*